# EXHIBIT B

1 | Nancy L. Fineman (Cal. SBN 124870)
nfineman@cpmlegal.com
2 | **COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
3 | Burlingame, CA 94010
Telephone: (650) 697-6000
4 | Facsimile: (650) 697-0577

5 | Gregory A. Wedner (Cal. SBN 67965)          Jack W. Lee (Cal. SBN 71626)
gwedner@lozanosmith.com                     JLee@MinamiTamaki.com
6 | **LOZANO SMITH**                            Sean Tamura-Sato (Cal. SBN 254092)
One Capitol Mall, Suite 640                 seant@minamitamaki.com
7 | Sacramento, CA 95814                        **MINAMI TAMAKI LLP**
Telephone: (916) 329-7433                   360 Post Street, 8th Floor
8 | Facsimile: (916) 329-9050                   San Francisco, California 94108-4903
Telephone: 415 788 9000
9 | *Attorneys for Plaintiff San Mateo*        Facsimile: 415 398 3887
*Union School District*
10 |                                            *Attorneys for Plaintiff AP Students – Viking Parent*
*Group*
11 |

12 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SAN MATEO**
13 |

14 | SAN MATEO UNION HIGH SCHOOL            Case No. Civ. 523184
DISTRICT, a school district, individually and on
15 | behalf of the members of the SAN MATEO    **PLAINTIFFS' NOTICE OF *EX PARTE***
UNION HIGH SCHOOL DISTRICT, and AP      **APPLICATION FOR TEMPORARY**
16 | STUDENTS – VIKING PARENT GROUP, an      **RESTRAINING ORDER; ORDER TO**
incorporated association,                   **SHOW CAUSE RE PRELIMINARY**
17 |                                            **INJUNCTION**
Plaintiffs,
18 |                                            Date: August 8, 2013
v.                            Time: 2:00 p.m.
19 |                                            Dept: 21
EDUCATIONAL TESTING SERVICES, a        Presiding Judge, Hon. Robert D. Foiles
20 | corporation; and COLLEGE ENTRANCE
EXAMINATION BOARD, a corporation; and
21 | DOES 1 through 10, inclusive,              Complaint Filed: August 5, 2013

22 |                    Defendant.

23 |

24 |

25 |

26 |

27 |

28 |

1  TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE that on August 8, 2013 at 2:00 p.m. in Department 21, or as soon

3  thereafter as this matter may be heard by the above-captioned Court located at the Hall of Justice, 400

4  County Center, Redwood City, California 94063, Plaintiffs will, and hereby do, apply *ex parte*, pursuant

5  to California Code of Civil Procedure § 527, and California Rule of Court 3.1150 and 3.1200 *et seq.,* for

6  a temporary restraining order and order to show cause why a preliminary injunction should not issue

7  against Defendants Educational Testing Services ("ETS") and College Entrance Examination Board

8  ("College Board") ordering ETS and College Board to grade and validate the AP tests taken by students

9  at Mills High School in May 2013 in the subjects of US History, Macro-Economics, English Language,

10 English Literature, US Government and Politics, Calculus AB, Calculus BC, Physics B, Statistics,

11 Chemistry and Biology, and report those scores to colleges and universities, as requested by the

12 students.

13         No prior injunctive relief has been requested or granted regarding this matter.

14         Plaintiffs' application for a Temporary Restraining Order and preliminary injunctive relief is

15 made on the basis that (a) Plaintiffs can show a likelihood of success on the merits regarding their claims

16 that Defendants improperly refused to validate Advanced Placement Scores for Mills High School in 11

17 subjects; (b) Plaintiffs have suffered and will continue to suffer irreparable harm absent injunctive relief

18 as Defendants have put form over substance in making their decision; and (c) the balance of hardships

19 tips strongly in Plaintiffs' favor.   The evidence demonstrates that the AP tests were given in an

20 environment that ensured the validity of the test results and did not provide an unfair advantage to any

21 student and there is no evidence of misconduct or cheating during the administration of the exams.  Yet

22 Defendants have improperly refused to validate the tests and report the scores to colleges and

23 universities as requested by the students.

24         In addition to Plaintiffs' request for a Temporary Restraining Order, Plaintiffs request that

25 Defendants be ordered to appear before this Court, at the earliest available date, time and place to be set,

26 to show cause why the Court should not issue a Preliminary Injunction consistent with the Temporary

27 Restraining Order Plaintiffs seek through this Application to order ETS and College Board to grade and

28 validate the AP tests taken by students at Mills High School in May 2013 in the subjects of US History,

- 1 -

Macro-Economics, English Language, English Literature, US Government and Politics, Calculus AB, Calculus BC, Physics B, Statistics, Chemistry and Biology, and report those scores to colleges and universities, as requested by the students.

This *Ex Parte* Application is based on this Application, the Memorandum of Points and Authorities filed in support thereof, the Declarations of Nancy L. Fineman, Paul Belzer, Valerie Arbizu, Kelly Chao, Darren Fong, Jennifer Kao, Nathan Li, Jessica Liang, Grant Murphy, Christopher Tarangioli, Songyi Xu, Brandon Ye, Jason Zhang, Paul Seto, Gordon Lee, Janet Choy and Jean Joh, and their exhibits, the Request for Judicial Notice, the Proposed Order filed herewith, the Complaint on file in this case, and such further papers, evidence, and arguments as may be submitted to the Court.

Pursuant to California Rule of Court 3.1203, Plaintiffs, through their counsel, have informed Defendants of their intention to seek a Temporary Restraining Order to and order to show cause why a preliminary injunction should not issue, and the nature of the relief requested by email and personal service on August 5, 2013.  Plaintiffs originally scheduled the *Ex Parte* for August 7, 2013, but at the request of Bruce Berman of WilmerHale, counsel for Defendants, the hearing was rescheduled for August 8, 2013.

Dated: August 6 2013

COTCHETT, PITRE & McCARTHY, LLP

By
NANCY L. FINEMAN

LOZANO SMITH

By
GREGORY A. WEDNER /ALP

*Attorneys for Plaintiff San Mateo Union
High School District*

MINAMI TAMAKI LLP

By
JACK W. LEE /ALP

*Attorneys for Plaintiff AP Students—Viking
Parent Group*

- 2 -

1   Nancy L. Fineman (Cal. SBN 124870)
  nfineman@cpmlegal.com
2   Aron K. Liang (Cal. SBN 228936)
  aliang@cpmlegal.com
3   **COTCHETT, PITRE & McCARTHY LLP**
  San Francisco Airport Office Center
4   840 Malcolm Road, Suite 200
  Burlingame, CA 94010
5   Telephone:   (650) 697-6000
  Facsimile:    (650) 697-0577
6

  Gregory A. Wedner (Cal. SBN 67965)
7   gwedner@lozanosmith.com
  **LOZANO SMITH**
8   One Capitol Mall, Suite 640
  Sacramento, CA 95814
9   Telephone: (916) 329-7433
  Facsimile: (916) 329-9050
10

11 *Attorneys for Petitioner/Plaintiff San Mateo Union High School District*

Jack W. Lee (Cal. SBN 71626)
jlee@minamitamaki.com
Sean Tamura-Sato (Cal. SBN 254092)
seant@minamitamaki.com
**MINAMI TAMAKI LLP**
360 Post Street, 8th Floor
San Francisco, California 94108-4903
Telephone: 415 788 9000
Facsimile: 415 398 3887

*Attorneys for Petitioner/Plaintiff AP Students – Viking Parent Group*

12

13

**IN THE SUPERIOR COURT OF CALIFORNIA**

14

**IN AND FOR THE COUNTY OF SAN MATEO**

15

16 | SAN MATEO UNION HIGH SCHOOL ) 
17 | DISTRICT, individually and on behalf )
of the members of the SAN MATEO )
18 | UNION HIGH SCHOOL DISTRICT )
and AP STUDENTS - VIKING )
19 | PARENT GROUP, )
                            )
20 |           **Plaintiffs,** )
         v.                 )
21 | **EDUCATIONAL TESTING** )
**SERVICES, a New York corporation;** )
22 | **and COLLEGE ENTRANCE** )
**EXAMINATION BOARD, a New York** )
23 | **corporation; and DOES 1 through 10,** )
**inclusive,** )
24 |          **Defendants.** )
                            )
25 | _____ )

CASE NO.

**PLAINTIFFS' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

Date:       August 8, 2013
Time:       2:00 p.m.
Department:  21
Judge:     Judge Robert D. Foiles

Complaint Filed: August 5, 2013

26

27

28

---

**PLAINTIFFS' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CIV 523184**

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ......................................................... 1

II.  FACTUAL BACKGROUND ............................................... 2

    A.   The AP Exams Allow High School Students to Receive College Credit ....... 2

    B.   Mills High School is Responsible for Making Sure that the Grades Each
        Student Earns Can Be Relied upon by Colleges or Employers as Accurate
        Reflections of the Work Performed by a Student ........................ 3

    C.   AP Exams Were Properly Proctored and Supervised at Mills High School ..... 3

    D.   Defendants Invalidate 641 AP Test Scores Solely on the Basis of
        Allegedly Improper Seating Arrangements ............................ 4

    E.   Defendants Abuse Their Discretion When They Invalidate All Scores
        Without Adequately Warning Schools and Students that They Will
        Invalidate Exams Solely Based Upon Improper Seating Conditions .......... 5

III. LEGAL ARGUMENT .................................................... 6

    A.   The Court has Authority and Discretion to Issue a TRO .................. 6

    B.   This Court Has Authority to Grant a Preliminary Injunction ............... 8

    C.   Plaintiffs Have a Reasonable Probability of Prevailing On the Merits ........ 8

        1.   Breach of Contract/Implied Covenant of Good Faith and Fair
            Dealing ................................................. 9

        2.   Plaintiffs Have A Reasonable Likelihood of Prevailing on UCL
            Claim .................................................. 12

        3.   Plaintiffs Have A Reasonable Likelihood of Prevailing on Due
            Process Claim ............................................ 13

    D.   The Balancing of Hardships Weighs in Favor of Plaintiffs ............... 13

        1.   The Harm to Plaintiffs is Irreparable and Unascertainable .......... 13

        2.   Defendants Will Not Be Harmed by an Injunction ................ 14

    E.   A Bond Should Not Be Required In This Case ........................ 15

IV.  CONCLUSION ....................................................... 15

1

## TABLE OF AUTHORITIES

**Page(s)**

2

3

### CASES

4   *Anderson v. Souza*
        (1952) 38 Cal. 2d 825 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

5   *Baypoint Mortgage Corp. v. Crest Premium Real Estate Investments Retirement Trust*
        (1985) 168 Cal.App.3d 818 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
6

7   *Butt v. State of California*
        (1992) 4 Cal.4th 668 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

8   *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*
        (1992) 2 Cal.4th 342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
9

10  *Chico Feminist Women's Health Ctr. v. Scully*
        (1989) 208 Cal.App.3d 230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11  *Continental Baking Co. v. Katz*
        (1968) 68 Cal.2d 512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
12

13  *Cortale v. Educational Testing Service*
        (1998) 251 A.D.2d 528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14  *Dalton v. Educational Testing Service*
        (1987) 87 N.Y.2d 384 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
15

16  *FEI Enterprises, Inc. v. Yoon*
        (2011) 194 Cal.App.4th 790 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17  *Freeman & Mills, Inc. v. Belcher Oil Co.*
        (1995) 11 Cal.4th 85 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
18

19  *Gallagher v. Equitable Gaslight Co.*
        (1904) 141 Cal. 699 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20  *IT Corp. v. County of Imperial*
        (1983) 35 Cal.3d 63 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8
21

22  *Korea Supply Co. v. Lockheed Martin Corp.*
        (2003) 29 Cal.4th 1134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

23  *Murray v. Educational Testing Service*
        (5th Cir. 1999) 170 F.3d 514 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
24

25  *NewLife Sciences, LLC v. Weinstock*
        (2011) 197 Cal.App.4th 676 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26  *Olsen v. Breeze, Inc.*
        (1996) 48 Cal.App.4th 608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

27

28

*Ticconi v. Blue Shield of California Life & Health Ins. Co.*
   (2008) 160 Cal.App.4th 528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Voorhies v. Green*
   (1983) 139 Cal.App.3d 989 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Waller v. Truck Ins. Exchange, Inc.*
   (1995) 11 Cal.4th 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Youngblood v. Wilcox*
   (1989) 207 Cal.App.3d 1368 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATUTES AND CODES

Business & Professions Code

   § 17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Code of Civil Procedure

   § 526(a)(2), (4)-(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   § 527 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15

   § 527(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## I.    **INTRODUCTION**

By this *ex parte* application ("Application"), Plaintiffs San Mateo Union High School District ("SMUHSD"), individually and on behalf of the students of the San Mateo Union High School District and AP Students - Viking Parent Group ("Plaintiffs") seek to restore the *status quo* which existed before Defendants Educational Testing Services ("ETS") and the College Entrance Examination Board ("College Board") (collectively "Defendants") improperly invalidated 641 Advanced Placement ("AP") test scores for **286 Mills High School students ("AP Students")** in 11 different subjects.  Defendants invalidated these scores because of alleged improper seating conditions at Mills High School **even though there was no evidence of any wrongdoing and no evidence that any of the test results were affected, in any way.** Defendants never even contacted the AP Students before invalidating their scores.

As the evidence submitted herein demonstrates, the AP exams at Mills High School were conducted pursuant to test protocols that ensured the validity of the test results.  Defendants have failed to act in good faith by putting form over substance and irreparably injuring Plaintiffs. Many AP Students are heading off to college over the next few weeks and need their AP scores to obtain college credit and to determine what classes to take their first semester of college. Defendants have ignored the requests of students, parents, school personnel, and government leaders to validate the scores.

Defendants' only solution is to have the AP Students retake the AP exams starting on **August 9, 2013**.  Yet, these re-tests are unfair to the AP Students because they are being taken under significantly different circumstances than when originally taken in May of 2013 and do not provide relief to the AP students who spent months studying for the May tests.

Therefore, Plaintiffs look to this Court, as their last chance to obtain relief, and request that the Court issue a Temporary Restraining Order ("TRO") and Order to Show Cause ("OSC") why a Preliminary Injunction should not issue ordering College Board and ETS to grade and validate the AP tests taken by the AP Students in May 2013 in the subjects of US History, Macro-Economics, English Language, English Literature, US Government and Politics, Calculus

---

1 | AB, Calculus BC, Physics B, Statistics, Chemistry and Biology, and report those scores to
2 | colleges and universities, as requested by the students and as required by the legal obligations
3 | owed by the Defendants to Plaintiffs.

4 | **II.    FACTUAL BACKGROUND**

5 |     Defendants invalidated 641 AP test scores of 286 Mills High School students solely
6 | because of round tables and because not all of the students were facing the same direction. This
7 | decision was made to indiscriminately punish all 286 AP Students without any evidence of
8 | wrongdoing by any of the students, without any evidence that the seating arrangements materially
9 | impacted any of the AP test scores, and without conducting a legitimate investigation of the
10 | testing environment at Mills High School.

11 |     **A.    The AP Exams Allow High School Students to Receive College Credit**

12 |     In this era of increasing college costs, the AP exams provide the sole means for high
13 | school students to earn college credit by taking advanced high school course courses using a
14 | curriculum approved by Defendants College Board and ETS.  Defendants control the AP system,
15 | which is the only method by which American high school students can earn college credit.
16 | Public and private universities across the country support this paradigm by granting college
17 | credit, and thus reducing tuition costs for students who take and pass AP exams.  Students who
18 | receive certain scores on multiple exams receive special recognition.  Request for Judicial Notice
19 | ("RJN") Exhibits ("Ex.") 3-4, 10-12.

20 |     AP tests are administered each year in May.  Mills High School, part of the SMUHSD, in
21 | Millbrae, California is one of the 18,000 high schools world wide that teaches AP courses and
22 | oversees AP Exams.  Defendants are the only parties who can grade and send out AP test results.
23 | Teachers at Mills High have been teaching AP courses for years and its students' testing results
24 | have never previously been questioned.

25 | / / /

26 | / / /

27 |

28 |

**B.   Mills High School is Responsible for Making Sure that the Grades Each Student Earns Can Be Relied upon by Colleges or Employers as Accurate Reflections of the Work Performed by a Student**

SMUHSD and all its school sites, including Mills High School, have been providing quality education to their students for years and has substantial experience in guaranteeing the integrity of all of its exams, testing and student grades.  The Mills High School faculty and staff administer roughly 4,000 high stakes tests each year including the California High School Exit Exam, California Standards tests in Math, English, Science and Social Science, and Advanced Placement exams.  Declaration of Paul Belzer ("Belzer Decl.") ¶¶ 3-5.  Mills High School is responsible for making sure that the grades each student earns can be relied upon by colleges or employers as accurate reflections of the work performed by a student.

**C.   AP Exams Were Properly Proctored and Supervised at Mills High School**

During the period May 6 to 17, 2013, over 200 Mills High School students took over 600 AP exams.  Mills High School implemented strict oversight over the exams, including but not limited to: a secure testing site with only approved students in the area, control over the tests themselves to make sure that students could not obtain copies in advance of the test; assigned seating so that students could not select their own seats; multiple proctors who vigilantly oversaw the tests and made sure that no prohibited items, such as cell phones, notes or study guides were used during the exams; students were not allowed to leave the exam room, except to go to the bathroom and then they could only go one at a time and were carefully monitored; the proctors monitored students during the allowed breaks to make sure that the students did not discuss the exam; there was no improper time given for the exam; and there was no observed misconduct by the proctors or reported to the school by any student.  Belzer Decl.; Declaration of Valerie Arbizu ("Arbizu Decl."), ¶¶ 3-7, 9-10, 7-25; Declarations of Kelly Chao, Darren Fong, Jennifer Kao, Nathan Li, Jessica Liang, Grant Murphy, Christopher Tarangioli, Songyi Xu, Brandon Ye, Jason Zhang ("Student Decls."); and Gordon Lee, Janet Choy and Jean Joh ("Proctor Decls.").

The evidence shows that the testing environment protected the integrity of the test results by providing more than sufficient proctoring and excellent controls to ensure that the students

1   were operating in a fair test environment. *Id.* Defendants admit that they have no evidence of

2   any cheating or wrongdoing by any of the students. Belzer Decl., ¶ 10.

3   **D.    Defendants Invalidate 641 AP Test Scores Solely on the Basis of Allegedly
           Improper Seating Arrangements**

4

5            On May 22, 2013, a representative from Defendant ETS spoke with the Vice Principal of

6   Mills High School in which the ETS representative asked questions solely about the AP Statistics

7   exam and specifically, what time the test began, what tables were used, how many students sat at

8   tables, were breaks monitored, did students discuss the exam during the breaks, and were cell

9   phones used in the testing room while the tests were out. That day, Mills High School answered

10  all of ETS' questions via email. On May 24, June 10, 12, 13, 17, 24, Defendant ETS and Mills

11  High School had telephone conversations or exchanged emails. At this time, all of Defendant

12  ETS' questions related solely to seating arrangements. Mills High School promptly answered all

13  of the questions asked, including sending a preliminary seating chart with the names of the

14  students included. Arbizu Decl., ¶¶ 26-35.

15           During this time, Defendant ETS never visited Mills High School or visited the testing

16  sites at issue. Belzer Decl., ¶ 11. Then, on June 25, 2013, ETS emailed Mills High School the

17  following: "Thank you for the additional information regarding the exams that were

18  administered at your school. I will forward this information to the proper departments for a

19  decision." Arbizu Decl., ¶ 37. ETS did not ask Mills High School if it had any information that

20  it wanted to furnish about the testing environments or raise any questions about student

21  misconduct. ETS did not give Mills High School or any of the students an opportunity to address

22  any of ETS' concerns. Defendants did not contact the students at all.

23           On July 8, 2013, almost two weeks later, ETS emailed Mills High School stating in full:

24       Thank you for all of the additional information regarding the 2013 AP exams that were
         administered at your school. **The information submitted confirms that the following
25       exams were administered under improper seating conditions**: US History;
         Macro-economics; English Language; English Literature; US Government and Politics;
26       Calculus AB; Calculus BC; Physics B; Statistics; Chemistry; Biology. Therefore, the test
         takers' scores are invalid. Please contact Ms. Evans or myself to arrange and schedule
27       retest dates for the above exams."

28  *Id.*, ¶ 38 (emphasis added; some punctuation changed).

---

**PLAINTIFFS' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CIV 523184                              4**

1   Defendants' treatment of Plaintiffs is unequal to their treatment of other high schools. In

2   other cases, Defendants have not acted to invalidate AP test scores without proof of cheating.

3   RJN, Exs. 1-3; Fineman Decl., ¶ 4 and Exs. 3, 4. At Mills High School, however, Defendants

4   have indiscriminately sanctioned hundreds of students without any evidence of wrongdoing by

5   them.

6   **E.      Defendants Abuse Their Discretion When They Invalidate All Scores
            Without Adequately Warning Schools and Students that They Will**

7   **        Invalidate Exams Solely Based Upon Improper Seating Conditions**

8   Defendants publish multiple manuals with policies and procedures regarding the AP tests.

9   The AP Coordinator's Manual for 2012-13 is over 120 pages long. RJN, Ex. 6. If inadequate

10  seating alone justifies imposing "death penalty" sanctions against all of the students, there would

11  be clear and prominent warning to schools and students. However, none of Defendants'

12  documents warn schools or students that inadequate seating, without evidence of misconduct or

13  evidence that the test results are not the work of the students, will automatically invalidate all

14  scores. *See, e.g.,* RJN Exs. 6-8. In fact, the invalidation is not mandatory. The AP

15  Coordinator's Manual states that "[f]ailure to follow seating requirements **could** result in

16  cancellation of exam scores." RJN Ex. 6 at 48.

17  The form sent by the school to Defendants about complying with the rules does not

18  mention seating. While the 2012-13 Participation Form incorporates by reference all of the

19  policies and procedures in the AP Coordinator's Manual, it only specifically identifies as

20  "Participation Policies" six rules that require separate verification by the high school:

21      ●   AP Exams will be administered only on their official dates and times.

22      ●   Teachers, department chairs, tutors, individuals involved in test preparation

23          services, and educators of any kind (including, but not limited to, curriculum
            specialists, guidance counselors, and administrators) are prohibited from taking,

24          or reviewing the content of, an AP Exam.

25      ●   No one, except for AP students during the AP Exam, may see multiple-choice
            questions. Multiple-choice questions must never be shared, copied, or

26          reconstructed through any means. Free-response questions may only be discussed
            if and when the specific free-response questions on the exam are released on the

27          College Board website two days after the exam. Free-response questions in
            alternate exams may never be discussed.

28

---

- Only AP Coordinators and authorized staff may receive, check, store, distribute, and return exam materials. Exams must be secured in locked storage to which only authorized staff persons have access.

- Non-authorized staff, including, but not limited to, AP teachers in the subject of the given exam, will not be present in the exam room.

- Prohibited devices, including electronic equipment (cell phone, smart phone, tablet computer, etc.), portable listening or recording devices (MP3 player, iPod, etc.), cameras or other photographic equipment, devices that can access the internet, and any other electronic or communication devices, will not be present in the exam room or accessible during breaks.

RJN Ex. 7.

Defendants' policies and procedures are designed to protect the integrity of the AP Exams. "The policies and procedures have been developed to afford all students equivalent opportunities to demonstrate their knowledge on exam day and prevent any student from gaining an unfair advantage." RJN Ex. 6 at 13. There is no way, however, that all 18,000 schools that administer these exams follow the rules in identical fashion. As long as Defendants' goals are met in the giving of the exams, Defendants should invalidate the test scores only if the test results are affected by material irregularity.

## III.   **LEGAL ARGUMENT**

### A.   **The Court has Authority and Discretion to Issue a TRO**

Plaintiffs seek a TRO and an OSC directed at the Defendants to show cause why this Court should not issue an order requiring Defendants to comply with their legal obligations and to validate, score and report the AP test scores of the AP Students to the colleges and universities, as requested by the students. The issuance of a TRO or preliminary injunction is within the sound discretion of the trial court and is judged on appeal on an abuse of discretion standard. *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69. A TRO and Preliminary Injunction are necessary to protect the *status quo* pending full resolution of this case.

A court may issue a TRO to prohibit certain acts by the defendant and to preserve the status quo pending a hearing on whether the plaintiff is entitled to a preliminary injunction. Code Civ. Proc. § 527; *Chico Feminist Women's Health Ctr. v. Scully* (1989) 208 Cal.App.3d 230,

1    237, n.1. This Court can issue a preliminary injunction enjoining a defendant from refusing to

2    perform an action that they are legally obligated to perform. *See, e.g. Gallagher v. Equitable*

3    *Gaslight Co.* (1904) 141 Cal. 699, 707-709. Courts can also require parties to specifically

4    perform contractual obligations, particularly if continuing court supervision is not required. *See,*

5    *e.g. Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 547.

6         "The *ex parte* hearing concerning a TRO is no more than a review of the conflicting

7    contentions to determine whether there is a sufficiency of evidence to support the issuance of an

8    interlocutory order to keep the subject of litigation in *status quo* pending a full hearing to

9    determine whether the applicant is entitled to a preliminary injunction. The issuance of a TRO is

10   not a determination of the merits of the controversy." A TRO remains in effect until the court

11   issues or denies a preliminary injunction. A TRO may be obtained by *ex parte* application. Code

12   Civ. Proc. § 527(c).

13        In this case, there is more than sufficient evidence to support a TRO. Defendants

14   performed a perfunctory investigation which they believe was sufficient and acknowledge that

15   there is no evidence of any cheating or wrongdoing by any of the students. *See* Belzer Decl., ¶

16   10. While Defendants have no evidence of cheating, there is substantial evidence that the AP

17   exams at Mills High School were conducted in a secure testing environment that was heavily

18   proctored so as to ensure that the test results are valid and that no one obtained an unfair

19   advantage. Belzer Decl. at ¶¶ 3-7, 9, 10; Arbizu Decl., ¶¶ 6-25; Student Decls.; Proctor Decls.

20        The AP Students took the AP exams in May 2013, expecting that their test results would

21   be reported in July 2013. Instead, in July 2013, Defendants invalidated their AP test scores. The

22   AP Students, particularly the graduating seniors, need their AP test scores before college begins

23   in August/September 2013. *See* Student Decls. If a TRO is not issued immediately, the impact

24   on the Plaintiffs will be substantial as it will affect the AP Students' ability to gain admission to

25   colleges or universities, obtain college credit and to skip introductory classes at their colleges or

26   universities and also harm SMUHSD. *See* Student Decls. Several students are not in a position

27   to retake the test because they are out of the country, including one student who has been

28

---

1 spending the summer volunteering in Nicaragua. *See, e.g.,* Declaration of Paul Seto, ¶ 5.

2 Without proof of cheating, indiscriminate invalidation of the 641 AP test scores at Mills High

3 School is unwarranted. Prior to Defendants' decision to invalidate the AP test scores of the 286

4 Mills High School students, Defendants were required to validate, score and report their AP test

5 scores to the colleges and universities they requested. This is the *status quo* to which the parties

6 should be returned.

7     **B.**     **This Court Has Authority to Grant a Preliminary Injunction**

8     This Court should not only grant a TRO but also issue an OSC requiring Defendants to

9 show cause why a preliminary injunction should be granted. Two factors are considered in

10 deciding whether to grant a preliminary injunction. The first is whether the Plaintiffs are likely

11 to prevail on the merits at trial. The second is whether Plaintiffs are likely to suffer interim harm

12 if the injunction is denied compared to the interim harm likely to be suffered by the respondent if

13 the injunction is issued. *IT Corp.*, 35 Cal.3d at 69-70. In judging these two factors, courts apply

14 a balancing test. *See Butt v. State of California* (1992) 4 Cal.4th 668, 678.

15     The purpose of a preliminary injunction is to preserve the *status quo* pending a trial on

16 the merits. *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528. "*Status quo* 'has been

17 defined to mean 'the last actual peaceable, uncontested status which preceded the pending

18 controversy.'" *Voorhies v. Green* (1983) 139 Cal.App.3d 989, 995.

19     **C.**     **Plaintiffs Have a Reasonable Probability of Prevailing On the Merits**

20     When determining whether to issue a TRO or preliminary injunction, the first factor

21 courts consider is whether the moving parties have a reasonable probability of prevailing on the

22 merits at trial. The issuance of a preliminary injunction does not determine any of the merits of

23 the controversy or whether Plaintiffs will prevail. *Baypoint Mortgage Corp. v. Crest Premium*

24 *Real Estate Investments Retirement Trust* (1985) 168 Cal.App.3d 818, 823, 824. Rather, a trial

25 court's TRO or preliminary injunction will be affirmed so long as it was "not beyond the bounds

26 of reason" for the trial court to conclude that the plaintiff was likely to prevail on the merits.

27 *Youngblood v. Wilcox* (1989) 207 Cal.App.3d 1368, 1375.

28

---

1    There is a reasonable likelihood that Plaintiffs will prevail on the merits on its claims.

2    There is substantial evidence to support two key findings:

3          (1)     The AP tests at Mills High School were conducted in a secure testing environment
4                     that was heavily proctored;

      (2)     There is no evidence of wrongdoing on the part of any students, any improper
5                     advantage the students actually received, or invalid test results.

6    Belzer Decl., ¶¶ 3-7, 9-10; Arbizu Decl., ¶¶ 6-25; Student Decls., Proctor Decls.

7             **1.**     **Breach of Contract/Implied Covenant of Good Faith and Fair Dealing**

8         SMUHSD and Defendants entered into a contract.  After completing each AP exam, the

9    AP Students/AP Students-Viking Parent Group signed contracts with Defendants in which the

10   Defendants were obligated to validate, score and report their AP test scores to the requested

11   colleges and universities.  Specifically, Defendants promised that "[s]core reports are provided in

12   July of the year you take the exam, to you, to the college you designated on your registration

13   answer sheet and to your high school."  RJN Ex. 8 at 8.  Defendants did not do so.

14        Plaintiffs also have a reasonable likelihood of prevailing on their breach of the implied

15   covenant of good faith and fair dealing claims.  Several cases involving ETS specifically have

16   found that ETS owes test takers: (1) a duty not to exercise its contractual discretion, such as to

17   invalidate test scores, in an arbitrary or irrational manner; and (2) a duty to investigate, in good

18   faith, whether there has been wrongdoing before scores can be invalidated.  In *Dalton v.*

19   *Educational Testing Service* (1987) 87 N.Y.2d 384, 389, the New York Court of Appeals,

20   applying New York law, held that ETS owed students a good faith duty to exercise its contractual

21   discretion in a manner that was **not arbitrary or irrational**.  *Id.*  In addition to the duty not to

22   exercise its contractual discretion in an arbitrary or irrational manner, ETS also owed students a

23   good faith duty to investigate any allegations of wrongdoing and to evaluate all evidence before

24   invalidating test scores.  *Id.* at 390.  In *Cortale v. Educational Testing Service* (1998) 251 A.D.2d

25   528, 529-530, the Supreme Court of New York, following *Dalton*, held that "[i]n discharging its

26   contractual obligation, ETS must honor its duty of good faith and fair dealing, and may not act

27   arbitrarily or irrationally."  In *Murray v. Educational Testing Service* (5th Cir. 1999) 170 F.3d

28

---

1    514, 516, the Fifth Circuit held that, under Louisiana law, ETS owed Murray a contractual duty

2    "to investigate the validity of Murray's scores in good faith." *Id.*

3         California law similarly imposes the same, if not higher, good faith requirement on

4    contractual parties. *See, e.g. Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 91.

5    "It has long been recognized, of course, that every contract imposes upon each party a duty of

6    good faith and fair dealing in the performance of the contract such that neither party shall do

7    anything which will have the effect of destroying or injuring the right of the other party to receive

8    the fruits of the contract." *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36. "The

9    covenant of good faith finds particular application in situations where one party is invested with a

10   discretionary power affecting the rights of another. Such power must be exercised in good faith."

11   *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342,

12   372. When evaluating the propriety of the exercise of such discretionary power, courts prefer to

13   apply an objective standard. *FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 800.

14        In this case, there is a reasonable likelihood of proving that Defendants' conduct was not

15   in good faith since Defendants indiscriminately invalidated 641 AP test scores without any

16   finding of misconduct or that the test results were not valid. The decision was made solely on the

17   grounds that Defendants concluded that 11 "exams were administered under improper seating

18   conditions" and, therefore, "the test taker's scores are invalid." Arbizu Decl., Ex. 3; Belzer

19   Decl., ¶ 10. When the evidence shows that there were sufficient controls in place to provide a

20   fair testing environment where no one obtained an unfair advantage and there is no evidence that

21   the test scores are invalid, Defendants have breached their contract with Plaintiffs and the

22   implied covenant by refusing to validate the scores.

23        The contrast in facts of Mills High School and the two reported other times in California

24   when Defendants invalidated scores is stark. The information that is publically available shows

25   that Defendants have only invalidated scores when there has been evidence of actual cheating.

26        In 2011, Defendants conducted an investigation at Skyline High School in California in

27   which the scores of 30 students were invalidated due to "testing irregularities." In that case, a

28

---

**PLAINTIFFS' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CIV 523184**                          10

1  thorough investigation by Defendants had been undertaken in response to multiple allegations of
2  reported testing irregularities, including overly intimate seating, alleged cheating and overall
3  student misconduct, and proctors who were not qualified to oversee the tests. After receiving
4  multiple calls about testing irregularities, Defendant ETS sent an investigator to the high school
5  who found evidence of actual cheating. In the end, Defendant ETS invalidated the scores of only
6  30 students. A student who had his score invalided, had his family's lawyer contact Defendant
7  ETS to obtain more information. An official from Defendant ETS informed the student that the
8  disparity between his multiple choice and essay scores was so large that ETS could not believe
9  the same person did both sections, without prior knowledge of the essay prompts. This student
10  was permitted to attend a panel review of his score to prove his innocence. Fineman Decl., Exs.
11  3, 4.

12      Similarly, according to Defendants' own account, in another high school in California,
13  Defendants only invalidated AP scores after numerous students admitted to cheating (the final
14  count was that 40 students had been identified as cheating), students admitted sending text
15  messages, proctor-student ratios were improper, test takers seated themselves, students were
16  seated too close together, and proctors were not vigilant. Defendants sent out an investigator
17  who interviewed school administrators and students. The investigator inspected the test sites and
18  concluded that there were crowded conditions, tables were too small and one room had
19  inadequate sight lines. There was a "circus atmosphere" during the tests. Defendants performed
20  some statistical analysis that demonstrated the correlation between students' performance on the
21  multiple choice and constructed response parts were lower-in some cases much lower-than was
22  observed across the country. Further these students as a group performed consistently better on
23  multiple choice questions than did test takers nationwide. RJN Exs. 1, 2, 3.

24      Individual students accused of misconduct are also provided more process than the AP
25  Students in this case because Defendants only cancel the scores based upon **substantial** evidence
26  that the scores are invalid. In those cases, Defendants notify the affected student in writing about
27  their concerns, give the student an opportunity to submit information that addresses the concerns
28

1  and consider any such information that is submitted.  Defendants also offer various options,

2  which include voluntary score cancellation, a free retest and arbitration in accordance with the

3  ETS Standard Arbitration Agreement.  See RJN Ex. 8 at 4.  Here, the Defendants are treating 286

4  students, in which there is no evidence of wrongdoing, with less due process than an individual

5  student, in which there is actual evidence of wrongdoing.  This is an unfair and unsupportable

6  result.

7       The purpose of the rules for test administration is to make sure that the test results are

8  accurate and reflect the knowledge and abilities of the test taker, not to simply invalidate scores

9  when the rules are not followed to the letter.  There is no evidence that Mills High School had

10  inadequate controls.  To the contrary, the evidence demonstrates that Mills High School had

11  adequate controls in place to ensure security of the testing environment.  Belzer Decl., ¶¶ 3-7, 9-

12  10; Arbizu Decl., ¶¶ 6-25; Student Decls.; Proctor Decls.  Because the evidence shows that the

13  testing environment was secure, because Defendants have no evidence of any wrongdoing by any

14  student and because there was no legitimate investigation of the testing environment at Mills

15  High School, Defendants' decision to invalidate 641 AP test scores breaches their contract and

16  violates their duty of good faith and fair dealing to the students.

17       **2.      Plaintiffs Have A Reasonable Likelihood of Prevailing on UCL Claim**

18       The UCL forbids "unlawful, unfair or fraudulent business act or practice."  Bus. & Prof.

19  Code § 17200.  California courts have consistently interpreted this language broadly.  *Korea*

20  *Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143.  A business practice is

21  unfair if the harm to the victim outweighs any benefits of the business practice.  *Olsen v. Breeze,*

22  *Inc.* (1996) 48 Cal.App.4th 608, 618.  Defendants' business is to prepare and administer tests for

23  a fee.

24       As set forth above, there is a reasonable likelihood that Plaintiffs will prevail on the

25  merits as there is substantial evidence proving that ETS invalidated the scores of 286 Mills High

26  School students based on **no evidence of wrongdoing** by any of the students.  Defendants have

27  **no evidence** that any of the students' test scores were impacted by the seating arrangement of the

28

1 students. Defendants also **conducted no legitimate investigation** of the Mills High School

2 testing sites. Defendants have **not provided SMUHSD or the students any opportunity to**

3 **appeal or contest the invalidation**. Defendants' actions constitute an unfair business practice.

4         **3.**    **Plaintiffs Have A Reasonable Likelihood of Prevailing on Due Process**

5              **Claim**

6       Defendants are state actors resulting from their joint participation with SMUHSD and

7 California public colleges and universities in certifying students' advanced placement credit to

8 state colleges and universities and/or their joint participation with the state's colleges and

9 universities in accurately reporting the advanced placement test scores which are relied on for

10 student admission and the awarding of student scholarships. They also have relationships with

11 the colleges and universities through the use of delegates on each campus to provide assistance to

12 the students and colleges so that the students can receive college credit for their test. Through

13 their actions, they have violated Article 1, §7(a) of California's Constitution.

14     **D.**    **The Balancing of Hardships Weighs in Favor of Plaintiffs**

15       The second factor in evaluating a request for TRO and preliminary injunction is to

16 balance the relative hardships if a TRO or preliminary injunction is either granted or denied.

17 *NewLife Sciences, LLC v. Weinstock* (2011) 197 Cal.App.4th 676, 687-688. A TRO or

18 preliminary injunction can be based on a finding that the plaintiffs will suffer irreparable injury if

19 injunctive relief is not granted or if monetary damages are difficult to ascertain or inadequate as a

20 remedy. Code Civ. Proc. § 526(a)(2), (4)-(5). "The term 'irreparable injury' . . . means that

21 species of damages, whether great or small, which ought not to be submitted to on the one hand

22 or inflicted on the other." *Anderson v. Souza* (1952) 38 Cal. 2d 825, 834.

23         **1.**    **The Harm to Plaintiffs is Irreparable and Unascertainable**

24       The harm to Plaintiffs in this case is sufficient to meet the standards set out above as it

25 would result in substantial and irreparable harm to the Plaintiffs. Furthermore, calculating the

26 monetary value of such damages is difficult, if not impossible, and monetary damages are

27 inadequate. The harm to the AP Students is substantial and includes, but is not limited to: (1)

28 Loss of Admission to Colleges and Universities; (2) Loss of College Credit; (3) Loss of Ability

---

1  to Skip Introductory Classes; (4) Inability to Take Re-Test; (5) Being Forced to Take Re-Test

2  Under Substantially Different Circumstances. Belzer Decl., ¶¶ 12-14; Students Decls.; Seto

3  Decl. The harm to Plaintiffs is "irreparable" and unascertainable. *Id.* The proposed solution of a

4  retest on those 641 AP exams by all 286 Mills High Schools does not solve the problem,

5  especially when Defendants acknowledge that there is **no evidence of any specific wrongdoing**

6  **by any student**.

7   • **Loss of Equivalent Opportunity to Demonstrate Knowledge:** The proposed
        solution, a re-test, is not adequate. ETS advises students that "policies and
8        procedures have been developed to afford all students equivalent opportunities to
        demonstrate their knowledge on exam day and prevent any students from gaining
9        an unfair advantage." RJN Ex. 8 at 3. It is not possible for 18,000 schools across
        the country to provide identical testing conditions. An unexpected retest in
10       August after having their scores cancelled does not offer these AP Students an
        equivalent opportunity to demonstrate their knowledge. Other students had the
11       benefit of a teaching curriculum and review courses designed to lead up to the
        testing date in May. The testing conditions under which these retests will be taken
12       are markedly different than the May test conditions. Student Decls; Belzer Decl.,
        ¶¶ 12-14.
13

14  • **Inability to Register for Classes:** For the seniors who will be leaving for
        college, they must know if they have qualified to pass certain introductory courses
15       so that they may appropriately pick their fall 2013 course schedule. In colleges
        and universities, course selection has become highly competitive and the inability
16       to register for certain classes because of delayed AP reporting can affect a
        student's ability to graduate on time. Student Decls; Belzer Decl., ¶¶ 12-14; RJN
17       10-12.

18  **2.   Defendants Will Not Be Harmed by an Injunction**

19   Defendants will not be harmed if a TRO or preliminary injunction is granted. Defendants

20  collected a fee for each AP exam and continues to hold that fee. That fee is for the validation,

21  scoring and reporting of Plaintiffs' scores. Defendants will suffer no financial impact. As such,

22  Defendants suffer **no harm** if an injunction is granted.

23   Defendants may claim that granting an injunction harms them by impacting the integrity

24  of the AP testing process. This is incorrect. They conducted the investigation that they thought

25  was sufficient and found no evidence of cheating or wrongdoing. Accordingly, they can stand

26  behind the exam results. The abstract concept of testing integrity is not protected by granting

27  Defendants *carte blanche* to invalidate scores without due process. Indeed, the integrity of the

28  testing process is strengthened by a judicial determination that scores cannot be invalidated

---

1  without due process to Plaintiffs.  This is a fundamental concept of fairness and jurisprudence

2  and a better lesson to American high students than the concept of rule by fiat.

3      For the reasons stated the balance of hardships tips strongly in favor of Plaintiffs.

4      **E.**    **A Bond Should Not Be Required In This Case**

5      Plaintiffs urge this Court to issue temporary relief without requiring a bond.  A TRO is

6  not subject to a bond requirement under Code of Civil Procedure § 527.  Since the only financial

7  impact to Defendants of an injunction relates to the $89 fee paid to Defendants by the students

8  for each AP exam, and since Defendants already are in possession, custody and control of that

9  fee, Defendants are sufficiently protected if they are allowed to hold onto that fee pending

10  resolution of this case.  This Court should therefore exercise its discretion and decline to order a

11  bond.  If the Court decides a bond is necessary, it should require a bond of no more than $5,000.

12  **IV.**    **CONCLUSION**

13      Because Plaintiffs are highly likely to succeed on the merits, are subject to irreparable

14  harm and because the balance of hardships tips strongly in favor of granting the TRO and a

15  preliminary injunction, Plaintiffs respectfully request that the Court grant the *ex parte* application

16  for a TRO and Order to Show Cause re Preliminary Injunction.

17  Dated:  August 6, 2013        COTCHETT, PITRE & McCARTHY LLP

18                                    By:

19                                      NANCY L. FINEMAN

20                              **LOZANO SMITH**

21                              By:     GREGORY A. WEDNER

22                              *Attorneys for Petitioner/Plaintiff*

23                              *San Mateo Union High School District*

24                              **MINAMI TAMAKI LLP**

25                              By:     JACK W. LEE

26

27                              *Attorneys for Petitioner/Plaintiff*
                            *AP Students - Viking Parent Group*

28

---

# merilpac

10:37:0
13. B. 3. Paul Demone invoice for Agere patent work 2.2007.pdf

1  Nancy L. Fineman (Cal. SBN 124870)
   nfineman@cpmlegal.com
2  Aron K. Liang (Cal. SBN 228936)
   aliang@cpmlegal.com
3  **COTCHETT, PITRE & McCARTHY LLP**
   San Francisco Airport Office Center
4  840 Malcolm Road, Suite 200
   Burlingame, CA  94010
5  Telephone:      (650) 697-6000
   Facsimile:      (650) 697-0577
6
7  Gregory A. Wedner (Cal. SBN 67965)          Jack W. Lee (Cal. SBN 71626)
   gwedner@lozanosmith.com                     jlee@minamitamaki.com
8  **LOZANO SMITH**                            Sean Tamura-Sato (Cal. SBN 254092)
   One Capitol Mall, Suite 640                 seant@minamitamaki.com
9  Sacramento, CA 95814                        **MINAMI TAMAKI LLP**
   Telephone:  (916) 329-7433                  360 Post Street, 8th Floor
10 Facsimile:  (916) 329-9050                  San Francisco, California 94108-4903
                                               Telephone: 415 788 9000
11 *Attorneys for Petitioner/Plaintiff San Mateo*   Facsimile: 415 398 3887
   *Union High School District*
12                                             *Attorneys for Petitioner/Plaintiff AP Students –*
                                               *Viking Parent Group*
13

14                    IN THE SUPERIOR COURT OF CALIFORNIA

15                  IN AND FOR THE COUNTY OF SAN MATEO

16

17 **SAN MATEO UNION HIGH SCHOOL** )          **CASE NO. Civ. 523184**
   **DISTRICT, individually and on behalf** )
18 **of the members of the SAN MATEO**     )   **PLAINTIFFS' INDEX OF EVIDENCE IN**
   **UNION HIGH SCHOOL DISTRICT**          )   **SUPPORT OF *EX PARTE* APPLICATION**
19 **and AP STUDENTS - VIKING**            )   **FOR TEMPORARY RESTRAINING**
   **PARENT GROUP,**                       )   **ORDER AND ORDER TO SHOW CAUSE**
20                                         )   **RE PRELIMINARY INJUNCTION**
                   **Plaintiffs,**         )
21              v.                         )
                                           )
22 **EDUCATIONAL TESTING**                 )   Date:          August 8, 2013
   **SERVICES, a New York corporation;**   )   Time:          2:00 p.m.
23 **and COLLEGE ENTRANCE**               )   Department:    21
   **EXAMINATION BOARD, a New York** )        Judge:         Judge Robert D. Foiles
24 **corporation; and DOES 1 through 10,** )
   **inclusive,**                         )
25                 **Defendants.**         )

26

27

28

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

**PLAINTIFFS' INDEX OF EXHIBITS ISO *EX PARTE* APPLICATION FOR TEMPORARY**
**RESTRAINING ORDER AND OSC RE PRELIMINARY INJUNCTION; Case No. 523184**

1        Plaintiffs respectfully submit the following evidence in support of their Ex Parte

2  Application for a Temporary Restraining Order and Order to Show Cause re Preliminary

3  Injunction:

4  **I.**       **<u>DECLARATIONS</u>**

5        *Attorney*

6             A.    Nancy L. Fineman

7        *Mills High School Administration*

8             B.    Valerie Arbizu (Assistant Principal)

9             C.    Paul Belzer (Principal)

10       *Mills High School Students*

11            D.    Kelly Chao

12            E.    Darren Fong

13            F.    Jennifer Kao

14            G.    Jessica Liang

15            H.    Nathan Li

16            I.    Grant Murphy

17            J.    Christopher Tarangioli

18            K.    Songyi Xu

19            L.    Brandon Ye

20            M.    Jason Zhang

21       *Mills High School Parent*

22            N.    Paul Seto

23       *Proctors*

24            O.    Janet Choy

25            P.    Jean Joh

26            Q.    Gordon Lee

27

28

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

**II.     REQUEST FOR EXHIBIT NOTICE**

Exhibit 1:     Opposition of Educational Testing Service and the College Board to

Plaintiffs' *Ex Parte* Application for Order to Show Cause re Preliminary

Injunction and Temporary Restraining Order filed in *Justice for 375*

*Trabuco Scholars et al. v. Educational Testing Service and College*

*Entrance Examination Board*, Orange County Case No. 30-2008-

00109666.

Exhibit 2:     Declaration of Susan Landers filed by Educational Testing Service and

College Board in *Justice for 375 Trabuco Scholars et al. v. Educational*

*Testing Service and College Entrance Examination Board*, Orange County

Case No. 30-2008-00109666.

Exhibit 3:     Declaration of Karl Clark in Support of Defendants' Opposition to

Temporary Restraining Order filed by Defendants Educational Testing

Service and College Board in *Justice for 375 Trabuco Scholars et al. v.*

*Educational Testing Service and College Entrance Examination Board*,

Orange County Case No. 30-2008-00109666.

Exhibit 4:     Put AP to Work for You found at

https://apstudent.collegeboard.org/exploreap/the-rewards.

Exhibit 5:     AP Scholar Awards found at  https://apstudent.collegeboard.org/scores/ap-

awards/ap-scholar-awards.

Exhibit 6:     2012-13 AP Coordinator's Manual found at

professionals.collegeboard.com/.../2012-13_AP_Coordinators_Manual.pdf

Exhibit 7:     2012-13 AP Participation Form found at

http://professionals.collegeboard.com/profdownload/ap-participation-form

.pdf

Exhibit 8:     AP Bulletin for AP Students and Parents (2012-2013) found at

media.collegeboard.com/.../2012-13AP_Bulletin_Students_Parents.pdf.

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

**PLAINTIFFS' INDEX OF EXHIBITS ISO *EX PARTE* APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND OSC RE PRELIMINARY INJUNCTION; Case No. 523184**                                    2

| | |
|---|---|
| Exhibit 9: | Why and How ETS Questions Test Scores found at www.ets.org/s/praxis/pdf/why_and_how.pdf. |
| Exhibit 10: | Website from Yale College re Award of Acceleration Credit Based on Advanced Placement Test Scores found at http://yalecollege.yale.eud/content/table-accration-credit and http://yalecollege.edu/content/aware-acceleration-credit-based-advanced-placement-test-scores. |
| Exhibit 11: | Website from the University of California regarding AP credits, found at http://admission.universityofcalifornia.edu/counselors/exam-credit/ap-credits/index.html. |
| Exhibit 12: | Website from the University of California, San Diego re university course exemptions found at http://admission.universityofcalifornia.edu/counselors/exam-credit/ap-credits/san-diego. |

Dated:  August 6, 2013

**COTCHETT, PITRE & McCARTHY LLP**

By: _____

NANCY L. FINEMAN

**LOZANO SMITH**

By: _____

GREGORY A. WEDNER

*Attorneys for Petitioner/Plaintiff*
*San Mateo Union High School District*

**MINAMI TAMAKI LLP**

By: _____

JACK W. LEE

*Attorneys for Petitioner/Plaintiff*
*AP Students - Viking Parent Group*

---

**PLAINTIFFS' INDEX OF EXHIBITS ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC RE PRELIMINARY INJUNCTION; Case No. 523184**

# merilpac

10:37:4
14. B. EX 16 2007-02-08 Notes from Call with Agere MOSAID00033830.pdf

1  Nancy L. Fineman (Cal. SBN 124870)
   nfineman@cpmlegal.com
2  Aron K. Liang (Cal. SBN 228936)
   aliang@cpmlegal.com
3  **COTCHETT, PITRE & McCARTHY LLP**
   San Francisco Airport Office Center
4  840 Malcolm Road, Suite 200
   Burlingame, CA  94010
5  Telephone:    (650) 697-6000
   Facsimile:    (650) 697-0577
6
   Gregory A. Wedner (Cal. SBN 67965)
7  gwedner@lozanosmith.com
   **LOZANO SMITH**
8  One Capitol Mall, Suite 640
   Sacramento, CA 95814
9  Telephone:  (916) 329-7433
   Facsimile:  (916) 329-9050
10
   *Attorneys for Petitioner/Plaintiff San Mateo*
11 *Union High School District*

   Jack W. Lee (Cal. SBN 71626)
   jlee@minamitamaki.com
   Sean Tamura-Sato (Cal. SBN 254092)
   seant@minamitamaki.com
   **MINAMI TAMAKI LLP**
   360 Post Street, 8th Floor
   San Francisco, California 94108-4903
   Telephone: 415 788 9000
   Facsimile: 415 398 3887

   *Attorneys for Petitioner/Plaintiff AP Students –*
   *Viking Parent Group*

12

13                  **IN THE SUPERIOR COURT OF CALIFORNIA**

14                  **IN AND FOR THE COUNTY OF SAN MATEO**

15

16  **SAN MATEO UNION HIGH SCHOOL** )    CASE NO.
    **DISTRICT, individually and on behalf** )
17  **of the members of the SAN MATEO** )    **APPENDIX OF NON-CALIFORNIA**
    **UNION HIGH SCHOOL DISTRICT** )    **AUTHORITIES ISO PLAINTIFFS'** *EX*
18  **and AP STUDENTS - VIKING** )    *PARTE* **APPLICATION FOR**
    **PARENT GROUP,** )    **TEMPORARY RESTRAINING ORDER**
19                                   )    **AND ORDER TO SHOW CAUSE RE**
                    **Plaintiffs,** )    **PRELIMINARY INJUNCTION**
20              v.                   )
    **EDUCATIONAL TESTING** )
21  **SERVICES, a New York corporation;** )    Date:        August 8, 2013
    **and COLLEGE ENTRANCE** )    Time:        2:00 p.m.
22  **EXAMINATION BOARD, a New York** )    Department:  21
    **corporation; and DOES 1 through 10,** )    Judge:       Judge Robert D. Foiles
23  **inclusive,** )
                    **Defendants.** )
24                                   )    Complaint Filed: August 5, 2013
                                     )
25  _____ )

26

27

28

1    The following non-California authorities are cited in Plaintiffs' Ex Parte Application for

2  Temporary Restraining Order and Order to Show Cause re Preliminary Injunction and are

3  attached hereto for reference:

4  **Tab**

5  1      *Cortale v. Educational Testing Service* (1998) 251 A.D.2d 528

6  2      *Dalton v. Educational Testing Service* (1987) 87 N.Y.2d 384

7  3      *Murray v. Educational Testing Service* (5th Cir. 1999) 170 F.3d 514

8

9  Dated: August 6, 2013                         **COTCHETT, PITRE & McCARTHY LLP**

10                                                          By:

11                                                                NANCY L. FINEMAN

12                                                          **LOZANO SMITH**

13                                                          By: Gregory A Wedner /ALR

                                                                 GREGORY A. WEDNER

14

15                                                          *Attorneys for Petitioner/Plaintiff*
                                                            *San Mateo Union High School District*

16                                                          **MINAMI TAMAKI LLP**

                                                            By: Jack W. Lee /ALR

17                                                                JACK W. LEE

18                                                          *Attorneys for Petitioner/Plaintiff*
                                                            *AP Students - Viking Parent Group*

19

20

21

22

23

24

25

26

27

28

---

**APPENDIX OF NON-CALIFORNIA AUTHORITIES ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY
INJUNCTION; Case No. CIV 523184**                                                     2

# Tab 1



LexisNexis®

Jennifer E. Cortale, Respondent, v. Educational Testing Service, Appellant.

97-06233

SUPREME COURT OF NEW YORK, APPELLATE DIVISION, SECOND DEPARTMENT

251 A.D.2d 528; 674 N.Y.S.2d 753; 1998 N.Y. App. Div. LEXIS 7505

April 3, 1998, Argued
June 22, 1998, Decided

**PRIOR HISTORY:** [***1] In an action, *inter alia,* for a permanent injunction and a judgment declaring the validity of the score earned by the plaintiff on the December 1995 Graduate Record Examination, the defendant appeals from so much of an order of the Supreme Court, Suffolk County (Underwood, J.), entered April 24, 1997, as denied its cross-motion, *inter alia,* for summary judgment dismissing the complaint.

**DISPOSITION:** ORDERED that the order is affirmed insofar as appealed from, with costs.

**COUNSEL:** Paul, Hastings, Janofsky & Walker, LLP, New York, N.Y., and Wilmer, Cutler & Pickering, Washington, D.C. (Bruce M. Berman of counsel), for appellant (one brief filed).

Vincent F. Nicolosi, Bayside, N.Y., for respondent.

**JUDGES:** Bracken, J. P., Miller, O'Brien and Copertino, JJ., concur.

**OPINION**

[*528] [**754] Ordered that the order is affirmed insofar as appealed from, with costs.

In October 1995 the plaintiff Jennifer Cortale took the Graduate Record Examination (hereinafter GRE) administered by the defendant Educational Testing Service (hereinafter ETS) as a condition to gaining entrance to graduate school. Having achieved higher scores on practice tests she had taken as part of a preparatory course [***2] offered by the Princeton Review, the plaintiff was dissatisfied with her October score and registered to take the GRE a second time in December 1995. Upon her second examination, the plaintiff attained a score on the verbal portion of the examination which exceeded her October score by more than 200 points. Deeming this increase to be suspicious, ETS conducted an investigation into the plaintiff's testing, and ultimately determined that there was substantial evidence to invalidate that score. In essence, ETS concluded, through statistical analysis and an examination of the pattern of erasures on the plaintiff's answer sheet and that of another student, referred to as Candidate B, who may have been seated near her during the administration of the exam, that the plaintiff achieved her increased score by copying answers from Candidate B.

In accordance with its procedures, ETS notified the plaintiff of its preliminary findings and provided her the opportunity to submit evidence to refute the circumstantial evidence that she had cheated on the December 1995 GRE. The plaintiff submitted evidence, *inter alia,* that she had sustained an injury to [*529] her hand and had been [***3] taking a prescription narcotic pain reliever shortly before the October examination, thus explaining why her score might have been substantially

251 A.D.2d 528, *529; 674 N.Y.S.2d 753, **754;
1998 N.Y. App. Div. LEXIS 7505, ***3

lower in October than in December when she was no longer disabled. She also submitted academic evidence tending to demonstrate that her December results were more consistent with her academic abilities, and that her lower October scores were anomalous. She requested that ETS furnish various items to her to enable her to defend against the charge, including copies of her test booklet, as well as the test booklet of Candidate B. ETS did provide certain materials, but not the test booklets, which it had destroyed. Additional correspondence was exchanged, but ETS was not persuaded and determined that the plaintiff's December scores would be invalidated.

The plaintiff commenced this action and obtained a preliminary injunction prohibiting ETS from notifying the plaintiff's chosen schools of the invalidation of her December scores pending the determination of this matter. ETS does not appeal from so much of the order as awarded the plaintiff a preliminary injunction. However, ETS cross-moved, [**755] *inter alia*, for summary judgment, [***4] arguing that as a matter of law, it had the right and the obligation to invalidate the plaintiff's score and notify the affected schools. The Supreme Court denied the cross motion (*see, Cortale v Educational Testing Serv.,* 171 Misc 2d 928). We now affirm.

In *Dalton v Educational Testing Serv.* (87 NY2d 384) the Court of Appeals dealt with an analogous controversy concerning ETS suspicions that a high school student had cheated on a Scholastic Aptitude Test. As the court explained, applicants who take examinations administered by ETS are obligated to abide by its rules concerning investigations into questionable examination results. The relationship between ETS and test takers results from the contract between them (*see, Matter of K. D. v Educational Testing Serv.,* 87 Misc 2d 657; *see also, Johnson v Educational Testing Serv.,* 754 F2d 20, *cert denied* 472 US 1029). Pursuant to the contract, ETS has the right to question test results it deems suspicious, and to provide enumerated options to examinees, including a retest at no additional charge (*see, Matter of Yaeger v Educational Testing Serv.,* 158 AD2d 602). [***5] Additionally, the contract provides that ETS will undertake an investigation and, *inter alia*, will consider relevant material submitted by examinees which might refute its suspicion of cheating (*see, Dalton v Educational Testing Serv., supra,* at 390). In discharging its contractual obligation, ETS must honor its duty of good faith and fair dealing, [*530] and may not act

arbitrarily or irrationally (*see, Dalton v Educational Testing Serv., supra,* at 389).

In the instant case, ETS, in reliance upon purely circumstantial evidence, determined that the plaintiff was guilty of cheating. This determination was based largely upon a statistical analysis of the pattern of erasures and incorrect answers appearing on the plaintiff's answer sheet, as compared to that of Candidate B. ETS submitted numerous affidavits and other evidence tending to substantiate its methodology. However, in opposing the cross motion for summary judgment, the plaintiff adduced expert evidence which attacked those statistical analytical methods as unreliable. Moreover, ETS itself submitted an article from The Princeton Review Foundation, ostensibly in support of its [***6] motion, which was critical of its own investigative policies. The article charged that ETS had a tendency to ignore most evidence submitted by test takers because of an institutionalized bias. This article, *submitted by ETS,* potentially casts doubt upon whether ETS gave adequate consideration to the plaintiff's evidence, and whether it exercised its investigatory discretion in good faith. Indeed, in *Dalton v Educational Testing Serv.* (206 AD2d 402, 404, *mod* 87 NY2d 384, *supra*), this Court found that ETS wrongfully failed to consider relevant evidence which would have exonerated an examinee accused of cheating, and had violated its contractual duty of good faith and fair dealing by so doing. The Court of Appeals did not disturb that finding. We find that the plaintiff's submissions have demonstrated the existence of a similar issue of fact on the instant record. Similarly, in light of the disconsonant expert opinions in the record concerning the validity of the ETS investigatory statistical analysis, factual issues of good faith and fair dealing are presented for a fact finder's determination.

It is also significant that in this case [***7] the plaintiff requested that ETS provide her with her original test booklet and that of Candidate B, so as to enable her to demonstrate from her "scratch work" that the responses on her computer-scanned answer sheet were in fact her own. ETS, however, had destroyed these booklets, allegedly in the due course of its business. While there is no indication in the record that ETS deliberately destroyed evidence so as to frustrate the plaintiff's efforts to clear her name and prove her entitlement to her score, given the serious educational and vocational ramifications that may flow from a finding that the plaintiff cheated, the failure to preserve such evidence

251 A.D.2d 528, *530; 674 N.Y.S.2d 753, **755;
1998 N.Y. App. Div. LEXIS 7505, ***7

may also implicate the good faith of ETS. The stakes for the plaintiff are sufficiently [**756] high that she [*531] should not be deprived of every reasonable ability to prove her case.

The cross motion of ETS for summary judgment rested entirely upon circumstantial evidence. "A determination based on circumstantial evidence is essentially one to be made by the fact-finder" ( *Abramo v Pepsi-Cola Buffalo Bottling Co.*, 224 AD2d 980, 981). Moreover, on a motion for summary judgment, the evidence is [***8] to be viewed in a light most favorable to the party opposing the motion, giving her the benefit of every favorable inference (*see, Rosen Furs v Sigma Plumbing & Heating Corp.*, 249 AD2d 276; *National*

*Enters. Corp. v Dechert, Price & Rhoads*, 246 AD2d 481; *Santiago v Frito-Lay, Inc.*, 235 AD2d 528; *Gant v Sparacino*, 203 AD2d 515). In light of the aforementioned issues concerning whether ETS acted in good faith, clearly it has not met its evidentiary burden. Since this case presents genuine issues of credibility, many of which go to the heart of the duty of good faith and fair dealing, it is clear that the Supreme Court correctly denied the ETS motion for summary judgment.

The remaining contentions of ETS are without merit.

Bracken, J. P., Miller, O'Brien and Copertino, JJ., concur. [*See,* 171 Misc 2d 928.]

# Tab 2

 **LexisNexis®**

**Peter Dalton, as Parent and Natural Guardian of Brian M. Dalton, an Infant, Respondent, v. Educational Testing Service, Appellant.**

**No. 263**

**COURT OF APPEALS OF NEW YORK**

**87 N.Y.2d 384; 663 N.E.2d 289; 639 N.Y.S.2d 977; 1995 N.Y. LEXIS 4450**

**October 19, 1995, Argued**
**December 7, 1995, Decided**

**PRIOR HISTORY:**    Appeal, by permission of the Court of Appeals, from an order of the Appellate Division of the Supreme Court in the Second Judicial Department, entered July 11, 1994, which affirmed so much of a judgment of the Supreme Court (William D. Friedmann, J.; opn 155 Misc 2d 214), entered in Queens County after a nonjury trial, as directed defendant to release, without comment or qualification, Brian M. Dalton's test scores on the November 2, 1991, Scholastic Aptitude Test.

*Dalton v Educational Testing Serv.*, 206 AD2d 402, 614 N.Y.S.2d 742, modified.

**DISPOSITION:**    Order modified in accordance with the opinion herein and, as so modified, affirmed, without costs.

**HEADNOTES**

Colleges and Universities — Entrance Examinations -- Breach of Contract between Student and Standardized Testing Firm -- Procedures Concerning Questioned Scores

1. In an action for breach of a contract between defendant standardized testing firm and plaintiff, a student who took the standardized test twice, arising from defendant's refusal to release the second test score based upon its determination that someone other than plaintiff may have completed the test, there is support in the record for the affirmed findings below that defendant ignored relevant documentation provided by plaintiff to contest defendant's determination which defendant was obliged to consider in good faith pursuant to contractual procedures governing refusal to release test scores and, therefore, the affirmed findings are binding upon the Court of Appeals. While defendant was under no duty, express or implied, to initiate an external investigation into a questioned score, the contract explicitly afforded plaintiff the option to provide defendant's Board of Review with relevant information upon notification that defendant questioned the legitimacy of his test score and, therefore, it was reasonable to expect that defendant would, at the very least, consider any relevant material submitted in reaching its final decision. The record contains testimony of several Board of Review members, each of whom had the power to release plaintiff's score, that they believed the information submitted by plaintiff was irrelevant to their determination and that only a successful retest would validate plaintiff's score. Accordingly, defendant breached its contract with plaintiff.

Colleges and Universities -- Entrance Examinations — Breach of Contract between Student and Standardized Testing Firm -- Specific Performance

2. Where defendant standardized testing firm refused to release plaintiff's test score due to a question

concerning the score's validity, and breached its contract with plaintiff by failing to consider in good faith relevant documentation submitted by plaintiff pursuant to the contract's provisions governing test security procedures, plaintiff is entitled to specific performance of the contract--good-faith compliance with the stated procedures--not release of his score as though fully validated. The goal of specific performance is to produce as nearly as is practicable, the same effect as if the contract had been performed. Had the contract here been performed, defendant would have considered the information provided by plaintiff in reaching a final decision. Defendant never promised to release a score believed to be invalid, and the validity of plaintiff's score has yet to be determined. Further, like academic credentials, if courts were to require testing services to release questioned scores, the value of these credentials from the point of view of society would be seriously undermined.    Given    the    reliance    that    students, educational institutions, prospective employers and others place on the legitimacy of scores released by defendant, requiring challenged scores to be reported would be contrary to the public interest and exceed the scope of defendant's promised performance.

**COUNSEL:** *White & Case*, New York City (*Philip H. Schaeffer, J. Stepan Wood* and *William R. Spiegelberger* of counsel), and *Wilmer, Cutler & Pickering* (*Bruce Berman* and *Michael F. Bennet*, of the District of Columbia Bar, admitted *pro hac vice*, of counsel), for appellant. I. Educational Testing Service (ETS) did not breach the duty of good faith and fair dealing. (*Rowe v Great Atl. & Pac. Tea Co.*, 46 NY2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566; *Van Valkenburgh, Nooger & Neville v Hayden Publ. Co.*, 30 N.Y.2d 34, 409 U.S. 875; *Gordon v Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 410 U.S. 931; *Kirke La Shelle Co. v Armstrong Co.*, 263 NY 79, 188 N.E. 163; *Murphy v American Home Prods. Corp.*, 58 NY2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86; *Wieder v Skala*, 80 NY2d 628, 593 N.Y.S.2d 752, 609 N.E.2d 105; *Bank of China v Chan*, 937 F2d 780; *Havel v Kelsey-Hayes Co.*, 83 AD2d 380, 445 N.Y.S.2d 333; *M/A-Com Sec. Corp. v Galesi*, 904 F2d 134; *Tuttle v Grant Co.*, 5 A.D.2d 370, 6 N.Y.2d 754.) II. Notwithstanding their de novo review of the evidence, the lower courts did not find that Dalton's scores are valid. III. If ETS' review was inadequate, the matter should have been remanded to ETS for further consideration. (*Matter of Olsson v Board of Higher Educ.*, 49 NY2d 408, 426 N.Y.S.2d 248, 402 N.E.2d

1150; *Matter of Chusid v Albany Med. Coll.*, 157 A.D.2d 1019, 75 N.Y.2d 711; *Matter of Susan M. v New York Law School*, 149 A.D.2d 69, 76 N.Y.2d 241; *Matter of Yaeger v Educational Testing Serv.*, 158 AD2d 602, 551 N.Y.S.2d 574; *De Pina v Educational Testing Serv.*, 31 AD2d 744, 297 N.Y.S.2d 472; *Matter of K. D. v Educational Testing Serv.*, 87 Misc 2d 657, 386 N.Y.S.2d 747.)

*Nicolosi & Sciacca*, Bayside (*Vincent F. Nicolosi* and *Laurie S. Hershey* of counsel), for respondent. I. The lower courts only held ETS to its express and implied commitments and did not expand the implied covenant of good faith as reasonably understood by the parties. (*Wood v Lucy, Lady Duff-Gordon*, 222 NY 88, 118 N.E. 214; *Rowe v Great Atl. & Pac. Tea Co.*, 46 NY2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566; *Kirke La Shelle Co. v Armstrong Co.*, 263 NY 79, 188 N.E. 163; *Wieder v Skala*, 80 NY2d 628, 593 N.Y.S.2d 752, 609 N.E.2d 105; *De Pina v Educational Testing Serv.*, 31 AD2d 744, 297 N.Y.S.2d 472; *Matter of K. D. v Educational Testing Serv.*, 87 Misc 2d 657, 386 N.Y.S.2d 747; *Johnson v Educational Testing Serv.*, 615 F Supp 633, 754 F2d 20, 472 US 1029; *Matter of Seagroatt Floral Co. [Riccardi]*, 78 NY2d 439; *Humphrey v State of New York*, 60 NY2d 742, 469 N.Y.S.2d 661, 457 N.E.2d 767; *Najjar Indus. v City of New York [Mersereau Pumping Sta.]*, 57 NY2d 647, 454 N.Y.S.2d 65, 439 N.E.2d 874.) II. The trial court acted correctly in ordering ETS to release the scores without comment or qualification. (*Matter of Olsson v Board of Higher Educ.*, 49 NY2d 408, 426 N.Y.S.2d 248, 402 N.E.2d 1150; *Matter of Susan M. v New York Law School*, 149 A.D.2d 69, 76 N.Y.2d 241; *Lowinger v Touro Coll.*, 202 AD2d 298, 610 N.Y.S.2d 771; *Morales v New York Univ.*, 83 A.D.2d 811, 55 N.Y.2d 822; *Melvin v Union Coll.*, 195 AD2d 447, 600 N.Y.S.2d 141; *Tedeschi v Wagner Coll.*, 49 NY2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302; *Muller v Muller*, 266 NY 68, 193 N.E. 642; *Demilo Corp. v E.K. Constr. Co.*, 207 AD2d 480, 616 N.Y.S.2d 240; *Van Wagner Adv. Corp. v S & M Enters.*, 67 NY2d 186, 501 N.Y.S.2d 628, 492 N.E.2d 756; *Matter of Hall v Johnstone*, 209 AD2d 982, 620 N.Y.S.2d 630.)

**JUDGES:** Judges Titone, Bellacosa, Smith and Ciparick concur with Chief Judge Kaye; Judge Levine dissents and votes to reverse in a separate opinion in which Judge Simons concurs.

**OPINION BY:** KAYE

## OPINION

[*386] [**290] [***978] Chief Judge Kaye.

[1, 2] The primary question before us is whether defendant, Educational Testing Service (ETS), a standardized testing firm, complied with procedures specified in its contract with high school senior Brian Dalton in refusing to release Dalton's Scholastic Aptitude Test (SAT) score. Because the factual findings underlying the trial court's determination that ETS failed to act in good faith in following those procedures were affirmed by the Appellate Division, have support in the record and are consequently beyond the scope of our review, we conclude--as did the trial court and Appellate Division--that ETS breached its contract with Dalton. Though we agree, moreover, with the [*387] courts below that specific performance is the appropriate remedy, we nevertheless conclude that the promised performance was good-faith compliance with the stated procedures, not release of the questioned scores as ordered by those courts.

I

In May 1991, Brian Dalton took the SAT, which was administered by ETS, at Holy Cross High School in Queens where Dalton was a junior. Six months later, in November, he took the examination a second time, as a senior, this time at John Bowne High School in Queens, and his combined score increased 410 points.

Because Dalton's score increased by more than 350 points, his test results fell within the ETS category of "Large Score Differences" or "discrepant scores." In accordance with ETS policy, members of the ETS Test Security Office therefore reviewed his May and November answer sheets. Upon a finding of disparate handwriting, the answer sheets were submitted to a document examiner, who opined that they were completed by separate individuals. Dalton's case was then forwarded to the Board of Review, which preliminarily decided that substantial evidence supported cancelling Dalton's November score.

Upon registering for the November SAT, Dalton had signed a statement agreeing to the conditions in the New York State edition of the Registration Bulletin, which reserved to ETS "the right to cancel any test score ... if ETS believes that there is reason to question the score's validity." The Registration Bulletin further provided that,

if "the validity of a test score is questioned because it may have been obtained unfairly, ETS [will] notif[y] the test taker of the reasons for questioning the score" and offer the test-taker the following five options: (1) the opportunity to provide additional information, (2) confirmation of the score by taking a free retest, (3) authorization for ETS to cancel the score and refund all fees, (4) third-party review by any institution receiving the test score or (5) arbitration.

As specified in the Registration Bulletin, ETS apprised Dalton of its preliminary decision to cancel his November SAT score in a letter from Test Security Specialist Celeste M. Eppinger. Noting the handwriting disparity and the substantial difference between his May and November test results, Eppinger informed Dalton that "[t]he evidence suggests that [*388] someone else may have completed your answer sheet and that the questioned scores may be invalid." She advised him that he could supply "any additional information that will help explain" this or, alternatively, elect one of the other options.

Eppinger enclosed the Procedures for Questioned Scores pamphlet with her letter, which reiterated the test-taker's right to "submit additional relevant information" to the Board of Review supporting the validity of questioned scores. In cautioning test-takers to provide only information "relevant to the questions being raised," the Procedures for Questioned Scores explained, "[f]or example, character references or testimonial letters do not explain handwriting differences." As to the four additional options, the guide further explained, "ETS also offers other options ... if additional information [**291] [***979] doesn't resolve the questions about the validity of the scores. The option to provide additional information to resolve these questions may be used in combination with one or more of the[se] options."

Dalton opted to present additional information to the Board of Review, including the following: verification that he was suffering from mononucleosis during the May examination; diagnostic test results from a preparatory course he took prior to the November examination (he had taken no similar course prior to the May SAT) that were consistent with his performance on that test; a statement from an ETS proctor who remembered Dalton's presence during the November examination; and statements from two students--one previously unacquainted with Dalton--that he had been in the

classroom during that test. Dalton further provided ETS with a report from a document examiner obtained by his family who concluded that Dalton was the author of both sets of answer sheets.

ETS, after several Board of Review meetings, submitted the various handwriting exemplars to a second document examiner who, like its first, opined that the May and November tests were not completed by the same individual. As a result, ETS continued to question the validity of Dalton's November score.

At this point plaintiff Peter Dalton, father and natural guardian of Brian Dalton, filed a CPLR article 78 proceeding, later converted to an action at law, to prohibit ETS from cancelling Dalton's November SAT score and to compel immediate release of the score. Following a 12-day nonjury trial, the trial court found that ETS failed "to make even rudimentary efforts to evaluate or investigate the information" furnished by [*389] Dalton and thus concluded that ETS failed to act in good faith in determining the legitimacy of Dalton's score, thereby breaching its contract (155 Misc. 2d 214, 225). The trial court premised this conclusion on its determination that the ETS Board of Review members failed to evaluate the information submitted because they believed Dalton's presence at the November SAT to be wholly irrelevant to the handwriting issue and that he could controvert the Board's preliminary finding that the score was invalid solely by taking a retest. As a remedy for the contractual breach, the trial court ordered ETS to release the November SAT score.

The Appellate Division affirmed. It too found that ETS ignored the documentation provided by Dalton and considered only the reports of its own document examiners. Like the trial court, the Appellate Division concluded that this failure to evaluate as well as to investigate Dalton's information constituted a breach of contract. In light of these factual determinations, we agree that ETS breached its contract with Dalton but differ as to the scope of the relief.

II

By accepting ETS' standardized form agreement when he registered for the November SAT, Dalton entered into a contract with ETS (see, *AEB & Assocs. Design Group v Tonka Corp.*, 853 F. Supp. 724, 732). Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance (see,

*Van Valkenburgh, Nooger & Neville v Hayden Publ. Co.*, 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 281 N.E.2d 142, cert denied 409 U.S. 875, 34 L. Ed. 2d 128, 93 S. Ct. 125).

Encompassed within the implied obligation of each promisor to exercise good faith are " 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included' " (*Rowe v Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566, quoting 5 Williston, Contracts § 1293, at 3682 [rev ed 1937]). This embraces a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (*Kirke La Shelle Co. v Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163). Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion (see, *Tedeschi v Wagner Coll.*, 49 N.Y.2d 652, 659, 427 N.Y.S.2d 760, 404 N.E.2d 1302). The duty of [**292] [***980] good faith and fair dealing, however, is not without limits, and no obligation can be implied that "would be inconsistent with other terms of the contractual relationship" (*Murphy v American Home Prods. Corp.*, 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86).

[*390] The parties here agreed to the provisions in the Registration Bulletin, which expressly permit cancellation of a test score so long as ETS found "reason to question" its validity after offering the test-taker the five specified options. Nothing in the contract compelled ETS to prove that the test-taker cheated. Nor did the invitation to the test-taker to furnish ETS with relevant information reasonably and realistically translate into any requirement that ETS conduct a field investigation or gather evidence to verify or counter the test-taker's documentation. Indeed, such an obligation would be inconsistent with the contractual language placing the burden squarely on the test-taker to overcome the ETS finding of score invalidity. ETS, therefore, was under no duty, express or implied, to initiate an external investigation into a questioned score.

The contract, however, did require that ETS consider any relevant material that Dalton supplied to the Board of Review. The Registration Bulletin explicitly afforded Dalton the option to provide ETS with relevant information upon notification that ETS questioned the legitimacy of his test score. Having elected to offer this

option, it was certainly reasonable to expect that ETS would, at the very least, consider any relevant material submitted in reaching its final decision.

Dalton triggered this implied-in-law obligation on the part of ETS by exercising his contractual option to provide ETS with information (*compare, Matter of Yaeger v Educational Testing Serv.*, 158 A.D.2d 602, 551 N.Y.S.2d 574 [where test-taker declined to invoke any of the proffered options, ETS cancelled score in good faith and in accordance with terms of the contract]). Significantly, Dalton heeded the advice in the Procedures for Questioned Scores and tendered numerous documents that did more than simply deny allegations of wrongdoing or attest to his good character, such as medical evidence regarding his physical condition, statements by fellow test-takers, the statement of a classroom proctor and consistent diagnostic test results (*compare, Swencki v Educational Testing Serv.*, No. C 81-0689 [WD KY] [test-taker sent letter to ETS explaining that he could not have cheated]; *Matter of K. D. v Educational Testing Serv.*, 87 Misc. 2d 657, 386 N.Y.S.2d 747 [test-taker submitted sworn statement that he did not cheat]).

Nevertheless, with the exception of the document examiner's report, ETS disputes the relevancy of this information. Specifically, ETS maintains that the sole issue before the Board of Review was the disparate handwriting and that evidence regarding Dalton's health (apart from a damaged arm) or presence during both examinations is irrelevant to resolving that issue.

[*391] To be sure, the Procedures for Questioned Scores warned Dalton "to provide only additional information that is relevant to the questions being raised." The Eppinger letter to Dalton, however, informed him that his November score was possibly invalid precisely because ETS believed "that someone else may have completed [his] answer sheet." Thus, ETS expressly framed the dispositive question as one of suspected impersonation. Because the statements from the classroom proctor and November test-takers corroborated Dalton's contention that he was present at and in fact took the November examination, they were relevant to this issue.

Likewise, inasmuch as the medical documentation concerning Dalton's health at the time of the May SAT provided an explanation for his poor performance on that examination, and the consistent diagnostic test results

demonstrated his ability to achieve such a dramatic score increase, these items were also germane to the question whether it was Dalton or an imposter who completed the November examination. Indeed, in its manual, Policies and Procedures Concerning Scores of Questionable Validity--which details internal ETS procedure regarding questioned scores--ETS offers several examples of "relevant information" that a test-taker might provide, including "a doctor's report that the candidate was under the influence of medication at the time the low score was earned." Regarding "a case of [**293] [***981] possible impersonation" in particular, the manual suggests that "other test results might demonstrate that the questioned score is not inconsistent with other measures of the candidate's abilities." Thus, Dalton's material fell within ETS' own definition of relevancy, as expressed in its manual and letter to Dalton.

[1] The critical question then is whether the Board of Review made any effort to consider this relevant information submitted by Dalton. That is a factual inquiry. Both the trial court and the Appellate Division concluded that the Board utterly failed to evaluate the material. Given these affirmed findings, "our scope of review is narrow. This Court is without power to review findings of fact if such findings are supported by evidence in the record" (*Humphrey v State of New York*, 60 N.Y.2d 742, 743, 469 N.Y.S.2d 661, 457 N.E.2d 767).

Several Board of Review members--each member alone had the power to order release of Dalton's November score--testified that they believed information establishing Dalton's presence during the November examination to be irrelevant to [*392] their determination* and, moreover, that only a successful retest would validate Dalton's score. Thus, there is support in the record for the factual determinations of the trial court and Appellate Division and they are binding on us. This is so notwithstanding inconsistent testimony by Board members that the Board did review Dalton's information but found it unpersuasive. In light of the affirmed findings, the Court of Appeals simply does not have authority to weigh conflicting evidence and make its own factual determinations, as the dissent would do.

> *     For example, when Shirley Kane-Orr--chairperson of the Board of Review and a member of the three-member panel of the Board that initially reviewed Dalton's case on December 11, 1991, the panel that again

considered his case on January 3d, 1992, and the final panel to review Dalton's case on February 7, 1992--was asked whether she "or any member of the panel or the test security office ever question[ed] [Dalton's] presence in the classroom," she answered, "[n]o"; when further asked by Dalton's counsel, "[s]o am I to assume ... that since you didn't question his presence in the classroom, that it was not an issue in this case," she responded, "[i]t was a non-issue in the sense that [it] was not an issue at all to be considered whether or not he was in the classroom." Likewise, Sydell Carlton, member of the panel that considered Dalton's case on January 17, 1992, was also asked whether she ever questioned Dalton's presence in the classroom, to which she replied, "[t]hat was not an issue for us to decide. The issue for us to decide was, why are those handwritings disparate? His presence in the room was not, for us, in issue."

Consequently, this case is factually distinct from those relied upon by ETS, where the testing service considered but then rejected information provided by the test-taker (see, e.g., Langston v ACT, 890 F.2d 380; Denburg v Educational Testing Serv., No. C-1715-83 [NJ Super Ct]; cf., Johnson v Educational Testing Serv., 754 F.2d 20, 26, cert denied 472 U.S. 1029, 87 L. Ed. 2d 635, 105 S. Ct. 3504 [noting that ETS provided test-taker with opportunity to be heard and to be represented by counsel]). When ETS fulfills its contractual obligation to consider relevant material provided by the test-taker and otherwise acts in good faith, the testing service--not the courts--must be the final arbiter of both the appropriate weight to accord that material and the validity of the test score. This Court will not interfere with that discretionary determination unless it is performed arbitrarily or irrationally.

Where, however, ETS refuses to exercise its discretion in the first instance by declining even to consider relevant material submitted by the test-taker, the legal question is whether this refusal breached an express or implied term of the contract, not whether it was arbitrary or irrational. Here, the courts below agreed that ETS did not consider the relevant information [*393] furnished by Dalton. By doing so, ETS failed to comply in good faith with its own test security procedures, thereby breaching its contract with Dalton.

The dissent urges that because the trial court and Appellate Division relied in part on ETS' failure to investigate Dalton's information, they arguably employed an erroneous legal standard. Overlooked, however, is that both courts also concluded that ETS' refusal to evaluate the material breached the contract with Dalton and, thus, employed a correct legal standard. Moreover, the crucial [**294] [***982] factual inquiry under the correct standard--whether ETS considered Dalton's relevant material--has already been resolved by those courts. Because this factual finding dictates the legal conclusion that ETS breached the contract, remittal is unnecessary.

III

[2] We agree with the trial court and Appellate Division that Dalton is entitled to specific performance of the contract. Dalton is not, however, entitled to release of his score as though fully validated. The goal of specific performance is to produce "as nearly as is practicable, the same effect as if the contract had been performed" (Farnsworth, Contracts § 12.5, at 823 [1982]). Had the contract here been performed, ETS would have considered the information provided by Dalton in reaching a final decision. ETS never promised to release a score believed to be invalid, and the validity of Dalton's November SAT score has yet to be determined. Indeed, the trial court specifically noted that it was not resolving the question whether Dalton in fact took the November test.

In an analogous context, we have refused to compel a university to issue a degree to a student who had not fulfilled the academic requirements (see, Matter of Olsson v Board of Higher Educ., 49 N.Y.2d 408, 426 N.Y.S.2d 248, 402 N.E.2d 1150). This reluctance to interfere with the exercise of academic discretion is motivated by sound considerations of public policy. "When an educational institution issues a diploma to one of its students, it is, in effect, certifying to society that the student possesses all of the knowledge and skills that are required by his [or her] chosen discipline" (id., at 413). Likewise, we have held that a college did not act arbitrarily in declining to "round off" a student's failing grade so that she could graduate (see, Matter of McIntosh v Borough of Manhattan Community Coll., 78 A.D.2d 839, 433 N.Y.S.2d 446, affd 55 N.Y.2d 913, 449 N.Y.S.2d 26, 433 N.E.2d 1274).

The comparison between ETS and academic institutions is surely not exact, inasmuch as judicial

restraint in matters of [*394] academic achievement is based, in part, on the inherently subjective nature of the evaluation to be made by professional educators (see, *Tedeschi v Wagner Coll.*, 49 N.Y.2d 652, 658, 427 N.Y.S.2d 760, 404 N.E.2d 1302, *supra*). Still, similar policy concerns militate against directing ETS to release a questioned score. When a standardized testing service reports a score, it certifies to the world that the test-taker possesses the requisite knowledge and skills to achieve the particular score. Like academic credentials, if courts were to require testing services to release questioned scores, "the value of these credentials from the point of view of society would be seriously undermined" (*Olsson, supra,* at 413). Given the reliance that students, educational institutions, prospective employers and others place on the legitimacy of scores released by ETS, requiring challenged scores to be reported would be contrary to the public interest and exceed the scope of ETS' promised performance.

While courts as a matter of policy are reluctant to intrude upon academic discretion in educational matters, they stand ready as a matter of law and equity to enforce contract rights. Where a contract is breached, moreover, and the injured party is entitled to specific performance, the remedy must be a real one, not an exercise in futility.

Dalton is entitled to relief that comports with ETS' contractual promise--good-faith consideration of the material he submitted to ETS. We cannot agree with Dalton's assumption that ETS will merely rubber-stamp its prior determination without good-faith attention to his documentation and that reconsideration by ETS will be an empty exercise. Our conclusion that the contract affords Dalton a meaningful remedy rests also on the provision in the Procedures for Questioned Scores allowing Dalton to utilize one or more of the remaining four options in combination with renewed consideration by the Board of Review. Those options--including third-party review by any institution receiving the test score as well as arbitration--remain available should ETS determine that the information submitted fails to resolve its concerns about the validity of the November score.

Accordingly, the Appellate Division order should be modified in accordance with this [**295] [***983] opinion and, as so modified, affirmed, without costs.

**DISSENT BY: LEVINE**

**DISSENT**

Levine, J. (Dissenting). I agree with the majority that the Educational Testing Service (ETS) had no duty, express or implied, to investigate the information submitted by Brian [*395] Dalton. However, I do not agree that we are bound by the factual determinations of the lower courts, which are based on an erroneous legal standard, or that the record contains any evidence that ETS arbitrarily failed to consider the materials submitted by Dalton. I, therefore, respectfully dissent.

A primary obligation of ETS as administrator of the SAT and other scholastic aptitude tests heavily relied upon by institutions of higher education is to certify that released scores accurately reflect the performance on the test of the identified test taker. The college admission process is highly dependent on the authenticity of the SAT scores released by ETS, as are other test takers whose scores are valued in relation to those of all others who take the exam and are competing for admission. In order to ensure the reliability of its certification process, ETS has established elaborate procedures that balance the harms to institutions and other candidates of the release of possibly invalid scores against the detriment to students whose scores are challenged as potentially invalid. The procedures established by ETS are unquestionably fair; they give test takers whose scores are questioned opportunity after opportunity to validate their scores. In the end, however, ETS as a practical necessity must be the final arbiter of whether it can honestly certify the validity of a student's score. Thus, the standard contract between ETS and test takers reserves to ETS the right "to cancel any test score ... if ETS believes that *there is reason to question* the score's validity [emphasis supplied]."

Peter Dalton, Brian Dalton's father, brought this suit based on the claim that ETS treated Brian Dalton unfairly because it did not conduct a thorough investigation of the material Brian submitted to ETS when his scores were questioned. The trial court accepted Dalton's argument. * Thus, to support its conclusion that ETS failed "to make even rudimentary efforts to evaluate or investigate the information furnished by" Dalton and thus failed to act in good faith in carrying out its obligations to Dalton, the court pointed to ETS's failure to make contact with or question the proctor, the test administrator, or other students who gave evidence that tended to show that Dalton was present, and to ETS's refusal to conduct fingerprint [*396] or lie detector tests on Dalton (155 Misc. 2d 214, 225). Likewise, the Appellate Division

clearly considered ETS's failure to investigate as a factor in its ultimate conclusion that ETS acted without good faith: "The practice of ignoring Dalton's evidence *without even initiating a preliminary investigation* clearly demonstrate a lack of good faith by ETS" (206 A.D.2d 402, 403 [emphasis supplied]).

> *  Notably, Dalton's scores had not been finally cancelled at the inception of this suit. Dalton had been offered, but refused, the opportunity to validate his scores by taking another test at the expense of ETS and scoring within a specified range of his November score, or to submit the matter to arbitration.

My colleagues in the majority here, however, correctly conclude that ETS had no express or implied duty to investigate. Thus, it seems indisputable that the ultimate determinations of the courts below--that ETS breached its implied covenant of good faith and fair dealing--were reached at least in significant part by reliance on an erroneous legal standard, that ETS had a duty to investigate. Thus, at a minimum, reversal and remittal for new findings based on the proper legal standard is required here.

However, applying the correct legal standard to the record evidence, it is my conclusion that ETS fulfilled its contractual obligations as a matter of law and, therefore, we should reverse and dismiss the Daltons' complaint.

As the Chief Judge concludes, ETS was contractually obligated to consider any relevant material that Dalton supplied the Board of Review (majority opn, at 390). After considering [**296] [***984] that evidence, ETS had the stated right to cancel Dalton's test score if it possessed "a reason to question" the score's validity. Thus, it seems self-evident that ETS expressly reserved to itself substantial discretion on whether to refuse to certify a test score.

To be sure, there is a covenant of good faith and fair dealing implicit in the contract between Dalton and ETS (*see, Rowe v Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 68, 412 N.Y.S.2d 827, 385 N.E.2d 566; *Van Valkenburgh, Nooger & Neville v Hayden Publ. Co.,* 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 281 N.E.2d 142, *cert denied* 409 U.S. 875, 34 L. Ed. 2d 128, 93 S. Ct. 125). It requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (*Kirke La*

*Shelle Co. v Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163). In this way, the implied covenant "is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship" (*Murphy v American Home Prods. Corp.,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 [rejecting application of implied covenant to at-will employment contracts]). Where good faith is an *express* condition of a contract that contemplates a wide scope of discretion on the part of one party, there [*397] is no breach if the discretionary act performed is "not arbitrary and capricious" (*Smith v Robson,* 148 N.Y. 252, 255, 42 N.E. 677; *see also,* 3A Corbin, Contracts § 647, at 104-106). The implied covenant does no more; it works only to ensure that a party with whom discretion is vested does not act arbitrarily or irrationally (*see, e.g., Tedeschi v Wagner Coll.,* 49 N.Y.2d 652, 659, 427 N.Y.S.2d 760, 404 N.E.2d 1302).

Thus, the issue here is whether there is evidence that ETS performed its discretionary functions arbitrarily or irrationally, or with bad faith in fact (*cf., Langston v ACT,* 890 F.2d 380, 386; *Johnson v Educational Testing Serv.,* 754 F.2d 20, *cert denied* 472 U.S. 1029, 87 L. Ed. 2d 635, 105 S. Ct. 3504 [American College Testing Program only contractually required to act in good faith]).

Here, there was no evidence of bad faith in fact. Moreover, ETS had two definitive reports of highly qualified handwriting experts, of proven reliability, that the November 1991 answer sheet was filled out by someone other than the person who filled out the May 1991 exam answer sheet and the documents known to have been signed or produced by Brian Dalton. Surely it was not irrational or arbitrary for ETS to find that the unexplained disparate handwriting on the November 1991 answer sheet gave it reason to question the validity of the second test score. The courts below did not find otherwise. Nor can it be said that, as a matter of law, the evidence submitted by Dalton totally obviated the reasons ETS had to question the test score. It was, therefore, not a breach of the implied covenant of good faith to refuse to certify Dalton's scores after consideration of the evidence submitted, and the majority does not so hold.

Rather the majority holds that there is evidence that ETS breached its implied covenant of good faith in its deliberative process in failing "to consider" Dalton's submissions (majority opn, at 391). However, the

Case 4:13-cv-03660-SBA   Document 1-2   Filed 08/07/13   Page 46 of 224

uncontroverted evidence accepted by the courts below
and the majority here is that when ETS received the
information submitted by Dalton it did not totally
disregard it. Rather, it considered it and judged it
weighty enough to merit further evaluation. Thus, it is
undeniable that ETS responded to the submissions by
retaining another handwriting expert to get a third
evaluation of the documents. In addition, ETS submitted
Dalton's additional handwriting samples to its first
handwriting expert for a second evaluation.

To overcome this concrete evidence of consideration,
the majority points to selectively narrow portions of the
record in which ETS Board of Review members testified
that they deemed irrelevant Dalton's evidence that tended
to show he [*398] was in the room on the day the test
was given as evidence that ETS "failed to consider"
Dalton's submissions, which in turn supported the
determination of its breach of the implied covenant of
good faith and fair dealing. I disagree.

[**297] [***985] Again, it is uncontroverted that
each member of the ETS Board of Review gave a *reason*
why he or she found Dalton's submissions irrelevant.
Therefore, a breach of the implied covenant of good faith
and fair dealing could only be established if the *reason*
the Board members gave to deem irrelevant Dalton's
submissions was arbitrary, capricious or irrational. Each
Board member testified that the evidence did not explain
their one lingering crucial doubt, the disparate
handwriting, which was the exact doubt communicated to
Dalton by ETS--"someone else may have completed [the]
answer sheet" (Dec. 11, 1991 letter to Brian Dalton).
Because the reason to deem irrelevant Dalton's evidence

of presence was not irrational, arbitrary or capricious it
cannot, as a matter of law, form the basis of a breach of
the implied covenant of good faith. It is only by
substituting its judgment for that of ETS as to what
should have been deemed relevant evidence that the
majority finds evidence of bad faith. However, "[w]hen
an [institutional decision maker] ... acts within its
jurisdiction, not arbitrarily but in the exercise of an
honest discretion based on facts within its knowledge that
justify the exercise of discretion, a court may not review
the exercise of its discretion" (*Matter of Carr v St. John's
Univ.,* 17 A.D.2d 632, 634, 231 N.Y.S.2d 410, *affd* 12
N.Y.2d 802, 235 N.Y.S.2d 834, 187 N.E.2d 18; *see also,
Matter of Harris v Trustees of Columbia Univ.,* 98
A.D.2d 58, 70, 470 N.Y.S.2d 368 [Kassal, J., dissenting],
*revd on dissenting opn below* 62 N.Y.2d 956).

In sum, ETS acted within its discretion in continuing
the security process rather than releasing the score after
considering and rejecting Dalton's evidence. There is no
evidence that ETS acted arbitrarily in its discretionary
decision-making process. Hence there is no evidence that
ETS breached any express or implied covenant in its
contract with Dalton. Accordingly, I would reverse the
order of the Appellate Division and dismiss the
complaint.

Judges Titone, Bellacosa, Smith and Ciparick concur
with Chief Judge Kaye; Judge Levine dissents and votes
to reverse in a separate opinion in which Judge Simons
concurs.

Order modified in accordance with the opinion
herein and, as so modified, affirmed, without costs.

**Tab 3**



**KERRY JOSEPH MURRAY, Plaintiff-Appellant, versus EDUCATIONAL TESTING SERVICE, Defendant-Appellee.**

**No. 98-30425 Summary Calendar**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

**170 F.3d 514; 1999 U.S. App. LEXIS 6096**

**April 6, 1999, Decided**

**SUBSEQUENT HISTORY:**     [**1]  As Amended
April 8, 1999.

**PRIOR HISTORY:**     Appeal from the United States
District Court for the Middle District of Louisiana.
97-CV-30. John V Parker, Chief Judge.

**DISPOSITION:**  AFFIRMED.

**COUNSEL:** For KERRY JOSEPH MURRAY, Plaintiff
- Appellant: Kevin L James, Kevin L James &
Associates, Baton Rouge, LA.

For EDUCATIONAL TESTING SERVICE, Defendant -
Appellee: Keith M Pyburn, Jr, McCalla, Thompson,
Pyburn, Hymowitz & Shapiro, New Orleans, LA.
Heather G Magier, New Orleans, LA.

**JUDGES:** Before GARWOOD, JONES and
BARKSDALE, Circuit Judges.

**OPINION BY:** GARWOOD

**OPINION**

[*514] GARWOOD, Circuit Judge:

This case involves a contractual dispute between
plaintiff-appellant Kerry Murray (Murray) and
defendant-appellee Educational Testing Service (ETS),

the administrator of the Scholastic Aptitude Test (SAT).
Based on the undisputed facts, the district court granted
summary judgment in favor of ETS. We affirm.

**Facts and Proceedings Below**

ETS is a non-profit educational organization that
administers the SAT I: Reasoning Test (SAT I). The SAT
I is a multiple-choice test designed to provide students
and colleges with a uniform measure of verbal and
mathematical reasoning abilities. Many colleges and
universities [**2] require students to take the SAT I, and
use the students' SAT I scores as a factor in determining
college admissions.

The SAT I is divided into seven sections. Scores are
reported on six sections, three verbal and three math.
These scores are calculated to achieve separate verbal and
math scores, which are then added together to create a
combined, or total, score. The seventh "variable" section
contains new questions that require pretesting before they
can officially be used. Scores on the variable section are
not reported. The variable sections vary among test
books.

[*515] The ETS maintains procedures to ensure that
test scores are accurate and not the result of "testing
irregularities or misconduct." The SAT I registration
bulletin (bulletin), which all students must sign before
taking the test, clearly states ETS's policy of reviewing
irregular scores and explicitly reserves ETS's right to

withhold any score which it has reason to believe was the result of misconduct. [1] The bulletin also outlines procedures which ETS follows in the case of a questionable score. [2]

[1]

> "The College Board is obligated to report scores that accurately reflect your performance. For this reason, ETS maintains, on behalf of the College Board, test administration and test security standards designed to assure that all test takers are given the same opportunity to demonstrate their abilities and to prevent any student from gaining an unfair advantage over others because of testing irregularities or misconduct. ETS routinely reviews irregularities and test scores believed to be earned under unusual or questionable circumstances.

> ETS reserves the right to cancel any test score if there is an apparent discrepancy in photo identification, if the student engages in misconduct, if there is a testing irregularity, of if ETS believes there is a reason to question the score's validity."

[**3]
[2]

> "When the validity of a test score is questioned because it may have been obtained unfairly, ETS notifies the test taker of the reasons for questioning the score and gives the student an opportunity to provide additional information, to confirm the questioned score by taking the test again . . ., or to authorize ETS to cancel the score and receive a refund of all test fees.

> In addition, the test taker can

request third-party review of the matter by asking any score recipient to review the information and make its own decision about accepting a score that may be invalid or by asking that a member of the American Arbitration Association arbitrate ETS's action in accordance with ETS procedures established for this purpose . . . ."

ETS regularly reviews test takers' scores and compares those to any scores that test taker received on a previous SAT I test. When ETS finds a large score increase, it further examines the student's score sheet to determine whether misconduct may have occurred. ETS defines a large score increase as a 250-point increase in either the verbal or math section, [**4] or a 350-point total score increase. [3]

> [3] The highest possible combined score is 1600. In 1995, ETS conducted a statistical analysis of students who took the SAT as juniors in the spring of 1995 and again as seniors in the fall of 1995. On average, those students increased their scores by 14 points in both the verbal and math sections--for a total increase of 28 points. Only 0.4% of those students improved their scores by 150 points on either section. Of the 1,772 students scoring 700 (combined) on the spring 1995 test, only six received combined scores over 1,000 on the fall 1995 test. The highest of those scores was 1130.

Murray was a student at McKinley Senior High School in Baton Rouge, Louisiana, who had been promised a basketball scholarship by the University of Texas-El Paso. In order to receive the scholarship, Murray was required to achieve a minimum combined score of 820 (on a scale of 200 to 1600) on the SAT I. Murray took the SAT I on March 26, 1996, and achieved a combined score of 700. Because [**5] he failed to achieve the required score of 820, Murray enrolled in "Testbusters," a four-week course designed to raise SAT I scores. On June 1, 1996, Murray retook the SAT I. This time, Murray achieved a combined score of 1300.

The large score difference between Murray's March 26 and June 1 exam caused ETS to closely examine Murray's scores. Following standard review procedure,

ETS conducted a computer analysis comparing Murray's June 1, 1996, answer sheets to those of other students who took the SAT I at the same time and location. The analysis revealed an unusual correspondence between Murray's answer sheet and that of another test-taker (test-taker B). According to statistical analysis, the number of Murray's incorrect answers matching test-taker B's incorrect answers could be expected to occur only three times in comparing one hundred million pairs of answer sheets. ETS also conducted an "erasure analysis," which showed a substantial number of erasure marks on Murray's answer sheet where answers apparently had been changed to match answers on test-taker B's answer sheet. Further, ETS compared Murray's answers on the variable section of the test to test-taker B's answers on the [**6] variable section. Although the respective variable sections of the two tests were different, Murray's responses to thirteen of the fifteen questions on that section matched [*516] test-taker B's responses. While test-taker B answered all fifteen questions correctly on the variable section, only three of Murray's responses were correct. Based on this information, ETS referred Murray's scores to a Board of Review for investigation. The Board of Review determined that ETS should continue to withhold Murray's scores. Upon further investigation, the Board of Review learned that test-taker B was seated diagonally in front of Murray during the test.

On August 22, 1996, ETS informed Murray that an investigation of his June 1996 scores revealed substantial evidence supporting cancellation of his scores. ETS informed Murray that, as described in the bulletin, Murray could provide ETS with information supporting the validity of his scores, retake the test, ask ETS to cancel the scores and obtain a refund, or request third-party review.

Murray provided ETS with a letter from his mother, academic records, and a letter stating that he had enrolled in the Testbusters course between the March [**7] 26 and June 1 test dates. On September 20, 1996, ETS informed Murray that despite the additional evidence, the Board of Review still believed it had substantial evidence to warrant canceling Murray's scores. ETS informed Murray of his right to retake the test, cancel the scores and obtain a refund, or seek third party review.

Murray requested information about arbitration, but ultimately decided to take the test again. Murray took the

SAT I again on November 8, 1996. His combined score was 800 (420 verbal and 380 math). On November 21, 1996, ETS informed Murray that the retest did not confirm the validity of his June 1, 1996, scores, and those scores would be canceled if Murray did nothing further.

ETS notified Murray of his remaining rights, including canceling the scores and obtaining a refund, asking any college, university, or agency to independently review his file, or arbitration. ETS also informed Murray of his right to seek judicial review. Murray filed suit in federal court, alleging that ETS breached its contract with Murray by failing to release the June 1, 1996, scores. [4]

> 4   Murray also alleged a purported claim under 42 U.S.C. § 1983 for deprivation of his civil rights without due process of law. The district court dismissed that claim for lack of state action. Murray does not challenge that ruling on appeal.

[**8] Discussion

This Court reviews a summary judgment de novo, applying the same standards as the district court. Merritt-Campbell, Inc. v. RXP Products, Inc., 164 F.3d 957, 961 (5th Cir. 1999). Summary judgment is proper where the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986), quoting Fed. R. Civ. P. 56(c). Once the moving party has identified material facts not in genuine dispute, the nonmovant must come forward with or identify in the record summary judgment evidence sufficient to sustain a finding in its favor respecting such of those facts as to which it bears the trial burden of proof. Smith v. Brenoettsy, 158 F.3d 908, 911 (5th Cir. 1998). [**9]

No genuine issue of material fact exists as to whether ETS breached its contract with Murray. ETS's contract with Murray clearly and explicitly reserved to ETS the right to withhold any scores ETS had reason to believe were not valid. The only contractual duty ETS owed to Murray was to investigate the validity of Murray's scores in good faith. See Pogo Producing Co. v. Shell Offshore Oil, Inc., 898 F.2d 1064, 1067 (5th Cir. 1990) ("Louisiana law imposes upon contracting parties the obligation to perform contracts in good faith.") (citing La. Civ. Code arts. 1759, 1983.). See also Johnson v.

*Educational Testing Service*, 754 F.2d 20, 26 (1st Cir. 1985) (Massachusetts law requires ETS to investigate scores in good faith).

ETS fulfilled that duty by allowing Murray to present evidence supporting his scores, informing Murray of his right to seek independent review, and ultimately allowing Murray to retake the test. *See Langston v. ACT*, 890 F.2d 380 (11th Cir. 1989) (testing agency fulfilled contractual duty by faithfully investigating questionable [**10] test score, allowing plaintiff [*517] to retake test, and offering to submit to arbitration); *Johnson*, 754 F.2d at 26 (consulting handwriting expert, providing plaintiff opportunity to be heard, and offering retest were evidence of good faith).

Several courts, including this one, have recognized the importance of allowing ETS to assure itself of the validity of students' scores through internal review procedures. ETS provides a valuable service to colleges and universities by providing a standardized measure of students' ability. *See, e.g., Crow v. Educational Testing Service*, 1982 U.S. Dist. LEXIS 18191, Civ. No. 80-1865, (W.D. La. 1982) (recognizing "the valuable service performed by ETS and its obligations and duties to the [schools] to accurately predict the aptitude of candidates."), *aff'd,* 703 F.2d 556 (5th Cir. 1983) (table); *K.D. v. Educational Testing Service*, 87 Misc. 2d 657, 386 N.Y.S.2d 747, 752 (N.Y. Sup. Ct. 1976) ("To the extent that [ETS] can accurately predict the aptitude of a candidate . . . by means of its test results, it performs a highly valuable service not only to the [schools] [**11] but to the public as well."). Accordingly, ETS has an obligation to provide, or use its best efforts to provide, only valid scores to the colleges and universities that rely on ETS's services. *Id.* Moreover, ETS has the right to protect its own reputation by assuring the reliability of the information it provides. *See, e.g., Scott v. Educational Testing Service*, 252 N.J. Super. 610, 600 A.2d 500, 504 (N.J. Sup. Ct. App. Div. 1991) ("ETS has an interest in assuring the accuracy of the test results it reports and the predictions it thereby makes."); *K.D.*, 386 N.Y.S.2d at 752 ("The accuracy of its predictions is defendant's sole stock in trade. The less accurate as a forecaster its tests are, the less value they have to the . . . schools. Thus, if defendant reasonably believed that the tests scores . . . did not accurately reflect [the plaintiff's] aptitude . . ., it acted within its right to protect its own image . . . in cancelling plaintiff's scores and requiring him to take a retest."). Finally, "the other test-takers are entitled to assurance

that no examinee enjoys an unfair advantage in scoring." *Scott*, 600 A.2d at 504. [**12] In this case, ETS dutifully fulfilled its contract with Murray by following established procedures for determining the validity of questionable scores. ETS provided the district court with substantial evidence regarding its reasons for questioning Murray's scores and the procedures it followed to determine whether Murray's score should be withheld. Moreover, ETS provided the district court with copies of its policies and procedures, as well as the testing agreement which every student must sign before taking the SAT I.

On appeal, Murray raises only mistaken claims of district court confusion [5] and conclusory accusations of breach of contract. Murray has presented no summary judgment evidence disputing that ETS had grounds to doubt Murray's scores or that ETS failed to pursue Murray's case in good faith and, indeed, reasonably. As all of the aforementioned facts remain uncontested, there is no genuine dispute as to material facts. Summary judgment was properly granted and the judgment of the district court is

AFFIRMED.

5 Murray accuses the lower court of "confusing the issues" and applying an improper standard of review by ruling on ETS's alternative motion to dismiss or for summary judgment. However, the district court explicitly stated that it was granting the motion on summary judgment grounds.

Murray also claims that the district court improperly considered the merits of the claim by noting that ETS had substantial reason to question Murray's scores. Here, the district court was merely noting that ETS had fulfilled its obligation under the contract. The court was not, as Murray suggests, offering an opinion as to whether Murray had actually cheated on the test. *See Crow v. Educational Testing Service*, 1982 U.S. Dist. LEXIS 18191, Civ. No. 80-1865 (W.D. La. 1982) ("The issue before this court is not whether or not [plaintiff] cheated on the test; the issue is whether or not ETS could refuse to release the score."), *aff'd* 703 F.2d 556 (5th Cir. 1983) (table).

[**13]

1   Nancy L. Fineman (Cal. SBN 124870)
    nfineman@cpmlegal.com
2   Aron K. Liang (Cal. SBN 228936)
    aliang@cpmlegal.com
3   **COTCHETT, PITRE & McCARTHY LLP**
    San Francisco Airport Office Center
4   840 Malcolm Road, Suite 200
    Burlingame, CA  94010
5   Telephone:    (650) 697-6000
    Facsimile:    (650) 697-0577
6
    Gregory A. Wedner (Cal. SBN 67965)          Jack W. Lee (Cal. SBN 71626)
7   gwedner@lozanosmith.com                     jlee@minamitamaki.com
    **LOZANO SMITH**                            Sean Tamura-Sato (Cal. SBN 254092)
8   One Capitol Mall, Suite 640                 seant@minamitamaki.com
    Sacramento, CA 95814                        **MINAMI TAMAKI LLP**
9   Telephone:  (916) 329-7433                  360 Post Street, 8th Floor
    Facsimile:  (916) 329-9050                  San Francisco, California 94108-4903
10                                              Telephone: 415 788 9000
    *Attorneys for Petitioner/Plaintiff San Mateo*   Facsimile: 415 398 3887
11  *Union High School District*

12                                              *Attorneys for Petitioner/Plaintiff AP Students –*
                                                *Viking Parent Group*

13

14              **IN THE SUPERIOR COURT OF CALIFORNIA**

15            **IN AND FOR THE COUNTY OF SAN MATEO**

16

| 17 | **SAN MATEO UNION HIGH SCHOOL** ) | **CASE NO. Civ. 523184** |
|---|---|---|
| 18 | **DISTRICT, individually and on behalf** ) | |
| | **of the members of the SAN MATEO** ) | **PLAINTIFFS' DECLARATIONS IN** |
| 19 | **UNION HIGH SCHOOL DISTRICT** ) | **SUPPORT OF *EX PARTE* APPLICATION** |
| | **and AP STUDENTS - VIKING** ) | **FOR TEMPORARY RESTRAINING** |
| 20 | **PARENT GROUP,** ) | **ORDER AND ORDER TO SHOW CAUSE** |
| | ) | **RE PRELIMINARY INJUNCTION** |
| 21 | **Plaintiffs,** ) | |
| | **v.** ) | |
| 22 | **EDUCATIONAL TESTING** ) | Date:        August 8, 2013 |
| | **SERVICES, a New York corporation;** ) | Time:        2:00 p.m. |
| 23 | **and COLLEGE ENTRANCE** ) | Department:  21 |
| | **EXAMINATION BOARD, a New York** ) | Judge:       Judge Robert D. Foiles |
| 24 | **corporation; and DOES 1 through 10,** ) | |
| | **inclusive,** ) | |
| 25 | **Defendants.** ) | |

26

27

28

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

1    Plaintiffs respectfully submit the following Declarations in support of their *Ex Parte*

2   Application for a Temporary Restraining Order and Order to Show Cause re Preliminary

3   Injunction:

4       ***Attorney***

5           A.    Nancy L. Fineman

6       ***Mills High School Administration***

7           B.    Valerie Arbizu (Assistant Principal)

8           C.    Paul Belzer (Principal)

9       ***Mills High School Students***

10          D.    Kelly Chao

11          E.    Darren Fong

12          F.    Jennifer Kao

13          G.    Jessica Liang

14          H.    Nathan Li

15          I.    Grant Murphy

16          J.    Christopher Tarangioli

17          K.    Songyi Xu

18          L.    Brandon Ye

19          M.    Jason Zhang

20      ***Mills High School Parent***

21          N.    Paul Seto

22      ***Proctors***

23          O.    Janet Choy

24          P.    Jean Joh

25          Q.    Gordon Lee

26

27

28

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

**PLAINTIFFS' DECLARATIONS ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND OSC RE PRELIMINARY INJUNCTION; Case No. 523184**

1

1    Except for the Declaration of Nancy L. Fineman, Plaintiffs' counsel obtained the

2  signatures by fax or email.  They will submit original signatures if the Court or Defendants

3  request.

4  Dated:  August 6, 2013                    **COTCHETT, PITRE & McCARTHY LLP**

5

6                                            By:

7                                                 NANCY L. FINEMAN

8                                            **LOZANO SMITH**

9

10                                           By:
                                                 GREGORY A. WEDNER

11
                                             *Attorneys for Petitioner/Plaintiff*
12                                           *San Mateo Union High School District*

13                                           **MINAMI TAMAKI LLP**

14                                           By:
15                                                 JACK W. LEE

16                                           *Attorneys for Petitioner/Plaintiff*
                                             *AP Students - Viking Parent Group*
17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

**PLAINTIFFS' DECLARATIONS ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND OSC RE PRELIMINARY INJUNCTION; Case No. 523184**                        2

# EXHIBIT A

1 | Nancy L. Fineman (Cal. SBN 124870)
nfineman@cpmlegal.com
2 | Aron K. Liang (Cal. SBN 228936)
aliang@cpmlegal.com
3 | **COTCHETT, PITRE & McCARTHY LLP**
San Francisco Airport Office Center
4 | 840 Malcolm Road, Suite 200
Burlingame, CA  94010
5 | Telephone:    (650) 697-6000
Facsimile:    (650) 697-0577
6 |
7 | Gregory A. Wedner (Cal. SBN 67965)
gwedner@lozanosmith.com
**LOZANO SMITH**
8 | One Capitol Mall, Suite 640
Sacramento, CA 95814
9 | Telephone: (916) 329-7433
Facsimile: (916) 329-9050
10 |
*Attorneys for Petitioner/Plaintiff San Mateo*
11 | *Union High School District*
12 |
13 |

Jack W. Lee (Cal. SBN 71626)
jlee@minamitamaki.com
Sean Tamura-Sato (Cal. SBN 254092)
seant@minamitamaki.com
**MINAMI TAMAKI LLP**
360 Post Street, 8th Floor
San Francisco, California 94108-4903
Telephone: 415 788 9000
Facsimile: 415 398 3887

*Attorneys for Petitioner/Plaintiff AP Students –*
*Viking Parent Group*

14 | ## IN THE SUPERIOR COURT OF CALIFORNIA

15 | ## IN AND FOR THE COUNTY OF SAN MATEO

16 |

17 | **SAN MATEO UNION HIGH SCHOOL**
**DISTRICT, individually and on behalf**
18 | **of the members of the SAN MATEO**
**UNION HIGH SCHOOL DISTRICT**
19 | **and AP STUDENTS - VIKING**
**PARENT GROUP,**
20 |
                        **Plaintiffs,**
21 |                            v.
22 | **EDUCATIONAL TESTING**
**SERVICES, a New York corporation;**
23 | **and COLLEGE ENTRANCE**
**EXAMINATION BOARD, a New York**
24 | **corporation; and DOES 1 through 10,**
**inclusive,**
25 |                      **Defendants.**

**CASE NO. Civ. 523184**

**DECLARATION OF NANCY L. FINEMAN**
**IN SUPPORT OF PLAINTIFFS'** *EX PARTE*
**APPLICATION FOR TEMPORARY**
**RESTRAINING ORDER AND ORDER TO**
**SHOW CAUSE RE PRELIMINARY**
**INJUNCTION**

Date:          August 8, 2013
Time:          2:00 p.m.
Department:     21
Judge:         Judge Robert D. Foiles

26 |
27 |
28 |

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

**DECL. OF NANCY L. FINEMAN ISO PLAINTIFFS'** *EX PARTE* **APPLICATION FOR TEMPORARY**
**RESTRAINING ORDER AND OSC RE PRELIMINARY INJUNCTION; Case No. 523184**

I, Nancy L. Fineman, hereby declare as follows:

1.     I am an attorney duly licensed to practice before this Court and all courts of this State and am a partner with the law firm of Cotchett, Pitre & McCarthy, LLP, counsel for Plaintiff San Mateo Union High School District.  Except as otherwise stated, the matters set forth herein are within my personal knowledge and if called and sworn as a witness I could competently testify regarding them.

2.     Pursuant to California Rule of Court 3.1203, Plaintiffs, on August 5, 2013 when we served the complaint, informed Defendants of our intention to seek a Temporary Restraining Order to Show Cause why a preliminary injunction should not issue, and the nature of the relief requested by email to Bruce Berman of WilmerHale and personal service through a process server.  A true and correct copy of the letter that I sent is attached as <u>Exhibit 1</u>.  I had previously spoken to Mr. Berman about the case and he told me that he represented Educational Testing Services ("ETS").  We had originally scheduled the *Ex Parte* Hearing for August 7, 2013, but at the request of Mr. Berman  the hearing was rescheduled for August 8, 2013.  Attached as <u>Exhibit 2</u> is a true and correct copy of the email exchange between Aron Liang, an attorney in this office and Mr. Berman about rescheduling the hearing and Mr. Berman advising us that he would accept service of the *Ex Parte* papers on behalf of both the College Entrance Examination Board and ETS.

3.     As part of our investigation to prepare the Complaint and this *Ex Parte*, we researched other situations where Defendants had invalidated test scores.  We only found two examples of test invalidations of school scores in California.  The first involved Trabuco Hills in Orange County, California.  The Request for Judicial Notice has some of the pleadings that were filed in that case.  The court in that case denied, without explanation in the written order, the request for the Temporary Restraining Order.  Unlike in this case where there is no evidence of misconduct or cheating, in Trabuco Hills, there were 40 students who were identified as cheating.

4.     The second case involved Skyline High in Oakland.  During our research, we found an article from the *Skyline Oracle* about the invalidation of the AP tests and a letter from

**DECL. OF NANCY L. FINEMAN ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC RE PRELIMINARY INJUNCTION; Case No. 523184**          1

1  the principal about the situation.  A true and correct copy of the article found on the Internet is

2  attached as <u>Exhibit 3</u> and can be found at

3  www.skylineoracle.com/news/2011/10/31/investigation-voids-ap-exam-scores-ets-cites-'testing-

4  irregularies'/.  Attached as <u>Exhibit 4</u> is a copy of a letter dated July 27, 2011 purportedly from the

5  principal of Skyline High to the high school community which is attached to the following blog

6  about the Skyline incident:

7  http://www.ibabuzz.com/education/2011/07/27/ets-finds-cheating-took-place-on-ap-tests-at-skyli

8  ne/.  These documents also demonstrate that there was evidence of cheating, unlike the situation

9  at Mills High School.  If this information is not accurate, Defendants have access to information

10  to refute it.  Plaintiffs do not have access to this information except through these public sources.

11        I declare under penalty of perjury under the laws of the State of California that the

12  foregoing is true and correct.  Executed on this 6th day of August, 2013, at Burlingame,

13  California.

NANCY L. FINEMAN

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

# EXHIBIT 1

## Nancy Fineman

| | |
|---|---|
| **From:** | Joanne Lein |
| **Sent:** | Monday, August 05, 2013 12:47 PM |
| **To:** | bruce.berman@wilmerhale.com |
| **Cc:** | Nancy Fineman; Aron Liang |
| **Subject:** | SMUHSD v. ETS and College Board |
| **Attachments:** | LTR FROM NLF RE EX PARTE.pdf; SUMMONS.pdf; CIVIL COVER SHEET.pdf; COMPLAINT-FILE ENDORSED.pdf; COURT PACKET RE CMC AND ADR.pdf |

**Importance:** High

Mr. Berman,

Attached are pdf copies of the Summons, Complaint and Civil Cover Sheet which were filed with the Court today in this matter, along with the Court packet re Case Management and ADR, and finally a letter of today's date from Nancy Fineman. These documents have been sent for service today to the registered agents of Educational Testing Services and College Entrance Examination Board.

JoAnne Lein
Legal Assistant to
STEVEN N. WILLIAMS, NANCY L. FINEMAN,
ADAM J. ZAPALA, BRIAN M. SCHNARR, GENE W. KIM,
ELIZABETH T. TRAN and JOANNA W. LiCALSI
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577
Email: jlein@cpmlegal.com

CONFIDENTIALITY NOTICE: The documents accompanying this email transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this emailed information is strictly prohibited. If you have received this email in error, please notify us by telephone immediately to arrange for the return of the original documents to us.

LAW OFFICES
COTCHETT, PITRE & McCARTHY, LLP
SAN FRANCISCO AIRPORT OFFICE CENTER

LOS ANGELES
SACRAMENTO

840 MALCOLM ROAD
BURLINGAME, CALIFORNIA 94010
TELEPHONE (650) 697-6000
FAX (650) 697-0577

NEW YORK
WASHINGTON, DC

August 5, 2013

*Via Fax and Email*
Bruce M. Berman
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006

Via Personal Service
Educational Testing Service
c/o Corporation Service Company aka
CSC - Lawyers Incorporating Service
2710 Gateway Oaks Dr., Ste. 150N
Sacramento, CA 95833

Via Personal Service
College Entrance Examination Board
c/o C T Corporation System
818 W Seventh St
Los Angeles, CA 90017

Re:   *San Mateo Union High School District et al. v. ETS and College Board*
       Notice of Ex Parte Hearing re TRO and OSC on August 7, 2013

Dear Mr. Berman and Agents for Service of Process for College Board and ETS:

Please take notice that on **Wednesday, August 7, 2013 at 2:00 p.m,** or as soon
**thereafter as the matter can be heard in Department 21 of the San Mateo Superior
Court, located at the Hall of Justice, 400 County Center, Redwood City, California
94063,** Plaintiffs San Mateo Union High School District and AP Students–Viking Parents
Group will move Ex Parte for a temporary restraining order and Order to Show Cause why a
preliminary injunction should not issue against Educational Testing Services ("ETS") and
College Entrance Examination Board ("College Board"). Both the TRO and preliminary
injunction will request that the Court order ETS and College Board to grade and validate the
AP tests taken by students at Mills High School in May 2013 in the subjects of US History,
Macro-Economics, English Language, English Literature, US Government and Politics,
Calculus AB, Calculus BC, Physics B, Statistics, Chemistry and Biology, and report those
scores to colleges and universities, as requested by the students.

If you have any questions, do not hesitate to contact me.

Sincerely,

NANCY L. FINEMAN

cc:   Gregory A. Wedner and Jack Lee

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Nancy L. Fineman, 124870<br>COTCHETT, PITRE & McCARTHY, LLP<br>840 Malcolm Rd Suite 200<br>Burlingame, CA 94010<br>TELEPHONE NO.: (650) 697-6000<br>ATTORNEY FOR *(Name):* Plaintiff | FOR COURT USE ONLY |
|---|---|

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF<br>Superior Court of California, San Mateo County<br>400 County Center<br>Redwood City, CA 94063-1655 | |
|---|---|

| PLAINTIFF/PETITIONER: San Mateo Union High School District | CASE NUMBER:<br>CIV 523184 |
|---|---|
| DEFENDANT/RESPONDENT: Educational Testing Services | |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>SMUHSD #1299 |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of:   Summons, Complaint, Civil Case Cover Sheet, Letter dated 8-5-13, ADR Packet, Jury Fees FAQ

**BY FAX**

3. a. Party served: College Entrance Examination Board, a corporation

   b. Person Served: CT Corporation System, Margaret Wilson - Person authorized to accept service of process

4. Address where the party was served:   818 West Seventh Street 2nd Floor
                                          Los Angeles, CA 90017

5. I served the party
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to
      receive service of process for the party (1) on (date): 8/5/2013          (2) at (time): 2:20 PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:

   c. on behalf of:


   College Entrance Examination Board, a corporation


   under:     CCP 416.10 (corporation)

7. **Person who served papers**
   a. Name:       Jimmy Lizama
   b. Address:    One Legal – 194-Marin
                  504 Redwood Blvd #223
                  Novato, CA 94947

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 36.95
   e. I am:
      (3) registered California process server.
          (i) Employee or Independent contractor.
          (ii) Registration No.: 4553
          (iii) County: LOS ANGELES

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 8/5/2013

|  |  |
|---|---|
| Jimmy Lizama | |
| (NAME OF PERSON WHO SERVED PAPERS) | (SIGNATURE) |

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |
|---|---|---|

OL# 7319886

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Nancy L. Fineman, 124870<br>COTCHETT, PITRE & McCARTHY, LLP<br>840 Malcolm Rd Suite 200<br>Burlingame, CA 94010<br>TELEPHONE NO.: (650) 697-6000<br>ATTORNEY FOR *(Name):* Plaintiff | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, San Mateo County
400 County Center
Redwood City, CA 94063-1655

| PLAINTIFF/PETITIONER: San Mateo Union High School District | CASE NUMBER:<br>CIV 523184 |
|---|---|
| DEFENDANT/RESPONDENT: Educational Testing Services | |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>SMUHSD #1299 |

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.
2. I served copies of:   Summons, Complaint, Civil Case Cover Sheet, Court packet re Case Management and ADR, Letter dated 8-5-13 from Nancy Fineman re Ex Parte Hearing

3. a. Party served: Educational Testing Services, a corporation

   b. Person Served: CSC - Becky DeGeorge - Person authorized to accept service of process

**BY FAX**

4. Address where the party was served: 2710 N Gateway Oaks Dr Ste 150
   Sacramento, CA 95833

5. I served the party
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to
      receive service of process for the party (1) on (date): 8/5/2013        (2) at (time): 2:17 PM
6. The "Notice to the Person Served" (on the summons) was completed as follows:
   c. on behalf of:

   Educational Testing Services, a corporation

   under:   CCP 416.10 (corporation)
7. **Person who served papers**
   a. Name:        Tyler Dimaria
   b. Address:     Orie Legal - 194-Marin
                   504 Redwood Blvd #223
                   Novato, CA 94947

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 36.95
   e. I am:
      (3) registered California process server.
          (i) Employee or independent contractor.
          (ii) Registration No.: 2006-06
          (iii) County: SACRAMENTO
8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.
   Date: 8/6/2013

   Tyler Dimaria
   (NAME OF PERSON WHO SERVED PAPERS)                                         (SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 7319887

# EXHIBIT 2

**Nancy Fineman**

| | |
|---|---|
| **From:** | Aron Liang |
| **Sent:** | Tuesday, August 06, 2013 8:58 AM |
| **To:** | Berman, Bruce |
| **Cc:** | Nancy Fineman; Gregory A. Wedner (GWedner@lozanosmith.com); Jack Lee (JLee@MinamiTamaki.com) |
| **Subject:** | RE: San Mateo Union High School District, et al. v. Educational Testing Services, et al. |

Mr. Berman-

I respectfully disagree with your assertion that we are "delaying service to obtain a tactical advantage." As I told you, we would serve the papers on you as soon as they were completed as required under the California Rules of Court.

Aron K. Liang
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

CONFIDENTIALITY NOTICE The documents accompanying this email transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this emailed information is strictly prohibited. If you have received this email in error, please notify us by telephone immediately to arrange for the return of the original documents to us.

**From:** Berman, Bruce [mailto:Bruce.Berman@wilmerhale.com]
**Sent:** Tuesday, August 06, 2013 6:01 AM
**To:** Aron Liang
**Cc:** Nancy Fineman; Gregory A. Wedner (GWedner@lozanosmith.com); Jack Lee (JLee@MinamiTamaki.com); Berman, Bruce
**Subject:** RE: San Mateo Union High School District, et al. v. Educational Testing Services, et al.

Aron,

Thank you for your email. When I called you yesterday afternoon, you said you intended to serve plaintiffs' ex parte application today. When you called me back and agreed to reschedule the hearing for tomorrow, you told me that, because the hearing would be pushed back a day, you intended to delay service of the ex parte application until tomorrow. I objected to delaying service to obtain a tactical advantage, and I asked you to reconsider your position and serve your papers today. I renew my objection and my request.

Bruce Berman

**Bruce M. Berman | WilmerHale**
1875 Pennsylvania Avenue NW
Washington, DC 20006 USA
+1 202 663 6173 (t)
+1 202 663 6363 (f)
bruce.berman@wilmerhale.com

1

Please consider the environment before printing this email.

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

**From:** Aron Liang [mailto:ALiang@cpmlegal.com]
**Sent:** Monday, August 05, 2013 9:43 PM
**To:** Berman, Bruce
**Cc:** Nancy Fineman; Gregory A. Wedner (GWedner@lozanosmith.com); Jack Lee (JLee@MinamiTamaki.com)
**Subject:** San Mateo Union High School District, et al. v. Educational Testing Services, et al.

Mr. Berman-

Thank you for your call today regarding the complaint filed today and the letter dated August 5, 2013 from Nancy L. Fineman informing you of our intent to file an *ex parte* application for a Temporary Restraining Order and a Order to Show Cause Re: Preliminary Injunction.   This e-mail confirms our agreement today by telephone to move the *ex parte* hearing to Thursday, August 8, 2013. You indicated that you had received a copy of both our complaint and the August 5, 2013 letter from Nancy L. Fineman, and stated that you would accept service of the *ex parte* application on behalf of both Educational Testing Service ("ETS") and the College Entrance Examination Board ("College Board").

Please let me know if any of this is incorrect or if there is anyone else that needs to be served a copy of our *ex parte* papers.  Thank you for your professionalism in this matter.

Aron K. Liang
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

CONFIDENTIALITY NOTICE The documents accompanying this email transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this emailed information is strictly prohibited. If you have received this email in error, please notify us by telephone immediately to arrange for the return of the original documents to us.

**EXHIBIT 3**

Search this website...

# The Skyline Oracle

- Home
- About
- Calendar
- Staff
- Contact Us

- News
- Sports
- A&E
- Opinion
- Poetry
- Features
- Blogs »

Home > News > Investigation Voids AP Exam Scores

# Investigation Voids AP Exam Scores

## Related Content

## Last 5 stories in News

- No more multiple-choice standardized testing: California shifts to more writing exam questions to test students ability in academics - June 12, 2013
- Skyline community decides on course of action for the new principal next year - June 12, 2013
- Skyline takes charge in a city championship debate tournament - June 12, 2013
- Bomb threat evacuation occurs at Skyline once again - June 12, 2013
- At-site store ran by students opens - June 12, 2013

## Other stories that might interest you...

- Skyline under investigation for AP Testing Anomalies
- Skyline Does Not Have an API Score This Year
- College Board Removes AP Exam Guessing Penalty
- Attempted Robbery of School Treasurer on Campus
- Mr. Jang Investigated

By Jeff Seidl
October 31, 2011
Filed under News

A summer investigation of Skyline's 2011 AP Exams by the Education Testing Service (ETS) caused score delays for hundreds of Skyline AP students. Ultimately, 30 student scores were cancelled due to 'testing irregularities.'

After Skyline's 2011 AP exams were completed, ETS received multiple phone calls regarding reported testing irregularities. ETS could not comment on the exact nature of the supposed offenses, but Vice Principal Arkin said they were a mix of overly intimate seating, alleged cheating, and overall student misconduct.

Several students corroborate these accusations. Senior Mauro Saulcero Pena, who was in the AP Environmental Science testing room, was extremely dissatisfied with the testing conditions.

"It was terrible. People were screaming and going crazy outside. I couldn't concentrate at all. The proctors looked like they had never seen a library before," he recalled.

Senior Frances Wong said that during the AP English Language Exam, "I was rubbing elbows with people . . . and people were whispering."



Both the causes and the consequences of the investigation upset many in the Skyline community. AP Environmental Science teacher Ms.Ostrom believes, "If a student is taking an AP class, we, the Skyline community, have an obligation to provide them with the best testing environment. They're competing with every other student in the nation . . . Shame on us if we're giving our students a disadvantage by setting them up in a classroom that is not conducive to testing."

After receiving the calls, ETS sent an investigator to tour the testing rooms as well as to interview Arkin and the 2010-2011 counselors, who proctored most of the exams. Arkin provided the investigator with a list of student interview candidates.

The Skyline administration was under the impression that the accusations were too inconsistent to be credited. In the June 2011 issue of The Oracle, reporters captured the optimism that pervaded Skyline following the initial investigative tour: "There is no reason to believe that students' scores will be affected."

On July 1, however, some students willing to pay an $8-dollar fee to call the Collegeboard's AP Score Reporting hotline received an unexpected message telling them that not all of their scores were available. Two weeks later, when Skyline's AP students received mailed score reports from the Collegeboard's AP department, they were surprised to find text, reading "*89: Score Delayed: to be reported as soon as possible" in the space where they expected to find their scores.

Some scores, such as those from the Calculus BC Exam, were released on time. However, the vast majority of the AP subjects taken by Skyline students was delayed. Thomas Ewing, Director of External Relations at ETS, said this was to allow time for review of scores.

"[ETS investigators] compare a student's answers with the students next to or across from them," said Ewing. "What we look for is agreement of wrong answers, not agreement of right answers . . . we get probabilities on the magnitude of, say, one in 10 billion chance that these students got the answers wrong in the same pattern."

ETS, the world's largest testing organization, administers 15 million tests per year in 180 countries. The Collegeboard, which produces the AP, SAT and PSAT exams, was one of three organizations that founded ETS in 1947. ETS develops, administers, and conducts test security for the Collegeboard exams.

Arkin said that in order to keep the Skyline community informed, the administration made automated calls and sent a letter home with students about the



situation. She said Principal Johnston also sent an email to the Skyline community.

However, some members of the Skyline community are dissatisfied with the amount of information they received regarding the investigation. Ms. Mason, last year's Calculus AB teacher, did not receive any notification from ETS before logging on in early July. Teachers also said that they did not receive official written information from the Skyline administration, though Ostrom says she was told verbally by Johnston that the investigator had detected "some problems" regarding the tests.

Arkin said ETS is "very careful about what they say and how they say it. They were very limited in the information they were able to give me . . . [the investigation] was between ETS and the students and the students' families."

In accordance with Arkin's assertion, Ewing was "not able to comment" on many crucial points of ETS's investigation. These included how many scores were invalidated, the specific testing transgressions, the possibility of a test being cancelled for all students, when and where retakes will take place, and the steps taken by ETS to keep Skyline informed.

All information in this article that addresses these topics was gathered from other sources.

On July 27, Johnston published a letter to the Skyline community, stating, "current events require that I provide an update on an issue that is negatively impacting our school community." The letter stated that during the week of July 18, ETS informed Skyline that "cheating did, in fact, occur during AP Testing.

As predicted later in the principal's letter, scores began to surface during the third week of July. According to Ostrom, most of Skyline's AP Environmental Science scores were released during the second week of August, after almost a month-and-a-half delay. She still does not have all of her classes' scores, and believes that she will never receive the scores she does not yet have.

The principal's letter went on to state that 30 student scores were affected (invalidated). These students received a letter from ETS informing them their scores had been voided, giving them the options of either retesting or receiving a full refund.

One student, who wished to remain anonymous, had his family's lawyer call ETS to find out more information about his invalidated score. An official informed him that the disparity between his multiple choice and essay scores was so large that ETS could not believe the same person did both sections, without prior knowledge of the essay prompts.

 

He will be attending a panel review of his score later in October, where he will attempt to prove his innocence. If he succeeds, he will receive a 5, the highest score possible for an AP exam.

Arkin said many things will be done differently this year to prevent a recurrence of last year's fiasco. These changes include better-trained proctors, an official AP training for Vice Principals Trinh and Blye, and a viewing of the testing rooms in advance. Arkin claims her request to view last year's rooms at Merritt was rejected.

"If I could do it over I would have pushed to go in beforehand and see the rooms . . . I have connected with Dr. Adams (President of Meritt College), and they will be more cooperative this year and give us a bigger space," she said.

Johnston wrote, "We accept responsibility for the non-compliance issues uncovered by the ETS and fully understand our important role in ensuring the integrity of AP Testing and the testing process . . . We apologize for the mistakes made in this regard and the negative impact they presented for our community."

Tags: ap exam, AP test, cheating, ETS, investigation voids ap exam, Jeff Seidl, Skyline AP exam score delays

## Comments

**Feel free to leave a comment...**
**and oh, if you want a pic to show with your comment, go get a gravatar!**

Name (required)

_____

Email Address (required)

_____

Website

_____

Speak your mind

_____

[ Submit Comment ]

- Enter your email address below to receive our daily email updates

**Email Updates**

Enter your email address. [ GO ]

## Polls

**What was your favorite memory of Skyline?**

○ The tree collapsing in Sophomore Square
○ Jean Quan visiting Skyline's "Climb the Mountain of Success"
○ Senior Prom at the Gift Center
○ Skyline Performing Arts' "A Cinderella's Christmas" and "The Wiz"
○ All the spirit weeks!

Vote

View Results

Copyright © 2013 • The Skyline Oracle • Herald Design by School Newspapers Online • Log in

**EXHIBIT 4**



OAKLAND UNIFIED
SCHOOL DISTRICT



Wednesday, July 27, 2011

Dear Skyline High School Community,

I hope you are enjoying the summer. I hate to intrude upon your break with sobering news, but current events require that I provide an update on an issue that is negatively impacting our school community.

Some of you know that the Educational Testing Service (ETS), the agency responsible for managing the Advance Placement (AP) testing program, received complaints about Skyline's administration of the 2011 exam. Specifically, charges of "testing irregularities" prompted an ETS investigation into the proctoring of the exam and a review of the tests themselves. As a result of this investigation, receipt of some scores has been delayed and other test results have been invalidated due to what the ETS considers evidence of cheating.

This assessment is devastating to me personally and I want express my extreme regret over the finding that cheating occurred during the AP testing. I'd also like to apologize to those students, families and staff who have been affected and to those members of the Skyline community who may have been tainted in the process. Finally, I'd like to provide some additional context, a basic timeline of what's occurred since the test administration, and the corrective action we are taking to guard against this in the future.

During the week of May 16, 2011, a representative from ETS informed Skyline administration that the organization had received a phone call and an email alleging that "irregularities" occurred during the AP testing process at Skyline High School. At the time, we informed ETS that we followed the same process in 2011 that was used during previous administrations of the AP tests, specifically that our students took the exams at Merritt College, where the tests were proctored by non-AP school staff.

Subsequently, ETS notified us that it had received continuing complaints. In response, ETS sent an investigator to Skyline High School during the week of May 31, 2011. The ETS investigator explained the complaints and the procedure for investigating them.

In the investigation, we detailed our process, complied with all requests and led the ETS investigator through the testing rooms and other relevant facilities. During this time, we explained that:

1. The AP Testing process at Skyline High School in 2011 was the same process used in the last several years.
2. The AP Testing rooms were basically the same rooms used over the last several years.



OAKLAND UNIFIED
SCHOOL DISTRICT

Community Schools, Thriving Students

3. The AP Testing Coordinator, along with the entire Skyline Administrative Team, was brand new to the school this year and, unfortunately, did not take part in the AP Testing Coordinator training offered by ETS.

Skyline High School cooperated fully with the ETS investigator's requests. He interviewed the AP Testing Coordinator, the proctors of the AP exams and other individuals who assisted with testing room set-up. Further, Skyline High School made available random students (of his choice) to be interviewed.

After the ETS Investigator interviewed all parties, he conducted an exit interview with the administration in which he explained the following conclusions:

1. There was no indication of "pervasive" cheating by students.
2. There was no evidence of "malicious intent" with regard to AP Testing at Skyline High School.
3. This was not the first investigation the investigator has made at Skyline High School.
4. The AP Testing Coordinator should have gone through the AP Testing Coordinator training.
5. Proctors did not meet all AP Testing guidelines.
6. Some AP Testing rooms were too small to meet AP Testing guidelines.
7. According to AP Testing guidelines, students were sitting too close together.
8. Skyline High School cooperated fully with the ETS investigator.
9. Skyline High School took note of all non-compliance issues to ensure full compliance during the 2011-2012 testing process.

From the end of the investigation in June 2011 to July 2011, Skyline High School received no word from ETS concerning AP testing. In early July 2011, teachers began to look for AP Test results and noticed that Skyline High School scores were not present. Concerned by this discovery, administration immediately contacted ETS to inquire.

At the time of that call, ETS provided little information other than to say that all Skyline High School tests were being "examined." Later in the same week, ETS responded to an inquiry by saying the results would be posted soon. Finally, during the week of July 18, 2011, a conversation with ETS yielded the following explanations:

1. ETS informed Skyline High School, July 21, 2011 that AP Test scores would be available to students on Friday, July 22, 2011.
2. ETS determined that cheating did, in fact, occur during AP Testing
3. ETS would not share the number of students nor identify the students who had been determined to cheat.
4. ETS indicated that they would work with individual families of those students whose AP Test scores were determined to be invalid due to its findings of cheating.

This report is very disheartening and we are saddened by the ETS findings. We are, however, determined to meet all compliance requirements mandated by ETS and the College Board in the future. We accept responsibility for the non-compliance issues uncovered by the ETS and fully understand our important role in ensuring the integrity of AP Testing and the testing process. Similarly, we will work very hard with students to make sure that they understand their responsibility in the AP testing process. We apologize for the mistakes made in this regard and the negative impact they presented for our community.



OAKLAND UNIFIED
SCHOOL DISTRICT

Community Schools, Thriving Students

We have been working with ETS to try to determine the impact of the testing irregularities and to seek redress for students. Although we are still gathering information in this area, we now know that:

- ETS is sending a letter on July 26 explaining its actions and potential next steps for affected students and families.
- Only students who did *not* get a score will receive the letter.
- 30 students did not receive scores but only those exams which would have received a score of 3, 4 or 5 (the level at which some schools award college credit or allow students to bypass entry-level courses) were withheld.
- All students who did not receive a score will be able to retake the test.
- There will be no charge for retaking the exam.
- ETS will notify colleges that the students' scores have been delayed but will not indicate whether new scores are forthcoming; that is the responsibility of the student.

Should the situation change or more information become available, we will update you promptly. In the meantime, should you have further questions or require any assistance from Skyline High School, please do not hesitate to contact me directly.

Regards,


Troy E. Johnston
Principal Skyline High School

# EXHIBIT B

1

2   Nancy L. Fineman (SBN 124870)
    nfineman@cpmlegal.com
3   Aron K. Liang (SBN 228936)
    aliang@cpmlegal.com
    **COTCHETT, PITRE & McCARTHY, LLP**
4   840 Malcolm Road, Suite 200
    Burlingame, CA 94010
5   Telephone:  (650) 697-6000
    Facsimile:  (650) 697-0577
6
    Gregory A. Wedner (SBN 67965)          Jack W. Lee (SBN 71626)
7   gwedner@lozanosmith.com                JLee@MinamiTamaki.com
    **LOZANO SMITH**                       Sean Tamura-Sato (SBN 254092)
8   One Capitol Mall, Suite 640            seant@minamitamaki.com
    Sacramento, CA 95814                   **MINAMI TAMAKI LLP**
9   Telephone:  (916) 329-7433             360 Post Street, 8th Floor
    Facsimile:  (916) 329-9050             San Francisco, California 94108-4903
10                                         Telephone: 415 788 9000
    *Attorneys for Plaintiff San Mateo*    Facsimile: 415 398 3887
11  *Union School District*
                                           *Attorneys for Individual Plaintiffs*
12

13              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                  **IN AND FOR THE COUNTY OF SAN MATEO**
14

15  SAN MATEO UNION HIGH SCHOOL            Case No. CIV 523184
    DISTRICT, a school district, individually and on
16  behalf of the members of the SAN MATEO   **DECLARATION OF VALERIE ARBIZU**
    UNION HIGH SCHOOL DISTRICT and AP        **IN SUPPORT OF PLAINTIFFS'**
17  STUDENTS – VIKING PARENT GROUP, an       **EX PARTE APPLICATION FOR**
    unincorporated association               **TEMPORARY RESTRAINING ORDER;**
18                                           **ORDER TO SHOW CAUSE RE**
              Plaintiffs,                    **PRELIMINARY INJUNCTION**
19
                   v.                      Date:  August 8, 2013
20                                         Time:  2:00 p.m.
    EDUCATIONAL TESTING SERVICES, a        Dept.:  21
21  corporation; and COLLEGE ENTRANCE      Judge:  Hon. Robert D. Foiles
    EXAMINATION BOARD, a corporation; and
22  DOES 1 through 10, inclusive.          Complaint Filed: August 5, 2013

23            Defendant.

24

25

26

27

28

—————————————————————————————————————
    Declaration of Valerie Arbizu ISO Plaintiffs' Ex Parte Application for Temporary Restraining
    Order; Order to Show Cause re Preliminary Injunction; Case No. CIV 523184

1  I, VALERIE ARBIZU, declare:

2      1.      I am a citizen of the United States and am over eighteen years of age. I am the

3  Assistant Principal of Mills High School. I have personal knowledge of the facts set forth below,

4  and if called as a witness I would testify as follows.

5      2.      I have served as a professional educator in California public schools for eleven

6  years. I completed my Bachelor of Arts in English and a Single Subject Teaching Credential at

7  San Jose State University. I have also completed a Master of Arts degree in Educational

8  Leadership and earned an Administrative Credential at Santa Clara University, completing all

9  post-baccalaureate work at Santa Clara University with a 4.0 grade point average. As a teacher, I

10  have been recognized for excellence in the classroom, receiving the Dorothy Wright Outstanding

11  Teaching Award from San Jose State University over three consecutive years (2007, 2008, 2009)

12  and the East Side Union High School District Teacher of the Year Award in 2009.

13      3.      As a founding teacher in the School of Global Economy at Evergreen Valley High

14  School (EVHS) (2002-2009), I was a classroom English teacher and Advanced Placement (AP)

15  teacher, and worked closely with administration as an English Department Chair, WASC

16  Coordinator, and Professional Development Coordinator. I also worked closely with the

17  Counseling Department and other AP teachers to begin a number of programs, including the

18  establishment of the online student newspaper and two AP courses in English. I established and

19  taught in the AP Summer Institute, a program that worked with students in underrepresented

20  demographics in the general AP population at Evergreen Valley High School. I also taught the

21  AP English Literature and AP English Language courses at EVHS for six years.

22      4.      After seven years in the classroom and assisting with the opening of Evergreen

23  Valley High School, I sought a position as a classroom teacher at Saratoga High School in

24  Saratoga, California – part of the Los Gatos Saratoga Union High School District. A year later, I

25  applied for and was honored with a promotion to Assistant Principal of Los Gatos High School

26  and, in 2012, transitioned to the San Mateo Union High School District and Mills High School to

27  work in the community in which I live. I have resided in San Mateo, California, since June

28  2010.

---

5.      I began working at San Mateo Union High School District in July 2012.  My current position is Assistant Principal of Mills High School (MHS).  My primary responsibilities at MHS are to oversee Facilities, Athletics, and Activities, assist and plan Graduation and special community events, work with the Instructional Technology Coordinator and oversee campus technology.  Additional responsibilities include the oversight of attendance and discipline for students in grades 10-12, working with Professional Development and acting as the administrative liaison for the district Professional Development Council, close work with the PTO and Sports Boosters, and evaluation of teachers.  This year, I was also assigned to oversee Advanced Placement Testing at MHS.

6.      I organized the AP testing this year much as it had been organized in past years – I used the same primary proctor and the same testing locations that had been established in past years by other Assistant Principals at MHS.  I organized and completed the registration process with students, ordered the exams, and led pre-administration sessions where students were provided with a copy of the 2012-13 AP Student and Parent Bulletin and completed the demographic portion of their first answer document.  As the testing dates approached, I worked with our primary proctor, Mr. Len Froomin.  We identified the preferred testing rooms for the AP exams, and I reserved the large conference room at the California Teachers Association (CTA) building on 1705 Murchison Drive in Millbrae, the MHS Library, and the MHS Computer Labs.

## Examination Room Identification and Set-up

7.      Mr. Froomin and I chose exam locations that were well-lit, offered comfortable seating and air conditioning, and were located on the periphery of campus to control for noise and the possibility of interruption.  When possible, we chose to use the large conference room at the CTA building: the room provides a good deal of natural light, is not subject to campus noise, and the temperature can be controlled to a good level of comfort.  Similarly, the MHS library was chosen for its position on campus, its large, well lit space and natural light from skylights, light wells, and windows, comfortable furniture, and temperature control.  In all, we chose testing venues that offered students the best possible testing environments.

8.     As the testing dates approached, I reached out to the MHS Parent Teacher

Organization (PTO) and to the community-at-large for assistance in locating additional volunteer

test proctors.  As a result, Mills High School met or exceeded the requirements for the

proctor/student ratio as required by the College Board/ETS rules.  We did not have any parents

proctor exam(s) for their own children.  For many exams we were able to assign additional

proctors to the testing rooms to better ensure that students were focused only on their own

exams.

9.     Prior to the testing period in May, Mr. Froomin and I agreed that students would

be seated in alphabetical order to better facilitate entry to the site, student check-in and

attendance, test document organization, and seating within the room.  This would allow me to

prepare exam materials in an efficient manner.

### Test Security and Organization

10.     As pre-administration and exam shipments were received, they were placed in

Testing Room A29-B at MHS.  I reviewed the contents of each box in each shipment within 24-

hours of receipt, and ensured that the room (also known as "The Vault"), was locked at all times.

Our pre-administration sessions ("Bubblefest") were held on Thursday, April 18 and Friday,

April 19, 2013, and the make-up Bubblefest session was held on Wednesday, May 1, 2013.  I

was assisted by Attendance Clerk for the primary Bubblefest sessions, in which students met in

the Cafeteria and were guided through their pre-administration packets.  These packets included

a 2013 AP Student Pack, one 2013 AP Answer Sheet, a 2012-13 AP Bulletin for AP Students

and Parents, and a "Blue Card".  The "Blue Card" is an internal document I used to assist

students with checking over their pre-administration documents and to collect their AP ID

numbers at the end of each Bubblefest session.  The AP ID numbers were stored in Testing

Room A29-B and referenced in the event that an AP Student Pack was misplaced or missing (we

did not need to reference any of the Blue Cards for this purpose during the 2013 test

administration period).

11.     I prepared the test day rosters and organized the exam materials in Testing Room

A29-B for each exam administration, ensuring that proctors would be able to easily identify

exam materials in an efficient manner.  I prepared the Exam Packets each evening prior to the

next day's test administration, to ensure that all materials were prepared and accounted for.

Exam packets were organized in alphabetical order and consisted of the 2012-13 AP Student

Pack, a 2013 AP Answer Sheet, and sealed Exam materials.

### Exam Day Instructions and Proctoring

12.     Students were asked to report for morning exams at 8:00 am and for their

afternoon exams by 12:30 pm.  I chose these report times to ensure that students were able to

arrive with sufficient time to eat a good breakfast and to provide a lunch break between exams

for students who were scheduled to take both a morning and afternoon exam on the same day.

All students had turned off and put away their electronic devices and were sequestered in their

exam rooms no later than 9:00 am for the morning exams, and no later than 1:00 pm for the

afternoon exams, in keeping with the regulations of the College Entrance Examination Board

("College Board").

13.     I delivered exam and administration documents to the testing sites each morning,

with the exception of the Calculus AB test administration at the CTA building, as I was

scheduled to proctor the Calculus BC exam at the MHS Library at the same time on the same

morning.  As part of my delivery protocol, I brought the testing materials into the testing rooms,

placed the Exam Packets on the tables in alphabetical order and left the room in the care of Mr.

Froomin as I met students outside of the testing location to check them in for their exams.

During the check-in process, Mr. Froomin was inside the test room while I was outside to

assisting in the check-in process.

14.     The check-in process at the CTA building consisted of taking attendance to ensure

that each student had arrived on time to the testing location and providing each student with a

badge that identified them as an MHS student that was onsite for AP testing.  The CTA

personnel requested that all students wear them as long as they were onsite in the event that there

was a problem or emergency.  In preparation for any emergency issues, copies of the daily exam

rosters were also provided to the main desk of the CTA – we wanted to ensure that all students

would be accounted for in the event of a major emergency.  As part of my check-in procedure,

1   students were instructed to line-up in alphabetical order and to remove all electronic devices

2   from their bags and pockets and turn them to the off-position. At this time, our volunteer parent

3   proctors assisted with ensuring that all cell phones were turned off and put away in a 'zippered'

4   compartment of a bag and/or purse. Some students did not bring a bag or purse and elected to

5   either have another student store their devices or to have a proctor hold their device for the

6   duration of the exam period.

7       15.    Students were not allowed to select their own seats, but were assigned seats. For

8   the Calculus AB, Calculus BC and U.S. History exams, which have scrambled multiple-choice

9   sections, I made sure that students that were sitting at the same table had different exams.

10      16.    We followed a similar process for checking students in for exams at the MHS

11  Library, where students were held in the Career Center until they were allowed in to the library

12  for their exams, and in the MHS Labs, where students were held in the hallway prior to entering

13  the computer lab for testing.

14      17.    Prior to students entering the exam rooms, Mr. Froomin and I would change

15  locations (he would come out to address the students and I or another proctor would stay in the

16  testing room before the students entered the testing room to ensure test security) and Mr.

17  Froomin would give the students additional information regarding the testing requirements for

18  the session. This information included a requirement to keep all non-testing materials under

19  their desks at all times, a reaffirmation of the need to keep all electronic devices in the 'off'

20  position and stowed in bags/purses (or with a proctor) until they were released from the exam

21  location, and a first reminder that students were not allowed to speak to each other during the

22  exam period nor were they allowed to speak about any part of the exam after the exam period

23  had concluded.

24      18.    Students were then led into the testing room by Mr. Froomin or myself, where

25  Mr. Froomin sat students down at their tables and instructed them to prepare their testing space

26  with College Board approved materials (pens, pencils, erasers, and time pieces that did not beep

27  or make noise, facial tissue for those with allergies, and calculator(s) for exams that allowed for

28  their use.) After students were seated, Mr. Froomin led them through a list of testing reminders,

1  including the express need to keep all testing materials flat on the tables during the exam period

2  to remove the temptation of others to look at other students' exam materials.

3       19.    Mr. Froomin then read General Instructions II and paused for (and encouraged)

4  questions.  While Mr. Froomin read the instructions, the additional proctors circulated through

5  the room with additional testing materials (pens, pencils, and tissue) and ensured that all students

6  were following the instructions given.  In the event that students had gone ahead to the next

7  section (bubbling in their date of birth when the instructions at hand asked them to bubble in

8  their last name, for example), proctors asked students to stop what they were doing and wait to

9  move ahead until they had received instructions to do so.

10       20.    After General Instructions II were complete, Mr. Froomin would begin reading

11  the exam specific instructions; additional proctors continued to circulate through the testing room

12  to assist students and to remove discarded exam materials from student tables (this included the

13  plastic wrap on the exam packets and the paper left from exam closure labels, as well as any

14  discarded facial tissue).  Students were not allowed to get up from their tables without

15  permission for any reason – they were instructed to quietly raise their hands and wait for a

16  proctor to come to them in the event that they needed assistance, including using the restroom or

17  getting a drink of water.  Students adhered to this requirement closely – we had one student raise

18  her hand and ask a proctor for permission to remove their sweater during a test administration.

19  In the event that a student needed to use the restroom during the exam, they were instructed to

20  leave all of their personal belongings in the room and were released one at a time to use the

21  restroom.  At the CTA building, proctors stood in the open doorway between the testing room

22  and the lobby where bathrooms were located to ensure that students were alone in the bathroom

23  and came directly back to the testing room; at the MHS Library, students were instructed to use

24  the faculty restroom in the administration building.  In the event that a proctor needed a restroom

25  break of their own, they left one at a time and often waited for an additional proctor to arrive to

26  insure that we had as many proctors in the testing room as possible.

27       21.    Prior to the mandatory testing breaks (as allowed for exam instructions), all

28  testing materials were accounted for and students were reminded that they were required to leave

1    personal belongings in the testing room and that they were not allowed to discuss the exam.

2    Then, they were released into the outer lobby (CTA Building) or Career Center/Center Court

3    (MHS locations), where proctors circulated and observed the students to ensure that they were

4    not discussing the exams or doing anything inappropriate.  Students were allowed to use the

5    restroom; they were also allowed to bring a snack and eat it during this 10-minute break period.

6    A proctor stayed in the testing room at all times during the break to maintain the security of the

7    exams.  This proctor often took this time to make sure all testing booklets were alphabetized

8    prior to packing.

9          22.    After the breaks, Mr. Froomin would review with the students the expectation that

10   they continue to follow testing procedures for the second part of the exam.  At that time, Mr.

11   Froomin would continue with the exam instructions and the remaining proctors would circulate

12   and assist with the collection of the remaining exam materials (plastic wrap and sticker sheets).

13   As the exams were completed, all students were instructed to remain seated and quiet until all

14   exam materials were accounted for.  Students were then released when it was clear that all

15   materials had been collected and the testing site was clear.

16         23.    At no time did any proctor note any mischievous or unacceptable student testing

17   behavior – students were focused on their exams and proctors were quick to step in when it

18   appeared that the slightest infraction may have occurred, like a student picking up their testing

19   materials that may have allowed another student to have seen their exams or answers.

20         24.    MHS implemented a secure testing environment that did not allow any students

21   an unfair testing advantage.  There were more than sufficient proctors to monitor all of the AP

22   exams at MHS and none of them noted any indication of cheating by any of the students.

23                              **Testing Issues and Irregularities**

24         25.    I checked in with Mr. Froomin and the majority of our volunteer proctors at the

25   end of each exam to ask if there had been any testing issues or irregularities.  This year, we had

26   two different testing irregularities, and both were reported to College Board immediately.  The

27   first was a technology issue in the AP Chinese Language exam, which I reported to College

28   Board during the exam – the computer that a student was using for the exam stopped recognizing

1 | the keyboard mid-test. The student stopped taking the exam and elected to take the alternate test

2 | on Thursday, May 23, 2013. The second irregularity occurred during the Statistics exam, where

3 | a student experienced a mild asthma attack and elected to stop taking the exam. This student was

4 | offered the option of taking the exam during the alternate testing date; the student declined the

5 | alternate exam and instead elected to cancel his score for the Statistics exam. In both cases, all

6 | exam materials were collected from the students, a 2013 AP Coordinator's Incident Report (IR)

7 | Form was completed, and the materials were packed in the appropriate envelopes and mailed to

8 | College Board in boxes marked with "IR" stickers.

9 | **Investigation – First Contact**

10 |     26.    I first spoke with Ms. Dionne Evans of Educational Testing Service ("ETS") on

11 | Tuesday, May 22, 2013. Ms. Evans informed me that ETS had received a complaint regarding

12 | the AP Statistics Exam administered by MHS on Friday, May 10, 2013. Ms. Evans asked me if

13 | the test had begun on time. I told her that we had all of the students sequestered in the testing

14 | room by 1:00pm. At that time, Ms. Evans asked me if we'd experienced any testing

15 | irregularities during our exam administrations, and I told her about the two issues we'd

16 | experienced – the first with the technology issue and the second with the mild asthma attack.

17 | Ms. Evans had additional questions for me regarding the AP Statistics exam regarding what time

18 | the test began, what tables were used, how many students say at the tables, were breaks

19 | monitored, did students discuss exams during the breaks, were cell phones used in the testing

20 | room when the exams were out. I answered all of Ms. Evans' questions verbally. At Ms. Evans'

21 | request, I sent an e-mail response to ETS on May 22, 2013. I stated that students were sitting in

22 | the testing room prior to 1:00 p.m., students were sitting at square, rectangular, and round tables,

23 | 1-2 students were sitting at the tables, timed breaks and bathroom breaks were monitored by

24 | proctors, to my knowledge students did not discuss the exam during the breaks, and that I had

25 | used my cell phone as the students took their assigned places to check the time and an incoming

26 | email, but that I turned off the phone before the students began their exam. After this exchange,

27 | the ETS questions only asked about seating arrangements. ETS personnel never asked me any

28 | other type-questions.

### Email to Dionne Evans (ETS) on Friday, May 24, 2013

27.    I received a call from Ms. Evans on Friday, May 24, 2013, asking that I return her call. I returned her call and left her a voicemail, and also responded via email to let her know that I had received her voicemail and that I would try to call her back. I indicated that I thought I had answered all of her questions already, but was happy to find any additional information she might need. I did not hear back from her until Monday, June 10, 2013.

### Email from Dionne Evans (ETS) on Monday, June 10, 2013

28.    I received an email from Ms. Evans requesting that I send her a seating chart for the AP Statistics Exam. I responded to Ms. Evans promptly and emailed her a copy of the preliminary seating arrangement for the AP Statistics exam on June 12, 2013.

### Email from Patricia Taylor (ETS) on June 13, 2013

29.    On June 13, 2013, I received an email from Patricia Taylor, also from ETS, requesting additional information regarding the testing environment. I called Ms. Taylor and expressed a concern that if the investigation had been triggered by an upset student, he or she would unfairly report that the environment was not conducive to testing. This characterization would be contrary to the actual testing environment, which was heavily proctored and secure. Ms. Taylor was brusk in her response and changed the subject quickly, asking that I please respond to her questions about the AP Statistics exam.

### Email to Patricia Taylor (ETS) on Thursday, June 14, 2013

30.    I responded to Ms. Taylor's questions from her June 13, 2013 email about the testing environment as best I could, based on my recollections and the information I had available to me. I also told Ms. Taylor that I would be out of the office on vacation the following week and my access to email would be limited as we traveled.

### Email from Patricia Taylor (ETS) on Friday, June 14, 2013.

31.    I received a response to my email from Ms. Taylor that afternoon, on Friday, June 14, 2013, in which she asked a series of new questions about the testing for MHS. I also received a call and voicemail on my cell phone from Ms. Taylor on Friday, June 14, asking that I

1   return her call (but no other information) – I returned that call and left a voicemail in response

2   that same afternoon.

3                    **Email from Patricia Taylor (ETS) on Monday, June 17, 2013.**

4          32.    On Monday, July 17, 2013, I was cc'd on an email from Ms. Taylor to Paul

5   Belzer, the principal, which included a list of additional questions about all of our exams.

6                      **Email from Patricia Taylor on Monday, June 24, 2013**

7          33.    I received an email and a voicemail from Ms. Taylor the morning I returned to the

8   office on Monday, June 24, 2013.  In her email, Ms. Taylor asked me to provide her with seating

9   arrangement information for all of the AP exams except for Chemistry, Statistics and Biology.

10                      **Email to Patricia Taylor on Monday, June 24, 2013**

11         34.    I addressed Ms. Taylor's call and email via email that very morning.  I scanned

12  and emailed her a copy of the sketch I had made for the library seating, which included table

13  dimensions and seat placement and provided further information about seating arrangements.

14                     **Email from Patricia Taylor on Monday, June 24, 2013.**

15         35.    I received a response from Ms. Taylor quickly, in which she asked a series of

16  questions for eight additional exams – US History, Macro-Economics, English Language &

17  Composition, English Literature & Composition, US Government & Politics, Physics B,

18  Calculus AB, and Calculus BC.  These questions in the email attached as Exhibit 1 are as

19  follows:

20         *How many test takers tested?*

21         *Was the exam administered in the library or at the CTA building?*

22         *Where all the test takers facing one direction?*

23         *What is the distance between the test takers sitting at the four ft, eight ft tables and at the*

24         *computer tables?*

25         *Where test takers seated around round tables for this exam?  If yes, how many were at*

26         *each round table?*

27         *How many proctors were used for this exam?*

28         *Where the Calculus BC test takers in a separate testing room?*

### Email to Patricia Taylor (ETS) on Tuesday, June 25, 2013

36.    I answered all of Ms. Taylor's questions, test by test, and sent them to her for review, with an additional request that she email me with any additional questions.

### Email from Patricia Taylor (ETS) on Tuesday, June 25, 2013

37.    I received an email from Ms. Taylor which thanked me for the additional information. She also let me know that she would "forward this information to the proper departments for a decision." A true and correct copy of the email is attached as Exhibit 2.

### Email from Patricia Taylor (ETS) on Monday, July 8, 2013

38.    Mr. Belzer, the principal, received a very short email from Ms. Taylor on Monday, July 8, 2013, about the final ETS decision. In the email, Ms. Taylor states that "The information that was submitted confirms that the following exams were administered under improper seating conditions: US History, Macro-Economics, English Language, English Literature, US Government and Politics, Calculus AB, Calculus BC, Physics B, Statistics, Chemistry, Biology. Therefore, the test takers' scores are invalid. Please contact Ms. Evans or myself to arrange and schedule retest dates for the above exams." A true and correct copy of the email is attached as Exhibit 3.

39.    At no time did any representative from ETS or from the College Board visit MHS and visit any of the testing sites. I am not aware of any investigation undertaken by ETS or College Board besides the email and phone communications between ETS and the College Board on the one hand and MHS.

40.    At meetings regarding the invalidation of the AP test scores, representatives from ETS and College Board stated explicitly that there was **no evidence** of any cheating by any student. This statement was repeated numerous times by ETS and College Board representatives. The decision to invalidate the AP test scores of the 286 MHS students who took AP exams in eleven different AP subjects was due solely because of alleged seating irregularities. There is no evidence that any student cheated or that the seating arrangement materially impacted the validity of any of the AP exam results of any of the MHS students. I am not aware of any cheating or misconduct that occurred during any of the AP exams.

41.     Based upon my professional experience as an educator, it is my opinion that each of the AP tests were administered in a testing environment that protected the integrity of the test results because they had adequate controls and oversight and provided a fair testing environment to the students taking the tests.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on this 6th day of August, 2013.

VALERIE ARBIZU

**EXHIBIT 1**



## Additional Seating Information

**Taylor, Patricia J** <ppalmer-taylor@ets.org>
To: Valerie Arbizu <varbizu@smuhsd.org>

Mon, Jun 24, 2013 at 2:09 PM

Dear Ms. Arbizu:


Thank you for the e-mail.  I still have several questions regarding each exam.  Please provided me with the additional information regarding each exam.  In the library are pillar from the floor to the ceiling?


For US History:

How many test takers tested?

Was the exam administered in the library or at the CTA building?

Where all the test takers facing in one direction?

What is the distance between the test takers sitting at the four ft, eight ft tables and at the computer tables?

Where test takers seated at round tables for this exam?  If yes, how many were at each round table?

How many proctors were used for this exam?


For Macro-Economics:

How many test takers tested?

Was the exam administered in the library or at the CTA building?

Where all the test takers facing in one direction?

What is the distance between the test takers sitting at the four ft, eight ft tables and at the computer tables?

Where test takers seated at round tables for this exam?  If yes, how many were at each round table?

How many proctors were used for this exam?


For English Language & Composition

How many test takers tested?

Was the exam administered in the library or at the CTA building?

Where all the test takers facing in one direction?

What is the distance between the test takers sitting at the four ft, eight ft tables and at the computer tables?

Where test takers seated at round tables for this exam?  If yes, how many were at each round table?

How many proctors were used for this exam?


For English Literature & Composition

How many test takers tested?

Was the exam administered in the library or at the CTA building?

Where all the test takers facing in one direction?

What is the distance between the test takers sitting at the four ft, eight ft tables and at the computer tables?

Where test takers seated at round tables for this exam?  If yes, how many were at each round table?

How many proctors were used for this exam?


For US Government & Politics

How many test takers tested?

Was the exam administered in the library or at the CTA building?

Where all the test takers facing in one direction?

What is the distance between the test takers sitting at the four ft, eight ft tables and at the computer tables?

Where test takers seated at round tables for this exam?  If yes, how many were at each round table?

How many proctors were used for this exam?


For Physics B

How many test takers tested?

Was the exam administered in the library or at the CTA building?

Where all the test takers facing in one direction?

What is the distance between the test takers sitting at the four ft, eight ft tables and at the computer tables?

Where test takers seated at round tables for this exam?  If yes, how many were at each round table?

How many proctors were used for this exam?


Calculus AB

How many test takers tested?

Was the exam administered in the library or at the CTA building?

Where all the test takers facing in one direction?

What is the distance between the test takers sitting at the four ft, eight ft tables and at the computer tables?

Where test takers seated at round tables for this exam?  If yes, how many were at each round table?

How many proctors were used for this exam?

Where the Calculus BC test takers in a separate testing room?


Calculus BC

How many test takers tested?

Was the exam administered in the library or at the CTA building?

Where all the test takers facing in one direction?

What is the distance between the test takers sitting at the four ft, eight ft tables and at the computer tables?

Where test takers seated at round tables for this exam?  If yes, how many were at each round table?

How many proctors were used for this exam?

Where the Calculus AB test takers in a separate testing room?


Thank you for your time and cooperation during this busy time.


Sincerely,


Patricia Taylor

**From:** Valerie Arbizu [mailto:varbizu@smuhsd.org]
**Sent:** Monday, June 24, 2013 4:18 PM
**To:** Taylor, Patricia J
**Subject:** Additional Seating Information

[Quoted text hidden]

---

This e-mail and any files transmitted with it may contain privileged or confidential information. It is solely for use by the individual for whom it is intended, even if addressed incorrectly. If you received this e-mail in error, please notify the sender; do not disclose, copy, distribute, or take any action in reliance on the contents of this information; and delete it from your system. Any other use of this e-mail is prohibited.

Thank you for your compliance.

---

**EXHIBIT 2**



# Additional Seating Information

**Taylor, Patricia J** <ppalmer-taylor@ets.org>                    Tue, Jun 25, 2013 at 12:40 PM
To: Valerie Arbizu <varbizu@smuhsd.org>
Cc: Paul Belzer <PBelzer@smuhsd.org>, Irma Munoz <IMunoz@smuhsd.org>

Dear Ms. Arbizu:


Thank you for the additional information regarding the exams that were administered at your school.  I will forward this information to the proper departments for a decision.


Sincerely,


Patricia Taylor


---

**From:** Valerie Arbizu [mailto:varbizu@smuhsd.org]
**Sent:** Tuesday, June 25, 2013 1:44 PM
**To:** Taylor, Patricia J
**Cc:** Paul Belzer; Irma Munoz
**Subject:** Re: Additional Seating Information


Hi Ms. Taylor,


I have included my responses to your questions below - they are in bold italics.  Many of the answers are repeated for the exams.  Please let me know if you have any additional questions.


Thank you,


Valerie Arbizu


In the library are pillar from the floor to the ceiling?  *Yes, they are.  The pillars don't obstruct the table placement, but did impede our ability to sit 3 students at the tables closest to the pillars, so only two*

*students were seated at those two specific 12'6" tables.*

For US History:

How many test takers tested? **53**

Was the exam administered in the library or at the CTA building? ***MHS Library***

1. Where all the test takers facing in one direction? ***No.***

2. ***All tables were a minimum of 2 1/2' apart***

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

# EXHIBIT 3

San Mateo Union High School District Mail - RE: AI: 051972 Mills High School



# RE: AI: 051972 Mills High School

**Taylor, Patricia J** <ppalmer-taylor@ets.org>                    Mon, Jul 8, 2013 at 1:32 PM
To: Paul Belzer <pbelzer@smuhsd.org>
Cc: Valerie Arbizu <varbizu@smuhsd.org>, "Evans, Dionne R" <DEvans@ets.org>

Dear Mr. Belzer,

Thank you for all of the additional information regarding the 2013 AP exams that were administered at your school.

The information that was submitted confirms that the following exams were administered under improper seating conditions:

- US History
- Macro-economics
- English Language
- English Literature
- US Government and Politics
- Calculus AB
- Calculus BC
- Physics B
- Statistics
- Chemistry
- Biology

Therefore, the test takers' scores are invalid. Please contact Ms. Evans or myself to arrange and schedule retest dates for the above exams.

Sincerely,



Patricia Taylor

---

**From:** Paul Belzer [mailto:pbelzer@smuhsd.org]
**Sent:** Monday, June 24, 2013 4:09 PM
**To:** Taylor, Patricia J
**Subject:** RE: FW: AI: 051972 Mills High School

Hello,

I will be out of the office beginning Monday, June 24 though Monday, July 1 and will return emails when i return. I f you need immediate assistance, please contact Assistant Principal, Valerie Arbizu.

Thank you,

Paul Belzer

--

Paul Belzer, Principal

Mills High School

---

This e-mail and any files transmitted with it may contain privileged or confidential information. It is solely for use by the individual for whom it is intended, even if addressed incorrectly. If you received this e-mail in error, please notify the sender; do not disclose, copy, distribute, or take any action in reliance on the contents of this information; and delete it from your system. Any other use of this e-mail is prohibited.

Thank you for your compliance.

---

# EXHIBIT C

1 | Nancy L. Fineman (SBN 124870)
nfineman@cpmlegal.com
2 | Aron K. Liang (SBN 228936)
aliang@cpmlegal.com
3 | **COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
4 | Burlingame, CA 94010
Telephone:  (650) 697-6000
5 | Facsimile:  (650) 697-0577

6 | Gregory A. Wedner (SBN 67965)
gwedner@lozanosmith.com
7 | **LOZANO SMITH**
One Capitol Mall, Suite 640
8 | Sacramento, CA 95814
Telephone:  (916) 329-7433
9 | Facsimile:  (916) 329-9050

10 | *Attorneys for Plaintiff San Mateo*
*Union School District*

11 |

Jack W. Lee (SBN 71626)
JLee@MinamiTamaki.com
Sean Tamura-Sato (SBN 254092)
seant@minamitamaki.com
**MINAMI TAMAKI LLP**
360 Post Street, 8th Floor
San Francisco, California 94108-4903
Telephone: 415 788 9000
Facsimile: 415 398 3887

*Attorneys for AP Students-Viking Parent Group*

12 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
13 | **IN AND FOR THE COUNTY OF SAN MATEO**

14 | SAN MATEO UNION HIGH SCHOOL
DISTRICT, a school district, individually and on
15 | behalf of the members of the SAN MATEO
UNION HIGH SCHOOL DISTRICT, and AP
16 | STUDENTS – VIKING PARENT GROUP, an
incorporated association,
17 |
18 | Plaintiffs,
19 | v.
20 | EDUCATIONAL TESTING SERVICES, a
corporation; and COLLEGE ENTRANCE
21 | EXAMINATION BOARD, a corporation; and
DOES 1 through 10, inclusive,
22 | Defendant.
23 |

Case No. CIV 523184

**DECLARATION OF PAUL BELZER IN
SUPPORT OF PLAINTIFFS' *EX PARTE*
APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO
SHOW CAUSE RE PRELIMINARY
INJUNCTION**

Date:  August 8, 2013
Time:  2:00 p.m.
Dept:  21
Presiding Judge, Hon. Robert D. Foiles

Complaint Filed:  August 5, 2013

24 |
25 |
26 |
27 |
28 |

DECLARATION OF PAUL BELZER ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR TRO AND OSC RE
PRELIMINARY INJUNCTION; Case No. CIV 523184

1    I, Paul Belzer, Principal of Mills High School, declare as follows:

2       1.      I am a citizen of the United States and am over eighteen years of age.  I have personal

3    knowledge of the facts set forth below, and if called as witness I would testify as follows:

4       2.      I have served as a professional educator in the public schools of California for the past 22

5    years and have served as Principal of Mills High School for the past seven.  I have a Bachelors of

6    Science Degree from the University of Wisconsin-Madison in English and Secondary Education and

7    hold a Master's Degree in Educational Administration from San Francisco State University.

8       3.      The Mills Faculty and Staff is a dedicated team of educators committed to the academic

9    and social well-being of our students.  We work diligently to provide a challenging and engaging

10   curriculum for all students.  We are focused on assuring all students are well prepared for College and

11   Career options upon graduating from Mills.  We offer Advanced Placement classes in thirteen curricular

12   areas as well as a comprehensive and strategic intervention program for students in need of support.  We

13   evaluate our curricular programs on a yearly basis and are committed to the ideal of continual

14   improvement. Site, District, State and Federal Assessments are consistently used to evaluate individual

15   student needs, programmatic success, and school-wide achievement.  We value the data we receive from

16   these assessments and use it to guide school improvement efforts.

17      4.      The Mills High School faculty and staff administer roughly 4,000 high stakes tests each

18   year including the California High School Exit Exam, California Standards tests in Math, English,

19   Science and Social Science, and Advanced Placement exams.  This total does not include SAT and

20   PSAT tests which are also administered at Mills by Mills Staff on weekends as a service to our school

21   community interested in taking these tests.

22      5.      In each of these test administrations, Mills faculty and staff are diligent in our preparation

23   and organization so as to support student achievement and test integrity.  We carefully consider test

24   schedules, testing environment, and administrative supervision and support to create an environment that

25   is conducive to student performance and test security.  We take test integrity seriously and communicate

26   the importance of this with our students.  We provide multiple controls and review academic integrity

27   regularly with each test administration.

28

---

DECLARATION OF PAUL BELZER ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR TRO AND OSC RE
PRELIMINARY INJUNCTION; Case No. CIV 523184                                            1

6.  The student body of Mills High School understands the importance of these various tests and works cooperatively with faculty and staff during test administrations.  They work diligently and honestly on the various assessments.  Student performance has led Mills to be consistently ranked as one of the top performing high schools in California as well as in National Publications such as *Newsweek* and *US News and Reports*.

7.  Throughout the year, Mills reinforces the characteristics of academic integrity, diligence, and honestly through school assemblies, School Honor Code presentations for all students, and through multiple presentations and conversations by teachers.  Student expectations are clear and students adhere to and reinforce positive academic and social behaviors.

8.  It should be noted that during each of these test administrations, only a portion of the Mills student population are being assessed with normal school activities typically continuing as usual.  In the case of Advanced Placement tests, the average number of students taking Advanced Placement tests makes up between four and eight percent of our total school population.  In each of these administrations, we are challenged with providing an environment conducive to student performance while not interfering with the necessary requirements of continuing the academic program for the remainder of students.

9.  Over the past 7 years in each of these annual test administrations, including this years' proctoring of the Advanced Placements tests, I believe Mills has worked diligently at meeting the intent of maintaining a secure and appropriate test environment.  In the case of the Advanced Placement test administration in May of 2013, I believe that the administering of these tests met the intent of the AP Test Administration guidelines as it applies to the test environment and to test security and integrity.

10.  Given my discussions with the test coordinator, test proctors and supervisors, and with students, I believe all Mills students took each Advanced Placement test independently and on their own merits and did not receive any unfair advantage.  I have not heard or seen any evidence to the contrary.  In fact, College Board and ETS have repeatedly stated to that they have no evidence of cheating or that any student obtained an unfair advantage.  Trevor Packer, Vice President of Advanced Placement and Instruction of College Board stated during a Telephone Town Hall hosted by Congress representative

1     Jackie Speier, that I attended, that the students had done nothing wrong. Tom Ewing, a spokesperson

2     for ETS, has stated that it was impossible to tell if the students cheated in statements that he made to the

3     press. Attached as Exhibit 1 is a true and correct article from the *San Jose Mercury News* of August 3,

4     2013, which includes his statement.

5         11.     During the Town Hall meeting, Mr. Packer stated that students could take the re-tests on

6     different dates if they were unavailable on the dates we scheduled the exams, but Mills High School has

7     not received any information allowing us to reschedule the exams for any time, except the period of

8     August 9-19, 2013.

9         12.     No one from ETS or College Board has come to the school to conduct any investigation

10     by interviewing administrators, students and/or proctors or inspecting the testing sites.

11         13.     ETS's decision to unilaterally invalidate all student test scores has led to significant

12     stress, anger, and anxiety amongst these college bound students College Board states it supposedly

13     serves. Mills students work diligently throughout the year with a heightened sense of urgency leading up

14     to the Advanced Placement administrations in May. Similar to an athlete in training, Advanced

15     Placement students prepare vigorously the months prior to test dates to prepare for the A.P. tests. By

16     requiring students to re-test, with limited time to prepare and with new obligations such as employment,

17     education, or travel, College Board and ETS have placed Mills students at a serious disadvantage of

18     demonstrating their understanding of college level curriculum. After having their previous efforts

19     invalidated with no evidence of student misconduct or cheating, our students feel their hard work and

20     preparation have been discounted and demeaned. Worse, they feel a system that they believed should be

21     just and able to act fairly and appropriately has been proven unjust and unfair.

22         14.     Requiring students to re-take the Advanced Placement exams with less than a month to

23     prepare, without the resources of structured class time, a certificated teacher, class materials, and

24     dedicated time for study and review, has placed Mills students at a tremendous disadvantage when

25     compared with their peers. The impact of ETS decision has significant repercussions for students who

26     are enrolling and selecting classes in colleges and universities around the Country. Students unable to

27     attend the re-test administration and those who are already enrolling in college classes are placed at an

28

08/06/2013  13:05    16505   52                MILLS HIGH SCHO              PAGE  06/10

14.    I implore College Board and ETS to validate and release all students' test scores so that students are not required to undergo the related stress caused by delayed reporting of test scores and the decisions and work necessary with requiring students to re-test.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this __6__ day of August, 2013.

_Paul N_

PAUL BELZER

# Exhibit 1



5 of 120 DOCUMENTS

Copyright 2013 San Jose Mercury News
All Rights Reserved
San Jose Mercury News (California)

August 3, 2013 Saturday

**SECTION:** BREAKING; Communities; News

**LENGTH:** 954 words

**HEADLINE:** Mills High students escalate campaign to get AP tests scored

**BYLINE:** By Aaron Kinney akinney@bayareanewsgroup.com

**BODY:**

MILLBRAE -- When Mills High School students took the Advanced Placement exams in the spring, they wound up learning a useful lesson, though not what the College Board and Educational Testing Service had in mind.

What students say they discovered is that rules are sometimes applied arbitrarily and you can be punished despite having done nothing wrong. And, perhaps, most important -- if you don't look out for your own interests, chances are no one else will.

Their lesson arrived in public fashion when, in a rare move, the ETS in July invalidated exam results of nearly 300 students because school officials violated testmakers' seating guidelines.

"The world is unfair and difficult," said 18-year-old Erika Lee, who is headed to Boston College. "Corporations, 'nonprofit' or not, are simply selfish. However, if we're persistent enough and utilize our voices, we can make a difference and raise awareness."

Even though there is no evidence that anyone cheated, ETS said it can't rule out the possibility that some students were able to look at others' test sheets, and so it canceled the results of more than 600 tests taken in May in 11 subjects.

Students, along with the San Mateo Union High School District, called the decision a wild overreaction, and they haven't taken it quietly.

High-profile support

The students' campaign to persuade ETS to score the exams has so far garnered support from politicians including state Sen. Jerry Hill, Lt. Gov. Gavin Newsom and Rep. Jackie Speier.

The district has also enlisted a high-profile Burlingame law firm that is preparing to file a lawsuit on its behalf.

Mills High students escalate campaign to get AP tests scored San Jose Mercury News (California) August 3, 2013
Saturday

Barring a change of heart by ETS and the College Board, attorney Nancy Fineman of Cotchett, Pitre & McCarthy said she will soon seek a court order compelling the companies to grade and validate the exams.

The district admits Mills strayed from guidelines specifying that students must face the same direction when taking AP exams. Instead, some students were seated across from each other at circular or square tables.

But the invalidation was overly harsh, Fineman said. The manual for AP coordinators states that failing to follow seating requirements "could result in cancellation of exam scores," she noted, implying ETS has discretion not to cancel them.

ETS inquiry

Fineman also questioned the legitimacy of the ETS inquiry, triggered by a student tip. The district claims that ETS asked questions by phone and email but never conducted an on-site investigation, as it did when cheating occurred during exams at Oakland's Skyline High School in 2011 and Trabuco Hills High School in Mission Viejo in 2008. As a result of the investigation at Skyline, only 30 exams were invalidated.

Jessica Liang, who is headed to Yale University, said the disparity makes a mockery of the College Board's motto of equal opportunity.

"The students at Mills are not cheaters," Liang said, "but we're being treated worse than students at Skyline High School, where it was proved there was actual student misconduct."

ETS has declined to answer specific questions about the inquiry at Mills, but spokesman Tom Ewing defended the company, which administered more than 4 million AP tests for the College Board this year and invalidated fewer than 6,000.

"The investigation of the student-reported unfair testing environment at Mills High School was thorough and conclusive," Ewing said, "and the findings were confirmed by the school's leadership."

ETS understands students are frustrated and disappointed, Ewing added, but the seating irregularities at Mills were too widespread to allow ETS to determine if anyone cheated.

Speier, D-Hillsborough, praised ETS and the College Board for taking steps to help the students, from expediting the scoring of retests now scheduled for Aug. 9-19 to contacting colleges on their behalf.

The district initially reported as many as 224 students had their exams invalidated. Officials now say the scores of 286 students were negated and 643 tests were invalidated. The ETS did score 91 tests.

Student frustration

ETS is offering the opportunity to retake the exams for free, but a number of students don't plan to take them, meaning they won't receive AP credit. Some will be traveling or leaving for college. Others fear they'll do poorly compared to peers who took the tests in May after months of preparation.

Students claim the invalidation has caused them various problems. Some who took the tests as seniors say they have to enroll in introductory college courses they otherwise could have skipped, which could cost their families thousands of dollars if they are unable to graduate as quickly as they'd planned. A parent of an incoming senior said the family is worried that the absence of scores could hurt his chances this fall when he submits early-deadline college applications.

Ten students shared their thoughts with this newspaper by phone and email on what they've learned from the fiasco. Most expressed cynicism about corporate behavior but said they felt empowered by their own ability to mobilize a

response.

Jennifer Kao, who will attend UC Berkeley this fall, said ETS and the College Board trampled on hardworking students to "uphold the 'integrity' of tests that, as evidenced, were never compromised." Even so, she remained optimistic.

"This experience has taught me the importance of persistence, collaboration and teamwork in organizing a movement and made me aware that as long as there is a cause, there is a community that cares," said Kao, 17. "After all, if we, as students, don't stand up for our own test-taker rights, how can we be expected to stand up against our society's other injustices in the future?"

Contact Aaron Kinney at 650-348-4357. Follow him atTwitter.com/kinneytimes .

**GRAPHIC:** Former Mills High School students, from left, Jennifer Kao,17, Raymond Magsaysay, 18, Grant Murphy, 18, Dhvani Patel, 18, and Jessica Liang, 18, pose for photo at Mills High School in Millbrae, Calif., on Friday, Aug. 2, 2013. The College Board and Educational Testing Service have invalidated the Advanced Placement test results of as many as 224 students, citing "seating irregularities" when the 11 exams were taken in May.(John Green/Bay Area News Group)

**LOAD-DATE:** August 3, 2013

# EXHIBIT D

<p style="text-align:center">SUPERIOR COURT OF THE STATE OF CALIFORNIA</p>

<p style="text-align:center">IN AND FOR THE COUNTY OF SAN MATEO</p>

| | |
|---|---|
| SAN MATEO UNION HIGH SCHOOL DISTRICT, individually and on behalf of the members of the SAN MATEO UNION HIGH SCHOOL DISTRICT, and AP STUDENTS – VIKING PARENT GROUP, an unincorporated California association, | **DECLARATION OF KELLEY CHAO** |
| Plaintiffs, | |
| v. | |
| EDUCATIONAL TESTING SERVICES, a corporation; and COLLEGE ENTRANCE EXAMINATION BOARD, a corporation; and DOES 1 through 10, inclusive. | |
| Defendant. | |

DECLARATION

I, Kelley Chao, declare as follows:

1.    The statements in this declaration are based on my own personal knowledge and, if called as a witness, I could and would testify thereto.

2.    I am a rising senior at Mills High School in Millbrae, California and a member of the class of 2014.

3.    I took Advanced Placement ("AP") examinations at Mills High School in May 2013. My test scores for the following examinations were invalidated:

     (i)    AP Calculus AB, and

     (ii)   AP Biology

4.    When I arrived at Mills High School to check in for my May 2013 AP examinations, I was provided a badge that identified me as a Mills High School student who was on-site for AP testing. I was required to wear this badge at all times. As part of the check-in procedure, students were ordered to remove all electronic devices from their bags and pockets and turn them to the off-position.

**AP Calculus AB**

5.    I took my AP Calculus AB examination at the California Teachers Association ("CTA") building. I sat at a square table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

6.    Two other students were seated at this table. One of these students was seated across from me and the other student was seated to my right. This student was approximately three to four feet away from me. These students were strictly moved to the far corners of the table. The main proctor and student monitors diligently maintained the placement of students on tables. They consistently made sure each student was at the farthest end of each table.

7.    There were four or five proctors in the examination room. Prior to the examination, the proctors instructed us on the rules of the examination. We were not allowed to look at the materials prior to starting. We had to move to the far corners of the table. Bags were to be placed under the seat, and bending over to get something inside our bags was not allowed.

- 1 -
DECLARATION

8.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including circling the room regularly, monitoring students in the hallways, and strictly enforcing time limitations.

9.     I did not observe any students in my examination room cheating. I did not observe any student using study guides in the testing room. I also did not observe any student using a cellular phone during the examination.

**AP Biology**

10.    I took my AP Biology examination at the Mills High School Library. I sat at a rectangular table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

11.    Two other students were seated at this table. One student was seated across from me and the other student was seated next to me during this examination. These students were three to four feet away from me.

12.    There were three or four proctors in the examination room. Prior to the examination, the proctors instructed us on the rules of the examination. We were not allowed to look at the materials prior to starting. We had to move to the far corners of the table. Bags were to be placed under the seat, and bending over to get something inside our bags was not allowed.

13.    The proctors also took steps to ensure that the testing environment was secure and appropriate, including circling the room regularly, monitoring students in the hallways, and strictly enforcing time limitations.

14.    I did not observe any students in my examination room cheating. I did not observe any student using study guides in the testing room. I also did not observe any student using a cellular phone during the examination.

**Invalidation of AP Examination Scores**

15.    The answers on my AP examinations were my work alone.

16.    I learned that my May 2013 AP examination scores had been invalidated in July 2013.

17.    I paid $90 to the College Board and Educational Testing Services to take each AP examination. In signing up for these examinations and paying this fee, I understood that the College

1   Board and ETS would score my examinations and report these results to colleges and universities to

2   which I applied for admission.

3          18.     Prior to taking my May 2013 AP examinations, I was never informed, advised or

4   instructed regarding the seating arrangements for these examinations.  I relied on the College Board,

5   Educational Testing Services, and the San Mateo Unified School District to ensure that the test

6   environment was satisfactory.

7          19.     As a result of the invalidation of my May 2013 AP examination scores, I have suffered,

8   and will continue to suffer, financial harm.  The invalidation of scores has not only taken the $180 in

9   testing fees that I paid, but may also force me to pay for an additional semester of college tuition. AP

10  Calculus and AP Biology are key GED classes I planned on finishing before beginning college. The

11  invalidation of my AP examination scores has created a heavy burden by forcing me to retake classes I

12  have already taken and passed once I get to college.

13         20.     The invalidation of my May 2013 AP examination scores has harmed, and will continue

14  to harm, my academic standing.  I have poured my heart into getting high scores in class in order to be

15  able to take different or more advanced classes in college. Because of the invalidation of my AP

16  examination scores, the high scores I have gotten on my transcript in honors and AP classes will mean

17  *next to nothing*.  Without the AP scores I have studied hours upon hours for, there is no way for future

18  colleges or universities to judge my performance in those advanced classes.

19         21.     Retaking my examinations is unreasonable because I have no doubt in my mind that I

20  will not do as well as I did in May 2013 due to the time constraints.  It is not a matter of getting *a* score,

21  it is the matter of getting our rightful scores from May.  The retakes will force me to finish all advanced

22  placement summer homework while simultaneously trying to relearn everything I learned over the

23  course of the last year.  The idea of retaking the examinations is extremely mentally draining; I already

24  studied hours upon hours to take these examinations in May, which required me to forego participation

25  in many social events and sports.  Retaking the AP examinations is not feasible and is unnecessary

26  //

27  //

28  //

- 3 -
DECLARATION

1    because we, the students, *are Innocent*.

2

3          I declare under penalty of perjury under the laws of State of California and the United States of

4    America that the foregoing is true and correct.

5

6          Executed this __6__ day of August, 2013 at _Millbrae_ , California.

7

8

9          KELLEY CHAO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -
DECLARATION

# EXHIBIT E

1

2

3

4

5

6

7

8

9         SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                   COUNTY OF SAN MATEO

11

12  SAN MATEO UNION HIGH SCHOOL          Case No.
    DISTRICT, individually and on behalf of the
13  members of the SAN MATEO UNION HIGH      **DECLARATION OF DARREN FONG**
    SCHOOL DISTRICT, and AP STUDENTS –
14  VIKING PARENT GROUP, an
    unincorporated
15  California association,

16                   Plaintiffs,

17                      v.

18  EDUCATIONAL TESTING SERVICES, a
    corporation; and COLLEGE ENTRANCE
19  EXAMINATION BOARD, a corporation; and
    DOES 1 through 10, inclusive,
20
                     Defendants
21

22       I, Darren Fong, declare as follows:

23       1.      The statements in this declaration are based on my own personal knowledge and, if

24  called as a witness, I could and would testify thereto.

25       2.      I am a 2013 graduate of Mills High School in Millbrae, California. I am an

26  incoming freshman at the University of California, Santa Barbara.

27       3.      I took four Advanced Placement ("AP") examinations at Mills High School in May

28  2013. My test scores for the following examinations were invalidated:

                              1
                         DECLARATION

1    (i)  AP Physics,

2    (ii)  AP Calculus BC,

3    (iii)  AP U.S. Government, and

4    (iv)  AP Macroeconomics.

5    4.  These exams had less students testing than many of the other AP examinations. For

6 example, to the best of my recollection, AP Physics B had only about 20-25 students testing and

7 AP Calculus BC (as opposed to Calculus AB) had only about 35 students testing.

8    5.  All of my exams were held at the Mills High School library. In these smaller

9 exams, I do not recall seeing anyone sitting at the round tables, which were located in the "back"

10 of the library.  Students sat at either long rectangular tables facing forward or at square tables,

11 sitting diagonally across from one other student (no one sat directly across from me).  Further

12 details of the seating arrangement for my exams are state below.

13    5.  To the best of my recollection, in each of my exams, there was one main proctor

14 and two or three other proctors in the examination room. Prior to the examination, the proctor read

15 all of the required instructions off of the proctors' manual.

16    6.  The proctors also took steps to ensure that the testing environment was secure and

17 appropriate, including having multiple proctors observing and walking up and down the rows

18 during the examination, monitoring students in the hallways, allowing only one student to use the

19 restroom at a time, and strictly enforcing time limitations.

20    7.  I did not observe any students in my examination room cheating. For the Calculus

21 BC test, my understanding is that the multiple choice sections are scrambled, so cheating by

22 looking another student's exam would be impossible.  Also, reading and copying the free response

23 answers of another student would have also been impossible since the proctors were monitoring us

24 the entire time.

25  **AP Physics B**

26    8.  I took my AP Physics B examination at the Mills High School library. I sat at a

27 square-ish table during this examination. My seat was preassigned; I was not allowed to select my

28 own seat or people by whom to sit.  One other student was seated at this table. This student was

1   seated diagonally across from me during this examination. This student was at least five feet away
2   from me. There were only about 20-25 students in the exam. I did not observe any student sitting
3   at a round table in this exam.  I did not observe more than 2 students sitting at any tables.

4       **AP Calculus BC**

5       9.    I took my AP Calculus BC examination Mills High School library. I sat at a square-
6   ish table during this examination. My seat was preassigned; I was not allowed to select my own
7   seat or people by whom to sit.

8       10.    One other student was seated at this table. This student was seated diagonally
9   across from me during this examination. This student was at least five feet away from me. There
10  were only about 35 students in the exam. I did not observe any student sitting at a round table in
11  this exam.  I did not observe more than 2 students sitting at any tables.

12      **AP U.S. Government**

13      11.    I took my AP U.S. Government examination at the Mills High School library. I sat
14  at a square-ish table during this examination. My seat was preassigned; I was not allowed to select
15  my own seat or people by whom to sit.

16      12.    There was one other students seated at this table. This student was seated
17  diagonally in relation to me. This student was at least five feet away from me.

18      **AP Macroeconomics**

19      13.    I took my AP Macroeconomics examination Mills High School library. I sat at a
20  square-ish table during this examination. My seat was preassigned; I was not allowed to select my
21  own seat or people by whom to sit.

22      14.    One other student was seated at this table. This student was seated diagonally in
23  relation to me. This student was at least five feet away from me.

24      **Invalidation of AP Examination Scores**

25      15.    The answers on my AP examinations were my work and my work alone.

26      16.    I learned that my May 2013 AP examination scores had been invalidated in July
27  2013.

28      17.    I paid $90 to the College Board and Educational Testing Services to take each AP

1 examination. In signing up for these examinations and paying this fee, I understood that the

2 College Board and ETS would score my examinations and report these results to colleges and

3 universities to which I applied for admission.

4       18.    Prior to taking my May 2013 AP examinations, I was never informed, advised or

5 instructed regarding the seating arrangements for these examinations. I relied on the College

6 Board, Educational Testing Services, and the San Mateo Unified School District to ensure that the

7 test environment was satisfactory.

8       19.    The invalidation of my May 2013 AP examination scores has harmed my academic

9 standing. AP scores for UCSB were due by July 15th which was before it was announced that our

10 scores were invalidated.

11       20.    I just returned from orientation at UCSB. I am an Pre-economics and Accounting

12 major, and my class selection was completed on August 1. One of the prerequisites for my major

13 is the completion of calculus. A high AP Calculus BC exam score will satisfy that requirement.

14 But, because the score has been withheld, when I was registering for classes, I was left in "limbo"

15 as to whether to register for calculus. The Economics advisor advised me that in order to stay on

16 track, I should complete calculus during my first two quarters (Fall 2013 and Winter 2014). But,

17 the Registration advisor told me that if I signed up for calculus at UCSB, the AP scores would not

18 be accepted, even if I "passed". So, I am currently "taking a risk" if ETS continues to withhold

19 the score and I won't "pass" the exam on the re-test. If that worst case scenario happens, I will be

20 1 or 2 quarters "behind" in completing the prerequisites required for my major and 2 quarters

21 behind in completing the general education requirements for graduation.

22       21.    Retaking my May 2013 AP examinations is unreasonable because it is not possible

23 to study for all four tests in two weeks. As to my AP Calculus BC test, while I was extremely well

24 prepared for the May 2013 examinations, I may not do as well on the re-test, which may delay my

25 progression toward a degree in Economics/Accounting at UCSB.

26       22.    As to the Physics B re-test, I will be out of the area and cannot retake that test.

27

28

23.     As a result of the invalidation of my May 2013 AP examination scores, I have suffered financial harm. I may have to spend additional quarters in college to graduate, which will cost me thousands of dollars and months of wasted time.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 4 day of August, 2013 at Burlingame, California.

Darren Fong

# EXHIBIT F

1

2

3

4

5

6

7

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                      **IN AND FOR THE COUNTY OF SAN MATEO**

10   SAN MATEO UNION HIGH SCHOOL

11   DISTRICT, individually and on behalf of the
     members of the SAN MATEO UNION HIGH

12   SCHOOL DISTRICT, and AP STUDENTS –                **DECLARATION OF JENNIFER KAO**
     VIKING PARENT GROUP, an unincorporated

13   California association,

14                    Plaintiffs,

15                       v.

16   EDUCATIONAL TESTING SERVICES, a
     corporation; and COLLEGE ENTRANCE

17   EXAMINATION BOARD, a corporation; and
     DOES 1 through 10, inclusive.

18                    Defendant.

19

20

21

22

23

24

25

26

27

28

                                   DECLARATION

I, Jennifer Kao, declare as follows:

1. The statements in this declaration are based on my own personal knowledge and, if called as a witness, I could and would testify thereto.

2. I am a 2013 graduate of Mills High School in Millbrae, California. I am an incoming freshman at the University of California, Berkeley.

3. I took Advanced Placement ("AP") examinations at Mills High School in May 2013. My test scores for the following examinations were invalidated:

(i) AP English Language and Composition,

(ii) AP English Literature and Composition,

(iii) AP Calculus AB,

(iv) AP Chemistry,

(v) AP United States Government & Politics, and

(vi) AP Macroeconomics.

4. When I arrived at Mills High School to check in for my May 2013 AP examinations, I was provided a badge that identified me as a Mills High School student who was on-site for AP testing. I was required to wear this badge at all times. As part of the check-in procedure, students were ordered to remove all electronic devices from their bags and pockets and turn them to the off-position. Before we even entered the CTA building, a proctor made us line-up in alphabetical order and stop talking. As we were walking into the building and the testing room, none of us could talk. If we made a sound, the proctor told us to be quiet and stop talking.

<u>AP Chemistry</u>

5. I took my AP Chemistry examination at the CTA building. I sat at a square table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

6. Two other students were seated at this table. We each sat at a different side of the square table. The student in the middle of the two other students sat right in the middle of his side, while the two other students (me and another boy) sat at the corner of our side that was furthest from the center student. These students were about three feet away from me during the examination.

7.     There were a total of four proctors in the examination room. Prior to the examination, the main proctor read aloud the proctor manual. He even wrote some key points on the large white board behind him (including "Do not talk," "Keep testing materials flat on your desk", the start/end time of the testing period). The main proctor told us that other than looking straight up at the ceiling to think or straight down at our test to think/work, we could not look anywhere else. The proctor told us to keep our backpacks directly underneath our seats, and we had to keep them completely closed. We couldn't touch our pencils at all until he told us to fill out a specific section of the background info. We couldn't touch our calculators at all until he told us to place them on our tables for a specific section of the test. We were instructed to keep our calculators flat on the desks.

8.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including going around to each person and double-checking that students did not have cellular phones in their pants pockets, allowing only one student to use the restroom at a time, strictly enforcing time limitations, and telling us that we could not discuss the questions or use any electronic devices during the breaks.

9.     I did not see any students in my examination room cheating. I did not see any student using study guides in the testing room. I also did not see any student using a cellular phone during the examination.

AP Calculus AB

10.    I took my AP Calculus AB examination at the CTA building. To the best of my recollection, I sat at a round table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

11.    One other student was seated at this table. We sat across from each other at this table. This student was approximately three-and-a-half to four feet away from me during the examination.

12.    There were a total of four proctors in the examination room. Prior to the examination, the main proctor read aloud the proctor manual. He even wrote some key points on the large white board behind him (including "Do not talk," "Keep testing materials flat on your desk", the start/end time of the testing period). The main proctor told us that other than looking straight up at the ceiling to think or straight down at our test to think/work, we could not look anywhere else. The proctor told us to keep

- 2 -

DECLARATION

1   our backpacks directly underneath our seats, and we had to keep them completely closed.  We couldn't

2   touch our pencils at all until he told us to fill out a specific section of the background info.  We couldn't

3   touch our calculators at all until he told us to place them on our tables for a specific section of the test.

4   We were instructed to keep our calculators flat on the desks.

5      13. The proctors also took steps to ensure that the testing environment was secure and

6   appropriate, including going around to each person and double-checking that students did not have

7   cellular phones in their pants pockets, allowing only one student to use the restroom at a time, strictly

8   enforcing time limitations, and telling us that we could not discuss the questions or use any electronic

9   devices during the breaks.

10      14. I did not see any students in my examination room cheating.  I did not see any student

11   using study guides in the testing room.  I also did not see any student using a cellular phone during the

12   examination.

13      <u>English Literature and Composition</u>

14      15. I took my English Literature and Composition examination at the CTA building.  To the

15   best of my recollection, I sat at a square table during this examination.  My seat was pre-assigned; I was

16   not allowed to select my own seat or people by whom to sit.

17      16. One other student was seated at this table.  This student was seated diagonally across

18   from me.  This student was approximately three-and-a-half to four feet away from me during the

19   examination.

20      17. There were a total of four proctors in the examination room.  Prior to the examination, the

21   main proctor read aloud the proctor manual.  He even wrote some key points on the large white board

22   behind him (including "Do not talk," "Keep testing materials flat on your desk", the start/end time of the

23   testing period).  The main proctor told us that other than looking straight up at the ceiling to think or

24   straight down at our test to think/work, we could not look anywhere else.  The proctor told us to keep

25   our backpacks directly underneath our seats, and we had to keep them completely closed.  We couldn't

26   touch our pencils at all until he told us to fill out a specific section of the background info.

27      18. The proctors also took steps to ensure that the testing environment was secure and

28   appropriate, including going around to each person and double-checking that students did not have

1 │ cellular phones in their pants pockets, allowing only one student to use the restroom at a time, strictly

2 │ enforcing time limitations, and telling us that we could not discuss the questions or use any electronic

3 │ devices during the breaks.

4 │       19.    I did not see any students in my examination room cheating. I did not see any student

5 │ using study guides in the testing room. I also did not see any student using a cellular phone during the

6 │ examination.

7 │       English Language and Composition

8 │       20.    I took my English Language and Composition examination at the CTA building. To the

9 │ best of my recollection, I sat at a square table during this examination. My seat was pre-assigned; I was

10 │ not allowed to select my own seat or people by whom to sit.

11 │       21.    One other student was seated at this table. This student was seated diagonally across

12 │ from me. This student was approximately three-and-a-half to four feet away from me during the

13 │ examination.

14 │       22.    There were a total of four proctors in the examination room. Prior to the examination, the

15 │ main proctor read aloud the proctor manual. He even wrote some key points on the large white board

16 │ behind him (including "Do not talk," "Keep testing materials flat on your desk", the start/end time of the

17 │ testing period). The main proctor told us that other than looking straight up at the ceiling to think or

18 │ straight down at our test to think/work, we could not look anywhere else. The proctor told us to keep

19 │ our backpacks directly underneath our seats, and we had to keep them completely closed. We couldn't

20 │ touch our pencils at all until he told us to fill out a specific section of the background info.

21 │       23.    The proctors also took steps to ensure that the testing environment was secure and

22 │ appropriate, including going around to each person and double-checking that students did not have

23 │ cellular phones in their pants pockets, allowing only one student to use the restroom at a time, strictly

24 │ enforcing time limitations, and telling us that we could not discuss the questions or use any electronic

25 │ devices during the breaks.

26 │       24.    I did not see any students in my examination room cheating. I did not see any student

27 │ using study guides in the testing room. I also did not see any student using a cellular phone during the

28 │ examination.

U.S. Government and Politics

25.    I took my U.S. Government and Politics examination at Mills High School library.  I sat at a square table during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

26.    One other student was seated at this table.  We sat diagonally across from each other at this table.  This student was at least four feet away from me during the examination.

27.    There were a total of four proctors in the examination room.  Prior to the examination, the main proctor read aloud the proctor manual.  The main proctor told us that other than looking straight up at the ceiling to think or straight down at our test to think/work, we could not look anywhere else.  The proctor told us to keep our backpacks directly underneath our seats, and we had to keep them completely closed.  We couldn't touch our pencils at all until he told us to fill out a specific section of the background info.

28.    The proctors also took steps to ensure that the testing environment was secure and appropriate, including going around to each person and double-checking that students did not have cellular phones in their pants pockets, allowing only one student to use the restroom at a time, strictly enforcing time limitations, and telling us that we could not discuss the questions or use any electronic devices during the breaks.

29.    I did not see any students in my examination room cheating.  I did not see any student using study guides in the testing room.  I also did not see any student using a cellular phone during the examination.

Macroeconomics

30.    I took my Macroeconomics examination at Mills High School library.  I sat at a square table during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

31.    One other student was seated at this table.  We sat diagonally across from each other at this table.  This student was at least four feet away from me during the examination.

32.    There were a total of four proctors in the examination room.  Prior to the examination, the main proctor read aloud the proctor manual.  The main proctor told us that other than looking straight up

1   at the ceiling to think or straight down at our test to think/work, we could not look anywhere else.  The

2   proctor told us to keep our backpacks directly underneath our seats, and we had to keep them completely

3   closed.  We couldn't touch our pencils at all until he told us to fill out a specific section of the

4   background info.

5          33.     The proctors also took steps to ensure that the testing environment was secure and

6   appropriate, including going around to each person and double-checking that students did not have

7   cellular phones in their pants pockets, allowing only one student to use the restroom at a time, strictly

8   enforcing time limitations, and telling us that we could not discuss the questions or use any electronic

9   devices during the breaks.

10         34.     I did not see any students in my examination room cheating.  I did not see any student

11  using study guides in the testing room.  I also did not see any student using a cellular phone during the

12  examination.

13         35.     Invalidation of AP Examination Scores

14         36.     The answers on all of my AP examinations were my work alone.

15         37.     I learned that my May 2013 AP examination scores had been invalidated on or about July

16  17, 2013.

17         38.     I paid $90 to the College Board and Educational Testing Services to take each AP

18  examination.  In signing up for these examinations and paying this fee, I understood that the College

19  Board and ETS would score my examinations and report these results to colleges and universities to

20  which I applied for admission.

21         39.     Prior to taking my May 2013 AP examinations, I was never informed, advised or

22  instructed regarding the seating arrangements for these examinations.  I relied on the College Board,

23  Educational Testing Services, and the San Mateo Unified School District to ensure that the test

24  environment was satisfactory.

25         40.     As a result of the invalidation of my May 2013 AP examination scores, I have suffered

26  and will continue to suffer financial harm.  I have lost the ability to enter college as a sophomore and

27  graduate early, and thus my family and I will incur additional tuition costs.  Also, my family and I paid

28  $540 for the six AP examinations that I took in May 2013 and that were invalidated.

- 6 -

DECLARATION

41.    The invalidation of my May 2013 AP examination scores has harmed, and will continue to harm, my academic standing. College Board was supposed to release my scores by July 8. It did not. My second and last appointment to sign up for college courses took place on July 9. I did not know which classes to sign up for because I did not know whether I would receive AP credit for certain classes. My AP scores were due to UC Berkeley by July 15. But on July 15, I was still unable to send my scores because my scores still showed up as "delayed" on the College Board website. Even if I take the re-examinations, classes would have already begun by the time I receive my re-test scores. Every day, every minute, every second that I don't have my AP scores, classes are filling up and my options are closing. College is even more difficult than high school. I believe a solid first semester is the foundation for having solid subsequent semesters in college. I've worked hard my entire life for this and I think I deserve at least that much.

42.    I stayed up until 1:00 a.m. or 2:00 a.m. to complete my academic and extracurricular responsibilities almost every day of the 2012-2013 school year. I attended every AP review session I could in the weeks leading up to the May 2013 tests. I bought review books for extra support. I am not a genius, but I work hard and have academic integrity. I did not cheat on any of my six AP exams.

43.    Retaking my May 2013 AP examinations in August is unreasonable because I am moving to Berkeley to attend college and I will be fully occupied preparing for my move. It is impossible for me to perform on the same level as three months ago, when the information was freshest in my mind. The summer between high school graduation and freshmen year of college is also one of the only times in a person's life where he or she can close a chapter and completely start anew. This summer for the class of 2013 should be dedicated to relaxing and making memories with friends and family. College Board is robbing me of this.

44.   When I signed up to take the tests, I trusted that I, as a College Board consumer and student, would get my score by the promised score release date if my peers and I obeyed the rules. Now that my peers and I have taken the test without any proven student misconduct, yet still cannot receive our

//
//
//

1    scores, I am not sure who to trust anymore.

2

3          I declare under penalty of perjury under the laws of the State of California and the United States

4    of America that the foregoing is true and correct.

5          Executed this  2  day of August, 2013 at  Burlingame , California.

6

7

8                                                     Jennifer Kao

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    - 8 -
                                 DECLARATION

**EXHIBIT G**

1

2

3

4

5

6

7

8    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9    **IN AND FOR THE COUNTY OF SAN MATEO**

10

11   SAN MATEO UNION HIGH SCHOOL
     DISTRICT, individually and on behalf of the
     members of the SAN MATEO UNION HIGH
12   SCHOOL DISTRICT, and AP STUDENTS –        **DECLARATION OF JESSICA LIANG**
     VIKING PARENT GROUP, an unincorporated
13   California association,

14               Plaintiffs,

15                   v.

16   EDUCATIONAL TESTING SERVICES, a
     corporation; and COLLEGE ENTRANCE
17   EXAMINATION BOARD, a corporation; and
     DOES 1 through 10, inclusive.

18               Defendant.

19

20

21

22

23

24

25

26

27

28

     DECLARATION

1  I, Jessica Liang, declare as follows:

2      1.      The statements in this declaration are based on my own personal knowledge and, if called

3  as a witness, I could and would testify thereto.

4      2.      I am a 2013 graduate of Mills High School in Millbrae, California.  I am an incoming

5  freshman at Yale University.

6      3.      I took Advanced Placement ("AP") examinations at Mills High School in May 2013.  My

7  test scores for the following examinations were invalidated:

8          (i)      AP Chemistry,

9          (ii)     AP English Literature and Composition,

10         (iii)    AP English Language and Composition, and

11         (iv)     AP Statistics.

12     4.      When I arrived at Mills High School to check in for my May 2013 AP examinations, I

13  was provided a badge that identified me as a Mills High School student who was on-site for AP testing.

14  I was required to wear this badge at all times.  As part of the check-in procedure, students were ordered

15  to remove all electronic devices from their bags and pockets and turn them to the off-position.

16  AP Chemistry

17     5.      I took my AP Chemistry examination at the California Teachers Association ("CTA")

18  building.  I sat at a square table during this examination.  My seat was pre-assigned; I was not allowed to

19  select my own seat or people by whom to sit.

20     6.      One other student was seated at this table.  This student was seated diagonally across

21  from me.  This student was at least five feet away from me.

22     7.      There were four proctors in the examination room.  Prior to the examination, the proctors

23  instructed us to turn off all electronics, raise our hands if we needed to use the restroom, keep all items

24  flat on the table, and avoid reaching into our backpacks.

25     8.      The proctors also took steps to ensure that the testing environment was secure and

26  appropriate, including telling students to leave their calculators flat on the desk, monitoring students in

27  the hallways and during bathroom breaks, allowing only one student to use the restroom at a time, and

28  strictly enforcing time limitations.

9.      I did not see any students in my examination room cheating. I did not see any student using study guides in the testing room. I also did not see any student using a cellular phone during the examination.

**AP English Literature and Composition**

10.      I took my AP English Literature and Composition examination at the CTA building. I sat at a round table during this examination. My·seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

11.      One other student was seated at this table. This student was seated diagonally across from me. This student was at least five feet away from me.

12.      There were four proctors in the examination room. Prior to the examination, the proctors instructed us to turn off all electronics, raise our hands if we needed to use the restroom, keep all items flat on the table, and avoid reaching into our backpacks.

13.      The proctors also took steps to ensure that the testing environment was secure and appropriate, including telling students to keep all items flat on the desk, monitoring students in the hallways and during bathroom breaks, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

14.      I did not see any students in my examination room cheating. I did not see any student using study guides in the testing room. I also did not see any student using a cellular phone during the examination.

**AP English Language and Composition**

15.      I took my AP English Language and Composition examination at the CTA building. I sat at a round table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

16.      One other student was seated at this table. This student was seated diagonally across from me. This student was at least five feet away from me.

17.      There were four proctors in the examination room. Prior to the examination, the proctors instructed us to turn off all electronics, raise our hands if we needed to use the restroom, keep all items flat on the table, and avoid reaching into our backpacks.

- 2 -

DECLARATION

18. The proctors also took steps to ensure that the testing environment was secure and appropriate, including telling students to keep all items flat on the desk, monitoring students in the hallways and during bathroom breaks, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

19. I did not see any students in my examination room cheating. I did not see any student using study guides in the testing room. I also did not see any student using a cellular phone during the examination.

**AP Statistics**

20. I took my AP Statistics examination at the CTA building. I sat at a square table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

21. Two other students were seated at this table. We each had one edge of the table, leaving one side unoccupied. One sat adjacent to me; the other, across. These students were at least five feet away from me.

22. There were four proctors in the examination room. Prior to the examination, the proctors instructed us to turn off all electronics, raise our hands if we needed to use the restroom, keep all items flat on the table, and avoid reaching into our backpacks.

23. The proctors also took steps to ensure that the testing environment was secure and appropriate, including telling students to keep all items flat on the desk, monitoring students in the hallways and during bathroom breaks, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

24. I did not see any students in my examination room cheating. I did not see any student using study guides in the testing room. I also did not see any student using a cellular phone during the examination.

Invalidation of AP Examination Scores

25. The answers on all of my AP examinations were my work alone.

26. I learned that my May 2013 AP examination scores had been invalidated in July 2013.

- 3 -
DECLARATION

27.     I paid $90 to the College Board and Educational Testing Services to take each AP examination. In signing up for these examinations and paying this fee, I understood that the College Board and ETS would score my examinations and report these results to colleges and universities to which I applied for admission.

28.     Prior to taking my May 2013 AP examinations, I was never informed, advised or instructed regarding the seating arrangements for these examinations. I relied on the College Board, Educational Testing Services, and the San Mateo Unified School District to ensure that the test environment was satisfactory.

29.     As a result of the invalidation of my May 2013 AP examination scores, I will suffer financial harm. One year at Yale University costs nearly $62,000. Realistically speaking, that's not particularly affordable. But because my parents want me to have a good education, they were willing to pay the price, thinking that maybe I wouldn't have to stay so long. Now, with the cancelled AP scores, that hope has been swept out from under our feet.

30.     The invalidation of my May 2013 AP examination scores has harmed my academic standing. Not only do I lose out on acceleration credit, but I am also inconvenienced when it comes to placement. High enough AP scores would have qualified me to enroll in intermediate-level courses, which also would have saved some of my time and energy.

31.     Retaking my May 2013 AP examinations is unreasonable because it's just not possible to try to cram an entire year's worth of knowledge into three weeks, retake the test, and hope to score just as well. After thinking that I was done with high school, there is no way I could have retained the same information that was in my head when I originally took these AP examinations. I am also leaving for college in the third week of August and thus will not be available to sit for three of

//
//
//
//
//
//

- 4 -

*DECLARATION*

1    the re-tests.

3         I declare under penalty of perjury under the laws of the State of California and the United States

4    of America that the foregoing is true and correct.

6         Executed this __2__ day of August, 2013 at ___MILLBRAE___, California.

                                                      _____
                                                      Jessica Liang

- 5 -

**DECLARATION**

**EXHIBIT H**

1

2

3

4

5

6

7

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                      **IN AND FOR THE COUNTY OF SAN MATEO**

10

11  SAN MATEO UNION HIGH SCHOOL
    DISTRICT, individually and on behalf of the
    members of the SAN MATEO UNION HIGH
12  SCHOOL DISTRICT, and AP STUDENTS –          **DECLARATION OF NATHAN LI**
    VIKING PARENT GROUP, an unincorporated
13  California association,

14                        Plaintiffs,

15                             v.

16  EDUCATIONAL TESTING SERVICES, a
    corporation; and COLLEGE ENTRANCE
17  EXAMINATION BOARD, a corporation; and
    DOES 1 through 10, inclusive.

18                        Defendant.

19

20

21

22

23

24

25

26

27

28

---

                              DECLARATION

I, Nathan Li, declare as follows:

1. The statements in this declaration are based on my own personal knowledge and, if called as a witness, I could and would testify thereto.

2. I am a 2013 graduate of Mills High School in Millbrae, California. I am an incoming freshman at the University of California, San Diego.

3. I took Advanced Placement ("AP") examinations at Mills High School in May 2013. My test scores for the following examinations were invalidated: AP English Language and Composition, AP English Literature and Composition, AP Chemistry, and AP Statistics.

4. When I arrived at Mills High School to check in for my May 2013 AP examinations, I was provided a badge that identified me as a Mills High School student who was on-site for AP testing. I was required to wear this badge at all times. As part of the check-in procedure, students were ordered to remove all electronic devices from their bags and pockets and turn them to the off-position.

AP English Language and Composition

5. I took my AP English Language and Composition examination at the California Teachers Association ("CTA") building. I sat at a round table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

6. One other student was seated at this table. This student was seated across from me during this examination. This student was approximately four to five feet away from me.

7. There was one main proctor and three other proctors in the examination room. Prior to the examination, the proctor read all of the required instructions off of the proctors' manual. These instructions included: do not open the exams until instructed, do not open the free response section until instructed after the break, keep all materials flat on the table, keep all other materials like snacks or water underneath our chairs, and keep only pencils, pens, and an eraser on the table.

8. The proctors also took steps to ensure that the testing environment was secure and appropriate, including having multiple proctors observing and walking up and down the rows during the examination, monitoring students in the hallways, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

9.      I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.

AP English Literature and Composition

10.      I took my AP English Literature and Composition examination at the CTA building.  I sat at a round table during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

11.      To the best of my recollection, two other students were seated at this table.  These students were seated diagonally in relation to me.  These students were approximately four to five feet away from me.

12.      There was one main proctor and three other proctors in the examination room.  Prior to the examination, the proctor read all of the required instructions off of the proctors' manual.  These instructions included:  do not open the exams until instructed, do not open the free response section until instructed after the break, keep all materials flat on the table, keep all other materials like snacks or water underneath our chairs, and keep only pencils, pens, and an eraser on the table.

13.      The proctors also took steps to ensure that the testing environment was secure and appropriate, including having multiple proctors observing and walking up and down the rows during the examination, monitoring students in the hallways, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

14.      I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.

AP Chemistry

15.      I took my AP Chemistry examination at the CTA building.  To the best of my recollection, I sat at a rectangular table during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

16.     To the best of my recollection, there were one or two other students seated at this table. This student or these students were seated diagonally in relation to me. This student or these students were approximately four to five feet away from me.

17.     There was one main proctor and three other proctors in the examination room. Prior to the examination, the proctor read all of the required instructions off of the proctors' manual. These instructions included:  Do not open the exams until instructed, do not open the free response section until instructed after the break, keep all materials flat on the table, keep all other materials like snacks or water underneath our chairs, and keep only pencils, pens, and an eraser on the table.

18.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including having multiple proctors observing and walking up and down the rows during the examination, monitoring students in the hallways, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

19.     I did not observe any students in my examination room cheating. I did not observe any student using study guides in the testing room. I also did not observe any student using a cellular phone during the examination.

AP Statistics

20.     I took my AP Statistics examination at the CTA building. I sat at a round table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

21.     One other student was seated at this table. This student was seated across from me during the examination. This student was approximately four to five feet away from me.

22.     There was one main proctor and three other proctors in the examination room. Prior to the examination, the proctor read all of the required instructions off of the proctors' manual. These instructions included:  Do not open the exams until instructed, do not open the free response section until instructed after the break, keep all materials flat on the table, keep all other materials like snacks or water underneath our chairs, and keep only pencils, pens, and an eraser on the table.

23.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including having multiple proctors observing and walking up and down the rows during the

examination, monitoring students in the hallways, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

24.    I did not observe any students in my examination room cheating. I did not observe any student using study guides in the testing room. I also did not observe any student using a cellular phone during the examination.

Invalidation of AP Examination Scores

25.    The answers on my AP examinations were my work and my work alone.

26.    I learned that my May 2013 AP examination scores had been invalidated in July 2013.

27.    I paid $90 to the College Board and Educational Testing Services to take each AP examination. In signing up for these examinations and paying this fee, I understood that the College Board and ETS would score my examinations and report these results to colleges and universities to which I applied for admission.

28.    Prior to taking my May 2013 AP examinations, I was never informed, advised or instructed regarding the seating arrangements for these examinations. I relied on the College Board, Educational Testing Services, and the San Mateo Unified School District to ensure that the test environment was satisfactory.

29.    The invalidation of my May 2013 AP examination scores has harmed my academic standing. AP scores for UCSD were due by July 15th which was before it was announced that our scores were invalidated. My class selection begins on August 19. Even if I were to retake my AP examinations, I would likely not receive my scores until after I had to register for classes. Therefore, these test results would not allow me to skip introductory courses.

30.    The credits that I would have received for taking these tests, along with the AP credits I earned last year, would have allowed me to enter college as a sophomore. That would have given me priority in course selections. As a Computer Engineering major, I have a lot of class requirements that makes my 4-year-plan fairly rigid without a lot of room for change. It is also becoming more and more difficult to get into the courses needed to graduate.

31.     As a result of the invalidation of my May 2013 AP examination scores, I have suffered financial harm. I may have to spend additional quarters in college to graduate, which will cost me thousands of dollars and months of wasted time.

32.     Retaking my May 2013 AP examinations is unreasonable because it is not possible to study for all four tests in two weeks. I am confident that I did well on the May 2013 examinations because I prepared and reviewed throughout the entire school year. It has been over two months since I last studied for these examinations, as it did not even occur to me that this invalidation could happen. I am especially worried about the AP English tests, where I will need to write 6 additional essays in total. Also, I am informed, and on that basis believe, that the re-tests will consist of questions that were not chosen for the May 2013 AP examinations because they were too difficult, or at least more obtuse than the original questions that were chosen. Overall, I believe that taking the re-tests will result in a lower score that does not accurately reflect the hard work that I put into each of my classes throughout the entire school year. I believe that it is unfair that this score will be compared on an equal basis to those of other students across the country who received their original scores from the May examinations.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

DECLARATION

1  //
2  //
3  //
4  //
5  //
6
7
8      I declare under penalty of perjury under the laws of California that the foregoing is true and
9  correct.
10
11      Executed this __1st__ day of August, 2013 at _____Millbrae_____, California.
12
13                                 _____
14                                   Nathan Li
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF SAN MATEO**

SAN MATEO UNION HIGH SCHOOL
DISTRICT, individually and on behalf of the
members of the SAN MATEO UNION HIGH
SCHOOL DISTRICT, and AP STUDENTS –
VIKING PARENT GROUP, an unincorporated
California association,

            Plaintiffs,

            v.

EDUCATIONAL TESTING SERVICES, a
corporation; and COLLEGE ENTRANCE
EXAMINATION BOARD, a corporation; and
DOES 1 through 10, inclusive.

            Defendant.

**DECLARATION OF GRANT MURPHY**

DECLARATION

I, Grant Murphy, declare as follows:

1. The statements in this declaration are based on my own personal knowledge and, if called as a witness, I could and would testify thereto.

2. I am a 2013 graduate of Mills High School in Millbrae, California. I am an incoming freshman at Emory University.

3. I took Advanced Placement ("AP") examinations at Mills High School in May 2013. My test scores for the following examinations were invalidated:

    (i)    AP Biology;

    (ii)    AP Government; and

    (iii)    AP Macroeconomics.

4. I arrived at Mills High School to check in for my May 2013 AP examinations. As part of the check-in procedure, students were ordered to remove all electronic devices from their pockets, turn them to the off-position and place them in their bags, which are inaccessible during testing and break.

**AP Biology**

5. I took my AP Biology examination at the Mills High School Library. I sat at a rectangular table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

6. One other student was seated at this table. This student was seated diagonally across from me at the table. To the best of my recollection, this student was more than five feet away from me.

7. To the best of my recollection, there were four proctors in the examination room. Prior to the examination, the proctors instructed us on the rules for the test by reading from the proctor's manual.

8. The proctors also took steps to ensure that the testing environment was secure and appropriate, including monitoring students in the hallways and during breaks and strictly enforcing time limitations.

9. I did not observe any students in my examination room cheating. I did not observe any student using study guides in the testing room. I also did not observe any student using a cellular phone during the examination.

**AP Government**

**AP Government**

10.     I took my AP Government examination at the Mills High School Library. I sat at a long rectangular table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

11.     To the best of my recollection, two or three other students were seated at this long rectangular table. These students sat facing the same direction as me. The closest students were seated five feet away from me.

12.     There were four proctors in the examination room. Prior to the examination, the proctors instructed us on the rules for the test by reading from the proctor's manual.

13.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including monitoring students in the hallways and during breaks and strictly enforcing time limitations.

14.     I did not observe any students in my examination room cheating. I did not observe any student using study guides in the testing room. I also did not observe any student using a cellular phone during the examination.

**AP Macroeconomics**

15.     I took my AP Macroeconomics examination at the Mills High School Library. I sat at a long rectangular table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

16.     To the best of my recollection, two or three other students were seated at this long rectangular table. These students sat facing the same direction as me. The closest students were seated five feet away from me.

17.     There were four proctors in the examination room. Prior to the examination, the proctors instructed us on the rules for the test by reading from the proctor's manual.

18.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including monitoring students in the hallways and during breaks and strictly enforcing time limitations.

19.     I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.

**Invalidation of AP Examination Scores**

20.     The answers on my AP examinations were my work and my work alone.

21.     I learned that my May 2013 AP examination scores had been invalidated in July 2013.

22.     I paid $90 to the College Board and Educational Testing Services to take each AP examination.  In signing up for these examinations and paying this fee, I understood that the College Board and ETS would score my examinations and report these results to colleges and universities to which I applied for admission.

23.     Prior to taking my May 2013 AP examinations, I was never informed, advised or instructed regarding the seating arrangements for these examinations.  I relied on the College Board, Educational Testing Services, and the San Mateo Unified School District to ensure that the test environment was satisfactory.

24.     As a result of the invalidation of my May 2013 AP examination scores, I have and will suffer financial harm.  The loss of these AP credits could cause me to stay in college for an additional semester or year, which would cost $30,000 or $60,000, respectively.

25.     The invalidation of my May 2013 AP examination scores has and will harm my academic standing.  The loss of these scores will make it more difficult to obtain a dual degree in four years.  I will not be able to start out in higher level classes and will need to repeat courses I have already taken.

26.     Retaking my May 2013 AP examinations is unreasonable because two of the three AP tests are offered on the same day I am leaving for college.  I have already made a commitment to Emory

//

//

//

University to arrive on campus early to begin participating as a member of the cross country team.

- 3 -
DECLARATION

1        I declare under penalty of perjury under the laws of State of California and the United States of

2    America that the foregoing is true and correct.

3

4        Executed this 2nd day of August, 2013 at Hillsborough, California.

5

6                                _____

7                                Grant Murphy

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

**DECLARATION**

# EXHIBIT J

1
2
3
4
5
6
7
8

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9

**IN AND FOR THE COUNTY OF SAN MATEO**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| SAN MATEO UNION HIGH SCHOOL DISTRICT, individually and on behalf of the members of the SAN MATEO UNION HIGH SCHOOL DISTRICT, and AP STUDENTS – VIKING PARENT GROUP, an unincorporated California association,<br><br>        Plaintiffs,<br><br>        v.<br><br>EDUCATIONAL TESTING SERVICES, a corporation; and COLLEGE ENTRANCE EXAMINATION BOARD, a corporation; and DOES 1 through 10, inclusive.<br><br>        Defendant. | **DECLARATION OF CHRISTOPHER TARANGIOLI** |

- 1 -

DECLARATION

1  I, Christopher Tarangioli, declare as follows:

2      1.      The statements in this declaration are based on my own personal knowledge and, if called

3  as a witness, I could and would testify thereto.

4      2.      I am a 2013 graduate of Mills High School in Millbrae, California.  I am an incoming

5  freshman at the University of California, San Diego.

6      3.      I took Advanced Placement ("AP") examinations at Mills High School in May 2013.  My

7  test scores for the following examinations were invalidated:

8          (i)      AP Physics B,

9          (ii)     AP Statistics,

10         (iii)    AP U.S. Government & Politics, and

11         (iv)     AP Macroeconomics.

12     4.      When I arrived at Mills High School to check in for my May 2013 AP examinations, I

13  was provided a badge that identified me as a Mills High School student who was on-site for AP testing.

14  I was required to wear this badge at all times.  As part of the check-in procedure, students were ordered

15  to remove all electronic devices from their bags and pockets and turn them to the off-position.

16  AP Statistics

17     5.      I took my AP Statistics examination at the CTA building.  I sat at a round table during

18  this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by

19  whom to sit.

20     6.      Two other students were seated at this table.  These students were seated diagonally in

21  relation to me.  These students were approximately five feet away from me.

22     7.      There were three or four proctors in the examination room.  Prior to the examination, the

23  proctors instructed us on testing requirements and the time limits.

24     8.      The proctors also took steps to ensure that the testing environment was secure and

25  appropriate, including walking around the room at all times, allowing only one student to use the

26  restroom at a time, and strictly enforcing time limitations.

27  //

28  //

- 2 -
DECLARATION

9.     I did not see any students in my examination room cheating.  I did not see any student using study guides in the testing room.  I also did not see any student using a cellular phone during the examination.

AP Physics B

10.     I took my AP Physics B examination at the Mills High School Library.  I sat at a square table during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

11.     One other student was seated at this table.  This student was seated diagonally in relation to me.  This student was approximately six feet away from me.

12.     To the best of my recollection, there were three proctors in the examination room.  Prior to the examination, the proctors instructed us on testing requirements and the time limits.

13.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including walking around the room at all times, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

14.     I did not see any students in my examination room cheating.  I did not see any student using study guides in the testing room.  I also did not see any student using a cellular phone during the examination.

AP U.S. Government and Politics

15.     I took my AP U.S. Government and Politics examination at the Mills High School Library.  I sat at a rectangular table during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

16.     No other students were seated at this table.  No students were within five feet of me during this examination.

17.     To the best of my recollection, there were three proctors in the examination room.  Prior to the examination, the proctors instructed us on testing requirements and the time limits.

18.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including walking around the room at all times, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

19.  I did not see any students in my examination room cheating. I did not see any student using study guides in the testing room. I also did not see any student using a cellular phone during the examination.

AP Macroeconomics

20.  I took my AP Macroeconomics examination at the Mills High School Library. I sat at a rectangular table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

21.  No other students were seated at this table. No students were seated within five feet of me during this examination.

22.  To the best of my recollection, there were three proctors in the examination room. Prior to the examination, the proctors instructed us on testing requirements and the time limits.

23.  The proctors also took steps to ensure that the testing environment was secure and appropriate, including walking around the room at all times, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

24.  I did not see any students in my examination room cheating. I did not see any student using study guides in the testing room. I also did not see any student using a cellular phone during the examination.

Invalidation of AP Examination Scores

25.  The answers on all of my AP examinations were my work alone.

26.  I learned that my May 2013 AP examination scores had been invalidated in July 2013.

27.  I paid $90 to the College Board and Educational Testing Services to take each AP examination. In signing up for these examinations and paying this fee, I understood that the College Board and ETS would score my examinations and report these results to colleges and universities to which I applied for admission.

28.  Prior to taking my May 2013 AP examinations, I was never informed, advised or instructed regarding the seating arrangements for these examinations. I relied on the College Board, Educational Testing Services, and the San Mateo Unified School District to ensure that the test environment was satisfactory.

- 4 -
DECLARATION

29.     As a result of the invalidation of my May 2013 AP examination scores, I have suffered, and will continue to suffer, financial harm. I will lose many general education and elective credits, which means that I will have to pay thousands of dollars to my college to take classes that I should not have to take.

30.     The invalidation of my May 2013 AP examination scores has harmed, and will continue to harm, my academic standing. Because I will lose many general education and elective credits, I may not be able to graduate from college in four years.

31.     Retaking my May 2013 AP examinations is unreasonable because I do not have the ability to study for a mere 2 weeks and be as prepared as I was in May 2013. AP examinations are some of the most difficult tests I have ever taken, especially Physics B. They will be even more difficult in August. I am also working about 7 hours a day throughout the entire summer and I simply cannot afford to take a week off from work to take retests.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

- 5 -
DECLARATION

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 2nd day of August, 2013 at ___Millbrae___, California.

Christopher Tarangioli

- 6 -
DECLARATION

# EXHIBIT K

1
2
3
4
5
6
7
8                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9                    **IN AND FOR THE COUNTY OF SAN MATEO**
10

| | |
|---|---|
| SAN MATEO UNION HIGH SCHOOL DISTRICT, individually and on behalf of the members of the SAN MATEO UNION HIGH SCHOOL DISTRICT, and AP STUDENTS – VIKING PARENT GROUP, an unincorporated California association, | **DECLARATION OF SONGYI XU** |
| Plaintiffs, | |
| v. | |
| EDUCATIONAL TESTING SERVICES, a corporation; and COLLEGE ENTRANCE EXAMINATION BOARD, a corporation; and DOES 1 through 10, inclusive. | |
| Defendant. | |

20
21
22
23
24
25
26
27
28

DECLARATION

I, SONGYI XU, declare as follows:

1.    The statements in this declaration are based on my own personal knowledge and, if called as a witness, I could and would testify thereto.

2.    I am a 2013 graduate of Mills High School in Millbrae, California. I am incoming freshman at the University of California, Berkeley.

3.    I took Advanced Placement ("AP") examinations at Mills High School in May 2013. My test scores for the following examinations were invalidated:

       (i)    AP Statistics,

       (ii)   AP Biology,

       (iii)  AP Macroeconomics, and

       (iv)  AP Government and Politics.

4.    When I arrived at Mills High School to check in for my May 2013 AP examinations, I was provided a badge that identified me as a Mills High School student who was on-site for AP testing. I was required to wear this badge at all times. As part of the check-in procedure, students were ordered to remove all electronic devices from their bags and pockets and turn them to the off-position.

**AP Statistics**

5.    I took my AP Statistics examination at the California Teachers Association ("CTA") building. I sat at a round table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

6.    One other student was seated at this table. This student was seated across from me during the examination.

7.    Prior to the examination, the examination proctors instructed us to sit quietly, and not talk. If we were uncomfortable with our seating, we could raise our hands and ask to be moved. Then, we put all our belongings under the chair except for our calculators, ID card, pencils, pens, erasers, watches, and water. The main proctor told us that we could eat our snacks during the break. He told us that our tests and calculators were to remain flat on the desk. He said that electronic devices were not permitted.

- 1 -
DECLARATION

8.      The proctors also took steps to ensure that the testing environment was secure and appropriate, including walking around the room while we were taking the test, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

9.      I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.

**AP Biology**

10.     I took my AP Biology examination at the Mills High School Library.  I sat at a rectangular table during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

11.     One other student was seated at this table.  This student was seated across from me during the examination.

12.     Prior to the examination, the examination proctors instructed us to sit quietly, and not talk.  If we were uncomfortable with our seating, we could raise our hands and ask to be moved.  Then, we put all our belongings under the chair except for our calculators, ID card, pencils, pens, erasers, watches, and water.  The main proctor told us that we could eat our snacks during the break.  He told us that our tests and calculators were to remain flat on the desk.  He said that electronic devices were not permitted.

13.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including walking around the room while we were taking the test, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

14.     I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.

**AP Macroeconomics**

15.     I took my AP Macroeconomics examination at the Mills High School Library.  I sat at a long rectangular table during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

16.    Two other students were seated at this table. I sat to the right of these students during the examinations.

17.    Prior to the examination, the examination proctors instructed us to sit quietly, and not talk. If we were uncomfortable with our seating, we could raise our hands and ask to be moved. Then, we put all our belongings under the chair except for our calculators, ID card, pencils, pens, erasers, watches, and water. The main proctor told us that we could eat our snacks during the break. He told us that our tests and calculators were to remain flat on the desk. He said that electronic devices were not permitted.

18.    The proctors also took steps to ensure that the testing environment was secure and appropriate, including walking around the room while we were taking the test, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

19.    I did not observe any students in my examination room cheating. I did not observe any student using study guides in the testing room. I also did not observe any student using a cellular phone during the examination.

**AP Government and Politics**

20.    I took my AP Government and Politics examination at the Mills High School Library. I sat at a long rectangular table during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

21.    One other student was seated at this table. This student and I sat faced the same direction during this examination.

22.    Prior to the examination, the examination proctors instructed us to sit quietly, and not talk. If we were uncomfortable with our seating, we could raise our hands and ask to be moved. Then, we put all our belongings under the chair except for our calculators, ID card, pencils, pens, erasers, watches, and water. The main proctor told us that we could eat our snacks during the break. He told us that our tests and calculators were to remain flat on the desk. He said that electronic devices were not permitted.

23.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including walking around the room while we were taking the test, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

24.     I did not observe any students in my examination room cheating. I did not observe any student using study guides in the testing room. I also did not observe any student using a cellular phone during the examination.

### Invalidation of AP Examination Scores

25.     The answers on my AP examinations were my work alone.

26.     I learned that my May 2013 AP examination scores had been invalidated in July 2013.

27.     I paid $90 to the College Board and Educational Testing Services to take each AP examination. In signing up for these examinations and paying this fee, I understood that the College Board and ETS would score my examinations and report these results to colleges and universities to which I applied for admission.

28.     Prior to taking my May 2013 AP examinations, I was never informed, advised or instructed regarding the seating arrangements for these examinations. I relied on the College Board, Educational Testing Services, and the San Mateo Unified School District to ensure that the test environment was satisfactory.

29.     The invalidation of my May 2013 AP examination scores has harmed, and will continue to harm, my academic standing. Without my AP examination scores, I have fewer units than the rest of my classmates. They have more priority than me when they register for classes solely because I have fewer units then they do.

30.     A few days after I received the letter about the cancellation of the AP scores on or about July 17, 2013, I called the admissions office of UC Berkeley, and I talked to the staff about the situation I was in. I explained that my scores were delayed due to seating irregularities. The staff told me that one of the conditions of admission at UC Berkeley was to submit an official report of my AP exam scores by July 15, 2013. However, the staff accepted my reasoning for my delayed scores. My admission to the school was almost cancelled because I did not meet one of the conditions of admission.

- 4 -
DECLARATION

31.     Retaking my May 2013 AP examinations is unreasonable because I had the whole year to prepare for the four AP examinations I took in May 2013. I only heard that my scores were invalidated in mid-July. I now have less than two weeks to study for these four AP examinations. Also, I am starting college in late August. After I take my exams, I will only have a week left in the summer to spend time with my friends and family.

I declare under penalty of perjury under the laws of State of California and the United States of America that the foregoing is true and correct.

Executed this _2__ day of August, 2013 at _____Millbrae_____, California.

Songyi Xu

Songyi Xu

DECLARATION

**EXHIBIT L**

1
2
3
4
5
6
7
8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                       **IN AND FOR THE COUNTY OF SAN MATEO**

10   SAN MATEO UNION HIGH SCHOOL
11   DISTRICT, individually and on behalf of the
     members of the SAN MATEO UNION HIGH
12   SCHOOL DISTRICT, and AP STUDENTS –        **DECLARATION OF BRANDON YE**
     VIKING PARENT GROUP, an unincorporated
13   California association,

14                    Plaintiffs,

15                         v.

16   EDUCATIONAL TESTING SERVICES, a
     corporation; and COLLEGE ENTRANCE
17   EXAMINATION BOARD, a corporation; and
     DOES 1 through 10, inclusive.
18
                      Defendant.
19

20
21
22
23
24
25
26
27
28
                              DECLARATION

1    I, Brandon Ye, declare as follows:

2       1.     The statements in this declaration are based on my own personal knowledge and, if called

3    as a witness, I could and would testify thereto.

4       2.     I am a 2013 graduate of Mills High School in Millbrae, California. I am an incoming

5    freshman at the University of California, Berkeley.

6       3.     I took Advanced Placement ("AP") examinations at Mills High School in May 2013. My

7    test scores for the following examinations were invalidated:

8            (i)      AP English Language,

9            (ii)     AP English Literature,

10          (iii)    AP Chemistry,

11          (iv)    AP Calculus BC,

12          (v)     AP Government, and

13          (vi)    AP Macroeconomics.

14       4.     When I arrived at Mills High School to check in for my May 2013 AP examinations, I

15    was provided a badge that identified me as a Mills High School student who was on-site for AP testing.

16    I was required to wear this badge at all times. As part of the check-in procedure, students were ordered

17    to remove all electronic devices from their bags and pockets and turn them to the off-position.

18    <u>AP English Language</u>

19       5.     I took my AP English Language examination at the CTA building. I sat at a square table

20    during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people

21    by whom to sit.

22       6.     One other student was seated at this table. This student was seated diagonally in relation

23    to me. This student was approximately four-and-a-half feet away from me.

24       7.     There were a total of approximately four proctors in the examination room. Prior to the

25    examination, the proctors instructed us to turn off our cellular phones, that we had to raise our hands in

26    our seats to use the bathroom, that tests must remain flat on our desks until the exam began, backpacks

27    must be stowed under tables until the end of the examination, and that we could not open our backpacks

28    once the examination began.

8.    The proctors also took steps to ensure that the testing environment was secure and appropriate, including monitoring students during breaks, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

9.    I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.

AP English Literature

10.    I took my AP English Literature examination at the CTA building.  I sat at a square table during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

11.    One other student was seated at this table.  This student was seated diagonally in relation to me.  This student was approximately four-and-a-half feet away from me.

12.    There were a total of approximately four proctors in the examination room.  Prior to the examination, the proctors instructed us to turn off our cellular phones, that we had to raise our hands in our seats to use the bathroom, that tests must remain flat on our desks until the exam began, backpacks must be stowed under tables until the end of the examination, and that we could not open our backpacks once the examination began.

13.    The proctors also took steps to ensure that the testing environment was secure and appropriate, including monitoring students during breaks, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

14.    I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.

AP Chemistry

15.    I took my AP Chemistry examination at the CTA building.  I sat at a round table during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

16.     One other student was seated at this table. This student was seated across from me. This student was approximately four feet away from me during the examination.

17.     There were a total of approximately four proctors in the examination room. Prior to the examination, the proctors instructed us to turn off our cellular phones, that we had to raise our hands in our seats to use the bathroom, that tests must remain flat on our desks until the exam began, backpacks must be stowed under tables until the end of the examination, and that we could not open our backpacks once the examination began.

18.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including monitoring students during breaks, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

19.     I did not observe any students in my examination room cheating. I did not observe any student using study guides in the testing room. I also did not observe any student using a cellular phone during the examination.

AP Calculus BC

20.     I took my AP Calculus BC examination at the Mills High School Library. I sat at a long table in the computer area during this examination. My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

21.     One other student(s) was seated at this table. This student was seated in the same direction as me. This student was more than five feet away from me.

22.     There were a total of approximately four proctors in the examination room. Prior to the examination, the proctors instructed us to turn off our cellular phones, that we had to raise our hands in our seats to use the bathroom, that tests must remain flat on our desks until the exam began, backpacks must be stowed under tables until the end of the examination, and that we could not open our backpacks once the examination began.

23.     The proctors also took steps to ensure that the testing environment was secure and appropriate, including monitoring students during breaks, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

24.    I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.

AP Government

25.    I took my AP Government examination at the Mills High School Library.  I sat at a long rectangular table in a computer area during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

26.    No other students were seated at this table.  No other students were within five feet of me during this examination

27.    There were a total of approximately four proctors in the examination room.  Prior to the examination, the proctors instructed us to turn off our cellular phones, that we had to raise our hands in our seats to use the bathroom, that tests must remain flat on our desks until the exam began, backpacks must be stowed under tables until the end of the examination, and that we could not open our backpacks once the examination began.

28.    The proctors also took steps to ensure that the testing environment was secure and appropriate, including monitoring students during breaks, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

29.    I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.

AP Macroeconomics

30.    I took my AP Macroeconomics examination at the Mills High School Library.  I sat at a long rectangular table in a computer area during this examination.  My seat was pre-assigned; I was not allowed to select my own seat or people by whom to sit.

31.    One other student was seated at this table.  This student sat in the same direction as me.  This student sat more than five feet away from me.

32.    There were a total of approximately four proctors in the examination room.  Prior to the examination, the proctors instructed us to turn off our cellular phones, that we had to raise our hands in

- 4 -

DECLARATION

1  our seats to use the bathroom, that tests must remain flat on our desks until the exam began, backpacks

2  must be stowed under tables until the end of the examination, and that we could not open our backpacks

3  once the examination began.

4       33.    The proctors also took steps to ensure that the testing environment was secure and

5  appropriate, including monitoring students during breaks, allowing only one student to use the restroom

6  at a time, and strictly enforcing time limitations.

7       34.    I did not observe any students in my examination room cheating. I did not observe any

8  student using study guides in the testing room. I also did not observe any student using a cellular phone

9  during the examination.

10       Invalidation of AP Examination Scores

11       35.    The answers on my AP examinations were my work and my work alone.

12       36.    I learned that my May 2013 AP examination scores had been invalidated in July 2013.

13       37.    I paid $90 to the College Board and Educational Testing Services to take each AP

14  examination. In signing up for these examinations and paying this fee, I understood that the College

15  Board and ETS would score my examinations and report these results to colleges and universities to

16  which I applied for admission.

17       38.    Prior to taking my May 2013 AP examinations, I was never informed, advised or

18  instructed regarding the seating arrangements for these examinations. I relied on the College Board,

19  Educational Testing Services, and the San Mateo Unified School District to ensure that the test

20  environment was satisfactory.

21       39.    The invalidation of my May 2013 AP examination scores has harmed my academic

22  standing. Because of the invalidation of my AP Calculus BC score, I cannot take second semester math

23  at UC Berkeley. I am instead waitlisted for first semester math. I also cannot enroll in statistics because

24  that class requires one semester of calculus, which I now do not have.

25       40.    The invalidation of my May 2013 AP examination scores may also affect my class

26  scheduling in the future. Without these AP examination scores, I may have fewer units and may be

27  assigned later appointment times to enroll in classes, thus decreasing the chance of enrolling in the

28  classes I want.

- 5 -

DECLARATION

41.     Retaking my May 2013 AP examinations is unreasonable because I would have to study for six examinations in two weeks.  These six classes took a year to prepare for.  My re-test scores will definitely not be up to par with my May 2013 scores.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 2<u>nd</u> day of August, 2013 at <u>Burlingame</u>, California.

8/2/2013

Brandon Ye

**EXHIBIT N**

1

2

3

4

5

6

7

8

9          SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      COUNTY OF SAN MATEO

11

12   SAN MATEO UNION HIGH SCHOOL          Case No.
     DISTRICT, individually and on behalf of the
13   members of the SAN MATEO UNION HIGH    **DECLARATION OF PAUL SETO**
     SCHOOL DISTRICT, and AP STUDENTS –
14   VIKING PARENT GROUP, an
     unincorporated
15   California association,

16                  Plaintiffs,

17                      v.

18   EDUCATIONAL TESTING SERVICES, a
     corporation; and COLLEGE ENTRANCE
19   EXAMINATION BOARD, a corporation; and
     DOES 1 through 10, inclusive,
20
                    Defendants
21

22       I, Paul Seto, declare as follows:

23       1.      The statements in this declaration are based on my own personal knowledge and, if

24   called as a witness, I could and would testify thereto.

25       2.      I am a parent of Noah Seto who will be a senior at Mills High School in Millbrae,

26   California.

27       3.      Noah took two Advanced Placement ("AP") examinations at Mills High School in

28   May 2013. His test scores for the following examinations were invalidated:

                                    1
                              DECLARATION

(i)    AP U.S. History, and

(ii)    AP Biology.

**Invalidation of AP Examination Scores**

4.    Noah and I learned that his May 2013 AP examination scores had been invalidated on July 17, 2013 while Noah was in China for a church mission trip.

5.    Noah is now out of the country, attending a summer abroad program in Nicaragua through Global Glimpse. He left home to attend the program on July 22, 2013, and he will not be returning from the program until August 12, 2013 at 7:30 p.m. Therefore, he will not be back from his summer abroad program in time to take the retest for AP Biology at 12:30 p.m. on August 12, 2013 and has not had time to review the material for the August 13, 2013 12:30 p.m. AP U.S. History exam.

6.    Retaking the May 2013 AP examinations is unreasonable because it will not be possible for him to study.

7.    Unlike most seniors who have already been accepted to a college, with the invalidation of Noah's scores, his college applications will be negatively impacted. The invalidation of his May 2013 AP examination scores will seriously harm his college applications for next year since even if he retests, it is likely that his scores will drop. The difference between a high or 5 score vs. a 3 or, worse, lower score, will impact the competitiveness of his application for college.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 4h day of August, 2013 at Millbrae, California.

Paul Seto

2
DECLARATION

**EXHIBIT O**

DocuSign Envelope ID: 596AAE8B-68A8-499C-8256-13EFED34CCC4

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF SAN MATEO**

| | |
|---|---|
| SAN MATEO UNION HIGH SCHOOL DISTRICT, individually and on behalf of the members of the SAN MATEO UNION HIGH SCHOOL DISTRICT, and AP STUDENTS – VIKING PARENT GROUP, an unincorporated California association, | **DECLARATION OF JEAN JOH** |
| Plaintiffs, | |
| v. | |
| EDUCATIONAL TESTING SERVICES, a corporation; and COLLEGE ENTRANCE EXAMINATION BOARD, a corporation; and DOES 1 through 10, inclusive. | |
| Defendant. | |

DECLARATION

DocuSign Envelope ID: 596AAE8B-68A8-499C-8256-13EFED34CCC4

I, Jean Joh, declare as follows:

1.     The statements in this declaration are based on my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.     I was a proctor for the Advanced Placement ("AP") Chemistry, Calculus AB, and English Literature examinations at Mills High School in May 2013.  Unless otherwise noted, all statements contained herein refer to the testing conditions at all three of these examinations.

3.     When students arrived at Mills High School to check in for the May 2013 AP examinations, they were provided badges that identified them as Mills High School students on-site for AP testing.  Students were required to wear these badges at all times.  Before even entering the building, the proctors instructed students that they were to completely turn off and put away their cell phones into their bags (not pockets), and that they could not look at their phones until the examinations were completed. Students were lined up in alphabetical order outside before entering the building and their testing rooms.  Students were also instructed to refrain from speaking to each other as they entered the building, and told that they should stay quiet during breaks as well.

4.     I proctored the AP Chemistry, AP Calculus AB, and AP English Literature examinations at the California Teachers Association ("CTA") building.  To the best of my recollection, students were seated at approximately 35-40 tables, the majority of which were square tables.  Student seats were pre-assigned; students were not allowed to select their own seat or people by whom to sit.

5.     There were two students seated at most of these tables; three students were seated at some tables. The students were seated approximately three to four feet away from each other.  On the tables at which two students were seated, the students sat across from each other.  At the square tables containing three students, the students each sat on different sides of the table.

6.     There was one main proctor and three other proctors (including myself) in the examination room during the AP Chemistry and AP English Literature examinations.  There was one main proctor and two other proctors (including myself) in the examination room during the AP Calculus AB examination.  Once the students entered the room, the main proctor guided the students one-by-one to their seats.  Once they were seated, the main proctor read through the instructions in the proctor's manual word-by-word and reiterated the policy prohibiting use of cellular phones.  We went around the

DocuSign Envelope ID: 596AAE8B-68A8-499C-8256-13EFED34CCC4

1    room to make sure that all items were put under the students' seats except for the items they would need

2    for the examinations.

3           7.      We also took steps to ensure that the testing environment was secure and appropriate,

4    including walking around the room during the entire examination, monitoring students in the hallways

5    and during breaks, allowing only one male student and one female student to use the restroom at a time,

6    and strictly enforcing time limitations. Students were not allowed to take anything with them during

7    breaks except for the snacks they brought, and I did not observe any of them speaking about the exam.

8           8.      Students taking the AP Calculus AB examination were allowed to use calculators. We

9    checked to confirm that the devices the students had were calculators, and that the devices did not have

10    any recording or networking capability. We instructed students not to lift any items off of the table at

11    any time, including their calculators.

12           9.      I did not observe any students in my examination room cheating. I did not observe any

13    student using study guides in the testing room. I also did not observe any student using a cellular phone

14    during the examinations. Students kept their eyes on their own papers throughout the examinations.

15

16           I declare under penalty of perjury under the laws of State of California and the United States of

17    America that the foregoing is true and correct.

18

19           Executed this _6th_ day of August, 2013 at _____ Millbrae _____, California.

20

21

22    Jean Joh

23

24

25

26

27

28

DECLARATION

**EXHIBIT P**

1
2
3
4
5
6
7

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8
9

**IN AND FOR THE COUNTY OF SAN MATEO**

10
11
12
13

SAN MATEO UNION HIGH SCHOOL DISTRICT, individually and on behalf of the members of the SAN MATEO UNION HIGH SCHOOL DISTRICT, and AP STUDENTS – VIKING PARENT GROUP, an unincorporated California association,

**DECLARATION OF JANET CHOY**

14

Plaintiffs,

15

v.

16
17
18

EDUCATIONAL TESTING SERVICES, a corporation; and COLLEGE ENTRANCE EXAMINATION BOARD, a corporation; and DOES 1 through 10, inclusive.

Defendant.

19
20
21
22
23
24
25
26
27
28

DECLARATION

I, Janet Choy, declare as follows:

1.      The statements in this declaration are based on my own personal knowledge and, if called as a witness, I could and would testify thereto.

2.      I proctored the AP Biology examination at the Mills High School Library in May 2013.

3.      Students sat at square, rectangular, and round tables during the examination.  Some students also took the examination at computer cubicles.

4.      One student sat at each of the square tables.  Students seated in each row of square tables faced the same direction.  These students were approximately three to four feet away from each other.

5.      Three students sat at each of the rectangular tables.  These students sat diagonally across from each other during the examination.

6.      There was one student seated at each of the computer cubicles. These students were approximately two to three feet away from each other.

7.      To the best of my recollection, there were three students seated at each of the round tables.  These students were approximately two to three feet away from each other.

8.      There were four proctors in the examination room.  The proctors took steps to ensure that the testing environment was secure and appropriate, including walking around the room and observing the students take their tests, and strictly enforcing time limitations.

9.      I did not observe any student leave the room while I was proctoring the examination.  I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.  I did not observe any student leave the room while I was proctoring the examination.

I declare under penalty of perjury under the laws of State of California and the United States of America that the foregoing is true and correct.

Executed this 6 day of August, 2013 at _Burlingame_, California.

JANET CHOY

- 1 -
ARA

# EXHIBIT Q

1
2
3
4
5
6
7
8

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9

**IN AND FOR THE COUNTY OF SAN MATEO**

10
11
12
13

SAN MATEO UNION HIGH SCHOOL
DISTRICT, individually and on behalf of the
members of the SAN MATEO UNION HIGH
SCHOOL DISTRICT, and AP STUDENTS –
VIKING PARENT GROUP, an unincorporated
California association,

**DECLARATION OF GORDON LEE**

14

Plaintiffs,

15

v.

16
17

EDUCATIONAL TESTING SERVICES, a
corporation; and COLLEGE ENTRANCE
EXAMINATION BOARD, a corporation; and
DOES 1 through 10, inclusive.

18

Defendant.

19
20
21
22
23
24
25
26
27
28

DECLARATION

I, Gordon Lee, declare as follows:

1.    The statements in this declaration are based on my own personal knowledge and, if called as a witness, I could and would testify thereto.

2.    I was a proctor for the following Advanced Placement ("AP") examinations at Mills High School in May 2013:

        (i)    AP Biology; and

        (ii)    AP English Literature and Composition.

AP Biology

3.    The AP Biology examination was held at the Mills High School Library.  Students sat at rectangular and round tables during this examination.  Student seats were pre-assigned; students were not allowed to select their own seats or by whom to sit.

4.    To the best of my recollection, there were two students seated at each rectangular table. The students at the rectangular tables sat facing the same direction during this examination.  These students were approximately four feet away from each other.

5.    To the best of my recollection, there were two students seated at each round table.  The students at the round tables sat across from each other during this examination.  These students were approximately four feet away from each other.

6.    There were a total of four proctors in the examination room.  Prior to the examination, the proctors gave many instructions to the students, including: No talking allowed during the examination, examinations must remain flat on the table, and students must raise their hands in order to use the bathroom or ask questions.

7.    The proctors also took steps to ensure that the testing environment was secure and appropriate, including walking around the room monitoring students, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

8.    I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.

<u>AP English Literature and Composition</u>

9.      The AP Biology examination was held at the California Teachers Association building. Students sat at rectangular and round tables during this examination.  Student seats were pre-assigned; students were not allowed to select their own seats or by whom to sit.

10.      To the best of my recollection, there were two students seated at each rectangular table. The students at the rectangular tables sat facing the same direction during this examination.  These students were approximately four feet away from each other.

11.      To the best of my recollection, there were two students seated at each round table.  The students at the round tables sat across from each other during this examination.  These students were approximately four feet away from each other.

12.      There were a total of three proctors in the examination room.  Prior to the examination, the proctors gave many instructions to the students, including:  No talking allowed during the examination, examinations must remain flat on the table, and students must raise their hands in order to use the bathroom or ask questions.

13.      The proctors also took steps to ensure that the testing environment was secure and appropriate, including walking around the room monitoring students, allowing only one student to use the restroom at a time, and strictly enforcing time limitations.

14.      I did not observe any students in my examination room cheating.  I did not observe any student using study guides in the testing room.  I also did not observe any student using a cellular phone during the examination.


I declare under penalty of perjury under the laws of State of California and the United States of America that the foregoing is true and correct.


Executed this _5th_ day of August, 2013 at ____Millbrae_____, California.


Gordon Leong Lee   Digitally signed by Gordon Leong Lee
                    DN: cn=Gordon Leong Lee, o=US, ou=13 Media
                    Group, email=glee@a13mediagroup.com
                    Date: 2013.08.05 15:18:47 -07'00'

GORDON LEE

- 2 -

DECLARATION

1    Nancy L. Fineman (Cal. SBN 124870)
      nfineman@cpmlegal.com
2    Aron K. Liang (Cal. SBN 228936)
      aliang@cpmlegal.com
3    **COTCHETT, PITRE & McCARTHY LLP**
      San Francisco Airport Office Center
4    840 Malcolm Road, Suite 200
      Burlingame, CA  94010
5    Telephone:     (650) 697-6000
      Facsimile:      (650) 697-0577
6

7    Gregory A. Wedner (Cal. SBN 67965)       Jack W. Lee (Cal. SBN 71626)
      gwedner@lozanosmith.com                   jlee@minamitamaki.com
8    **LOZANO SMITH**                         Sean Tamura-Sato (Cal. SBN 254092)
      One Capitol Mall, Suite 640             seant@minamitamaki.com
9    Sacramento, CA 95814               **MINAMI TAMAKI LLP**
      Telephone: (916) 329-7433           360 Post Street, 8th Floor
10   Facsimile: (916) 329-9050            San Francisco, California 94108-4903
                                        Telephone: 415 788 9000
11   *Attorneys for Petitioner/Plaintiff San Mateo*    Facsimile: 415 398 3887
      *Union High School District*
12                                        *Attorneys for Petitioner/Plaintiff AP Students –*
                                       *Viking Parent Group*

13

14                  **IN THE SUPERIOR COURT OF CALIFORNIA**

15                 **IN AND FOR THE COUNTY OF SAN MATEO**

16

17   **SAN MATEO UNION HIGH SCHOOL** )    **CASE NO. Civ. 523184**
      **DISTRICT, individually and on behalf** )
18   **of the members of the SAN MATEO**     )    **PLAINTIFFS' REQUEST FOR JUDICIAL**
      **UNION HIGH SCHOOL DISTRICT**     )    **NOTICE IN SUPPORT OF** *EX PARTE*
19   **and AP STUDENTS - VIKING**          )    **APPLICATION FOR TEMPORARY**
      **PARENT GROUP,**                 )    **RESTRAINING ORDER AND ORDER TO**
20                                       )    **SHOW CAUSE RE PRELIMINARY**
                **Plaintiffs,**        )    **INJUNCTION**
21                   v.               )
      **EDUCATIONAL TESTING**          )
22   **SERVICES, a New York corporation;**   )    Date:          August 8, 2013
      **and COLLEGE ENTRANCE**        )    Time:          2:00 p.m.
23   **EXAMINATION BOARD, a New York** )   Department:   21
      **corporation; and DOES 1 through 10,**   )   Judge:       Judge Robert D. Foiles
24   **inclusive,**                            )
                **Defendants.**     )
25   ——————————————————

26

27

28

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

---

**PLAINTIFFS' RJN ISO** *EX PARTE* **APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. 523184**

Pursuant to Evidence Code §§ 450, 451, 452, 453, and 454, Plaintiffs request the Court take judicial notice of the following documents. If for any reason the Defendants object to any of these documents, Plaintiffs request the right to take the necessary discovery to authenticate the documents for this Court.

## I. DOCUMENTS OF WHICH PLAINTIFFS REQUEST COURT TAKES JUDICIAL NOTICE

Plaintiffs hereby request that the Court take judicial notice of the following documents attached as <u>Exhibits 1 through 12</u>.

<u>Exhibit 1</u>: Opposition of Educational Testing Service and the College Board to Plaintiffs' *Ex Parte* Application for Order to Show Cause re Preliminary Injunction and Temporary Restraining Order filed in *Justice for 375 Trabuco Scholars et al. v. Educational Testing Service and College Entrance Examination Board*, Orange County Case No. 30-2008-00109666.

<u>Exhibit 2</u>: Declaration of Susan Landers filed by Educational Testing Service and College Board in *Justice for 375 Trabuco Scholars et al. v. Educational Testing Service and College Entrance Examination Board*, Orange County Case No. 30-2008-00109666.

<u>Exhibit 3</u>: Declaration of Karl Clark in Support of Defendants' Opposition to Temporary Restraining Order filed by Defendants Educational Testing Service and College Board in *Justice for 375 Trabuco Scholars et al. v. Educational Testing Service and College Entrance Examination Board*, Orange County Case No. 30-2008-00109666.

<u>Exhibit 4</u>: Put AP to Work for You found at https://apstudent.collegeboard.org/exploreap/the-rewards.

<u>Exhibit 5</u>: AP Scholar Awards found at https://apstudent.collegeboard.org/scores/ap-awards/ap-scholar-awards.

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

| | | |
|---|---|---|
| 1 | Exhibit 6: | 2012-13 AP Coordinator's Manual found at |
| 2 | | professionals.collegeboard.com/.../2012-13_AP_Coordinators_Manual.pdf |
| 3 | Exhibit 7: | 2012-13 AP Participation Form found at |
| 4 | | http://professionals.collegeboard.com/profdownload/ap-participation-form |
| 5 | | .pdf |
| 6 | Exhibit 8: | AP Bulletin for AP Students and Parents (2012-2013) found at |
| 7 | | media.collegeboard.com/.../2012-13AP_Bulletin_Students_Parents.pdf. |
| 8 | Exhibit 9: | Why and How ETS Questions Test Scores found at |
| 9 | | www.ets.org/s/praxis/pdf/why_and_how.pdf. |
| 10 | Exhibit 10: | Website from Yale College re Award of Acceleration Credit Based on |
| 11 | | Advanced Placement Test Scores found at |
| 12 | | http://yalecollege.yale.eud/content/table-acceration-credit and |
| 13 | | http://yalecollege.edu/content/aware-acceleration-credit-based-advanced- |
| 14 | | placement-test-scores. |
| 15 | Exhibit 11: | Website from the University of California regarding AP credits, found at |
| 16 | | http://admission.universityofcalifornia.edu/counselors/exam-credit/ap- |
| 17 | | credits/index.html. |
| 18 | Exhibit 12: | Website from the University of California, San Diego re university course |
| 19 | | exemptions found at |
| 20 | | http://admission.universityofcalifornia.edu/counselors/exam-credit/ap- |
| 21 | | credits/san-diego. |
| 22 | | |

## II.   STANDARD FOR TAKING JUDICIAL NOTICE OF DOCUMENTS

The purpose of judicial notice is recognize the existence of a matter of law or fact without the necessity of formal proof.  Evidence Code § 450 *et seq.*; *see Gravert v. DeLuse* (1970) 6 Cal.App.3d 576, 580; *Varcoe v. Lee* (1919) 180 Cal. 338, 344.  The Court must take judicial notice of certain matters as set forth in Evidence Code § 451 and shall, if a proper request is

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

PLAINTIFFS' RJN ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. 523184          2

1    made, take judicial notice of the matters in Evidence Code § 452.  Evidence Code §§ 451, 452,
2    453.

3        In order to determine whether to take judicial notice of a matter or the tenor thereof, the
4    Court may use "[a]ny source of pertinent information."  Evidence Code § 454.

5        **A.    DOCUMENTS IN COURT FILES**

6        The Court may take judicial notice of documents from the court files and records of any
7    court of record in the United States or any state of the United States.  Evidence Code § 452(d).
8    The documents from the court file in *Justice for 375 Trabuco Scholars et al. v. Educational*
9    *Testing Service and College Entrance Examination Board*, Orange County Case No. 30-2008-
10   00109666, Exhibits 1, 2, and 3, are documents that Defendants filed, including a Declaration of
11   Susan Landers, an employee of the College Board, and Karl Clark, an employee of ETS.  These
12   declarations are admissions by authorized agents of Defendants.

13       **B.    DOCUMENTS ON DEFENDANTS' WEBSITE**

14       Courts take judicial notice of documents on a party's website.  *Ampex Corp. v. Cargle*
15   (2005) 128 Cal.App.4th 1569, 1573 fn 2. The documents that College Board posts on its website
16   regarding AP exams, Exhibits 4, 5, 6, 7, 8, and 9,  "are not reasonably subject to dispute and are
17   capable of immediate and accurate determination by resort to sources of reasonably indisputable
18   accuracy" Evid. Code § 452(h).

19

20

21

22

23

24

25

26   ///

27   ///

28

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

**PLAINTIFFS' RJN ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. 523184**                          3

C.    **DOCUMENTS FROM UNIVERSITY WEBSITES REGARDING CREDIT GIVEN FOR THE AP EXAM**

The documents from university websites regarding the credit given for AP exams, Exhibits 10, 11, and 12, "are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" Evid. Code § 452(h).

Dated:  August 6, 2013

**COTCHETT, PITRE & McCARTHY LLP**

By:    NANCY L. FINEMAN

**LOZANO SMITH**

By:    GREGORY A. WEDNER / ALP

*Attorneys for Petitioner/Plaintiff*
*San Mateo Union High School District*

**MINAMI TAMAKI LLP**

By:    JACK W. LEE / ALP

*Attorneys for Petitioner/Plaintiff*
*AP Students - Viking Parent Group*

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

PLAINTIFFS' RJN ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. 523184          4

# EXHIBIT 1

1    O'MELVENY & MYERS LLP
     Michael G. Yoder     (Cal. Bar No. 83059)
2    Amy Laurendeau     (Cal. Bar No. 198321)
     610 Newport Center Drive, 17th Floor
3    Newport Beach, CA 92660
     (949) 760-9600
4    (949) 823-6994 (facsimile)

5    WILMER CUTLER PICKERING
     HALE AND DORR LLP
6    Bruce M. Berman (*pro hac pending*)
     Jonathan E. Paikin (*pro hac pending*)
7    1875 Pennsylvania Ave., NW
     Washington, DC  20006
8    (202) 663-6000
     (202) 663-6363 (facsimile)
9
     *Attorneys for Defendants Educational Testing Service*
10   *and College Entrance Examination Board*

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12              COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

13

14   JUSTICE FOR 375 TRABUCO          )
     SCHOLARS, an unincorporated       )
15   California association; DANIEL     )   Case No. 30-2008-00109666
     McCLURE, an individual; KELSEY     )
16   CLARK, an individual; and HELEN    )   Assigned To: Hon. Jamoa Moberly
     PASTORES, an individual,           )   Department:  C-7
17                                      )
                    Plaintiffs,         )
18                                      )   OPPOSITION OF EDUCATIONAL
          v.                            )   TESTING SERVICE AND THE COLLEGE
19                                      )   BOARD TO PLAINTIFFS' *EX PARTE*
     EDUCATIONAL TESTING SERVICE, a    )   APPLICATION FOR ORDER TO
20   New York corporation; COLLEGE      )   SHOW CAUSE RE PRELIMINARY
     ENTRANCE EXAMINATION BOARD,        )   INJUNCTION AND TEMPORARY
21   A New York corporation; and DOES 1 )   RESTRAINING ORDER
     through 100, inclusive,            )
22                                      )   Time:        1:30 p.m.
                                        )   Dept.:       C-7
23   Defendants.                        )   Hearing Date:  July 30, 2008
                                        )
24                                          [DECLARATIONS OF SUSAN LANDERS,
                                            CARSWELL WHITEHEAD, KARL
25                                          CLARK AND AMY SCHMIDT, Ph. D.
                                            FILED CONCURRENTLY HEREWITH]
26

27

28
     ─────────────────────────────────────────────────────────
     DEFENDANTS' OPPOSITION TO *EX PARTE* TEMPORARY RESTRAINING ORDER

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

JUL 30 2008

ALAN SLATER, Clerk of the Court
BY D. DUNNING

ORIGINAL

# TABLE OF CONTENTS

| | Page |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| FACTUAL BACKGROUND | 2 |
| A. The AP Program and AP Examinations | 2 |
| B. AP Test Administration Procedures | 3 |
| C. Testing Irregularities at Trabuco Hills High School | 4 |
| D. Free Retests | 7 |
| ARGUMENT | 8 |
| I. PLAINTIFFS DO NOT SPEAK FOR ALL TEST TAKERS | 8 |
| II. PLAINTIFFS' LAWSUIT IS MERITLESS | 8 |
| A. The College Board Has a Contractual Right to Cancel Scores | 8 |
| B. By Complying with the Contract, the College Board Acted in Good Faith. | 12 |
| C. The College Board Need Not Conduct a Police-Style Investigation. | 13 |
| III. THE EQUITIES ARE NOT IN PLAINTIFFS' FAVOR | 15 |
| CONCLUSION | 16 |

# TABLE OF AUTHORITIES

Page

**Cases**

*Braunstein v. ETS,*
No. MON-C-247-01 (N.J. Super. Ct. Ch. Div. Nov. 7, 2001)........................................................ 13

*Carma Developers, Inc. v. Marathon Dev. California, Inc.,*
2 Cal. 4th 342 (1992) ...................................................................................................................... 12

*County of San Luis Obispo v. Abalone Alliance,*
178 Cal. App. 3d 848 (1986) ........................................................................................................... 8

*Crow v. ETS,*
No. 80-1865, 1982 U.S. Dist. LEXIS 18191 (W.D. La. Apr. 28, 1982) ................................... 13, 14

*Dalton v. ETS,*
87 N.Y.2d 384 (1995)..................................................................................................................... 11

*Denburg v. ETS,*
No. C-1715-83 (N.J. Super. Ct. Ch. Div. Aug. 4, 1983), *amended by* Letter to Counsels, No. C-
1715-83 (N.J. Super. Ct. Ch. Div. Sept. 9, 1983) ......................................................................... 13

*DePina v. ETS,*
297 N.Y.S.2d 472 (App. Div. 1969)............................................................................................... 13

*Doe v. Nat'l Bd. of Podiatric Med. Exam'rs,*
No. 03-CIV-4034, 2003 U.S. Dist. LEXIS 10281 (S.D.N.Y. June 19, 2003)........................... 12, 13

*Hi-Desert County Water Dist. v. Blue Skies Country Club, Inc.,*
23 Cal. App. 4th 1723 (1994) ........................................................................................................ 10

*Johnson v. ETS,*
754 F.2d 20 (1st Cir. 1985).............................................................................................................. 13

*K.D. v. ETS,*
386 N.Y.S.2d 747 (Sup. Ct. 1976)...................................................................................... 10, 13, 16

*King v. Meese,*
43 Cal. 3d 1217 (1987) .................................................................................................................... 16

*Kirkendoll v. ETS,*
C-No.-97-0744, 1997 U.S. Dist. LEXIS 24190 (W.D. La. June 30, 1997).................................... 13

*Klein v. Earth Elements, Inc.,*
59 Cal. App. 4th 965 (1997) ........................................................................................................... 12

*Langston v. ACT Inc.,*
890 F.2d 380 (11th Cir. 1989) .................................................................................................... 9, 13

*Maupin v. Nat'l Bd. Podiatric Med. Exam'rs,*
No. 03-20027-CIV-ALTONAGA (S.D. Fla. July 3, 2003)............................................................ 13

*McAlister v. ETS,*
CV-No.-95-7880 (C.D. Cal. June 13, 1997)................................................................................ 9, 13

*Murray v. ETS,*
170 F.3d 514 (5th Cir. 1999) .................................................................................................... 10, 16

*Perez v. Hastings Coll. of the Law,*
45 Cal. App. 4th 453 (1996)............................................................................................................. 8

*Residents of Beverly Glen, Inc. v. City of Los Angeles,*
34 Cal. App. 3d 117 (1973) ............................................................................................................. 8

*Rothberg v. Law School Admissions Council,*
No. 04-1060, 102 Fed. Appx. 122, 125 (10th Cir. June 16, 2004)................................................. 16

*Scott v. ETS,*
600 A.2d 500 (N.J. Super. Ct. App. Div. 1991) ........................................................................ 13, 14

i

*Scripps Clinic v. Superior Court,*
  108 Cal. App. 4th 917 (2003) ..................................................................................... 12
*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.,*
  100 Cal. App. 4th 44 (2002) ..................................................................................... 12
*Tenants Ass'n of Park Santa Anita v. Southers,*
  222 Cal. App. 3d 1293 (1990) ..................................................................................... 8
*Thompson v. ETS,*
  No. PAS-L-2203-99 (N.J. Super. Ct. Law Div. Jan. 30, 2001) ....................................... 13
*Wehrhahn v. ETS,*
  No. C-104-96 (N.J. Super. Ct. Ch. Div. Jan. 23, 1998) .................................................. 13
*Yaeger v. ETS,*
  551 N.Y.S.2d 574 (App. Div. 1990) ..................................................................... 13, 16

**Statutes**
Cal. Bus. & Prof. Code Section 17200 ............................................................................. 12
Cal. Civ. Proc. Code § 382 .............................................................................................. 8

DEFENDANTS' OPPOSITION TO EX PARTE TEMPORARY RESTRAINING ORDER

# PRELIMINARY STATEMENT

The College Board's Advanced Placement Program enables high school students to qualify for advanced college placement, credit or both.  High schools wishing to administer AP exams must agree to comply with detailed test administration procedures promulgated by the College Board's contractor, Educational Testing Service ("ETS").  Students wishing to take the exams must accept the AP Program's policies and procedures.

As the principal of Trabuco Hills High School ("THHS") has acknowledged, when THHS administered the AP exams this past May 5-16, "there were breaches on the school's part regarding strict adherence to the AP Testing protocol."[1]  As just one example, the rules require three proctors for tests with 50-100 test takers, and four proctors for tests with over 100 test takers.  On ten tests administered at THHS, there were more than 50 students but only one proctor.  Because of the "circus atmosphere"[2] at THHS, students had an opportunity to gain an unfair advantage on those exams.  Ten students admitted cheating on one or two exams; there is no way to know whether they also cheated on others, or whether other students also engaged in misconduct.

The College Board has a clear contractual right to cancel AP scores when exams are not administered properly.  Defendants cannot, and are not required to, make individual determinations of guilt or innocence before cancelling scores in such circumstances.  After considering the extent of testing irregularities at THHS, the College Board determined – and, on July 8, notified THHS and affected students – that grades for seven exams could be released, but grades for the ten large administrations (*i.e.*, more than 50 students) had to be canceled and the test reoffered.  The proctor-to-student ratios at those exams, coupled with the seating violations and other breaches of testing protocol, made it impossible for the College Board to vouch for the grades.  Although it recognized that innocent students would be inconvenienced, its decision was compelled by fairness to all test takers and the colleges and universities that rely on AP scores.

---

[1]      Letter from Mr. Daniel Sullivan to ETS Office of Testing Integrity, dated June 3, 2008 (attached to the Declaration of Carswell Whitehead as Exhibit 8).

[2]      *Trouble at Trabuco*, L.A. Times, Jul. 25, 2008, at A20.

1

1        AP grades have been cancelled based on testing irregularities before, and those decisions

2  have been upheld. Indeed, there have been two AP testing irregularity cases nearly identical to this

3  one in the Los Angeles area alone. In August 1997 the grades of 250 test takers at Mira Costa High

4  School were cancelled; in August 1989 the grades of 79 test takers at Crescenta Valley High School

5  were cancelled.[3/] Both times TROs were sought, and both times denied, because the decision was

6  consistent with the contract. As even Plaintiffs seem to concede, no court has ever compelled the

7  College Board or ETS to report test scores under such circumstances.

8        Nearly 350 THHS students have signed up for retests, which are now scheduled to begin

9  next Wednesday, August 6, and review courses have begun at THHS.[4] Nonetheless, more than three

10  weeks after they were notified of the retests, and without any showing of irreparable harm as a result

11  of the retesting, Plaintiffs ask the Court to block *all students from taking the retests* until or unless

12  the College Board and ETS prove that individual students cheated. Just as in Mira Costa and

13  Crescenta Valley, an injunction should be denied here. There is no way for Defendants to tell who

14  cheated and who did not, and, accordingly, the contract does not require them to do so. The College

15  Board has the right to cancel test scores when there are testing irregularities, and that is why AP

16  grades were cancelled at THHS. An injunction should be denied for an additional reason. Plaintiffs

17  do not speak for the THHS students who have registered for the retests, and those students would be

18  irreparably harmed if retesting were temporarily enjoined.

19                          **FACTUAL BACKGROUND**

20  **A.**    **The AP Program and AP Examinations**

21        Since 1955, the AP Program has enabled millions of test takers to take college-level courses

22  and exams, and to earn college credit or placement, while still in high school. Declaration of Susan

23  Landers ("Landers Decl."), at ¶ 4. Many colleges and universities grant credit, placement or both to

24

25  [3/]    *Judge Denies Request to Reinstate Test Scores*, L.A. Times, Aug. 2, 1997, at B2; *Cheating by 7 Students Voids College Credit Exams*, L.A. Times, Aug. 3, 1989, at 1 (attached to Declaration

26  of Carswell Whitehead as Exhibit 1).

27  [4]    Many students registered when the retests were scheduled to begin on August 11. When they were rescheduled at the request of THHS, students were asked to re-register. The re-registration

28  period remains open.

DEFENDANTS' OPPOSITION TO EX PARTE TEMPORARY RESTRAINING ORDER

1   matriculating students based on their AP exam grades. *Id.* Last year, 1.4 million test takers took

2   more than 2.5 million AP exams. *Id.* Exams are offered in 37 courses in 22 different subject areas.

3   *Id.* Grades are reported on a 5 point scale: 5 (extremely well qualified); 4 (well qualified); 3

4   (qualified); 2 (possibly qualified); and 1 (no recommendation). *Id.* ¶ 8. Each college and university

5   decides for itself whether to grant advanced placement, credit, or both based on AP grades. *Id.* ¶ 9.

6       **B.       AP Test Administration Procedures**

7           The AP Program's success rests on the confidence of institutions of higher education that

8   students' AP grades accurately reflect their knowledge. *Id.* ¶ 10. The College Board therefore has a

9   significant stake in the integrity of AP grades. ETS is responsible for test security for the AP

10  Program. ETS prescribes test administration procedures; it may investigate reported noncompliance

11  with the procedures; and it makes recommendations for resolving such cases. The College Board

12  makes the final decision about what action to take in testing irregularity cases. *Id.*

13          Every high school that administers AP exams designates an AP Coordinator and receives the

14  *AP Coordinator's Manual.* Declaration of Carswell Whitehead ("Whitehead Decl."), at ¶ 7, Ex. 4.

15  The *AP Manual* includes the following test administration rules: (1) the school must assign 3

16  proctors for tests with 51–100 test takers, and 4 proctors for tests with more than 100 test takers; (2)

17  proctors must remain attentive; (3) test takers must be seated randomly, facing the same direction,

18  and with a specified amount of space between them; (4) test takers may not bring study aids and cell

19  phones into the test room; (5) tests must begin at designated times (to prevent "time zone cheating");

20  and (6) only one test taker at a time may leave the test room. *Id.*, Ex. 2, 4. The rules maximize

21  fairness to all test takers and minimize the risk that AP grades will have to be cancelled. *Id.* ¶ 6.

22          Each high school must agree to comply with AP test administration rules. *Id.* ¶ 8, Ex. 5.

23  THHS principal Daniel Sullivan and AP Coordinator William Rollins both promised in writing: "I

24  will ensure that AP Exams will be administered *in exact accordance* with the policies and

25  procedures detailed in the 2008 AP Coordinator's Manual." *Id.* ¶ 8, Ex. 5 (emphasis added).

26          Test takers are also put on notice of the importance of AP test administration requirements.

27  The *Bulletin for AP Students and Parents* ("*AP Bulletin*") warns that, "[w]hen testing irregularities

28  occur, the AP Program may decline to grade the exam or may cancel the grade." *Id.* ¶ 6, Ex. 2. At

1    the start of each exam, test takers also affirm: "I am aware of and agree to the AP Program's policies

2    and procedures as outlined in the 2007-08 Bulletin for AP Students and Parents . . . ." *Id.* ¶ 5, Ex. 3.

3    Nowhere does the *AP Bulletin* say that grades may be cancelled only upon proof of cheating.

4            **C.**    **Testing Irregularities at Trabuco Hills High School**

5          On May 13, 2008, ETS's Office of Testing Integrity received an alarming email. A THHS

6    AP student disclosed that another THHS student sent text messages during the Statistics exam on

7    May 6, the first day of AP testing. The e-mail also stated that other THHS test takers had boasted

8    that they would cheat on the U.S. History exam and the Physics B exam, and that THHS test takers

9    in other AP exams had been allowed to continue writing after time was called. The e-mail

10   concluded: "I attend Trabuco Hills High School, and I think if proctors take the test more seriously,

11   cheating could be eliminated at my school at least on AP tests." *Id.* ¶ 10, Ex. 6.

12         ETS immediately alerted Bill Rollins, THHS' Vice Principal and AP Coordinator. *Id.* ¶ 11.

13   He claimed to be unaware of any misconduct or irregularities, and he offered to speak with AP exam

14   proctors. *Id.* ETS later learned that Mr. Rollins himself was the sole proctor for the Statistics exam

15   and many others. Declaration of Karl Clark ("Clark Decl."), at ¶ 7, Ex. 8. The Macroeconomics and

16   Microeconomics exams were administered the same day ETS spoke to Mr. Rollins. THHS students

17   later admitted cheating on both. *Id.* ¶¶ 9, 16; Whitehead Decl., at ¶ 11, Ex. 2.

18         On May 21, THHS Principal Daniel Sullivan called ETS to report that an investigation by

19   THHS officials had revealed "that more (possibly many more) students were involved" in the

20   misconduct alleged in the May 13, 2008 student e-mail. Whitehead Decl., at ¶ 12, Ex. 7. Test takers

21   had admitted sending text messages during the Statistics exam, and one student had a study guide in

22   the exam. *Id.* Mr. Sullivan "expressed concern that more than 10 students could have been involved

23   and that similar activity could have occurred during other exams." *Id.* Mr. Sullivan stated that he

24   would get back in touch with ETS as the investigation continued. *Id.*

25         On June 4, ETS received a letter from Mr. Sullivan dated June 3, 2008. *Id.* ¶ 14, Ex. 8. Mr.

26   Sullivan admitted that "there were breaches on the school's part regarding *strict adherence to the AP*

27   *Testing protocol in the AP Coordinator's Manual.*" *Id.* Proctor-student ratios were improper; signs

28   about cell phones were not posted; test takers seated themselves; they were seated too close together;

1   and proctors were not vigilant. *Id.* Mr. Sullivan did not confine himself to any particular exams.
2   Rather, he stated that "[a]s our school has grown, it has now become evident that we must radically
3   alter our use of facilities and personnel to properly administer our AP exams in the future." *Id.*

4          The letter included ten signed statements from students who admitted cheating on the
5   Statistics or Macroeconomics exam. *Id.* ¶ 15, Ex. 8. According to the statements, students used cell
6   phones to send and receive text messages and talked during the exam. *Id.* One student used a study
7   guide, and another copied from a nearby student. *Id.* Another reached out to a friend who had just
8   taken the test: "I contacted a student on the East Coast. I was able to do this because we started the
9   test at 1:30. . . The Vice Principal had us sign stating that we started at 12 and not a minute later."
10  *Id.* The "Vice Principal," Mr. Rollins, was not only THHS's AP Coordinator, but also the THHS
11  administrator who had told ETS he was not aware of any testing irregularities; he was also one of the
12  people assigned to conduct THHS' investigation – that is, to investigate his own failure to comply
13  with AP test administration rules. *Id.* Moreover, Mr. Sullivan indicated that, although only ten
14  students had confessed, ***more than 25 students*** had been "identified by one source or another" as
15  having cheated. *Id.* Thus, he said, "[w]e believe there may be some additional students who may
16  have breached testing protocol and have not been confirmed even after multiple investigative
17  efforts." *Id.* ¶ 16, Ex. 8, at 2.

18         Mr. Sullivan's letter and the ten test taker confessions evidenced widespread testing
19  irregularities at THHS. *Id.* ¶ 17. Therefore, the THHS matter was reclassified from a "misconduct"
20  to a "group irregularity" investigation. *Id.* ETS test security specialist Nancy Wszolek e-mailed Mr.
21  Sullivan on June 10 to ask for more information. *Id.* ¶ 18, Ex. 9. Mr. Sullivan responded by e-mail
22  that the school had interviewed approximately ***40 test takers who had been named by at least one***
23  ***source*** and eight other Statistics and Macroeconomic test takers selected at random. *Id.* Mr.
24  Sullivan stated that misconduct had also been reported on the English Literature, Physics B and U.S.
25  History exams, but THHS had not been able to confirm those reports. *Id.*

26         On June 13, ETS test security specialist Karl Clark was assigned to the THHS matter. Clark
27  Decl., at ¶ 6. Mr. Clark called Mr. Rollins that day, and Mr. Rollins told him there were significant
28  violations of seating requirements and proctor-to-student ratios on a number of AP exams. *Id.* ¶ 7.

1  Specifically, Mr. Rollins said that test takers were seated facing each other, four to a table. *Id.* Mr.

2  Rollins also stated that *all exams with more than 50 test takers had a single proctor*, either himself

3  or Bob Justice; they had proctored the Statistics and Macroeconomics exams on which ten students

4  admitted cheating. *Id.*, Ex. 8. The chart below shows the dates on which the large exams were

5  administered, the number of test takers at each exam, where each was administered, and the name of

6  the sole proctor.[1]

| Date | Title | Number of Test Takers | Testing Room | Proctor |
|---|---|---|---|---|
| May 6 | Statistics | 52 | Multipurpose | Mr. Rollins |
| May 7 | Calculus AB | 61 | Multipurpose | Mr. Justice |
|  | Calculus BC | 7 |  |  |
| May 8 | English Lit. | 63 | Multipurpose | Mr. Rollins |
| May 9 (morning) | U.S. History | 109 | Multipurpose | Mr. Justice |
| May 9 (afternoon) | Euro. History | 132 | Multipurpose | Mr. Rollins |
| May 12 | Biology | 60 | Multipurpose | Mr. Justice |
| May 13 | Chemistry | 65 | Library | Mr. Rollins |
| May 15 (morning) | Macroeconomics | 72 | Library | Mr. Justice |
| May 15 (afternoon) | Microeconomics | 69 | Library | Mr. Rollins |

15      Mr. Clark flew to California on Father's Day, June 15, and spent the next day and the

16  morning after at THHS. *Id.*, ¶ 9, Ex. 8. He met with Mr. Sullivan, Mr. Rollins and Kevin Biggs,

17  another Assistant Principal. *Id.* ¶¶ 14, 22-23. He also spoke with Mr. Justice. *Id.* ¶ 24. Mr. Clark

18  also interviewed seven students, some of whom had previously admitted to misconduct. *Id.* ¶ 29-34,

19  Ex. 8. Some students were less than candid. Others named test takers they said had engaged in

20  misconduct, but from whom THHS had not obtained admissions. Mr. Clark also inspected the

21  Multipurpose Room and the Library, where the problem exams occurred. *Id.* ¶¶ 26-27. He noted

22  the crowded conditions, the too-small tables where up to four test takers had sat for each exam, and

23  the inadequacy of the sight lines in the Library. *Id.* The details of Mr. Clark's visit are set forth in

24  his Declaration and his report, which is attached to his Declaration. *Id.*, Ex. 8. Mr. Clark concluded

25  [1]      Multiple students cheated on Statistics and Macroeconomics. Those exams were
26  administered, respectively, near the beginning and end of the exam period. THHS never claimed
   that the testing conditions that opened the door to misconduct in Statistics and Macroeconomics
27  were any different for any of the large test administrations in between. Nor is it likely that students
   who "got away with" cheating on the Statistics and Macroeconomic exams did not engage in
28  misconduct on the AP exams administered in between the two. Clark Decl., at ¶ 7, Ex. 8.

DEFENDANTS' OPPOSITION TO EX PARTE TEMPORARY RESTRAINING ORDER

1   that serious irregularities pervaded the large exam administrations at THHS, and those irregularities

2   made it impossible to determine who gained an unfair advantage and who did not. *See* Appendix A.

3        On June 24, Mr. Sullivan sent a letter to Mr. Clark stating that "[t]he administration of

4   Trabuco Hills High School truly regrets that problems occurred with our AP testing this year."

5   Whitehead Decl., Ex. 10. He promised "to radically alter" the way AP tests are administered at

6   THHS. *Id.* Mr. Sullivan further commented about the incident, as follows:

7        "It has created an acute awareness of improper cell phone use beyond our current restrictions."

8        "It has alerted us to a 'culture of blurred ethical judgment' by test takers in regard to cheating."

9        "It has alarmed teachers about testing protocol in classrooms and in national settings."

10       "It has shattered the false image that honors test takers will always act honorably." *Id.*

11       After visiting THHS, Mr. Clark recommended that the College Board "[c]ancel every grade

12   in subjects with over 50 examinees" and "[f]ully restrict/sanction the school from further exams in

13   2009 and 2010." Clark Decl., at ¶ 36, Ex. 8, at 5. Mr. Clark did not recommend cancelling the

14   grades from any of the seven exams with adequate proctor-to-student ratios.

15       The College Board accepted Mr. Clark's first recommendation, that all AP grades must be

16   cancelled for exams with more than 50 test takers. Landers Decl., at ¶ 17. But the College Board

17   decided, based in part on THHS' cooperation and Mr. Sullivan's promise to bring THHS into

18   compliance with AP test administration requirements, that THHS would not be sanctioned and

19   would remain an AP testing site. *Id.* ¶ 18. The College Board also decided not to charge THHS for

20   Mr. Clark's trip to California, although under its contract with THHS, it was entitled to do so. *Id.*

21       **D.   Free Retests**

22       The College Board offered to provide free AP retests to THHS students. *Id.* Because there

23   is only one secure test form available for each subject area, only one retesting date for each subject

24   can be provided. Landers Decl., at ¶ 19. The retesting dates, which were set and then changed at the

25   request of Mr. Sullivan and the Orange County Department of Education, will be August 6, 7, 8, 11,

26   and 12. Whitehead Decl., at ¶ 26, Ex. 11. The College Board and ETS will use their best efforts to

27   expedite the grading process so that test takers will have their grades before the start of the fall

28   semester.

**ARGUMENT**

Plaintiffs have known that AP grades were being cancelled and retests scheduled since early July, but they now seek an *ex parte* order blocking the retests and requiring that every student's AP grades from the May exams be reported unless Defendants can prove that the student cheated. Plaintiffs bear a heavy burden. They must show that they are likely to prevail on the merits and that the harm to them if relief is denied outweighs the harm to the College Board and ETS if relief is granted. *See Perez v. Hastings Coll. of the Law*, 45 Cal. App. 4th 453, 456 (1996). Plaintiffs cannot meet their burden.

**I.    PLAINTIFFS DO NOT SPEAK FOR ALL TEST TAKERS**

The injunction Plaintiffs seek would affect *all* THHS students who took the AP exams at issue. But hundreds of THHS students want to retest and are preparing to do so, and some are counting on grades being reported before they register for college courses in the fall. Thus, Plaintiffs do not "fairly protect the rights of the group [they] purport[] to represent." *Residents of Beverly Glen Inc. v. City of Los Angeles*, 34 Cal. App. 3d 117, 126 (1973). Accordingly, they may not seek relief on behalf of students who do not want an injunction and would be prejudiced if one were granted.[b]

**II.    PLAINTIFFS' LAWSUIT IS MERITLESS**

**A.    The College Board Has A Contractual Right To Cancel Scores.**

The contract between the College Board and AP test takers is clear. So that all test takers have an equal opportunity to demonstrate their knowledge and no test takers gain an unfair advantage, AP exams are administered pursuant to detailed regulations. The *AP Bulletin* provides that grades may be cancelled for various reasons, including "misconduct" by an individual student,

---

[b]    Plaintiffs have not shown that there is a "well-defined community of interest in the questions of law and fact involved affecting the parties to be represented." *County of San Luis Obispo v. Abalone Alliance*, 178 Cal. App. 3d 848, 854 (1986); *see also* Cal. Civ. Proc. Code § 382. Although they have purported to form an unincorporated association to represent other interested students and parents, they acknowledge that these other students "prefer not to be separately named in the Amended Complaint" and they do not disclose the students or parents whose interests they purport to represent. Indeed, because the situations of different test takers vary dramatically, plaintiffs cannot bring a representative action for damages. *See Tenants Ass'n of Park Santa Anita v. Southers*, 222 Cal. App. 3d 1293, 1304 (1990) (rejecting representative action for compensatory damages because claims were "too inherently personal" to permit group-wide resolution).

8

"substantial evidence" that a student's scores are invalid, and testing irregularities that may affect a group of test takers. Misconduct, invalidity and testing irregularity cases differ markedly from one another. So does the evidence considered before scores are ever cancelled.

Misconduct: An AP test taker's grade may be cancelled where the test taker engages in misconduct, such as where the test taker is seen copying, uses a study aid during the exam, uses a cell phone or other messaging device, or removes test materials. In such instances, the test taker may be asked to leave, and his or her grade is automatically cancelled. Somehow neither THHS proctor (nor any of the Plaintiffs' declarants) saw anyone engage in misconduct, but ten THHS test takers later confessed that they had done so and their grades were cancelled on that basis. No other THHS AP grades have been cancelled on the basis of misconduct. Whitehead Decl., at ¶ 6.

Invalidity: An AP grade may be cancelled where there is substantial evidence that it is invalid. In such cases there is rarely any direct evidence that the test taker cheated. Rather, a variety of statistical and other information is analyzed, such as unusual answer patterns, discrepant handwriting, and inconsistent performance on different parts of the exam. When there is substantial evidence of invalidity, the test taker's score is questioned and he or she is offered options for resolving the security concern. *Id.* Score cancellations are not based on a conclusion that the test taker cheated, nor is any such proof required. *See, e.g., Langston v. ACT Inc.*, 890 F.2d 380, 385-86 (11th Cir. 1989), *McAlister v. ETS*, CV-No.-95-7880, at *9 (C.D. Cal. June 13, 1997).

Testing Irregularities: Exam grades may also be cancelled based on "testing irregularities." Where testing irregularities occur, the College Board has the contractual right to cancel a score. Such irregularities are often beyond the test takers' control. As the *AP Bulletin* states:

> Testing Irregularities: The term testing irregularities refers to problems with the administration of an exam and may affect an individual or group of test takers. These problems include, but are not limited to, administrative errors (e.g., improper timing, improper seating, defective materials, and defective equipment); improper access to exam content; and other disruptions of exam administrations. When testing irregularities occur, the AP Program may decline to grade the exam or may cancel the grade.

Whitehead Decl., Ex. 3, at 7.

1    The *AP Bulletin* does not require proof that a test taker cheated before the College Board

2 may cancel his grade based on testing irregularities. That fact alone, which Plaintiffs do not dispute,

3 is fatal to their breach of contract claim. "[I]n construing a contract, it is not a court's prerogative to

4 alter it, to rewrite its clear terms, or to make a new contract for the parties." *Hi-Desert County*

5 *Water Dist. v. Blue Skies Country Club, Inc.*, 23 Cal. App. 4th 1723, 1735 (1994).

6    The testing irregularities policy is perfectly reasonable, even though it may impose on

7 students the hardship of having to take a free retest. The College Board counts on high schools to

8 properly administer AP exams, and when they fail to do so, it need not compromise its standards and

9 jeopardize its good name by asking colleges and universities to rely on AP grades whose integrity is

10 in doubt. What courts have repeatedly said about ETS is equally true of the College Board:

11    ETS provides a valuable service to colleges and universities by
12    providing a standardized measure of students' ability…. Accordingly,
      ETS has an obligation to provide, or use its best efforts to provide,
13    only valid scores to the colleges and universities that rely on ETS's
      services. Moreover, ETS has the right to protect its own reputation by
14    assuring the reliability of the information it provides.

15 *Murray v. ETS,* 170 F.3d 514, 517 (5th Cir. 1999); *see also K.D. v. ETS*, 386 N.Y.S.2d 747, 752

16 (Sup. Ct. 1976) ("[ETS] acted within its right to protect its own image as well as its obligation to the

17 schools who are its clients in cancelling plaintiff's scores and requiring him to take a retest.").

18    Score cancellations in testing irregularity cases are not based on findings that any individual

19 test taker engaged in misconduct[1] or on substantial evidence that his or her score is invalid.[2]

20

21 [1]    The evidence considered in misconduct cases is not available in cases of testing
   irregularities. Misconduct cases typically arise when the proctor witnesses the misconduct. Testing
22 irregularity cases, however, often involve a proctor's failure to vigilantly monitor the test room. In
   such cases, as at THHS, improper proctoring means that there is no eyewitness to improper
23 behavior.

24 [2]    The evidence considered in invalidity cases is also unavailable in testing irregularity cases.
   In invalidity cases, it is possible to tell from a seating chart where test takers sat and compare answer
25 sheets if it is suspected that one test taker may have copied from another. But at THHS, test takers
   sat wherever they chose and no seating charts were prepared. Moreover, no techniques exist for
26 determining whether and to what extent students benefited by consulting study guides while testing
   was in progress, exchanging text messages with other students around the room and around the
27 country, and taking bathroom breaks together. All of these testing irregularities occurred at THHS.
28

                                         10

1   Rather, scores are cancelled in such cases because test takers were given an opportunity to gain an

2   unfair advantage, and it cannot be determined who did so.  Thus, Plaintiffs' reliance on the booklet

3   *Why and How ETS Questions Test Scores* is stunningly misplaced.  Because testing irregularity

4   cases are so fundamentally different from individual invalidity cases, the procedures and evidence

5   discussed in the *Why and How* booklet have nothing to do with testing irregularity cases.  For that

6   very reason, the *Why and How* booklet contains the following boldface proviso:  **"The procedures**

7   **and options described in this booklet do not apply to cases involving administrative or**

8   **procedural irregularities[.]"**  Declaration of Christopher Battersby, Ex. 7, at 4.[9/]

9          It would be a wonderful world if no student ever cheated on a test.  But that is not our world.

10  On a survey by the Josephson Institute of Ethics, 71% of teenagers admitted cheating on at least one

11  exam in the prior year, and 78% said they had lied to a teacher.  *See* David Oliver Relin, *Truth or*

12  *Consequences*, N.Y. Times Upfront, Jan. 1, 2001, at 1.  AP test administration regulations are not

13  premised on the assumption that students will cheat if given the chance.  Rather, they are designed to

14  lessen the opportunities for misconduct by those students who might otherwise be tempted.

15         It would also be wonderful if every student who engaged in misconduct confessed after the

16  fact.  Again that is not our world.  As the director of the Josephson Institute survey observed, "[w]e

17  know many of the test takers we questioned won't admit to cheating."  *Id.*  The College Board is not

18  required to rely on confessions and is not authorized or equipped to engage in investigations of

19  individual wrongdoing in testing irregularity cases.  Rather, where, as here, test administration

20  regulations were not followed, at least some test takers took advantage, and it is not possible to

21  distinguish those who benefited from those who did not, all test takers' grades must be cancelled.

22  That is so because "[t]he significant consideration in deciding whether or not to invalidate a test

23  score is . . . not whether the individual candidate engaged in misconduct, but whether the candidate's

24  test results are tainted by misconduct....  [The testing service] may have reason to invalidate

25  _____
    [9/]    For the same reason, the ETS cases cited in Section II(A) of Plaintiffs' brief, all of which

26  relate to invalidity determinations, do not support Plaintiffs' argument. Thus, in *Dalton v. ETS*, 87

27  N.Y.2d 384 (1995), the New York Court of Appeals required ETS to follow its established procedures in invalidity cases. The decision to cancel scores at THHS was based on testing

28  irregularities, and Plaintiffs do not contend that Defendants failed to follow their testing irregularity procedures.

1   candidates' test results even when they are innocent." *Doe v. Nat'l Bd. of Podiatric Med. Exam'rs*,

2   No. 03-CIV-4034, 2003 U.S. Dist. LEXIS 10281, at 14 (S.D.N.Y. June 19, 2003).

3          **B.     By Complying With The Contract, The College Board Acted In Good Faith.**

4          The California Supreme Court has stated: "We are aware of no reported case in which a

5   court has held the covenant of good faith may be read to prohibit a party from doing that which is

6   expressly permitted by an agreement." *Carma Developers, Inc. v. Marathon Dev. California, Inc.*, 2

7   Cal. 4th 342, 374 (1992). "[T]he implied covenant of good faith and fair dealing does not impose an

8   affirmative duty on a party to forbear from enforcing rights expressly given under the contract....

9   Contracts are enforceable at law according to their terms." *Storek & Storek, Inc. v. Citicorp Real*

10  *Estate, Inc.*, 100 Cal. App. 4th 44, 56 n.10 (2002). The College Board's contract with THHS

11  expressly obligated THHS to adhere to the AP test administration regulations, and both the College

12  Board's contract with THHS and its contract with students gave it the right to cancel test scores

13  where the test regulations were not followed. Under these circumstances, Defendants cannot be said

14  to have breached any duty of good faith and fair dealing.[10]

15         Moreover, the College Board acted only after receiving evidence showing that testing

16  irregularities occurred on all of THHS' large AP exams, that those irregularities gave test takers the

17  opportunity to gain an unfair advantage, and that there was no way to differentiate students who

18  benefited from those who did not. Thus, Defendants received and followed up on allegations of

19  misconduct from a THHS AP student; considered all of the information received from Mr. Sullivan,

20  including his statement that more than 40 students had been identified as having cheated; visited the

21  school, met with key administrators and a number of students and inspected testing rooms; and

22  reviewed inconsistent admissions and denials by various test takers. To be sure, some test takers

23  have maintained their innocence, but that is not the relevant inquiry because Defendants do not seek,

24  are not able, and have never been required to prove guilt. As Plaintiffs concede, score cancellations

25  [10]    Plaintiffs' cause of action under Cal. Bus. & Prof. Code Section 17200 is also deficient as a

26  matter of law. Plaintiffs do not allege, for example, that Defendants violated federal, state or local

27  law – a necessary element of *both* the "unlawful" and "unfair" prongs of Section 17200. *See Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003); *Klein v. Earth Elements, Inc.*, 59 Cal.

28  App. 4th 965, 969 (1997).

DEFENDANTS' OPPOSITION TO EX PARTE TEMPORARY RESTRAINING ORDER

1    are routinely upheld in invalidity cases. *See McAlister*, at *9 ("[A]s long as ETS acted reasonably

2    and in good faith, the Court must defer to ETS.").[11] Since Defendants acted reasonably and in good

3    faith here, this score cancellation decision should also be upheld.

4    **C.    The College Board Need Not Conduct A Police-Style Investigation.**

5         Plaintiffs complain that it is unfair to require truly innocent test takers to demonstrate their

6    knowledge a second time. These test takers assert that they should not be punished for THHS'

7    failure to comply with AP testing requirements. They demand a further investigation into which

8    THHS students actually cheated and contend that only those students' grades may be cancelled.

9         The fault Plaintiffs find with Defendants' decision is premised on a misunderstanding of

10   Defendants' objectives in testing irregularity cases. What matters to Defendants is whether AP

11   exams were properly administered, not whether individual students cheated. Thus, the objectives of

12   the THHS and ETS investigations were fundamentally different. As Mr. Sullivan stated in his June

13   3 letter, the school's "goal in questioning students was to identify specific students involved in

14   cheating and obtain either an admission of their misconduct or substantial eye-witness evidence."

15   Whitehead Decl., at ¶ 14, Ex. 2. By contrast, ETS sought to determine only whether the testing

16   irregularities at THHS created an environment in which misconduct may have occurred and not been

17   detected. Based on all of the evidence considered, that was the inescapable conclusion.

18        Plaintiffs seem to suggest that attestations of innocence from test takers are all the

19   Defendants need to stand behind their AP grades. But if that were the case, no testing rules would

20   be necessary, and test takers would be on their honor. No one would seriously expect the College

21   Board to stand behind AP grades, or colleges and universities to grant advanced placement or credit,

22   ---

[11]      *See also Langston v. ACT, Inc.*, 890 F.2d 380 (11th Cir. 1989); *Johnson v. ETS*, 754 F.2d 20
23   (1st Cir. 1985); *Maupin v. Nat'l Bd. Podiatric Med. Exam'rs*, No. 03-20027-CIV-ALTONAGA
     (S.D. Fla. July 3, 2003); *Doe*, 2003 U.S. Dist. LEXIS 10281; *Kirkendoll v. ETS*, C-No.-97-0744,
24   1997 U.S. Dist. LEXIS 24190 (W.D. La. June 30, 1997); *Crow v. ETS*, No. 80-1865, 1982 U.S. Dist.
     LEXIS 18191 (W.D. La. Apr. 28, 1982); *Braunstein v. ETS*, No. MON-C-247-01 (N.J. Super. Ct.
25   Ch. Div. Nov. 7, 2001); *Thompson v. ETS*, No. PAS-L-2203-99 (N.J. Super. Ct. Law Div. Jan. 30,
     2001); *Scott v. ETS*, 600 A.2d 500 (N.J. Super. Ct. App. Div. 1991); *Yaeger v. ETS*, 551 N.Y.S.2d
26   574 (App. Div. 1990); *Wehrhahn v. ETS*, No. C-104-96 (N.J. Super. Ct. Ch. Div. Jan. 23, 1998);
     *K.D.*, 386 N.Y.S.2d 747; *Denburg v. ETS*, No. C-1715-83 (N.J. Super. Ct. Ch. Div. Aug. 4, 1983),
27   *amended by* Letter to Counsels, No. C-1715-83 (N.J. Super. Ct. Ch. Div. Sept. 9, 1983); *DePina v.
     ETS*, 297 N.Y.S.2d 472 (App. Div. 1969).
28

13

1     under such conditions. For the same reasons, courts have consistently sustained the right of testing

2     services to cancel scores without "proof of wrong-doing." *See Scott v. ETS*, 600 A.2d 500, 504 (N.J.

3     Super. Ct. App. Div. 1991); *Crow v. ETS*, No. 80-1865, 1982 U.S. Dist. LEXIS 18191, at *3 (W.D.

4     La. Apr. 28, 1982) (ETS' right to withhold a test taker's score does not depend on proof that the test

5     taker actually cheated).

6          There is another cluster of reasons why no further investigation is necessary or possible.

7     Plaintiffs' assertions to the contrary notwithstanding, there is no statistical evidence that would

8     establish the fact or extent of improper conduct at THHS. For one thing, aggregate statistics would

9     say nothing about whether any individual test taker gained an unfair advantage. Even if, for

10    example, THHS' average grades on all of the exams at issue rose from 2006 to 2008, that would not

11    prove that any particular test taker cheated. In addition, as explained by Amy Schmidt, Ph.D.,

12    Executive Director, Statistical Analysis of ETS's Research and Development Department, AP exams

13    are not fully equated, so conclusions about cheating cannot be drawn from changes in grades from

14    year to year. Declaration of Amy Schmidt ("Schmidt Decl."), at ¶ 3.

15         Nor would it be useful, as Plaintiffs suggest, to compare test takers' AP exam performance

16    with their scores on other standardized tests such as the SAT. The AP exams test subject matter

17    knowledge that is unique to each exam and different from the SAT. Therefore, a high score on the

18    SAT or one AP exam hardly guarantees a high score on every AP exam.

19         As it turns out, however, 2008 AP data do reveal certain anomalies at THHS. For example,

20    as a group THHS test taker performed consistently better on multiple choice questions than did test

21    takers nationwide. *Id.* ¶ 8. In addition, the correlations between THHS students' performance on

22    the multiple choice and constructed response parts of the test was lower – in some cases much lower

23    – than was observed across the country. These kinds of analyses are not conducted before score

24    cancellation decisions are made in testing irregularity cases. But they are consistent with the

25    possibility that an unknown number of THHS students gained an unfair advantage. *Id.* ¶ 10.

26    **III.    THE EQUITIES ARE NOT IN PLAINTIFFS' FAVOR**

27         As the *Los Angeles Times* observed, "[a]s the overseer of the SAT and other staples of

28    university admissions exams, the testing service has a responsibility to ensure their integrity, for the

14

1   sake of both the test takers who take them and the colleges that consider the resulting scores."[12]
2   Plaintiffs' requested relief should be denied because they cannot establish that a balancing of the
3   equities tips in their favor.

4       *First*, there has been no showing whatsoever that further investigation is required or would
5   be helpful. There is overwhelming evidence of deficiencies in the testing environment for the exams
6   at issue. As discussed above, that is the question that matters, not whether each test taker engaged in
7   misconduct.

8       *Second,* Plaintiffs here do not represent all of the test takers scheduled to take retests starting
9   next week. It is not at all clear how many or which students are actually represented by "Justice for
10  375 Trabuco Scholars." What is clear is that many test takers have signed up and studied for the
11  retests that will be administered beginning next week, on dates set at the request of Orange County
12  Department of Education and THHS officials. If retesting is delayed, there can be no assurance that
13  the exams can be administered in time for grades to be reported before students must register for fall
14  classes. That is presumably why test takers who have signed up for retests, and for whom Justice for
15  375 Trabuco Scholars does not speak, want the retests to go forward as scheduled.

16      *Third*, even the students who are represented here will not be harmed, let alone irreparably,
17  by the retest administrations. They have known about the retesting since early July, yet they waited
18  until July 23 to file their complaint, and another week has elapsed since then. Plaintiffs are free to
19  take the retests or not. If they do so and pass, they will have suffered no injury other than having to
20  brush up on material for which they seek college placement or credit anyway. While studying may
21  be especially unpleasant in August, that cannot possibly justify depriving other students the
22  opportunity to take retests for which they have registered. And, whether Plaintiffs take the retests or
23  not, they may still pursue this lawsuit and attempt to have their cancelled scores reported.

24      The relief Plaintiffs seek would also seriously harm the College Board and ETS and be at
25  odds with the public interest. The College Board has a legitimate interest in giving AP students the
26  opportunity to obtain valid AP grades in time for them to be reported to colleges and universities for
27

28  [12]   *Trouble at Trabuco*, L.A. Times, July 25, 2008, at A20. Whitehead Decl., Ex.1.

DEFENDANTS' OPPOSITION TO EX PARTE TEMPORARY RESTRAINING ORDER

1  placement or credit. Moreover, the College Board and ETS have a fundamental interest – one that

2  no court has ever doubted – in ensuring that only valid test scores are reported. Requiring the

3  cancelled AP grades to be reported would tarnish the good name of the AP Program and of the

4  College Board and ETS. *See K.D.* 386 N.Y.S.2d at 752. There is also a "clear public interest in

5  reporting valid test scores." *Yaeger v. ETS*, 551 N.Y.S.2d 574, 576 (App. Div. 1990). "ETS has an

6  obligation to provide, or to use its best efforts to provide, only valid scores to the colleges and

7  universities that rely on ETS's services." *Murray*, 170 F.3d at 517.

8        Finally, the requested relief would be improper because it would effectively be a "final

9  adjudication of the ultimate rights in controversy." *See King v. Meese*, 43 Cal. 3d 1217, 1227 (1987);

10  *Rothberg v. Law School Admissions Council*, No. 04-1060, 102 Fed. Appx. 122, 125 (10th Cir. June

11  16, 2004) (reversing preliminary injunction requiring defendant to report the results of law school

12  admissions test because, among other reasons, it mooted the case prior to a full trial on the merits.).

13  Especially here, where Plaintiffs waited until the eleventh hour to sue and did not even serve their

14  papers until yesterday afternoon, it would be profoundly unfair for the Court to, in effect, make a

15  final adjudication of the merits at this early stage of the proceeding.

16                                      **CONCLUSION**

17        For the reasons set forth above, the Court should deny the TRO and Order To Show Cause

18  sought by Plaintiffs and allow retesting to go forward as scheduled beginning on August 6.

19  Dated: July 30, 2008                 Respectfully submitted,

21  WILMER CUTLER PICKERING       O'MELVENY & MYERS
22    HALE AND DORR LLP            Michael Yoder
   Bruce M. Berman (*pro hac pending*)    Amy Laurendeau
23  Jonathan E. Paikin (*pro hac pending*)   610 Newport Center Drive, 17th Floor
   1875 Pennsylvania Ave. NW      Newport Beach, CA 92660
24  Washington, DC 20006          (949) 823-7926
   (202) 663-6000             (949) 823-6994 (facsimile)
25  (202) 663-6363 (facsimile)

26       *Attorneys for Defendants Educational Testing Service and the College Board*

DEFENDANTS' OPPOSITION TO EX PARTE TEMPORARY RESTRAINING ORDER

# EXHIBIT
Appendix A



**APPENDIX A**

| Testing Administration Requirements | Irregularity/Violation |
|---|---|
| Proctor/Student Ratio: Three proctors are required for every exam with 51 to 100 test takers, and four proctors are required fore very exam with 101 to 150 test takers. (Manual, Page 25). | • Insufficient number of proctors; only one in each room.<br><br>Mr. Sullivan's June 24 letter promised: "School personnel and resources will be allotted to ensure a satisfactory student-to-proctor ratio . . ." |
| Proctor's Duties: Among other things, proctors are required to "[f]amiliarize themselves ahead of time with the administration and exam security procedures in the AP Coordinator's Manual." During the test administration proctors are required to "Supervise the testing room"; "Walk around the room to ensure test takers are working on the correct exam section"; "Guard against attempts at cheating"; "Keep the room attended at all times"; "Never read, eat, drink, engage in conversation, correct papers, or perform any activity not related to the administration"; and "Ensure that proper seating distance is maintained between test takers." (Manual, Pages 25-26). The high school is required to designate an AP Coordinator, and the AP Coordinator must provide detailed training to each proctor. (Manual, Pages 29-34.) Proctors are further required to "[n]ever leave the exam room unattended" and to "[s]tand at the back of the room [and] frequently walk along the aisles to make certain everyone is working on the appropriate section and to guard against misconduct." (Manual, Page 75). | • Proctor rarely walked the room.<br>• Proctor was "inattentive".<br>• Proctor did not ensure proper seating.<br>• Proctor sat in front of room, not in the back.<br>• Proctor either allowed or did not notice use of study guides, student discussions, and text messaging during Macroeconomics and Statistics exams. Same proctors administered other exams under same conditions.<br><br>Mr. Sullivan's June 24 letter promised: "[A]ll proctors will be carefully trained in every detail of the AP Testing Protocol." He further promised that "[p]roctors will be monitored for constant movement and vigilance within the testing room." |
| Mandatory Starting Times: In order to ensure that test takers Pacific time zone cannot receive information about the contents of an exam from test takers on the East Coast, AP exam must be administered on designated days and at designated times. Morning testing must begin between 8 and 9 a.m. local time, and afternoon testing must begin between 12 and 1 | • A student informed Mr. Clark that Mr. Bill Rollins (a proctor on many exams, the AP Coordinator, and one of the people charged with investigating testing conditions) began the Macroeconomics exam at 1:30 pm when it actually began at 12 pm. (A student admitted to texting with a friend in eastern time zone about substance of the exam). |

**APPENDIX A**

| Testing Administration Requirements | Irregularity/Violation |
|---|---|
| p.m. local time. (Manual, Page 73). | |
| <u>Seating Test takers</u>:  There are very detailed seating requirements for AP exam administrations.  In bold face type, the Manual generally requires that proctors: **"Allow *no less* than 5 feet (approximately 1.5 meters) between test takers. ... Seat them directly behind but not directly beside each other. *Everyone must face the same direction.* Assign seats randomly within the testing room. *Under no circumstances should test takers be permitted to select their own seats.* Seat no more than two test takers at a table. Seat only one student per table if it is less than six feet long."** (Manual, Page 73). | • Testing conditions were "too crowded" <br> • Lack of adequate spacing between test takers, with as many as four test takers seated around small tables. <br> • Test takers were allowed to select any seat they wanted, and "friends sat next to friends." <br> • Test takers were allowed to face one another. <br> • Discussions of answers between test takers were heard during testing. <br><br> Mr. Sullivan's June 24 letter promised: "Furniture will also be used from throughout the campus to guarantee that test takers are all seated properly with adequate spacing and all facing the same direction." |
| <u>Use of Cell Phones/Messaging Devices</u>:  The Manual specifies that: "Test takers are prohibited from bringing cell phones, PDAs, MP3 players, e-mail/messaging devices, or any other electronic or communication devices with them to the testing room." (Manual, Page 73).  Proctors are required to post a sign at the testing room entrance stating: "Cell phones are prohibited in the testing room." (Manual, Page 27).  The AP Coordinator is also required to train proctors as follows: "Although test takers should already be aware that cell phones and other electronic devices are prohibited in the testing room, the General Examination Instruction scripts still include text for you to ask the test takers if they have these devices. If any student has one, ask that it be turned off and collect it." (Page 31). | • Cell phones were not collected prior to any exams. <br> • Warning signs about prohibited use of cell phones were either not present or inadequate. <br> • Test takers admitted to texting on cell phones during two exams, and there is no reason to believe similar conduct did not occur during other exams where cell phones were similarly not collected. <br><br> Mr. Sullivan's June 24 letter promised: "All warning signs and placement of student bags will be carefully directed and supervised." He further promised that "[s]tudents will be searched for electronic devices and all other unauthorized aids individually upon entry to the testing room." |
| <u>Using Restrooms During Testing Periods</u>:  Test takers are required to use the use the restroom, if at all, only one at a time. Two or more test | • Test takers were allowed to leave exam early, before time was called. <br> • More than one student was allowed to leave |



**APPENDIX A**

| Testing Administration Requirements | Irregularity/Violation |
|---|---|
| takers may go only if a proctor accompanies them. (Manual, Page 75). | the exam at a time and they went to the restrooms together unsupervised. |
| <u>Breaks during exam</u>:  Test takers may not consult textbooks during the break, make phone calls, check e-mail, or have access to text messaging.  The Manual states in bold-face type that "**[f]ailure to adhere to these policies may result in invalidation of grades**." (Page 75). | • Test takers spoke about substance of exam and text messaging during breaks. |

# EXHIBIT

Appendix B



## THHS AP Re-Testing and Review Schedule – July/August 2008

### Subject Review Session Schedule

| Date | Test Subject | Time | Location | Instructor |
|------|-------------|------|----------|-----------|
| Monday, July 28 | US History | 8:00 am – 12:00 noon | MPR/306 | Lotito |
| | Calculus AB & BC | 3:30 pm – 6:30 pm | Room 504 | Paredes |
| Tuesday, July 29 | Macro Economics | 9:00 am – 12:00 noon | Room 109 | Cox |
| | US History | 1:00 pm – 5:00 pm | MPR/306 | Lotito |
| | Macro Economics | 7:00 pm - 10:00 pm | Room 109 | Cox (repeat of am session) |
| Wednesday, July 30 | European History | 9:00 am - 12:00 noon | MPR | Stordahl |
| | Micro Economics | 9:00 am – 12:00 noon | Room 109 | Cox |
| | European History | 2:00 pm - 5:00 pm | MPR | Stordahl (repeat of am session) |
| | Calculus AB & BC | 4:00 pm – 7:00 pm | Room 504 | Paredes |
| | Micro Economics | 7:00 pm – 10:00 pm | Room 109 | Cox (repeat of am session) |
| Thursday, July 31 | Biology | 8:00 am – 12:00 noon | Room 407 | McDermit |
| | European History | 9:00 am - 12:00 noon | MPR | Stordahl |
| | European History | 2:00 pm – 5:00 pm | MPR | Stordahl (repeat of am session) |
| | Chemistry | 6:00 pm – 10:00 pm | Room 322 | Rogers/Gaines |
| Friday, August 1 | English Literature | 8:00 am – 12:00 noon | Room 536 | Swenson |
| | Statistics | 1:00 pm - 5:00 pm | Room 128 | Gordon |
| Monday, August 4 | Statistics | 8:00 am – 12:00 noon | Room 128 | Gordon |
| | English Literature | 1:00 pm – 5:00 pm | Room 536 | Swenson |
| Tuesday, August 5 | Chemistry | 8:00 am – 12:00 noon | Room 322 | Rogers |
| | Biology | 1:00 pm – 5:00 pm | Room 407 | McDermit |

Review sessions are optional for students. Students may attend all or a portion of any review session. Individual help will be built into portions of the review sessions to assist students with specific concept questions. Multiple review sessions in different time frames are being provided to accommodate students who may have a conflict with one of the review opportunities. Additional sessions may be added if necessary.

### Testing Schedule
(note: Report Time for a.m testing is 7:30 am, p.m testing is 11:30 am)

| Date | 8 am | 12 pm |
|------|------|-------|
| Wednesday, August 6 | Macroeconomics | Microeconomics |
| Thursday, August 7 | Calculus AB & BC | Statistics |
| Friday, August 8 | Chemistry | English Lit. |
| Monday, August 11 | Biology | US History |
| Tuesday, August 12 | European History | |

# EXHIBIT 2