Nancy L. Fineman (Cal. SBN 124870)
nfineman@cpmlegal.com
Aron K. Liang (Cal. SBN 228936)
aliang@cpmlegal.com
**COTCHETT, PITRE & McCARTHY LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:   (650) 697-6000
Facsimile:   (650) 697-0577

Gregory A. Wedner (Cal. SBN 67965)
gwedner@lozanosmith.com
**LOZANO SMITH**
One Capitol Mall, Suite 640
Sacramento, CA 95814
Telephone: (916) 329-7433
Facsimile:  (916) 329-9050

Jack W. Lee (Cal. SBN 71626)
jlee@minamitamaki.com
Sean Tamura-Sato (Cal. SBN 254092)
seant@minamitamaki.com
**MINAMI TAMAKI LLP**
360 Post Street, 8th Floor
San Francisco, California 94108-4903
Telephone: 415 788 9000
Facsimile: 415 398 3887

*Attorneys for Plaintiff San Mateo Union High School District*

*Attorneys for Plaintiff AP Students – Viking Parent Group*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SAN MATEO UNION HIGH SCHOOL DISTRICT**, individually and on behalf of the members of the **SAN MATEO UNION HIGH SCHOOL DISTRICT** and **AP STUDENTS - VIKING PARENT GROUP**,<br><br>Plaintiffs,<br>v.<br>**EDUCATIONAL TESTING SERVICES**, a New York corporation; and **COLLEGE ENTRANCE EXAMINATION BOARD**, a New York corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | **CASE NO. CV-13-3660-SBA**<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Date:  TBD<br>Time:  TBD<br>Courtroom 1, Fourth Floor<br>Hon. Saundra Brown Armstrong<br><br>***IMMEDIATE ACTION REQUESTED*** |

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The AP Exams Allow High School Students to Receive College Credit. . . . . . . 2

    B. Mills High School is Responsible for Making Sure that the Grades Each Student Earns Can Be Relied upon by Colleges or Employers as Accurate Reflections of the Work Performed by a Student . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C. AP Exams Were Properly Proctored and Supervised at Mills High School. . . . . 3

    D. Defendants Invalidate 641 AP Test Scores Solely on the Basis of Allegedly Improper Seating Arrangements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    E. Defendants Abuse Their Discretion When They Invalidate All Scores Without Adequately Warning Schools and Students that They Will Invalidate Exams Solely Based Upon Improper Seating Conditions . . . . . . . . . . 5

III. LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A. The Court has Authority and Discretion to Issue a TRO . . . . . . . . . . . . . . . . . . . 6

        1. Plaintiffs Have a Likelihood of Success on the Merits. . . . . . . . . . . . . . . 8

            a. Breach of Contract/Implied Covenant of Good Faith and Fair Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            b. UCL Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            c. Violation of California Education Code sections 99159 and 99160 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            d. Due Process Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2. The Harm to Plaintiffs is Irreparable and Unascertainable. . . . . . . . . . . 13

        3. Defendants Will Not Be Harmed by an Injunction So the Equities Tip in Plaintiffs' Favor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        4. A Temporary Restraining Order and Preliminary Injunction Are In The Public Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B. A Bond Should Not Be Required In This Case. . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Burgess v. Forbes*,
    2009 U.S. Dist. LEXIS 16127 (N.D.Cal. Feb. 19, 2009).. . . . . . . . . . . . . . . . . . . . . . . . . 6

*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*,
    2 Cal.4th 342 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cortale v. Educational Testing Service*,
    251 A.D.2d 528 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Dalton v. Educational Testing Service*,
    87 N.Y.2d 384 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*FEI Enterprises, Inc. v. Yoon*,
    194 Cal.App.4th 790 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Freeman & Mills, Inc. v. Belcher Oil Co.*,
    11 Cal.4th 85 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Just Film, Inc. v. Merchant Services, Inc.*,
    2011 U.S. Dist. Lexis 62656 (N.D.Cal. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*MGM Studios, Inc. v. Grokster, Ltd.*,
    518 F.Supp.2d 1197, 1210 (C.D.Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Murray v. Educational Testing Service,*
    170 F.3d 514 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
    240 F.3d 832 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Waller v. Truck Ins. Exchange, Inc.,*
    11 Cal.4th 1 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**STATUTE & RULES**

Bus. & Prof. Code § 17200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I. **INTRODUCTION**

By this *ex parte* application ("Application"), Plaintiffs San Mateo Union High School District ("SMUHSD"), individually and on behalf of the students of the San Mateo Union High School District and AP Students - Viking Parent Group, an association of parents and students, ("Plaintiffs") seek to restore the *status quo* which existed before Defendants Educational Testing Services ("ETS") and the College Entrance Examination Board ("College Board") (collectively "Defendants") improperly invalidated 641 Advanced Placement ("AP") test scores for **286 Mills High School students ("AP Students")** in 11 different subjects. Defendants invalidated these scores because of alleged improper seating conditions at Mills High School **even though there was no evidence of any wrongdoing and no evidence that any of the test results were affected, in any way.** Defendants never even contacted the AP Students before invalidating their scores.

As the evidence submitted herein demonstrates, the AP exams at Mills High School were conducted pursuant to test protocols that ensured the validity of the test results. Defendants have failed to act in good faith by putting form over substance and irreparably injuring Plaintiffs. Many AP Students are heading off to college over the next few weeks and need their AP scores to obtain college credit and to determine what classes to take their first semester of college. Defendants have ignored the requests of students, parents, school personnel, and government leaders to validate the scores.

Defendants' only solution is to have the AP Students retake the AP exams starting on **August 9, 2013** and grade the tests as quickly as possible. Yet, these re-tests are unfair to the AP Students because they are being taken under significantly different circumstances than when originally taken in May of 2013 and do not provide relief to the AP students who spent months studying for the May tests.

Therefore, Plaintiffs look to this Court, as their last chance to obtain relief, and request that the Court issue a Temporary Restraining Order ("TRO") and Order to Show Cause ("OSC") why a Preliminary Injunction should not issue ordering College Board and ETS to grade and

---

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA**         1

validate the AP tests taken by the AP Students in May 2013 in the subjects of US History, Macro-Economics, English Language, English Literature, US Government and Politics, Calculus AB, Calculus BC, Physics B, Statistics, Chemistry and Biology, and report those scores to colleges and universities, as requested by the students and as required by the legal obligations owed by the Defendants to Plaintiffs.

## II.     FACTUAL BACKGROUND

Defendants invalidated 641 AP test scores of 286 Mills High School students solely because of round tables and because not all of the students were facing the same direction. This decision was made to indiscriminately punish all 286 AP Students without any evidence of wrongdoing by any of the students, without any evidence that the seating arrangements materially impacted any of the AP test scores, and without conducting a legitimate investigation of the testing environment at Mills High School.

### A.     The AP Exams Allow High School Students to Receive College Credit

In this era of increasing college costs, the AP exams provide the sole means for high school students to earn college credit by taking advanced high school course courses using a curriculum approved by Defendants College Board and ETS. Defendants control the AP system, which is the only method by which American high school students can earn college credit. Public and private universities across the country support this paradigm by granting college credit, and thus reducing tuition costs for students who take and pass AP exams. Students who receive certain scores on multiple exams receive special recognition. Request for Judicial Notice ("RJN") Exhibits ("Ex.") 3-4, 10-12.

AP tests are administered each year in May. Mills High School, part of the SMUHSD, in Millbrae, California is one of the 18,000 high schools world wide that teaches AP courses and oversees AP Exams. Defendants are the only parties who can grade and send out AP test results. Teachers at Mills High have been teaching AP courses for years and its students' testing results have never previously been questioned.

/ / /

---

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA**      2

**B.  Mills High School is Responsible for Making Sure that the Grades Each Student Earns Can Be Relied upon by Colleges or Employers as Accurate Reflections of the Work Performed by a Student**

SMUHSD and all its school sites, including Mills High School, have been providing quality education to their students for years and has substantial experience in guaranteeing the integrity of all of its exams, testing and student grades.  The Mills High School faculty and staff administer roughly 4,000 high stakes tests each year including the California High School Exit Exam, California Standards tests in Math, English, Science and Social Science, and Advanced Placement exams.  Declaration of Paul Belzer ("Belzer Decl.") ¶¶ 3-5.  Mills High School is responsible for making sure that the grades each student earns can be relied upon by colleges or employers as accurate reflections of the work performed by a student.

**C.  AP Exams Were Properly Proctored and Supervised at Mills High School**

During the period May 6 to 17, 2013, over 200 Mills High School students took over 600 AP exams.  Mills High School implemented strict oversight over the exams, including but not limited to: a secure testing site with only approved students in the area, control over the tests themselves to make sure that students could not obtain copies in advance of the test; assigned seating so that students could not select their own seats; multiple proctors who vigilantly oversaw the tests and made sure that no prohibited items, such as cell phones, notes or study guides were used during the exams; students were not allowed to leave the exam room, except to go to the bathroom and then they could only go one at a time and were carefully monitored; the proctors monitored students during the allowed breaks to make sure that the students did not discuss the exam; there was no improper time given for the exam; and there was no observed misconduct by the proctors or reported to the school by any student.  Belzer Decl.; Declaration of Valerie Arbizu ("Arbizu Decl."), ¶¶ 3-7, 9-10, 7-25; Declarations of Kelly Chao, Darren Fong, Jennifer Kao, Nathan Li, Jessica Liang, Grant Murphy, Christopher Tarangioli, Songyi Xu, Brandon Ye, Jason Zhang ("Student Decls."); and Gordon Lee, Janet Choy and Jean Joh ("Proctor Decls.").

The evidence shows that the testing environment protected the integrity of the test results by providing more than sufficient proctoring and excellent controls to ensure that the students

were operating in a fair test environment. *Id.* Defendants admit that they have no evidence of any cheating or wrongdoing by any of the students. Belzer Decl., ¶ 10.

### D. Defendants Invalidate 641 AP Test Scores Solely on the Basis of Allegedly Improper Seating Arrangements

On May 22, 2013, a representative from Defendant ETS spoke with the Vice Principal of Mills High School in which the ETS representative asked questions solely about the AP Statistics exam and specifically, what time the test began, what tables were used, how many students sat at tables, were breaks monitored, did students discuss the exam during the breaks, and were cell phones used in the testing room while the tests were out. That day, Mills High School answered all of ETS' questions via email. On May 24, June 10, 12, 13, 17, 24, Defendant ETS and Mills High School had telephone conversations or exchanged emails. At this time, all of Defendant ETS' questions related solely to seating arrangements. Mills High School promptly answered all of the questions asked, including sending a preliminary seating chart with the names of the students included. Arbizu Decl., ¶¶ 26-35.

During this time, Defendant ETS never visited Mills High School or visited the testing sites at issue. Belzer Decl., ¶ 11. Then, on June 25, 2013, ETS emailed Mills High School the following: "Thank you for the additional information regarding the exams that were administered at your school. I will forward this information to the proper departments for a decision." Arbizu Decl., ¶ 37. ETS did not ask Mills High School if it had any information that it wanted to furnish about the testing environments or raise any questions about student misconduct. ETS did not give Mills High School or any of the students an opportunity to address any of ETS' concerns. Defendants did not contact the students at all.

On July 8, 2013, almost two weeks later, ETS emailed Mills High School stating in full:

> Thank you for all of the additional information regarding the 2013 AP exams that were administered at your school. **The information submitted confirms that the following exams were administered under improper seating conditions**: US History; Macro-economics; English Language; English Literature; US Government and Politics; Calculus AB; Calculus BC; Physics B; Statistics; Chemistry; Biology. Therefore, the test takers' scores are invalid. Please contact Ms. Evans or myself to arrange and schedule retest dates for the above exams."

---

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA**     4

*Id.*, ¶ 38 (emphasis added; some punctuation changed).  Defendants failed to follow the requirements of the California Education Code in conducting their investigation and providing notice to the AP students regarding their rights.

Defendants' treatment of Plaintiffs is unequal to their treatment of other schools.  In other cases, Defendants have not acted to invalidate AP test scores without proof of cheating.  RJN, Exs. 1-3; Fineman Decl., ¶ 4 and Exs. 3, 4.  At Mills High School, however, Defendants have indiscriminately sanctioned hundreds of students without any evidence of wrongdoing by them.

### E. Defendants Abuse Their Discretion When They Invalidate All Scores Without Adequately Warning Schools and Students that They Will Invalidate Exams Solely Based Upon Improper Seating Conditions

Defendants publish multiple manuals with policies and procedures regarding the AP tests.  The AP Coordinator's Manual for 2012-13 is over 120 pages long.  RJN, Ex. 6.  If inadequate seating alone justifies imposing "death penalty" sanctions against all of the students, there would be clear and prominent warning to schools and students.  However, none of Defendants' documents warn schools or students that inadequate seating, without evidence of misconduct or evidence that the test results are not the work of the students, will automatically invalidate all scores.  *See, e.g.,* RJN Exs. 6-8.  In fact, the invalidation is not mandatory.  The AP Coordinator's Manual states that "[f]ailure to follow seating requirements **could** result in cancellation of exam scores."  RJN Ex. 6 at 48.

The form sent by the school to Defendants about complying with the rules does not mention seating.  While the 2012-13 Participation Form incorporates by reference all of the policies and procedures in the AP Coordinator's Manual, it only specifically identifies as "Participation Policies" six rules that require separate verification by the high school:

- AP Exams will be administered only on their official dates and times.

- Teachers, department chairs, tutors, individuals involved in test preparation services, and educators of any kind (including, but not limited to, curriculum specialists, guidance counselors, and administrators) are prohibited from taking, or reviewing the content of, an AP Exam.

- No one, except for AP students during the AP Exam, may see multiple-choice questions. Multiple-choice questions must never be shared, copied, or reconstructed through any means. Free-response questions may only be discussed

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA**       5

> if and when the specific free-response questions on the exam are released on the College Board website two days after the exam. Free-response questions in alternate exams may never be discussed.
>
> - Only AP Coordinators and authorized staff may receive, check, store, distribute, and return exam materials. Exams must be secured in locked storage to which only authorized staff persons have access.
>
> - Non-authorized staff, including, but not limited to, AP teachers in the subject of the given exam, will not be present in the exam room.
>
> - Prohibited devices, including electronic equipment (cell phone, smart phone, tablet computer, etc.), portable listening or recording devices (MP3 player, iPod, etc.), cameras or other photographic equipment, devices that can access the internet, and any other electronic or communication devices, will not be present in the exam room or accessible during breaks.

RJN Ex. 7.

Defendants' policies and procedures are designed to protect the integrity of the AP Exams. "The policies and procedures have been developed to afford all students equivalent opportunities to demonstrate their knowledge on exam day and prevent any student from gaining an unfair advantage." RJN Ex. 6 at 13. There is no way, however, that all 18,000 schools that administer these exams follow the rules in identical fashion. As long as Defendants' goals are met in the giving of the exams, Defendants should invalidate the test scores only if the test results are affected by material irregularity.

### III. LEGAL ARGUMENT

#### A. The Court has Authority and Discretion to Issue a TRO

Plaintiffs seek a TRO and an OSC directed at the Defendants to show cause why this Court should not issue an order requiring Defendants to comply with their legal obligations and to validate, score and report the AP test scores of the AP Students to the colleges and universities, as requested by the students. "The standard for issuance of a temporary restraining order is the same as that for issuance of a preliminary injunction." *Burgess v. Forbes*, 2009 U.S. Dist. LEXIS 16127 at *2 (N.D.Cal. Feb. 19, 2009). *See also New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 240 F.3d 832, 839 n. 7 (9th Cir. 2001). In order to obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) (citations omitted). The court applies a sliding scale so that a stronger showing of one element may offset a weaker showing of another. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2001). Plaintiffs seek a prohibitory injunction, which injunction prohibits a party from taking action and preserving the *status quo* pending determination of the action on the merits. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). The *status quo* means the last, uncontested status which preceded the pending controversy. *Id.* (citations omitted).

In this case, there is more than sufficient evidence to support a TRO. Defendants performed a perfunctory investigation which they believe was sufficient and acknowledge that there is no evidence of any cheating or wrongdoing by any of the students. *See* Belzer Decl., ¶ 10. Defendants failed to comply with the requirements of the California Education Code when conducting their investigation and communicating with the AP students about their rights. While Defendants have no evidence of cheating, there is substantial evidence that the AP exams at Mills High School were conducted in a secure testing environment that was heavily proctored so as to ensure that the test results are valid and that no one obtained an unfair advantage. Belzer Decl. at ¶¶ 3-7, 9, 10; Arbizu Decl., ¶¶ 6-25; Student Decls.; Proctor Decls.

The AP Students took the AP exams in May 2013, expecting that their test results would be reported in July 2013. Instead, in July 2013, Defendants invalidated their AP test scores. The AP Students, particularly the graduating seniors, need their AP test scores before college begins in August/September 2013. *See* Student Decls. If a TRO is not issued immediately, the impact on the Plaintiffs will be substantial as it will affect the AP Students' ability to gain admission to colleges or universities, obtain college credit and to skip introductory classes at their colleges or universities and also harm SMUHSD. *See* Student Decls. Several students are not in a position to retake the test because they are out of the country, including one student who has been spending the summer volunteering in Nicaragua. *See, e.g.,* Declaration of Paul Seto, ¶ 5. Without proof of cheating, indiscriminate invalidation of the 641 AP test scores at Mills High

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA         7**

1  School is unwarranted.  Prior to Defendants' decision to invalidate the AP test scores of the 286
2  Mills High School students, Defendants were required to validate, score and report their AP test
3  scores to the colleges and universities they requested.  This is the *status quo* to which the parties
4  should be returned.

### 1. Plaintiffs Have a Likelihood of Success on the Merits

There is a reasonable likelihood that Plaintiffs will prevail on the merits on its claims.
There is substantial evidence to support two key findings:

(1)   The AP tests at Mills High School were conducted in a secure testing environment that was heavily proctored;

(2)   There is no evidence of wrongdoing on the part of any students, any improper advantage the students actually received, or invalid test results.

Belzer Decl., ¶¶ 3-7, 9-10; Arbizu Decl., ¶¶ 6-25; Student Decls., Proctor Decls.

#### a. Breach of Contract/Implied Covenant of Good Faith and Fair Dealing

SMUHSD and Defendants entered into a contract.  After completing each AP exam, the AP Students/AP Students-Viking Parent Group signed contracts with Defendants in which the Defendants were obligated to validate, score and report their AP test scores to the requested colleges and universities.  Specifically, Defendants promised that "[s]core reports are provided in July of the year you take the exam, to you, to the college you designated on your registration answer sheet and to your high school."  RJN Ex. 8 at 8.  Defendants did not do so.

Plaintiffs also have a reasonable likelihood of prevailing on their breach of the implied covenant of good faith and fair dealing claims.  Several cases involving ETS specifically have found that ETS owes test takers: (1) a duty not to exercise its contractual discretion, such as to invalidate test scores, in an arbitrary or irrational manner; and (2) a duty to investigate, in good faith, whether there has been wrongdoing before scores can be invalidated.  In *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (1987), the New York Court of Appeals, applying New York law, held that ETS owed students a good faith duty to exercise its contractual discretion in a manner that was **not arbitrary or irrational**.  *Id.*  In addition to the duty not to exercise its contractual discretion in an arbitrary or irrational manner, ETS also owed students a

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA**    8

good faith duty to investigate any allegations of wrongdoing and to evaluate all evidence before invalidating test scores. *Id.* at 390. In *Cortale v. Educational Testing Service*, 251 A.D.2d 528, 529-530 (1998), the Supreme Court of New York, following *Dalton*, held that "[i]n discharging its contractual obligation, ETS must honor its duty of good faith and fair dealing, and may not act arbitrarily or irrationally." In *Murray v. Educational Testing Service,* 170 F.3d 514, 516 (5th Cir. 1999), the Fifth Circuit held that, under Louisiana law, ETS owed Murray a contractual duty "to investigate the validity of Murray's scores in good faith." *Id.*

California law similarly imposes the same, if not higher, good faith requirement on contractual parties. *See, e.g. Freeman & Mills, Inc. v. Belcher Oil Co.,* 11 Cal.4th 85, 91 (1995). "It has long been recognized, of course, that every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36 (1995). "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.,* 2 Cal.4th 342, 372 (1992). When evaluating the propriety of the exercise of such discretionary power, courts prefer to apply an objective standard. *FEI Enterprises, Inc. v. Yoon,* 194 Cal.App.4th 790, 800 (2011).

In this case, there is a reasonable likelihood of proving that Defendants' conduct was not in good faith since Defendants indiscriminately invalidated 641 AP test scores without any finding of misconduct or that the test results were not valid. Defendants failed to follow the requirements of the California Education Code. The decision was made solely on the grounds that Defendants concluded that 11 "exams were administered under improper seating conditions" and, therefore, "the test taker's scores are invalid." Arbizu Decl., Ex. 3; Belzer Decl., ¶ 10. When the evidence shows that there were sufficient controls in place to provide a fair testing environment where no one obtained an unfair advantage and there is no evidence that the test scores are invalid, Defendants have breached their contract with Plaintiffs and the implied

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA**      9

covenant. Defendants cannot point to contract language which contradicts the requirements of the California Evidence Code. The contracts cannot waive any of the requirements of California Education Code sections 99150 *et seq*. because these statutes were enacted for a public reason and cannot be waived. 1 Witkin, *Summary of California Law*, Contracts § 679 (10th ed. 2010).

The contrast in facts of Mills High School and the two reported other times in California when Defendants invalidated scores is stark. The information that is publically available shows that Defendants have only invalidated scores when there has been evidence of actual cheating.

In 2011, Defendants conducted an investigation at Skyline High School in California in which the scores of 30 students were invalidated due to "testing irregularities." In that case, a thorough investigation by Defendants had been undertaken in response to multiple allegations of reported testing irregularities, including overly intimate seating, alleged cheating and overall student misconduct, and proctors who were not qualified to oversee the tests. After receiving multiple calls about testing irregularities, Defendant ETS sent an investigator to the high school who found evidence of actual cheating. In the end, ETS invalidated the scores of only 30 students. A student who had his score invalided, had his family's lawyer contact Defendant ETS to obtain more information. An official from ETS informed the student that the disparity between his multiple choice and essay scores was so large that ETS could not believe the same person did both sections, without prior knowledge of the essay prompts. This student was permitted to attend a panel review of his score to prove his innocence. Fineman Decl., Exs. 3, 4.

Similarly, according to Defendants' own account, in another high school in California, Defendants only invalidated AP scores after numerous students admitted to cheating (the final count was that 40 students had been identified as cheating), students admitted sending text messages, proctor-student ratios were improper, test takers seated themselves, students were seated too close together, and proctors were not vigilant. Defendants sent out an investigator who interviewed school administrators and students. The investigator inspected the test sites and concluded that there were crowded conditions, tables were too small and one room had inadequate sight lines. There was a "circus atmosphere" during the tests. Defendants performed

some statistical analysis that demonstrated the correlation between students' performance on the multiple choice and constructed response parts were lower-in some cases much lower-than was observed across the country. Further these students as a group performed consistently better on multiple choice questions than did test takers nationwide. RJN Exs. 1, 2, 3.

Individual students accused of misconduct are also provided more process than the AP Students because Defendants only cancel the scores based upon **substantial** evidence that the scores are invalid. In those cases, Defendants notify the affected student in writing about their concerns, give them an opportunity to submit information that addresses the concerns and consider any submitted information. Defendants also offer various options, which include voluntary score cancellation, a free retest and arbitration in accordance with the ETS Standard Arbitration Agreement. See RJN Ex. 8 at 4. Here, the Defendants are treating 286 students, in which there is no evidence of wrongdoing, with less due process than an individual student, in which there is actual evidence of wrongdoing. This is an unfair and unsupportable result, especially since California Education Code § 99159 requires a substantial evidence standard.

The purpose of the rules for test administration is to make sure that the test results are accurate and reflect the knowledge and abilities of the test taker, not to simply invalidate scores when the rules are not followed to the letter. There is no evidence that Mills High School had inadequate controls. To the contrary, the evidence demonstrates that Mills High School had adequate controls in place to ensure security of the testing environment. Belzer Decl., ¶¶ 3-7, 9-10; Arbizu Decl., ¶¶ 6-25; Student Decls.; Proctor Decls. Because the evidence shows that the testing environment was secure, because Defendants have no evidence of any wrongdoing by any student and because there was no legitimate investigation of the testing environment at Mills High School, Defendants' decision to invalidate 641 AP test scores breaches their contract and violates their duty of good faith and fair dealing to the students.

### b. UCL Claim

The UCL forbids "unlawful, unfair or fraudulent business act or practice." Bus. & Prof. Code § 17200. California courts have consistently interpreted this language broadly. *See e.g.*

*Cel-Tech Communications & Cel-Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.  Further, the courts interpret the "unlawful" prong of Section 17200 to hold illegal a business practice that violates any other law, treating it as "unlawful" and making it independently actionable under 17200.  *Id.* Defendants' business is to prepare and administer tests for a fee.  Defendants have engaged in unlawful business practices.

### c.   Violation of California Education Code sections 99159 and 99160

As testing agencies administering the AP tests, Defendants must comply with the requirements of California Education Code sections 99159 *et seq*.  The California Legislature has enacted legislation to: "Ensure due process protection of test subjects whose scores are being questioned for suspected inauthenticity or irregularity in test administration."  *Id.*, § 99150(b)(2); *see also id.*, §§ 99150(a)(1),(2),(4).  Education Code Sections 99159 and 99160 spell out those due process protections. Section 99159 provides strict requirements that testing agencies must follow before they can invalidate test scores based upon irregular test administration, as is alleged here.  These requirements include providing notice of the decision to the test taker by registered mail, the notice is to include a complete summary of the information relied upon, a complete summary of the pertinent facts surrounding the investigation, the policies and procedures followed in reviewing and rendering the decision, the summary of the information that can be submitted to the test agency to support the authenticity of the scores, and that the test taker has no more than 15 working days to respond.  Cal. Educ. Code § 99159.  The scores can only be invalidated based upon substantial evidence.  *Id.*  Section 99160 provides the requirements of notice to a test taker about procedures once a score is invalidated.  Defendants failed to based their decision upon substantial evidence and follow the required notice procedures.  Therefore, they are liable for violating the statute.

### d.   Due Process Claim

Defendants are state actors resulting from their joint participation with SMUHSD and California public colleges and universities in certifying students' advanced placement credit to state colleges and universities and/or their joint participation with the state's colleges and

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA**            12

universities in accurately reporting the advanced placement test scores which are relied on for student admission and the awarding of student scholarships. They also have relationships with the colleges and universities through the use of delegates on each campus who facilitate the award of credits to students by colleges. Through their actions, they have violated Article 1, §7(a) of California's Constitution.

### 2. The Harm to Plaintiffs is Irreparable and Unascertainable

The harm to Plaintiffs is substantial and irreparable. Irreparable harm does not lend itself to a ready definition but is found to mean compensatory damages are unsuitable, cannot be adequately compensated for by money, or the inadequacy of legal remedies. *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1210 (C.D.Cal. 2007). The harm to the Plaintiffs is immediate and substantial and includes, but is not limited to: (1) Loss of Admission to Colleges and Universities; (2) Loss of College Credit; (3) Loss of Ability to Skip Introductory Classes; (4) Inability to Take Re-Test; (5) Being Forced to Take Re-Test Under Substantially Different Circumstances; and (6) Harm to SMUHSD when scores are invalidated. Belzer Decl., ¶¶ 12-14; Students Decls.; Seto Decl. The harm to Plaintiffs is "irreparable" and unascertainable. *Id.*

Time is of the essence because the AP exams are scheduled starting August 9 for two weeks. The proposed solution of a retest on those 641 AP exams by all 286 Mills High Schools does not solve the problem, especially when Defendants acknowledge that there is **no evidence of any specific wrongdoing by any student**.

- **Loss of Equivalent Opportunity to Demonstrate Knowledge:** The proposed solution, a re-test, is not adequate. ETS advises students that "policies and procedures have been developed to afford all students equivalent opportunities to demonstrate their knowledge on exam day and prevent any students from gaining an unfair advantage." RJN Ex. 8 at 3. It is not possible for 18,000 schools across the country to provide identical testing conditions. An unexpected retest in August after having their scores cancelled does not offer these AP Students an equivalent opportunity to demonstrate their knowledge. Other students had the benefit of a teaching curriculum and review courses designed to lead up to the testing date in May. The testing conditions under which these retests will be taken are markedly different than the May test conditions. Student Decls; Belzer Decl., ¶¶ 12-14.

- **Inability to Register for Classes:** For the seniors who will be leaving for college, they must know if they have qualified to pass certain introductory courses so that they may appropriately pick their fall 2013 course schedule. In colleges

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA**          13

and universities, course selection has become highly competitive and the inability to register for certain classes because of delayed AP reporting can affect a student's ability to graduate on time. Student Decls; Belzer Decl., ¶¶ 12-14; RJN 10-12.

### 3. Defendants Will Not Be Harmed by an Injunction So the Equities Tip in Plaintiffs' Favor

Defendants will not be harmed if a TRO or preliminary injunction is granted so the equities tip in Plaintiffs' favor. Defendants collected a fee for each AP exam and continue to hold that fee. That fee is for the validation, scoring and reporting of Plaintiffs' scores. They will suffer no financial impact. As such, Defendants suffer **no harm** if an injunction is granted.

Defendants may claim that granting an injunction harms them by impacting the integrity of the AP testing process. This is incorrect. They conducted the investigation that they thought was sufficient and found no evidence of cheating or wrongdoing. Accordingly, they can stand behind the exam results. The abstract concept of testing integrity is not protected by granting Defendants *carte blanche* to invalidate scores without due process. Indeed, the integrity of the testing process is strengthened by a judicial determination that scores cannot be invalidated without due process to Plaintiffs. This is a fundamental concept of fairness and jurisprudence and a better lesson to American high students than the concept of rule by fiat. Therefore, the balance of equities tips strongly in favor of Plaintiffs.

### 4. A Temporary Restraining Order and Preliminary Injunction Are In The Public Interest

The AP Students' right to obtain college credit based upon their hard work is in the public interest, especially in light of the increasing costs of attending college. The California Legislature has found and declared that "education is fundamental to the development of all residents and to the progress of the state as a whole," "Standardized tests are a major factor in the admission and placement of students in postsecondary education," and "The rights of test subjects should be assured without infringing upon the proprietary rights of the test agencies." California Education Code section 99150(a)(1),(2),(4). The California Legislature enacted legislation to "Ensure due process protection of test subjects whose scores are being questioned

---

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA**     14

for suspected inauthenticity or irregularity in test administration." *Id.*, section 99150(b)(2). Therefore, the public has an interest in this matter.

### B.     A Bond Should Not Be Required In This Case

Plaintiffs urge this Court to issue relief without requiring a bond.  Courts have wide discretion regarding the requirement of a bond and may dispense with the requirement if there is no realistic likelihood of harm to Defendants from enjoining his conduct. *Just Film, Inc. v. Merchant Services, Inc.*, 2011 U.S. Dist. Lexis 62656, *26-27 (N.D.Cal. 2011), citing *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).  Since the only financial impact to Defendants of an injunction relates to the $89 fee paid to Defendants by the students for each AP exam, and since Defendants already are in possession, custody and control of that fee, Defendants are sufficiently protected if they are allowed to hold onto that fee pending resolution of this case. This Court should therefore exercise its discretion and decline to order a bond.   If the Court decides a bond is necessary, it should require a bond of no more than $5,000.

### IV.    CONCLUSION

For the reasons set forth above and good cause, Plaintiffs respectfully request that the Court grant the *ex parte* application for a TRO and Order to Show Cause.

Dated: August 9, 2013            **COTCHETT, PITRE & McCARTHY LLP**

By: /s/
          NANCY L. FINEMAN

**LOZANO SMITH**

By: /s/
          GREGORY A. WEDNER

*Attorneys for Petitioner/Plaintiff
San Mateo Union High School District*

**MINAMI TAMAKI LLP**

By: /s/
          JACK W. LEE

*Attorneys for Petitioner/Plaintiff
AP Students - Viking Parent Group*

---

**PLAINTIFFS' MPA ISO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; Case No. CV-13-3660-SBA**          15