UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SAN MATEO UNION HIGH SCHOOL DISTRICT, a school district, individually and on behalf of the members of the SAN MATEO UNION HIGH SCHOOL DISTRICT and AP STUDENTS – VIKING PARENT GROUP, an unincorporated association,<br><br>          Plaintiffs,<br><br>    vs.<br><br>EDUCATIONAL TESTING SERVICES, a corporation; and COLLEGE ENTRANCE EXAMINATION BOARD, a corporation; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No: C 13-3660 SBA<br><br>**ORDER DENYING PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>Dkt. 20 |

Plaintiffs San Mateo Union High School District ("School District") and the AP Students-Viking Parent Group ("Viking Group") bring the instant action against the College Entrance Examination Board ("College Board") and Educational Testing Services ("ETS") on behalf of themselves and students and families of the School District who were affected by the decision of the College Board to invalidate the Advanced Placement ("AP") test scores of 286 students at Mills High School ("MHS"). The parties are presently before the Court on Plaintiffs' Ex Parte Application for Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction, which seeks the reinstatement of those test scores. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the application for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

# I.      BACKGROUND

## A.      THE COLLEGE BOARD'S AP PROGRAM

The College Board is a not-for-profit membership association comprised of over 6,000 colleges, universities and other educational organizations.  Packer Decl. ¶ 3, Dkt. 7. Among other things, the College Board develops and administers a variety of programs, tests and curricula for secondary level students seeking admission to college.  Id.  Some of the College Board's best known testing programs are the SAT, PSAT/NMSQT and the AP Program.  Id.

At issue here is the College Board's AP Program, through which high school students may enroll in college-level courses in numerous subjects, such as English Literature, Biology and Calculus, among others.  Id. ¶¶ 4, 6.  The College Board offers an annual examination in connection with these courses, the results of which may qualify students for college credit.  Id. ¶¶ 6, 9.  The exams typically vary from two to three hours and contain multiple choice and essay questions.  Id. ¶ 7.  Tests are scored on a scale of one to five.  Id. ¶ 9.  The College Board recommends that colleges (which are specified by the particular student) award credit to students who score three or higher on an AP test; however, the college ultimately makes the decision of whether to confer credit.  Id.

On behalf of the College Board, ETS is responsible for test security with respect to a variety of College Board tests, including the AP exams.  Id. ¶ 10.  In that capacity, ETS develops test administration procedures for AP exams; conducts security investigations where appropriate (i.e., cases where the high school failed to comply with test administration procedures); and makes recommendations to the College Board as to how cases should be resolved.  Id.  The College Board makes the final decision about what action, if any, should be taken in the event of testing irregularities.  Id.

All high schools administering AP exams are required to comply with detailed test administration and test security requirements, as set forth in the AP Coordinator's Manual ("AP Manual").  Cuccia Decl. ¶ 8 & Ex. D ("AP Manual") at 45, Dkt. 6.  The AP Manual requires, inter alia, that tests must start on time and that students must refrain from

discussing exam materials with each other.  <u>AP Manual</u> at 45.  In addition, and particularly

relevant here, students must be seated consistent with the following:  students must be

seated at least five feet from one another; they must face the same direction; more than one

student may be seated at a table only if the seating distance and directional requirements are

satisfied; and no students may be seated at round tables.  <u>Id.</u>  The <u>AP Manual</u> expressly

warns (in boldface type):  "**Failure to follow seating requirements could result in**

**cancellation of exam scores**."  <u>Id.</u>  The purpose of the seating requirements is to prevent

students from communicating with one another and thereby gain an unfair advantage over

other students taking the examination.  Cuccia Decl. ¶ 9.

AP students and parents are advised of the AP exam test security policies and

procedures through the <u>AP Bulletin for AP Students and Parents</u> ("AP Bulletin"), which is

provided to students desiring to take one or more AP exams.  <u>Id.</u> ¶ 6 & Ex. B ("<u>AP</u>

<u>Bulletin</u>").  The <u>AP Bulletin</u> expressly advises students of the paramount importance of test

security and administration procedures, which are "designed to protect the integrity of the

AP Exam and AP Exam scores."  <u>AP Bulletin</u> at 3.  Importantly, students are warned that:

"When the College Board determines that your testing experience did not meet the College

Board's standards for administering exams—even through no fault of your own—the

College Board reserves the right to cancel your AP Exam score."  <u>Id.</u>

The <u>AP Bulletin</u> identifies six types of occurrences that could lead to the

cancellation of a test score.  <u>Id.</u>  One of those situations, identified by the heading, "Testing

irregularities," refers specifically to the administration of the exams.  <u>Id.</u> at 4.  The types of

issues identified as testing irregularities include "administrative errors (e.g., improper

timing, *improper seating*, improper proctoring, . . . ."  <u>Id.</u> (emphasis added).  The <u>AP</u>

<u>Bulletin</u> warns that when testing irregularities occur, the College Board "may decline to

score the exams of one or more students when it determines that such actions are required

to protect the integrity of the exam," irrespective of whether the test-taker caused the

testing irregularity.  Id.[1]  The College Board may, in its judgment, allow the affected

student or students to retake the test without charge.  Id.  Every AP test-taker is required to

signify his or her agreement to comply with the policies and procedures outlined in the AP

Bulletin by affirming on his or her exam answer sheet:  "I am aware and agree to the AP

Program's policies and procedures as outlined in the 2012-13 Bulletin for AP Students and

Parents[.]"  Cuccia Decl. ¶ 6 & Ex. C.

     **B.**    **AP EXAMS AT MHS**

          **1.**    **May 2013 AP Exams at MHS**

     MHS, which is part of the School District, signed up to administer the 2012-13 AP

exams.  Id. ¶ 10.  As part of that process, MHS Principal, Paul Belzer ("Principal Belzer"),

and Vice-Principal, Irma Munoz ("VP Munoz"), signed the 2012-13 AP Participation Form

("AP Participation Form") in which they agreed that MHS would comply with all of the

requirements contained in the AP Manual.  Id. Ex. E.  They each further acknowledged as

follows:  "I understand that if my school does not comply with the above conditions and

procedures set forth in the AP Coordinator's Manual, then . . . one, some or all of my

students' AP Exam scores may be cancelled."  Id.

     In early May 2013, MHS administered 21 different AP examinations.  Id. ¶ 12.  At

the outset of the Statistics exam on May 10, 2013, a student complained to VP Munoz

about the exam.  Id. Ex. F.  VP Munoz responded by telling the student to take the test.  Id.

Several days later on May 13, 2013, the student complained directly to ETS in a detailed

email regarding what the student perceived were violations of the testing rules.  Id.  Among

other things, the student alleged that the test was started late, all students were not facing

the same direction, students were seated at round tables facing each other, students were

---

    [1] The AP Bulletin further warns that when testing irregularities occur, the College
Board may cancel test scores "whether or not the affected students caused the irregularities,
benefited from them or engaged in misconduct."  AP Bulletin at 4.

allowed to discuss the exam during breaks, and that at least one of the proctors was using a cellular phone during the exam.  Ex. F.[2]

### 2. ETS' Investigation

As a result of the student's complaint, ETS' Office of Testing Integrity ("OTI") commenced an investigation.  Id. ¶ 14.  The matter was assigned to Test Security Analyst Dionne Evans on May 16, 2013.  Id.  On that date, Ms. Evans called and left a message for VP Munoz, the AP Coordinator at MHS, but received no response.  Id.  After Ms. Evans called and left a second message on May 20, 2013, VP Munoz called back to state that Valeria Arbizu oversaw the May 2013 AP exam.  Id.

On May 21, 2013, Ms. Evans spoke with Ms. Arbizu about the student's complaint. Id. ¶ 15.[3]  Ms. Arbizu claims that she answered all of the questions presented to her regarding the Statistics exam.  Arbizu Decl. ¶ 26.  In contrast, Ms. Evans found Ms. Arbizu to be "evasive and unwilling to give direct answers."  Cuccia Decl. ¶ 15.  Ms. Arbizu denied the student's claims, but acknowledged that all students were not seated in the same direction and that round tables were used without authorization.  Id.  Upon Ms. Evans' request, Ms. Arbizu provided a written statement responding to the student's allegations. Id. ¶ 16.  Ms. Arbizu submitted the requested statement, though she omitted mention of the seating violations.  Id. & Ex. H.

On May 23 and 24, 2013, Ms. Evans left voicemail messages asking Ms. Arbizu to return her call.  Id. ¶ 17; Arbizu Decl. ¶ 27.  On May 24, 2013, Ms. Evans spoke with Ms. Arbizu and requested a seating chart for the Statistics exam.  Cuccia Decl. ¶ 17.  Although she agreed to provide such a chart, Ms. Arbizu failed to provide one.  Id.  Ms. Evans

---

[2] Other students (as well as MHS officials) later confirmed the seating irregularities. One student acknowledged that in each of her six AP exams she was facing another test-taker who was less than five feet away.  Kao Decl. ¶¶ 5, 6, 11, 16, 21, 31, Dkt. 1.  Another student taking the AP Statistics exam was seated while facing another student.  Liang Decl. ¶ 21, Dkt. 1. A proctor at the AP Biology exam confirmed that students were seated less than five feet from another and that some were facing each other.  Choy Decl. ¶¶ 4-7, Dkt. 1.

[3] Ms. Arbizu states that she spoke to Ms. Evans on May 22, 2013.  Arbizu Decl. ¶ 26, Dkt. 22-2.

1   attempted to follow up with Ms. Arbizu on June 7, 2013, but was only able to reach her

2   voicemail.  Id.  After hearing nothing further from Ms. Arbizu, Ms. Evans sent an email to

3   Ms. Arbizu on June 7, 2013, again requesting the seating chart.  Id.  Finally, on June 12,

4   2013, Ms. Arbizu sent a "preliminary" seating chart which showed the names of the

5   students and where they were seated, but did not indicate the direction they were facing, the

6   distance between them, or the shape and size of the tables used.  Id. ¶ 17 & Ex. I.

7        Thereafter, Test Security Analyst Patricia Taylor was assigned to the investigation.

8   Id. ¶ 18.  On June 13, 2013, Ms. Taylor sent an email to Ms. Arbizu requesting additional

9   details regarding the seating arrangements, i.e., the table sizes and types of rooms used and

10  whether the exams were administered in the same location.  Id. ¶ 19 & Ex. J.  Ms. Arbizu

11  responded that the Statistics exam was conducted offsite in a large conference room.  Id.

12  Ex. J.  With respect to the request for seating details, Ms. Arbizu stated:  Given the flexible

13  nature of this room, I am unable to provide you with the specific details on which students

14  sat at square or rectangular tables – my proctor moved them around often for the first week

15  of the tests and that's one item we did not track during the testing (exactly which style of

16  table was used by which set of students)."  Id.  She added, however, that, "I can say that

17  students were placed at least 4' apart from each other in the testing room."  Id.

18       Concerned with the possibility that MHS testing irregularities extended beyond the

19  Statistics exam, Ms. Taylor contacted Principal Belzer on June 17, 2013, to request

20  information about the administration of the other tests.  Id. ¶ 20.  Principal Belzer consulted

21  with other staff and responded by email later that day.  Id. Ex. K.  In his email, Principal

22  Belzer admitted that:  students were not facing the same direction in the Chemistry and

23  Statistics exams and that one to two students were at each table; three to four round tables

24  were used for the Statistics exam; and two to three round tables were used for the

25  Chemistry exam.  Id.

26       On June 21, 2013, Principal Belzer informed Ms. Taylor by telephone that test-

27  takers were facing each other during the Biology exam, which was administered in the

28  MHS library.  Id. ¶¶ 22-23.  Per Principal Belzer's suggestion, Ms. Taylor followed up with

Ms. Arbizu on June 24, 2013, by leaving a voicemail and sending her an email. Arbizu Decl. ¶¶ 33, 34; Cuccia Decl. ¶ 24. On the same day, Ms. Arbuzi sent an email in response to Ms. Taylor's voicemail and included a hand-drawn "quick diagram of the way the tables and chairs were set up in the library for testing." Cuccia Decl. Ex. N. She indicated that students were seated facing each other "on the right and left sides of the room" during the Biology exam. Id. Ms. Taylor subsequently called Ms. Arbizu and asked where exactly students were seated in the library, how close students were in relation to each other, and whether students were facing each other. Id. According to Ms. Taylor, Ms. Arbizu did not provide "direct answers" but did admit that students sitting at rectangular tables sat on the short side of the tables, facing each other. Id. ¶ 25. Ms. Taylor asked for seating charts for all tests administered in the library, but they were never produced. Id. ¶¶ 25, 26.

Dissatisfied with Ms. Arbizu's responses, Ms. Taylor sent her another email on June 24, 2013, with specific questions regarding eight other AP exams in U.S. History, Macroeconomics, English Language and Composition ("English Language"), English Literature and Composition ("English Literature"), U.S. Government and Politics, Physics B, Calculus AB and Calculus BC. Id. ¶ 27. In response, Ms. Arbizu acknowledged that all students were not facing the same direction in the exams for U.S. History, Macroeconomics, U.S. Government and Politics, Physics B, Calculus AB and Calculus BC. Id. ¶ 28 & Ex. O. Ms. Taylor also learned that students taking the English Language, English Literature, and Calculus AB exams were not facing the same direction. Id.[4]

_____

[4] In their Reply, Plaintiffs contend that the statements and actions attributed to Ms. Taylor and Evans are hearsay because they are presented through the declaration of Amy Cuccia, a Test Security Manager with ETS' OTI. Pls.' Reply in Supp. of Ex Parte Appl. for TRO ("Reply") at 2-3. However, due to the expedited nature of a TRO proceeding, the Court may give some weight to otherwise inadmissible evidence. See Rosen Entm't Sys., LP v. Eiger Vision, 343 F. Supp. 2d 908, 912 (C.D. Cal. 2004) (citing Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984)). In any event, Plaintiffs' concerns are unavailing. Regardless of whether the Court considers the statements attributed to Ms. Taylor and Ms. Evans in Ms. Cuccia's declaration, it is uncontroverted by Plaintiffs that MHS officials failed to comply with the applicable seating requirements during the various AP exams at issue. It also is uncontroverted that Plaintiffs did not provide Defendants with detailed seating charts for those tests which would have disclosed which particular students were improperly seated.

### 3. Decision to Cancel Exam Scores

On June 26, 2013, ETS informed the College Board that the OTI had recommended cancelling the scores in the following eleven exams: U.S. History, Macro-Economics, English Language, English Literature, U.S. Government and Politics, Calculus AB, Calculus BC, Physics B, Statistics, Chemistry and Biology. Id. ¶ 30. The College Board accepted the OTI's recommendations on July 2, 2013. Id.

On July 8, 2013, the College Board notified Principal Belzer by email of its decision to deem the scores for the aforementioned exams "invalid," and indicated that the affected 286 MHS students would have the opportunity to retake the exam free of charge. Id. ¶¶ 31-32; Arbizu Decl. ¶ 38 & Ex. 3. Principal Belzer, in turn, notified MHS staff, students and parents of the College Board's action on July 11, 2013. Cuccia Decl. ¶ 33. Shortly thereafter, students were notified that the retests were scheduled from August 5 to August 12, 2013. Id. ¶ 34. At MHS' request, those dates were postponed to August 9 to August 19, 2013. Id. ¶ 37. Defendants have offered a second retest opportunity for those students unable to make the rescheduled test dates. Id.

On July 19, 2013, representatives from the College Board and Cynthia Clark, Director of Curriculum and Standardized Assessment for the School District, participated in a telephone conference call. Id. ¶ 35. During the call, Ms. Clark admitted that there were testing irregularities at MHS, but asked whether the score cancellations could be limited to only the particular students impacted by the violations of test protocols. Id. The College Board expressed a willingness to consider her proposal if she could provide information regarding the seating arrangements that were more detailed than those previously provided by Principal Belzer and Ms. Arbizu. Id. Although Ms. Clark stated that she had additional seating charts that she could provide, none were presented to the College Board. Id.

### C. PROCEDURAL HISTORY

On August 5, 2013, the School District and the Viking Group filed the instant action against ETS and College Board in the California Superior Court for the County of San Mateo. The Viking Group is a non-profit association comprised of MHS students whose

scores were invalidated and parents of such students who claim they have been financially harmed by Defendants' actions.  Lee Reply Decl. ¶¶ 2-5, Dkt. 34-3.  Plaintiffs claim that 180 students and parents have joined the Viking Group.  Id. ¶ 4.  On August 7, 2013, Defendants removed the action to this Court on the basis of diversity jurisdiction, 28 U.S.C. § 1332.  Dkt. 1.

On August 9, 2013, Plaintiffs filed a First Amended Complaint ("FAC"), which alleges the following claims for relief:  (1) Breach of Contract (by School District); (2) Breach of Contract (by Viking Group); (3) Breach of the Implied Covenant of Good Faith and Fair Dealing (by School District); (4) Breach of the Implied Covenant of Good Faith and Fair Dealing (by Viking Group); (5) Violation of the California Unfair Competition Law; (6) Violation of California Education Code section 99159; (7) Declaratory Relief; (8) Temporary Restraining Order; (9) Injunction; and (10) Violation of Procedural Due Process Under California State Law California Constitution, Article 1, section 7(a).

On August 9, 2013, Plaintiffs filed the instant application for a TRO, pursuant to Federal Rule of Civil Procedure 65(b).  Dkt. 21.  Specifically, Plaintiffs seek a mandatory injunction directing Defendants to "grade and validate the AP tests taken by students at Mills High School in May 2013 in the subjects of US History, Macro-Economics, English Language, English Literature, US Government and Politics, Calculus AB, Calculus BC, Physics B, Statistics, Chemistry and Biology, and to report those scores to colleges and universities, as requested by the students."  Proposed Order Granting Pls.' Ex Parte Appl. for TRO and Order To Show Cause Re Prelim. Inj. at 1, Dkt. 20-2.  Defendants oppose the motion.  The matter has been fully briefed and is now ripe for adjudication.[5]

---

[5] Defendants removed the action after the application for a TRO was served but before it was actually filed with the state court.  Upon removal, Defendants filed an opposition to the motion, apparently unaware that the request for a TRO had not yet been filed.  Dkt. 5.  Thereafter, Plaintiffs filed their application for a TRO in this Court.  Dkt. 20.  Pursuant to the Court's scheduling order, Defendants filed a supplemental opposition on August 13, 2013, and Plaintiffs filed their reply and a supplemental reply on August 14, 2013.  Dkt. 33, 34, 34-1.

## II.      LEGAL STANDARD

The same legal standard applies to an application for a TRO and a motion for a preliminary injunction.  See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001).  To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest.  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief[.]"  Winter, 555 U.S. at 22.  The moving party bears the burden of meeting all prongs of the Winter test.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).  The decision of whether to grant or deny a TRO is matter of the district court's discretion.  See Grand Canyon Skywalk Devel., LLC v. 'Sa' Nyu Wa Inc., 715 F.3d 1196, 1200 n.1 (9th Cir. 2013).

The standards for obtaining a TRO are heightened, where, as here, the proposed injunction is mandatory, as opposed to prohibitory, in nature.  Dahl v. HEM Pharms. Corp., 7 F.3d 1399, 1403 (9th Cir. 1993).  An injunction that "*prohibits a party from taking action* and preserves the status quo pending a determination of the action on the merits" is considered prohibitory.  Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust, 636 F.3d 1150, 1159 (9th Cir. 2011) (internal quotations and alteration omitted, emphasis added).  The status quo means "the last, uncontested status which preceded the pending controversy."  Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir. 2009) (internal quotations omitted).  In contrast, "[a] mandatory injunction orders a responsible party *to take action*."  Id. (internal quotations omitted, emphasis added).  Because a mandatory injunction "goes well beyond simply maintaining the status quo," it is "particularly disfavored."  Id.  As such, a request for a mandatory injunction "is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party."  Dahl, 7 F.3d at 1403 (internal quotation marks omitted).

In the instant case, Plaintiffs seek an order compelling Defendants "to grade and validate" the previously invalidated AP tests and to report the scores to the colleges identified by the individual MHS students. Pls.' Not. of Ex Parte Appl. for TRO at 1, Dkt. 20. Although the proposed TRO clearly requires Defendants to "take action," see Marlyn Nutraceuticals, 571 F.3d at 877, Plaintiffs insist that they are seeking a "prohibitory injunction [] which prohibits a party from taking action and preserving the status quo." Mem. of P. & A. in Supp. of Pls.' Ex Parte Appl. for TRO ("Pls.' Mem.") at 7-8, Dkt. 31. They claim that the status quo is the period "[p]rior to Defendants' decision to invalidate the AP test scores[.]" Id. This contention is illogical. The phrase "last, uncontested status" refers to the status quo when the lawsuit was filed. N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dept. of Educ., 600 F.3d 1104, 1112 n.6 (9th Cir. 2010). Regardless of Plaintiffs' characterization of the "status quo," the fact remains that the order being sought seeks to compel Defendants to take action; to wit, to validate and report the AP test scores which they previously deemed invalid. Accordingly, the Court finds that the instant ex parte application is subject to the heightened requirements for mandatory injunctions.[6]

## III.   **DISCUSSION**

### A.   STANDING

The initial question presented is whether Plaintiffs have standing. Defs.' Br. in Opp'n to Pls.' Mot. for TRO ("Opp'n") at 10-11. Plaintiffs are the School District and the Viking Group, the latter of which is an association of certain MHS students whose AP scores were invalidated and their parents. Defendants contend that Plaintiffs "may not speak" for MHS students on the grounds that it is unclear whether Plaintiffs and the students' interests are aligned, and that the School District has a conflict of interest with the students. Id. Neither contention is compelling.

---

[6] In any event, regardless of whether the injunction being sought is characterized as prohibitory or mandatory, Plaintiffs have failed to persuade the Court that a TRO is warranted.

Under Article III of the United States Constitution, standing is a threshold and fundamental requirement in every civil action filed in federal court.  U.S. Const., art. III, § 2, cl. 1; Elk Grove Unified Sch. Dist. v. Newdow, 524 U.S. 1, 11 (2004) ("In every federal case, the party bringing the suit must establish standing to prosecute the action."). Constitutional standing is established by showing: (1) an injury in fact, which is a violation of a protected interest, that is both (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) a likelihood that the injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  "Standing is determined as of the commencement of litigation."  Biodiversity Legal Found. v. Badgley, 309 F.3d 1166, 1170 (9th Cir. 2002).  The party seeking relief "bears the burden of showing that he has standing for each type of relief sought."  Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).

An association may have standing in two situations.  First, "[a]n association-plaintiff has standing to seek redress of direct injury to the association itself."  Olagues v. Russoniello, 797 F.2d 1511, 1518 (9th Cir. 1986).  Second, an association or organization has representational standing to assert the claims of its members, "even where it has suffered no direct injury from a challenged activity."  Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity, 950 F.2d 1401, 1406 (9th Cir. 1991) (citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 341 (1977)).  Under Hunt, "[a]n association has standing to bring suit on behalf of its members when:  (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Contractors of Cal., 950 F.2d at 1406.  Plaintiffs assert representational standing.

Defendants do not directly address any of the Hunt factors.  Instead, they assert Plaintiffs have failed to show that all MHS students support this action and their corresponding efforts to seek reinstatement of their May 2013 test scores.  Opp'n at 10. The Ninth Circuit, however, has rejected the argument that an association's standing

1   necessarily requires the unanimous agreement of its membership regarding the matter in

2   dispute.  Associated Gen. Contractors of Cal., 950 F.2d at 1409 ("we reject the suggestion

3   that unanimity of membership be required in organizations seeking standing.").

4          As an ancillary matter, Defendants assert, without citation to legal authority, that the

5   School District has a conflict of interest with MHS students, since it was the school's

6   admitted mishandling of the test administration process that led directly to the invalidation

7   of the AP exam scores.  Opp'n at 10.  While there certainly is evidence to support the

8   MHS' blameworthiness, Defendants have not shown that there is a conflict that precludes

9   the School District's standing.  Generally, only where litigation would result in "profound"

10  conflicts of interest is associational standing typically considered inappropriate.  Retired

11  Chicago Police Ass'n v. City of Chicago, 76 F.3d 856, 863-64 (7th Cir. 1996).  A profound

12  conflict exists (1) "where an association seeks standing to directly sue some of its own

13  members" and (2) where "the association's suit, if successful, would cause a direct

14  detriment to the interests of some of its members and the litigation was not properly

15  authorized."  Id. at 864.  Defendants have not shown that either scenario is presented in this

16  case.  Thus, for purposes of the instant motion, the Court finds that Plaintiffs have carried

17  their burden of demonstrating standing.  The Court now addresses the Winter factors to

18  determine whether a TRO is warranted.

19         **B.   LIKELIHOOD OF SUCCESS**

20                **1.   Breach of Contract**

21                      *a)   School District*

22         The School District alleges that under the terms of the AP Bulletin, Defendants

23  promised to report AP test scores from the May 2013 exam by July 2013.  FAC ¶ 28.

24  According to the School District, Defendants breached such agreement by "refusing to

25  report the AP exam test scores for 286 Mills High School students in eleven different AP

26  subjects, and by rescheduling retests for August 2013."  Id. ¶ 88; Pls.' Request for Jud.

27  Notice ("RJN") Ex. 8 at 8.  "[T]he elements of a cause of action for breach of contract are

28  (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance,

1  (3) defendant's breach, and (4) the resulting damages to the plaintiff."  <u>Oasis West Realty,</u>

2  <u>LLC v. Goldman</u>, 51 Cal.4th 811, 821 (2011).  The plaintiff bears the burden of

3  establishing each of these elements.  <u>See</u> <u>Bank of Am., N.A. v. Roberts</u>, 217 Cal.App.4th

4  1386, 1393-94 (2013).

5        Plaintiffs have failed to sufficiently demonstrate their performance or excuse for

6  nonperformance of the subject agreements.  The <u>AP Bulletin</u> requires that all exams be

7  administered in compliance with the <u>AP Manual</u>.  <u>AP Bulletin</u> at 3-4.  <u>AP Manual</u> requires

8  that the School District comply with the mandatory seating protocols when administering

9  the AP exams, and that the failure to do so constitutes grounds for the cancellation of exam

10  scores.  <u>AP Manual</u> at 45.  The record shows that the School District failed to administer

11  eleven of the AP examinations in a manner consistent with the seating requirements

12  specified in the <u>AP Manual</u>.  Given Plaintiffs' failure to demonstrate that they complied

13  with their obligation to administer the AP exams in the manner specified in the <u>AP Manual</u>,

14  Defendants have no contractual obligation to accept and validate the test scores.  The Court

15  therefore finds that Plaintiffs have failed to demonstrate that the School District is likely to

16  succeed on its breach of contract claim.

17                     ***b)    Viking Group***

18        The Viking Group separately pleads that Defendants had a contractual obligation

19  under the terms of the <u>AP Bulletin</u> to report the AP exam scores, and breached such

20  agreement by "refusing to report the AP Students' AP exam scores, and by rescheduling the

21  AP exams for August 2013."  FAC ¶ 94; <u>see</u> <u>id.</u> ¶¶ 28-29.  The pleadings further allege that

22  the provision in the <u>AP Bulletin</u> in which students acknowledge that the College Board has

23  the sole discretion to invalidate test scores due to "testing irregularities" is substantively

24  and procedurally unconscionable, and therefore, should not be enforced.  <u>Id.</u> ¶¶ 28, 29, 95.

25        Defendants first argue that the Viking Group cannot allege a breach of contract

26  claim while simultaneously maintaining that a portion of the contract is unconscionable and

27  unenforceable.  Opp'n at 15.  This contention is contrary to California law, which

28  recognizes that an unconscionable clause may be severed from an otherwise enforceable

1    contract.  Cal. Civ. Code § 1670.5(a) ("If the court as a matter of law finds the contract or

2    any clause of the contract to have been unconscionable at the time it was made the court

3    may refuse to enforce the contract, or ***it may enforce the remainder of the contract without***

4    ***the unconscionable clause***, or it may so limit the application of any unconscionable clause

5    as to avoid any unconscionable result.") (emphasis added).

6         The above notwithstanding, Plaintiffs have failed to demonstrate that they are likely

7    to succeed on their claim that the "Testing irregularities" section of the AP Bulletin is

8    procedurally or substantively unconscionable.  FAC ¶ 95.  "Under California law, a

9    contract provision is unenforceable due to unconscionability only if it is both procedurally

10   and substantively unconscionable."  Shroyer v. New Cingular Wireless Servs., Inc., 498

11   F.3d 976, 981-82 (9th Cir. 2007).  The procedural element focuses on oppression and

12   surprise due to unequal bargaining power, while the substantive element is satisfied where

13   the results are overly harsh or one-sided.  Armendariz v. Found. Health Psychcare Servs.,

14   Inc., 24 Cal.4th 83, 114 (2000).  The procedural and substantive elements operate on a

15   sliding scale where a strong showing of one permits a lesser showing of the other.  Id.

16   Nonetheless, both elements must be present in order for a contract provision to be deemed

17   unconscionable.  Id.

18        The Viking Group contends that the disputed provision in the AP Bulletin is

19   procedurally unconscionable on the grounds that MHS students had no choice other than to

20   accept its terms.  Reply at 6.  However, "the take-it-or-leave-it nature of [a contract] is

21   insufficient to render it unenforceable."  Chalk v. T-Mobile USA, Inc., 560 F.3d 1087,

22   1094 (9th Cir. 2009).  Nor is it rendered substantively unconscionable by the fact that the

23   College Board has the sole discretion to invalidate test scores where the tests were

24   improperly administered.  "A contract term is not substantively unconscionable when it

25   merely gives one side a greater benefit; rather, the term must be so one-sided as to 'shock

26   the conscience.'"  Pinnacle Museum Tower Ass'n v. Pinnacle Market Devel. (US), LLC, 55

27   Cal.4th 223, 246 (2012).  The Court finds nothing shocking or unconscionable about an

28   agreement that requires test-takers to acknowledge their responsibility for abiding by rules

1   specifically designed to protect the integrity of the test results—or to acknowledge that

2   there are severe consequences when those rules are not observed.

### 2.       Breach of the Implied Covenant of Good Faith and Fair Dealing

4           The covenant of good faith and fair dealing is implied by law in every contract and

5   "exists merely to prevent one contracting party from unfairly frustrating the other party's

6   right to receive the benefits of the agreement actually made." Guz v. Bechtel Nat. Inc., 24

7   Cal.4th 317, 349 (2000).  "[T]here are at least two separate requirements to establish a

8   breach of the implied covenant:  (1) benefits due under the policy must have been withheld;

9   and (2) the reason for withholding benefits must have been unreasonable or without proper

10  cause." Love v. Fire Ins. Exch., 221 Cal.App.3d 1136, 1151 (1990).  "The covenant of

11  good faith is read into contracts in order to protect the express covenants or promises of the

12  contract, not to protect some general public policy interest not directly tied to the contract's

13  purposes." Foley v. Interactive Data Corp., 47 Cal.3d 654, 690 (1988).

### a)       Lack of Evidence of Cheating

15          Plaintiffs contend Defendants failed to act in good faith by invalidating the subject

16  AP test scores "without any finding of misconduct or that the test results were not valid."

17  Pls.' Mem. at 9.  This contention lacks merit.  The AP Manual explicitly authorizes

18  Defendants to cancel test scores for "**[f]ailure to follow seating requirements**[.]"

19  AP Manual at 45.  Likewise, the AP Bulletin provides that where testing irregularities—

20  which includes "improper seating"—are found, the College Board may cancel test scores

21  "whether or not the affected students caused the testing irregularities, benefitted from them

22  or engaged in misconduct." AP Bulletin at 4.  MHS officials admitted that they did not

23  follow Defendants' seating requirements.  Given that Defendants comported themselves

24  consistent with the terms of their contractual obligations, Plaintiffs are hard pressed to

25  claim that Defendants acted in bad faith.  See Carma Developers (Cal.), Inc. v. Marathon

26  Devel. Calif., Inc., 2 Cal.4th 342, 374 (1992) ("We are aware of no reported case in which a

27  court has held the covenant of good faith may be read to prohibit a party from doing that

28

1    which is expressly permitted by an agreement.  On the contrary, as a general matter,

2    implied terms should never be read to vary express terms.").

3        Setting aside the above, Plaintiffs are not likely to succeed on their argument that, as

4    a prerequisite to invalidating test scores, Defendants have an implied obligation to establish

5    that students, in fact, actually cheated or gained an unfair advantage as a result of the

6    School District's admitted failure to seat students properly.  The purpose of Defendants'

7    seating requirements is to prevent test-takers from gaining an unfair advantage over other

8    test-takers by, for instance, communicating with each other or observing another student's

9    answers.  The existence of these procedural safeguards, and certainly, Defendants' ability

10   to enforce them, is critical to the integrity of the test results which are relied upon by

11   thousands of colleges and universities.  Plaintiffs do not, and indeed, could not legitimately

12   dispute this.  Thus, when the testing environment transgresses the mandatory testing

13   protocols, Defendants cannot reasonably be expected to vouch for and report those scores

14   to member colleges and universities.  See Doe v. Nat'l Bd. of Podiatric Medical Examiners,

15   No. 03 Civ. 4034(RWS), 2003 WL 21403698, *5 (S.D.N.Y. 2003) ("The significant

16   consideration in deciding whether or not to invalidate a test score is thus not whether the

17   individual candidate engaged in misconduct, but whether the candidate's test results are

18   tainted by misconduct.  As exemplified in this case, [the testing agency] may have reason to

19   invalidate the candidate's test results even when they are innocent.").

20       Plaintiffs also fail to demonstrate how Defendants could have accurately gauged

21   whether any particular student cheated or benefited from MHS' failure to adhere to

22   Defendants' seating specifications.  For example, Plaintiffs posit that ETS could have

23   conducted on-campus interviews or performed a "statistical analysis" of student scores to

24   detect cheating.  FAC ¶ 60.  That, of course, assumes that Defendants were adequately

25   informed, in the first instance, about which students to interview or which scores to

26   analyze.  Defendants requested that the School District provide seating charts that were

27   more detailed than those previously provided that might have shown, for instance, which

28   students were seated less than five feet apart or were facing each other.  Those charts were

never provided.  Cuccia Decl. ¶ 35.  In addition, Defendants lack the authority to compel students to speak with them or to truthfully admit if they cheated.  Id. ¶ 4.  The statistical analysis suggested by Plaintiffs is used in cases where individual test scores are at issue, as opposed to situations where groups of test scores are involved.  Id.  When hundreds of students are tested under improper test conditions and there is no record where each student sat for each test, there are no statistical tools to determine which students were involved in cheating.  Id. ¶¶ 4, 7(a), 40.  That is why the question in testing irregularity cases is not whether one or more particular test-takers cheated, but whether improper testing conditions afforded a group of test-takers the opportunity to obtain an unfair advantage.

Lastly, Plaintiffs contend that Defendants should defer to the School District's assessment that all of the May 2013 AP exams at MHS were "conducted pursuant to test protocols that ensure the validity of the test results."  Pls.' Mem. at 1.  However, requiring Defendants to defer to each individual school's assessment of whether test conditions were adequately secure—notwithstanding the school's admitted failure to assure strict adherence to the requisite seating protocol—is entirely antithetical to the purpose of standardized testing.  The imposition of uniform test administration procedures is directed to ensuring that the particular test is administered under conditions that are as uniform as possible.  It is the uniformity of those requirements, and each school's adherence to them, that is imperative to maintaining the integrity of the testing process and the validity of corresponding test results.  Certainly, given that AP exams were offered at 18,000 schools across the country in 2013, it would fatally undermine the AP Program if each school were, in effect, allowed to make its own determination as to what constitutes sufficient test security.

### b)      *Comparison to Other Schools*

Plaintiffs next allege that Defendants failed to act in good faith by allegedly treating MHS differently when compared to two other instances of misconduct at California schools

1    where the College Board invalidated AP test scores. Pls.' Mem. at 10.[7]  The first case

2    involved the AP exams administered by Skyline High School ("Skyline") in 2011.  After

3    the examination, ETS received complaints regarding cheating ***and*** seating irregularities.

4    ETS commenced an investigation, and in response to ETS' inquiries, Skyline officials

5    provided proof of its compliance with testing procedures, which ETS accepted.  However,

6    ETS concluded from its investigation that the complaints of individual cheating were valid

7    and invalidated the test scores of thirty students.

8         Plaintiffs also cite an incident involving Trabacco Hills High School ("Trabacco"),

9    where, in 2008, the College Board invalidated certain AP test scores after being presented

10   with evidence of cheating ***and*** testing irregularities. Pls.' RJN Ex. 1 at 1.  In that case, a

11   Trabacco student notified ETS that another student had sent texts during the Statistics

12   exam, various students had stated their intention to cheat, and some students were allowed

13   to complete their exams after time was called.  Id. at 2.  In turn, ETS notified Trabacco

14   officials, who, upon further investigation, reported to ETS that the instances of misconduct

15   were likely more widespread than reported by the student, and that there were "significant

16   violations of seating requirements and proctor-to-student ratios on a number of AP exams."

17   Id. at 5.  ETS confirmed these findings, and ten students eventually confessed to cheating.

18   Id.  Following the recommendation of ETS, the College Board invalidated the test scores

19   only in those exams where the proctor-to-student requirement was not observed, and barred

20   the ten students identified as cheaters from taking the free retest being offered by the

21   College Board.

22         According to Plaintiffs, Defendants' purportedly disparate treatment of MHS,

23   relative to Skyline and Trabacco, shows their failure to act in good faith.  Not so.  In both of

24   those prior cases, ETS received specific complaints of individualized cheating, which

25   explains why ETS investigated whether any cheating actually transpired before taking any

26

27        [7] In 2013, the AP test scores at eight other schools were cancelled due to seating
     irregularities, and scores at fifty-two other schools were cancelled based on various other
28   testing irregularities.  Packer Decl. ¶ 18.

corrective action.  In contrast, Defendants in this case received no complaints of cheating by students; rather, the reporting student only complained about testing irregularities. Cuccia Decl. Ex. F.  Moreover, Plaintiffs' claim that Defendants invalidated AP exams for procedural irregularities at Skyline and Trabacco only after investigating whether there was actual cheating is inaccurate.  In the Skyline incident, the College Board only invalidated the scores of students involved in cheating.  At Trabacco, the College Board invalidated the test scores of all students who took an AP exam where the specified proctor-to-student ratio was not observed.  There is no indication that the invalidation of those students' scores was dependent on a finding of actual cheating or that students gained an unfair advantage. Though ten students also were found to have cheated, the tests of those students were handled separately.  Thus, based on the limited record presented, the Court is unpersuaded by Plaintiffs' claim that Defendants' handling of the incidents at Skyline or Trabacco demonstrates a lack of good faith.

Citing Dalton v. Educational Testing Service, 87 N.Y.2d 384, 389 (1995) and Cortale v. Educational Testing Service, 674 N.Y.S.2d 753, 755 (1998), Plaintiffs insist that before invalidating any test scores, Defendants' duty to act in good faith obligates them to investigate any allegation of wrongdoing to determine whether there was actual cheating. Mot. at 8-9.  In both cases, the individual test-taker was accused of cheating; neither involved irregularities in the administration of the test.  The courts held that ETS must consider evidence submitted by the student before deciding to invalidate a test score. Unlike Dalton and Cortale, this action involves procedural irregularities in the administration of the exams.  Since there are no individual accusations of cheating at issue, the Court finds both of those cases inapposite.[8]

_____

[8] Plaintiffs also cite Murray v. Educational Testing Service, 170 F.3d 514 (5th Cir. 1999), where the court held that ETS owed a student suspected of cheating a "contractual duty . . . to investigate the validity of [the student]'s scores in good faith."  Id. at 516. However, like Dalton and Cortale, Murray did not involve procedural irregularities in the testing process.

1

### 3.     Unfair Competition Law

2      Plaintiffs allege a claim under California's Unfair Competition Law ("UCL"), which

3   makes actionable any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. &

4   Prof. Code § 17200.  "Each prong of the UCL is a separate and distinct theory of liability."

5   Birdsong v. Apple, Inc., 590 F.3d 955, 959 (9th Cir. 2009).  With respect to the unlawful

6   prong, the UCL incorporates other laws and treats violations of those laws as unlawful

7   business practices independently actionable under state law.  Chabner v. United Omaha

8   Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000).  "[A]n action based on [the UCL] to

9   redress an unlawful business practice 'borrows' violations of other laws and treats these

10  violations . . . as unlawful practices, independently actionable under section 17200 et seq.

11  and subject to the distinct remedies provided thereunder."  Farmers Ins. Exch. v. Super.

12  Court, 2 Cal.4th 377, 383 (1992) (quotations and citations omitted).

13      Here, the FAC alleges violations of California Education Code sections 99159 and

14  99160 as the "unlawful" practices underlying the UCL claim.  FAC ¶ 107.[9]  Under

15  California law, an agency which administers standardized tests, such as an AP exam, is

16  subject to specific requirements governing the administration of such tests.  See Cal. Educ.

17  Code §§ 99150-99164.  Education Code section 99159 provides:

18          Whenever a test agency is presented with information which
            renders the test subject's test score suspect, whether that
19          information is in the form of allegations of collusion or
            cheating, or irregular test administration, or irregular statistical
20          data, or any other form, the test agency is responsible for
            reviewing the information and determining if withholding the
21          test subject's score is warranted.

22  Cal. Educ. Code § 99159(a).  If the testing agency determines that withholding the score is

23  warranted, it must provide, by registered mail, notice to the test subject within five days of

24

25

---

26      [9] Plaintiffs' argument in their moving papers only briefly addresses the unlawful
    prong of the UCL.  Pls.' Mem. at 11-12.  In their reply, Plaintiffs argue for the first time
27  that they are likely to prevail on the UCL claim based on the "unfair" prong of the UCL.
    Reply at 9.  A "district court need not consider arguments raised for the first time in a reply
28  brief."  Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) (citation omitted).

such decision.  Id. § 99159(b).[10]  The agency may invalidate a subject's score only if "substantial evidence . . . supports the cancellation or invalidation."  Id. § 99159.  If the agency decides to invalidate a test score, it must provide the test subject with the following options:  (1) cancellation of the test score with a full refund of all test fees; (2) to retake the test, without charge; or (3) the opportunity to seek judicial review.  Id. § 99160(a).  "Any test sponsor who intentionally violates any provision of this chapter [i.e., id. §§ 99150-99164] shall be liable for a civil penalty not to exceed seven hundred fifty dollars ($750) for each violation."  Id. § 99163.

Defendants contend that no private right of action exists to bring claims under either sections 99159 or 99160.  Defs.' Supp. Br. in Opp'n to Pls.' Ex Parte Appl. for TRO at 3, Dkt. 33.  This argument is misplaced.  The alleged violations of the Education Code form the basis of Plaintiffs' claim under the unlawful prong of the UCL.  FAC ¶ 107.  The absence of a private right of action does not foreclose a UCL claim based on a violation of that statute, unless such an action is actually barred by the statute.  Yanting Zhang v. Superior Court, -- Cal.4th --, 2013 WL 3942607, at *8 (Aug. 1, 2013).  There is no provision in the pertinent sections of the Education Code that expressly forecloses a legal action.  To the contrary, section 99160 envisions judicial review of an agency's decision to invalidate a test score.  Cal. Educ. Code § 99160(a)(3).

It nonetheless remains questionable whether sections 99159 and 99160 are applicable to the circumstances presented.  Defendants contend that those sections are intended to apply to *individual* test-taker cases, as opposed to situations, where, as here, test scores *in general* are invalidated due to irregularities in administering the test to hundreds of students.  As support, Defendants point to section 99160(f), which provides:

---

[10] The notice must include a summary of the information received by the agency and the facts surrounding the investigation, notice of the subject's right to receive the details underlying those summaries, the policies and procedures followed in connection with the agency's review and decision, a summary of the type of information the agency will consider to support the authenticity of the score, the potential consequences of the agency's investigation, and notice that that subject has fifteen days to respond to the notice.  Id. § 99159(c).

The procedures prescribed in Section 99159 and this section ***do not apply*** to instances where the cancellation of all test scores results from ***the complete disruption of the administration of the test, such as by*** natural disasters, national emergencies, ***inadequate or improper test conditions***, answer sheet printing errors, or testing agency errors.

Cal. Educ. Code § 99160(f) (emphasis added).  Plaintiffs counter that "[s]eating irregularities nowhere rises to the level of the examples provided in section 99160(f) of national emergency or disaster."  Pls.' Supp. Reply in Response to Supp. Opp'n ("Supp. Reply") at 3, Dkt. 34-1.  They contend that only a devastating event, such as a fire, is sufficient to constitute a "complete disruption of the administration of the test."  Id.

Plaintiffs' construction of section 99160(f) is not well taken.  The statute expressly defines "complete disruption" to include "inadequate or improper test conditions."  Cal. Educ. Code § 99160(f).  A reasonable construction of "inadequate or improper test conditions" includes a school's failure to abide by Defendants' mandatory AP exam seating requirements, which are intended to ensure the fairness and integrity of the test.  Plaintiffs do not dispute this.[11]  Moreover, the notion that the exemption provided by section 99160(f) is triggered only where there is a catastrophic event, such as a fire or natural disaster, is belied by the fact that the statute defines "complete disruption of the administration of the test" to also include "answer sheet printing errors" and "testing agency errors."  Id.  By defining "complete disruption" in this manner, it is apparent that the California Legislature intended that the exemption provided by section 99160(f) include defects in the testing administration process which affect an array of test-takers, even if the disruption is not physical in nature.  See In re C.H., 53 Cal.4th 94, 103 (2011) ("It is a settled principle of statutory construction, that courts should strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous.") (internal quotations omitted).

---

[11] Plaintiffs point out that section 99159 applies to situations involving "irregular test administration."  Supp. Reply at 3.  Perhaps so, but that does not alter the Court's conclusion that section 99159 only applies where individual test scores are concerned.

In sum, the Court is not persuaded that either provision of the Education Code cited by Plaintiffs applies under the circumstances presented. Accordingly, the Court finds that Plaintiffs have failed to show a likelihood of success on their UCL claim.

### 4. Education Code § 99159

In addition to their UCL claim, Plaintiffs also allege a claim for violation of Education Code section 99159. FAC ¶¶ 109-113. As discussed above, Plaintiffs have not shown that they are likely to succeed on the merits of this claim. But even if they had, a successful claim under section 99159 would not support a claim for injunctive relief. The only remedy specified in this statutory scheme is the imposition of a civil penalty in the amount of $750 for each intentional violation of the statute. Cal. Educ. Code § 99163.[12] Preliminary injunctive relief cannot be predicated upon a statute where such a remedy is unavailable. See Gray v. Central Mortg. Co., No. C 10-00483 RS, 2010 WL 1526451, *3 (N.D. Cal. Apr. 14, 2010) (denying preliminary injunction to enjoin foreclosure where the federal statute at issue only authorizes damages); Chung v. NBGI, Inc., No. C 09-04878 MHP, 2010 WL 841297, at *2 (N.D. Cal. Mar. 10, 2010) ("A preliminary injunction is generally only available if injunctive relief is appropriate in the first instance."); see also Sims Snowboards, Inc. v. Kelly, 863 F.2d 643, 647 (9th Cir. 1988) (holding that in a case involving diverse parties and state law claims a preliminary injunction cannot be granted if such remedy was unavailable under state law).

### 5. Due Process

Plaintiffs allege that Defendants violated their right to due process under California Constitution, Article 1, section 7(a), by invalidating MHS students' test scores without investigating whether cheating actually occurred and without complying with the requirements of the Education Code, as set forth above. FAC ¶ 128. As discussed above, the record presented supports Defendants' contention that they sufficiently investigated whether there were testing irregularities with respect to the eleven AP exams in dispute,

---

[12] Plaintiffs only seek monetary damages in connection with this claim. FAC ¶ 113.

1   and were not required to determine whether students actually cheated or benefited from the

2   seating irregularities.  In addition, Plaintiffs' claims that Defendants violated the Education

3   Code sections 99159 and 99160 do not appear to be well taken.  For those reasons,

4   Plaintiffs' due process claim is not likely to succeed on the merits.

5          Separately, Plaintiffs' due process claim is likely to fail due to the lack of state

6   action.  A due process claim requires a showing of state action, as "[o]nly those actions that

7   may fairly be attributed to the state . . . are subject to due process protections."  Coleman v.

8   Dep't of Pers. Admin., 52 Cal.3d 1102, 1112 (1991).  Although California courts have not

9   defined the contours of state action for purposes of a state law due process claim, federal

10  courts, in the context of addressing constitutional claims under 42 U.S.C. § 1983, have

11  recognize at least four different tests to identify state action: (1) public function; (2) joint

12  action; (3) governmental compulsion or coercion; and (4) governmental nexus.  Kirtley v.

13  Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003); see Wightman v. Franchise Tax Bd., 202

14  Cal.App.3d 966, 974 (1988) (finding that federal decisions may be instructive on issues of

15  state constitutional law).

16         The FAC alleges that Defendants are "state actors" based upon their "joint

17  participation" with the School District and California public colleges and universities in

18  reporting AP test scores, which, in turn, are relied upon for student admissions and

19  scholarships.  FAC ¶ 127.  "The joint action test asks whether state officials and private

20  parties have acted in concert in effecting a particular deprivation of constitutional rights."

21  Tsao v. Desert Place, Inc., 698 F.3d 1128, 1140 (9th Cir. 2012) (internal quotations

22  omitted).  Joint action exists where "the state has so far insinuated itself into a position of

23  interdependence with the private entity that it must be recognized as a joint participant in

24  the challenged activity."  People v. Taylor, 222 Cal.App.3d 612, 623 (1990) (internal

25  quotations and alterations omitted).

26         Here, the challenged activity is Defendants' invalidation of the test scores from the

27  AP exams conducted at MHS in May 2013.  Defendants are alleged to have made that

28  decision independently, without the involvement of MHS or any California public school.

As such, there simply is no nexus between the state and the challenged conduct to transmute Defendants into "joint actors" for purposes of civil liability under the California Constitution.[13]  The mere fact that Defendants administer tests that potentially are used by public colleges and universities is insufficient to show state action.  E.g., Langston By and Through Langston v. ACT, 890 F.2d 380, 385 (11th Cir. 1989) (affirming district court ruling that test administrator ACT was not a state actor where plaintiff "failed to show that the University of Alabama, or any other agency of a state, has exerted influence over ACT's security decisions."); Johnson v. Educ. Testing Serv., 754 F.2d 20, 25 (1st Cir. 1985) (holding that ETS was not a state actor, given that "the formulation, grading, and reporting of standardized tests is not an exclusive public function.").[14]

### C.   IRREPARABLE HARM

"A plaintiff who seeks preliminary injunctive relief must show 'that irreparable injury is *likely* in the absence of an injunction.'"  M.R. v. Dreyfus, 697 F.3d 706, 728 (9th Cir. 2012) (quoting Winter, 555 U.S. at 22); Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011) ("plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.").  "Speculative injury does not constitute irreparable injury."  Goldie's Bookstore v. Super. Ct., 739 F.2d 466, 472 (9th Cir. 1984)

As an initial matter, the Court notes that Plaintiffs' assertions of irreparable harm are undermined by their unexplained delay in seeking emergency injunctive relief.  MHS was notified of Defendants' decision to invalidate the exam scores on July 8, 2013.  Yet,

---

[13] Indeed, the suggestion that Defendants are joint actors with the School District is illogical, given that the School District is adverse to Defendants in this action.

[14] In the FAC, Plaintiffs allege state action based only on Defendants' alleged joint action with the School District and unspecified California public universities and colleges. FAC ¶ 127.  As such, Defendants focused their argument only on joint action.  Opp'n at 21-22.  In their reply, however, Plaintiffs attempt to establish state action under the governmental nexus test.  Reply at 10.  Since Plaintiffs did not rely on the governmental nexus test in their pleadings, Defendants did not address it in their opposition. Consequently, the Court declines to consider whether state action is present under the governmental nexus test.  See Zamani, 491 F.3d at 997.

1  Plaintiffs waited until almost a month later on August 5, 2013, to commence the instant

2  action and move for a TRO.  While such delay is not dispositive of whether a TRO is

3  warranted, it is a factor that the Court may consider in weighing a claim of irreparable

4  harm.  See Oakland Tribune, Inc. v. Chronicle Publ'g Co., 762 F.2d 1374, 1377 (9th Cir.

5  1985) (finding that delay in requesting a preliminary injunction "implies a lack of urgency

6  and irreparable harm"); Lydo Enters., Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th

7  Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in

8  weighing the propriety of relief.").

9       Delay aside, the Court finds Plaintiffs' claims of irreparable harm are too speculative

10  to support a temporary injunction, let alone a mandatory one.  Plaintiffs contend that absent

11  a TRO, MHS students will be irreparably harmed by: (1) the loss of admission to colleges

12  and universities; (2) the loss of college credit; (3) the loss of the ability to skip introductory

13  classes; (4) an inability to take the re-test; and (5) being forced to take the re-test under

14  substantially different circumstances.  The weakness in each of these claims of irreparable

15  harm is that they rest on the ***assumption*** that MHS students who choose to retake the exam

16  will not perform as well as they did before.  That, of course, cuts both ways.  While some

17  may perform worse, others may perform better.  Though Plaintiffs complain that students

18  only have a month's notice to prepare for the retests, they acknowledge that they have been

19  studying the AP curricula the entire school.  FAC ¶¶ 33, 34.  Moreover, having taken the

20  actual exam, many students may be better positioned to improve their scores.  In any event,

21  given the lack of any firm showing that MHS students are likely to perform worse upon

22  retaking the test, the Court finds Plaintiffs' claims of irreparable harm are entirely

23  speculative.

24       Even if the alleged irreparable harm were not speculative, Plaintiffs have not shown

25  that they lack an adequate remedy at law.  Plaintiffs assert that "[t]he loss of the AP credits

26  has cost all AP students the opportunity to skip introductory courses in college," which, in

27  turn, will require them students "to spend more money for tuition and time in college."

28  FAC ¶ 34.  The added tuition for any extra college courses is compensable in damages.

Monetary harm is insufficient to show irreparable injury.  <u>Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League</u>, 634 F.2d 1197, 1202 (9th Cir. 1980).[15]  Plaintiffs also suggest that an extra year of tuition may influence the student's choice of college or whether to go at all.  FAC ¶ 34.  No evidence is presented to support this assertion, which is otherwise entirely speculative.

### D.   BALANCE OF EQUITIES AND THE PUBLIC INTEREST

The final two factors—the balance of equities and the public interest—militate against granting a TRO.  Plaintiffs assert that Defendants will suffer no harm if they are compelled to grade and validate the scores from the May 2013 AP exams because they have already collected their fees for the AP exam.  Pls.' Mem. at 14.  Fees, however, are not the issue.  Defendants, and the College Board especially, have a strong interest in maintaining the validity of the test scores that are reported.  See <u>Murray</u>, 170 F.3d at 517 ("Several courts, including this one, have recognized the importance of allowing ETS to assure itself of the validity of students' scores through internal review procedures.").  Forcing Defendants to validate AP exam scores resulting from improperly administered tests would place them in the untenable position of having to act contrary to their obligations in the <u>AP Bulletin</u>, and also would result in colleges and universities being less likely to rely on the integrity of such scores.  Packer Decl. ¶ 11.  That, in turn, would inure to the detriment of Defendants, present and future AP students and the public in general.  See <u>Dalton</u>, 87 N.Y.2d at 394 ("Given the reliance that students, educational institutions, prospective employers and others place on the legitimacy of scores released by ETS, requiring challenged scores to be reported would be contrary to the public interest and exceed the scope of ETS' promised performance.").

The Court is sensitive to the fact that the affected MHS students may not be responsible for the events leading to the invalidation of their AP exam scores, and that

---

[15] Plaintiffs do not quantify the irreparable harm attributable to spending more time in college, nor is such harm readily apparent to the Court.  To the extent that Plaintiffs are referring to the additional cost of an additional quarter or semester, such concern is addressed above.

having to retake the tests imposes some level of hardship on them.  At the same time, the risk that test scores were subject to invalidation in the event of testing irregularities was fully disclosed to MHS students and their parents, the School District and MHS officials, in the <u>AP Manual,</u> the <u>AP Bulletin</u> and the AP Participation Form.  Significantly, the <u>AP Bulletin</u> expressly and unambiguously warns that the College Board may cancel test scores due to testing irregularities, regardless of whether students caused the irregularities, benefitted from them or engaged in misconduct.  <u>AP Bulletin</u> at 4.  For their part, Defendants investigated the MHS student's allegations of seating irregularities and confirmed through discussions with MHS officials that such irregularities did, in fact, occur.  In light of these facts, the Court finds that the balance of equities and the public interest weigh against granting a TRO.

## IV.    <u>CONCLUSION</u>

The Court finds that Plaintiffs have failed to demonstrate a likelihood of success on the merits or that they will suffer irreparable harm in the absence of a TRO.  Likewise, they have not shown that the balance of equities tips in their favor or that a TRO is in the public's interest.  Accordingly,

IT IS HEREBY ORDERED THAT:

1.      Plaintiffs' Ex Parte Motion for Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction is DENIED.

2.      This Order terminates Docket No. 20.

IT IS SO ORDERED.

Dated: August 30, 2013

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge